IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| Jane Doe 1, 2, 3, 4, 5, 6, 7, 7A, 7B, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105,  106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 125A, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166; Peter Doe 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 10A, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 62A, 63, 64, 65, 65A,66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 78A, 79, 80, 81. | Case Number: |
| | JURY TRIAL REQUESTED |
| Plaintiffs, | |
| v. | |
| Drummond Company, Inc.; Drummond Ltd.; Augusto Jimenez; Alfredo Araujo; and James Atkins, | |
| Defendants. | |

## COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

### I. BACKGROUND AND INTRODUCTION

1.      The United Self-Defense Forces of Colombia (hereafter "AUC") was

designated a terrorist organization by the U.S. State Department in September 2001.

To earn that designation, the AUC had, since its inception in late 1996, been engaged

in a very visible reign of terror in areas of Colombia where the leftist guerillas, such

as FARC, were operating, particularly Cesar and Magdalena Provinces. In these

areas, the AUC pursued a scorched earth policy of first driving the FARC out and

then brutally murdering and torturing people who lived in these areas.

2.      The AUC assumed that the people who were living in FARC-controlled

areas were sympathetic to FARC's leftist ideology, and so to ensure that there would

be no further support for FARC in these areas, the AUC terrorized the people and left

them with a clear message that any person who dared align with the leftist groups

would be brutally executed by the AUC. The AUC murdered thousands of people in

Cesar and Magdalena Provinces alone. Almost every family in these Provinces lost

a family member, a neighbor or friend to war crimes committed by the AUC during

its brutal civil conflict with the FARC.

3.      The AUC was a confederation of various right wing paramilitary groups

that in late 1996 united as the AUC under the leadership of Carlos Castaño. At the

1

very outset, Castaño approached the business community and other wealthy elites of Colombia and made an explicit bargain – if they provided the AUC with financial support, the AUC would drive the FARC out of the area and provide ongoing "security" to protect business interests. Virtually every major company that was engaged in activities that required land, especially mining and farming, joined on and became a financial founder of the AUC. Chiquita Brands International recently pled guilty to the felony of providing the AUC, a designated terrorist organization, with knowing and substantial assistance from 1997-2004. In that process, Chiquita admitted that it had been approached by Castaño at the launching of the AUC and it agreed to provide major support.

4.      Other major U.S. companies operating in Colombia likewise provided start up funds and ongoing support to the AUC to further their business interests. Until recently, these companies were certain that their major support for AUC, a designated terrorist organization, would remain a secret as no one from these companies was likely to admit to this serious crime, and the AUC commanders likewise were unlikely to endanger this key source of support. However, in early 2007, the Colombian government began a "Justice and Peace" process, under which any AUC leader who confessed to all of his crimes would get leniency and would be subject to a maximum prison term of eight years.

5.     The Justice and Peace process changed the dynamic of the prior bond and shared mission between the AUC, the Government of Colombia and the business community. Many of the AUC leaders are now speaking freely about their relationship with the elites of the Colombian business community, and their direct collaboration with the Colombian military, because, among other things, the AUC leaders have expressed that they were betrayed by their former government and business partners. The AUC leaders are in prison for their role in a shared crime, while the businessmen and politicians who were their partners remain free and are enjoying the substantial fruits of their criminal enterprise.

6.     As part of the Justice and Peace process, numerous AUC leaders gave testimony that implicated other U.S. companies as major supporters of the AUC. Recently, Salvatore Mancuso, who became the head of the AUC after Castaño was killed (or disappeared), specifically testified that Defendants Drummond Company, Inc. and Drummond Ltd. (collectively, "Drummond") had provided substantial support to the AUC, and had paid the AUC to assassinate the top union leaders at the Drummond coal mine in Cesar Province, Colombia. Other top AUC leaders have stated recently that Drummond provided substantial support to the AUC to provide security and other services to protect the Drummond mine, railroad and other facilities from attacks by the FARC and also to pacify the local population. The following are

3

among the new facts that have come to light regarding Drummond's relationship with
and support for the AUC:

A.    Defendant Alfredo Araujo Castro ("Araujo"), Drummond's
Manager of Community Relations in Colombia, met on numerous
occasions from 1999 to 2006 with his childhood friend, Rodrigo Tovar
Pupo, alias "Jorge 40," the leader of the AUC's Northern Block, to
arrange to make substantial payments from Drummond to help establish
and support the Juan Andres Alvarez Front of the AUC to provide
security and other services along Drummond's rail line in Cesar
Province. When Defendant Araujo was deposed in *Romero v. Drummond
Co.* on June 9, 2005, he testified under oath that he had never met with
Jorge 40 or any other AUC members. This was perjury.

B.    Defendant James Atkins, who was the Director of Security for
Drummond in Colombia at all times relevant to the events alleged herein,
was referred to by the AUC's top leaders, including Salvatore Mancuso
and Jorge 40, as "Mr. Jim." Defendant Atkins was present in November,
2000 at a meeting between Drummond officials and top AUC leaders.
The meeting occurred at the entrance to Drummond's mine in La Loma

4

at approximately 2 p.m. Defendant Atkins was accompanied by Defendant Araujo and Jaime Blanco, a friend of Araujo's who ran the cafeteria concession at the Drummond mine, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Oscar Jose Ospino Pacheco, alias "Tolemaida", and several other armed AUC members. At this meeting, Defendant Atkins, on behalf of Drummond, approved a payment to the AUC for the assassination of the top leaders of the Drummond union, including Valmore Locarno Rodriquez (hereinafter Locarno) and Victor Hugo Orcasita Amaya (hereinafter Orcasita). Locarno and Orcasita were murdered on March 12, 2001. They were pulled off a company bus on their way home from their shift in the Drummond mine and executed by the AUC. Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Alcides Manuel Mattos Tabares, alias "Samario", participated as well.

C.     Rafael Garcia was Director of the computer system office of the Colombian Administrative Department of Security (Spanish Acronym: DAS). DAS is, among other things, responsible for providing security to

5

Colombian state institutions and individuals. As is common with many government officials, Garcia also worked with and supported the AUC paramilitaries. He served as the AUC's political adviser. While serving at the DAS, he also acted as liaison between Director Jorge Noguera and the AUC Northern Block leader, Jorge 40. The AUC and the DAS worked closely together to further their joint mission of ridding Colombia of leftist guerillas. In early 2001, when he was working as political adviser to the AUC, Garcia traveled to Valledupar along with Jorge Castro Pacheco, who served as Jorge 40's representative. Garcia attended a meeting at the Hotel Sicarare in Valledupar with Jorge Castro Pacheco, of Ariguani, a municipality in Magdalena, Colombia. Jorge Castro Pacheco at the time of the meeting was 3rd succentor to Roberto Perez, a Senator from Sucre, Colombia. Also in attendance was Guillermo Sanchez Quintero, who at the time was Mayor of Ariguani and Alfredo Araujo, who was Drummond's Director of Community Relations. At this meeting, Garcia witnessed Defendant Araujo give Jorge Castro Pacheco a suitcase filled with money. Defendant Araujo and Jorge Castro Pacheco talked openly about the purpose of this money - to take violent measures against union workers at Drummond. Garcia

6

heard Defendant Araujo say to Jorge Castro Pacheco that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond. It was clear from things said in this conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Defendant Araujo and Jorge 40. Defendant Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems." Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Defendant Araujo.

D.     At a subsequent meeting in early May, 2001, Defendants Atkins and Araujo met again with the top leaders of the AUC, including Jorge 40, Tolemaida, "Don Luis," who was Jorge 40's chief financial officer, and several AUC operatives who worked closely with Jorge 40, including "Kener," "El Chino," "El Toro," "Samario," "Machoman", and "05." The meeting was held at a farm on the road between Bosconia and Plato. In front of the entire group, including Atkins and Araujo, Jorge 40 congratulated Tolemaida for the successful operation of executing the two Drummond union leaders Locarno and Orcasita. Jorge 40 brought

7

along a translator for Atkins named "Niki." (Niki was disappeared by the AUC shortly after this meeting). At this meeting Drummond, through Atkins and Araujo, made an agreement with Jorge 40 to make a large cash payment to the AUC of approximately \$1.5 million (U.S.) and regular monthly payments of approximately \$100,000 (U.S.) to support new AUC troops and equipment, including arms, for the Juan Andres Alvarez Front to provide security and other services for Drummond. The main assignment for the Front was to protect Drummond's rail line going from Drummond's coal mine in Cesar Province to the company-owned "Puerto Drummond," which is near Santa Marta in Magdalena Province. Drummond had previously funded the transformation of the Juan Andres Alvarez Front in 1999, when it was under the command of Jhon Jairo Esquivel Cuadrado, alias "El Tigre," from a small group of ill-equipped men to a significant fighting force of over 200 well-armed men. The additional funding in 2001 was to allow the Juan Andres Alvarez Front to maintain a permanent base and to have the arms and equipment necessary to provide Drummond's rail line with ongoing security.

8

E.      From 1999, when Drummond first started proving significant

funds to the Juan Andres Alvarez Front to March 2006, when the

Colombian government demobilized the AUC's Northern Block,

hundreds of people were executed by the Juan Andres Alvarez Front

during the course of its "security operations" for Drummond. These

people were murdered solely because Drummond brought the Juan

Andres Alvarez Front to the area of the railroad, provided it with

substantial financial and other material support, and directed it to clear

the area of suspected rebels and guerillas. Plaintiffs are family members

of innocent civilians who resided or worked in the area of the Drummond

rail line, and were murdered by the Juan Andres Alvarez Front as part of

a campaign of terror to pacify the region for Drummond's benefit.


F.      From 1999 to 2006, Drummond paid millions of dollars to Jorge

40 and the Juan Andres Alvarez Front. These payments were negotiated

by Drummond through Defendants Araujo and Atkins. These payments

were approved by Defendant Augusto Jimenez. Upon information and

belief, the payments were also known about and approved by Garry

Drummond and other Alabama-based officers of Defendants Drummond

9

Company, Inc. and Drummond Ltd.   Further, the AUC's Juan Andres

Alvarez Front had bases in and around the Drummond property and

along the railroad corridor from the mine to the port. These AUC bases

were plainly visible and in some cases established checkpoints through

which all persons, including Drummond employees, had to pass. When

Defendant Jimenez was deposed in *Romero v. Drummond Co.* and

testified at the trial in July, 2007, he testified under oath that he had never

met with Jorge 40 or any other AUC members, and that he had no

knowledge of any Drummond payments to the AUC. This was perjury.

7.     Plaintiffs are heirs of individuals who were murdered by paramilitaries

who were members of the United Self-Defense Forces of Colombia (hereafter

"AUC"). Many of the Plaintiffs were themselves terrorized when the AUC attacked

their homes and murdered their family members. This was a strategy employed by the

AUC to keep the survivors of the AUC's violent attacks on communities under the

AUC's control.

8.     This case is brought under the Alien Tort Claims Statute (ATS), Torture

Victims Protection Act (TVPA), 28 U.S.C. § 1350, and Colombian wrongful death

law.   Plaintiffs bring this action against the   Drummond Company, Inc. and

Drummond Ltd. (collectively, "Drummond"),  Augusto Jimenez, at all times relevant

10

hereto the President of Drummond's Colombia operations, Alfredo Araujo at all times relevant hereto the Manager of Community Relations for Drummond in Colombia, and James Atkins, at all times relevant hereto the Chief of Security for Drummond's operations in Colombia.

9.     Drummond has hired, contracted with and directed AUC paramilitary forces to use extreme violence, including against trade union leaders, to protect their property, assets and profits. When Drummond hired, provided material support to, and directed the overall mission of the Juan Andres Alvarez Front, Drummond knew that hundreds or even thousands of people living in the railroad corridor would be executed as part of the AUC's method for terrorizing a population. The murders of the decedents described herein are war crimes and extrajudicial killings in violation of the ATS, the TVPA, international human rights law and Colombian law.

10.     Plaintiffs do not have access to an independent or functioning legal system within Colombia to raise their complaints.  Any efforts by Plaintiffs to seek redress would be futile because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk of retaliation.   In particular, there is almost complete legal impunity for murders committed in Cesar Province by the AUC.

11

11.    In fact, the collaboration between the AUC and the government of

Colombia goes to the highest levels and ensures that no serious action will be taken

to bring to justice in Colombia those involved in the murders alleged herein. Indeed,

the administration of Colombian President Alvaro Uribe is under pressure from

outside Colombia, including from the U.S., due to the ongoing "para-political" scandal

which has implicated numerous high-ranking government officials, including 60

congressional representatives aligned with Uribe, and high-ranking military officers

in collaborating with paramilitaries and shielding paramilitaries from justice.

However, within Colombia, it is business as usual.  According to a Human Rights

Watch (HRW) report issued in November, 2008, entitled, *Breaking the Grip?*

*Obstacles to Justice for Paramilitary Mafias in Colombia*, Human Rights Watch

explains that

> In Colombia, more than in almost any country in the Western
> hemisphere, violence has corroded and subverted democracy. Too
> often, killings and threats - not free elections or democratic
> dialogue - are what has determined who holds power, wealth in the
> country. Nowhere is this more evident than in the relationship
> between paramilitary groups and important sectors of the political
> system, the military and the economic elite.
>
> Paramilitary groups have ravaged much of Colombia for two
> decades. Purporting to fight the equally brutal guerillas of the left,
> they have massacred, tortured, forcibly 'disappeared,' and
> sadistically killed countless men, women, and children. Wherever
> they have gone, they have eliminated anyone who opposed them,

12

> including thousands of trade unionists, human rights defenders,
> community leaders, judges and ordinary civilians.

12.     In this same report, HRW blames the "para-political" phenomenon for the

extensive paramilitary violence throughout the country. As HRW explains, "**[t]he

close military-paramilitary collaboration in several regions allowed the

paramilitaries to commit massacre after massacre of civilians largely unimpeded

and with impunity**." HRW further relates that President Uribe himself has been a

major obstacle to the efforts of the Colombian Supreme Court to investigate and

punish government officials for collaborating with the paramilitaries. As HRW states,

"President Uribe has [r]epeatedly launched personal attacks on the Supreme Court and

its members in what increasingly looks like a concerted campaign to smear and

discredit the Court; [o]pposed and effectively blocked meaningful efforts to reform the

Congress to eliminate paramilitary influence; [p]roposed constitutional reforms that

would remove the 'parapolitics' investigations from the jurisdiction of the Supreme

Court."

## II. JURISDICTION AND VENUE

13.     This Court has federal jurisdiction pursuant to 28 U.S.C. §1331, based

on the ATS and TVPA, 28 U.S.C. §1350, for the violations of international human

13

rights law. Supplemental jurisdiction exists over the claim for wrongful death under Colombian law, pursuant to 28 U.S.C. §1367.

14.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) as Defendants Drummond Company, Inc. and Drummond Ltd. are Alabama corporations, with their principal places of business in Alabama.

### III. PARTIES

#### A. Plaintiffs

15.     All of the decedents described herein are among the hundreds, or even thousands, of persons murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond to provide security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels. The following Plaintiffs seek damages for the loss of their relative who was an innocent civilian murdered in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC:

16.     Jane Doe 1 is the wife and legal heir of John Doe 1. Peter Doe 1 and Peter Doe 2 are John Doe 1's children and are also legal heirs. John Doe 1 was disappeared on March 9, 2000 in Mingillo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial

14

assistance from Drummond. John Doe 1 worked as a crime specialist in dactylography with the Cuerpo Técnico de Investigación (Technical Investigation Team)(hereinafter "CTI" ).[1] John Doe 1 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 1 along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

17.    Jane Doe 2 is the wife and legal heir of John Doe 2. Peter Doe 3 is John Doe 2's son and is also a legal heir. Jane Doe 3, Jane Doe 4, Peter Doe 4, Peter Doe 5, Peter Doe 6 are John Doe 2's siblings and are also his legal heirs. On March 9, 2000, John Doe 2 was killed in Mingillo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 2 worked as legal technician with the CTI. John Doe 2 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 2 along with the other CTI

---

[1] The CTI is a division of the *Fiscalía General de la Nación* (Office of the Attorney General of Colombia). The CTI advises the Attorney General on policies and strategies regarding criminal investigations, forensic and genetic services, and in the management of technical and legal information as relevant to criminal investigations.

colleagues who were present. He was officially proclaimed dead on March 9, 2002.

18.     Jane Doe 5, Jane Doe 6, Peter Doe 7 are John Doe 3's siblings and legal heirs. Jane Doe 7 is John Doe 3's mother and also his legal heir. Peter Doe 8 is John Doe 3's nephew and also his legal heir. Jane Doe 7A is John Doe 3's wife and also his legal heir. Jane Doe 7B is John Doe 3's child and also his legal heir. On March 9, 2000, John Doe 3 was killed in Mingillo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 3 worked as a dental surgeon with the CTI. John Doe 3 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 3 along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

19.     Jane Doe 8 is John Doe 4's mother and legal heir. Peter Doe 9 and Peter Doe 10 are John Doe 4's siblings and also his legal heirs. Jane Doe 9 is John Doe 4's wife and also his legal heir. Peter Doe 10A is John Doe 4's son and also his legal heir. On March 9, 2000, John Doe 4 was killed in Mingillo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 4 worked as a legal investigator with the CTI. John Doe 4 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia

on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 4 along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

20.     Jane Doe 10, Jane Doe 13, Jane Doe 14, and Peter Doe 11 are John Doe 5's children and legal heirs. Jane Doe 11 is John Doe 5's domestic partner and legal heir. Jane Doe 12 is also John Doe 5's domestic partner and legal heir.  On February 19, 2001, John Doe 5 was killed in Cruce De Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  John Doe 5 was murdered in front of his home at 1:45am. Paramilitaries from the Juan Andrés Álvarez Front knocked down the front door of John Doe 5's residence, pulled him outside and shot him multiple times.

21.     Jane Doe 15 is John Doe 6's mother and legal heir. Jane Doe 16, Jane Doe 17, Peter Doe 12, and Jane Doe 17A are John Doe 6's siblings and legal heirs. On November 24, 2000, John Doe 6 was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Members of the Juan Andrés Álvarez Front arrived at John Doe 6's residence at 1:45am, knocked down the door and pulled him out of his house. They tied him up and later murdered him where the road forks between Santa Isabel and San Roque, Cesar, Colombia.

17

22.     Jane Doe 18 is Paula Doe 1's mother and legal heir. Jane Doe 19, Jane Doe 20, and Peter Doe 15 are Paula Doe 1's children and legal heirs. Peter Doe 14 is Paula Doe 1's brother and legal heir. On April 2, 2003, Paula Doe 1 was killed on an unmaintained road known as Siberia in Bosconia, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 1:00pm Paula Doe 1 was traveling on a bus from Bosconia, Cesar, Colombia to the town of Valledupar, Cesar, Colombia, when members from the Juan Andrés Álvarez stopped the bus, pulled her off and shot her multiple times in the head.

23.     Peter Doe 15 is John Doe 7's son and legal heir. On April 2, 2003, John Doe 7 was killed on an unmaintained road known as Siberia in Bosconia, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 1:00pm John Doe 7 was traveling on a bus from Bosconia, Cesar, Colombia to the town of Valledupar, Cesar, Colombia, when members from the Juan Andrés Álvarez stopped the bus, pulled him off and shot him multiple times in the head.

24.     Jane Doe 21 and Peter Doe 16 are John Doe 8's siblings and legal heirs. At 7:00pm John Doe 8's friend arrived in a white car to John Doe's residence. His friend told him that there was a car that had broken down on the side of the road and that the owners were in the car.  John Doe 8 accompanied his friend, but when he

18

arrived he was assaulted, tortured and his arm was broken when he struggled for his life. He was shot three times in the head, once in the thorax and once in the spinal cord. His family found him the next day at 9:00am.

25.    Jane Doe 22 is John Doe 9's domestic partner and legal heir. Jane Doe 23, Jane Doe 24, Jane Doe 25, and Jane Doe 26 are John Doe 9's children and also legal heirs. On March 24, 2002, John Doe 9 was disappeared on the road leaving Rinconhondo, Cesar, Colombia going towards Curumani, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 9 needed to travel to Curumani to get money for an operation. He chartered a car to drive him from Rinconhondo to Curumani, but when the car arrived at 4:00pm there was no sign of him. John Doe 9 was never seen or heard from again.

26.    Jane Doe 27 is John Doe 10's domestic partner and legal heir. On July 17, 2004, John Doe 10 was killed in Poponte, Chiriguana, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 10:00pm two men from the Front arrived at John Doe 10's residence and knocked on his door. John Doe 10 opened the door and the men told John Doe 10 that he needed to leave with them. The men took him and within 15 minutes his family heard the fatal shot that took John Doe 10's life. The following day

the men came back to the house and told John Doe 10's family that he was dead and to go pick up the body.

27.     Jane Doe 28 is John Doe 11's domestic partner and legal heir. Peter Doe 17, Jane Doe 29, Jane Doe 30 are John Doe 11's children and legal heirs. On May 5, 2005, John Doe 11 was disappeared on Santa Isabel Farm in Curumani, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  John Doe 11 left for work the night before with his son, John Doe 12, and never returned home. When his family went to look for him the next day on the farm they encountered the AUC Northern Block's Juan Andrés Álvarez Front. They knew it was the AUC because the members wore armbands that said AUC. They detained the family along with John Doe 11 and then separated them; taking John Doe 11 and John Doe 12 out of town.  Neither was seen or heard from again.

28.     Jane Doe 28 is John Doe 12's mother and legal heir. On May 5, 2005, John Doe 12 was disappeared on Santa Isabel Farm in Curumani, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  John Doe 12 left for work the night before, with his father, John Doe 11, and never returned home. When his family went to look for him the next day on the farm they encountered the AUC Northern Block's Juan Andrés

20

Álvarez Front. They knew it was the AUC because the members wore armbands that said AUC. They detained the family along with John Doe 12 and then separated them; taking John Doe 12 and John Doe 11 out of town. Neither was seen or heard from again.

29.    Jane Doe 31 and Jane Doe 32 are John Doe 13's daughters and legal heirs. On July 29, 2002, John Doe 13 was killed in Poponte, Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 9:00pm that evening John Doe 13 was accosted and assassinated. His body was taken and left in a field.

30.    Jane Doe 33 and Peter Doe 18 are John Doe 14's parents and legal heirs. Jane Doe 34 is John Doe 14's domestic partner and legal heir. Jane Doe 35 is John Doe 14's daughter and legal heir. On March 12, 2002, John Doe 14 was killed in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 6:00am two men arrived at John Doe 14's residence with the story that they would take him to a man that owned him money. They took John Doe 14 to a site called Los Tupes and shot him.

31.    Jane Doe 36 is John Doe 15's mother and legal heir. Jane Doe 37 and Peter Doe 19 are John Doe 15's children and legal heirs. On January 14, 2001, John

Doe 15 was killed 5 meters from his home on El Hatillo Path in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 7:00pm John Doe 15 went out to close the gate to his home. There he was grabbed by two men and pushed 5 meters from his home where he was shot twice in the mouth, the bullets exiting through the back of the brain.

32.     Jane Doe 38 is John Doe 16's mother and legal heir. Jane Doe 39, Jane Doe 40, and Peter Doe 20 are John Doe 16's siblings and legal heirs. On August 19, 2003, John Doe 16 was disappeared in Poponte, Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 16 left the house at 7:00pm to look for work. The following day the family heard from witnesses in the area that John Doe 16 had been taken away by members of the AUC. John Doe 16 was never seen or heard from again.

33.     Jane Doe 41 is John Doe 17's domestic partner and legal heir. Jane Doe 42 is John Doe 17's daughter and legal heir. On August 22, 2000, John Doe 17 was killed in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 8:00pm John Doe 17 was asleep at his residence with his family. Members of the

22

AUC arrived at his residence and banged on the door. John Doe 17's domestic partner opened the door and the AUC members entered and threw John Doe 17 face down on the floor, hitting and injuring him. They took John Doe 17 and threw him in a car and drove to an area called Los Chorros in Rinconhondo where the AUC members shot him.

34.     Jane Doe 43 is John Doe 18's neice and legal heir. On February 5, 2003, John Doe 18 was disappeared in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At approximatly 6:30pm, three AUC members arrived on a motorcycle at John Doe 18's residence in Rinconhondo. They entered the home and turned off all the lights and remained inside with John Doe 18 for a half hour. The AUC members then left on the motorcycle and returned with a white car and then left again after 5 minutes. After they left Jane Doe 43 and her family went to John Doe 18's residence, but he was no where to be found. John Doe 18 was never heard or seen from again.

35.     Jane Doe 44 is John Doe 19's mother and legal heir.  On October 24, 2004, John Doe 19 was disappeared in Rinconhondo by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Desperate for work, John Doe 19 left with a man who said he could get

23

him a job. John Doe 19 was never seen or heard from again.

36.     Jane Doe 45, Peter Doe 21, Jane Doe 46  are John Doe 20's children and legal heirs. On August 22, 2000, John Doe 20 was killed in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  The AUC arrived at John Doe 20's residence at 7:30pm. They pulled him from his home, beat him and forced him into a truck. At 5:30 the next morning, his family found his dead body.

37.     Jane Doe 47 is John Doe 21's domestic partner and legal heir. Jane Doe 48 and Peter Doe 22 are John Doe 21's children and legal heirs.  On November 2, 2002, John Doe 21 was killed on the Pacho Prieto Path in Chiriguana, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 5:00pm John Doe 21 left his residence for work. While on his way to work, on the road, he came across two members of the AUC who took him further down the road, past where he was going. At 12:00pm they assassinated him with two shots to the head.

38.     Jane Doe 49 is John Doe 22's domestic partner and legal heir. Peter Doe 23, Jane Doe 50, Jane Doe 51, Peter Doe 24, Peter Doe 25, Peter Doe 26 are John Doe 22's children and legal heirs. On August 19, 2000, John Doe 22 was killed between Santa Isabel and San Roque, Rinconhondo, Cesar, Colombia by the AUC Northern

Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. The AUC arrived at John Doe 22's residence at 11:30pm. They beat him, cracked his skull, tied him up, put him in a vehicle and took him away. They shouted at his domestic partner and put a gun to her head. Then the AUC members locked John Doe 22's domestic partner and their children in the house and tied them up so they couldn't leave. The next day, in the earlier hours of the morning, John Doe 22's domestic partner, Jane Doe 49, was able to escape and found John Doe 22's corpse in an area which lies between Santa Isabel and San Roque, Rinconhondo, Cesar.

39.    Jane Doe 52 is the mother and legal heir of John Doe 23. Jane Doe 53, Jane Doe 54, Jane Doe 55 and Peter Doe 27 are John Doe 23's siblings and also legal heirs. John Doe 23 was killed on August 19, 2000 between the townships of Santa Isabel and San Roque, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 23 left his house at 8:30 in the evening to attend a dance. He was walking along the highway when the AUC stopped and forced him into their truck. They brought him to a political event where other people were forced into the truck. They were then all taken to Curumani, Cesar, Colombia where John Doe 23 was shot in the head.

25

40.     Jane Doe 56 is the mother and legal heir of John Doe 24. John Doe 24 was killed on March 29, 2003 in Santa Isabel, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. It was 9:00 pm when John Doe 24 was murdered by the AUC. He was playing in a billiards club with some friends and from there eight AUC members of the Juan Andrés Álvarez Front took him to a place about a kilometer outside of Rinconhondo, Cesar, Colombia and assassinated him.

41.     Peter Doe 28 and Jane Doe 57 are the parents and legal heirs of John Doe 25. Jane Doe 58, Jane Doe 59, Jane Doe 60, Jane Doe 61, and Peter Doe 29 are John Doe 25's siblings and legal heirs. John Doe 25 was disappeared on March 9, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 25 was a member of CTI. John Doe 25 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 25 along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

42.     Jane Doe 63 is the domestic partner and legal heir of John Doe 26. Peter Doe 30 and Jane Doe 64 are John Doe 26's children and legal heirs. Jane Doe 65 is

John Doe 26's mother and legal heir. Jane Doe 66, Jane Doe 67, Jane Doe 68 are John Doe 26's siblings and legal heirs.  John Doe 26 was disappeared on March 9, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 26 was a member of CTI. John Doe 26 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 26 along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

43.     Peter Doe 31 and Jane Doe 69 are the parents and legal heirs of John Doe 27. Jane Doe 70, Jane Doe 71, Peter Doe 32, Peter Doe 33 and Peter Doe 34 are John Doe 27's siblings and legal heirs. John Doe 27 was disappeared on March 9, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 27 was a member of CTI. John Doe 27 was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared John Doe 27 along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

44.    Jane Doe 72 is the mother and legal heir of John Doe 28.  John Doe 28 was killed on June 23, 2002 in San Roque, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 6:00pm, John Doe 28 was pulled out of his house located in the town of San Roque in the township of Chiriguana by two members of by the AUC Northern Block's Juan Andrés Álvarez Front. They took him to the entrance of the town of Piponte, Chiriguana. Two other men, who were also to be assassinated along side John Doe 28, accompanied John Doe 28 in the vehicle. His body was found at 2am the following morning at the entrance to the town of Piponte, Chiriguana.

45.    Peter Doe 35 is the father and legal heir of John Doe 29.  John Doe 29 was killed on December 17, 2000 in El Paso, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 29 was tricked into coming out of his home by two members of the AUC Northern Block's Juan Andrés Álvarez Front saying that they were friends that owed him money. When John Doe 29 stepped out of his house he was shot three times in the head.

46.    Jane Doe 73, Peter Doe 36, and Peter Doe 74 are the siblings and legal heirs of John Doe 30. Jane Doe 75 is John Doe 30's domestic partner and legal heir.

28

Jane Doe 76, Jane Doe 77, Jane Doe 78 and Peter Doe 37 are John Doe 30's children and legal heirs. John Doe 30 was killed on September 20, 2002 in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. The AUC Northern Block's Juan Andrés Álvarez Front told John Doe 30 they had set an appointment to meet with him. He had attended a meeting with the AUC previously and when he left for the second meeting, he left without informing his immediate family. Two cousins and a friend accompanied him to the meeting and when they arrived the AUC members asked him "Are you afraid, Professor?" and then shot him in the head and in the face.

47.     Jane Doe 79 is the mother and legal heir of John Doe 31. John Doe 31 was killed on August 10, 2001 in Cruce de Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 31 was forcibly taken from his home at 11:30 am by the AUC Northern Block's Juan Andrés Álvarez Front and was forced into a white automobile where he was taken to Cruce de Chiriguana and shot twice in the head.

48.     Jane Doe 82, Jane Doe 83, Jane Doe 84, Jane Doe 85, Peter Doe 38, Peter Doe 39, Peter Doe 40, and Peter Doe 41 are the siblings and legal heirs of Paula Doe

2. Jane Doe 80 is Paula Doe 2's daughter and legal heir. Jane Doe 81 is Paula Doe 2's mother and legal heir. Paula Doe 2 was killed on September 27, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Paula Doe 2 was a nurse and helped the sick and injured in the area. Juan Andrés Álvarez Front commander alias "El Tigre" once told her that when if anything every happened to him, the AUC would kill her. "El Tigre" was arrested on July 19, 2000. Almost exactly two month later at approximately midnight on the night of September 27th, a group of members belonging to the AUC Northern Block's Juan Andrés Álvarez Front arrived in military gear and knocked on the door of Paula Doe 2's home. Paula Doe 2 opened the door and they told her that they needed her to come with them and to provide first aid to one of their wounded men. She left with needles, medicine and other medical instruments telling her family not to worry that she would return soon. Shortly thereafter her family members found her dead body. She had been shot three times in the head.

49.     Peter Doe 42 is the father and legal heir of Paula Doe 3. Jane Doe 86, Jane Doe 87, Peter Doe 43 and Peter Doe 44 are Paula 3's siblings and legal heirs. Paula Doe 3 was killed on January 25, 2002 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing

and substantial assistance from Drummond. Paula Doe 3 was a daughter of a witness of crimes committed by the AUC Northern Block's Juan Andrés Álvarez Front, specifically by Front commander "El Tigre" and his men. She was murdered because of her relationship to the witness. Paula Doe 3 was washing clothes when "El Tigre" and his men approached and was asked where her relative (the witness) was hiding. Paula Doe 3 said that she did not know the whereabouts of the witness. "El Tigre" and his men proceeded to tie up Paula Doe 3's husband and locked her children in the house. They murdered Paula Doe 3 with a blow to the head.

50.     Jane Doe 88 is the daughter and legal heir of Paula Doe 4. Paula Doe 4 was killed on June 3, 2002 in Vereda La Bodega, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jane Doe 88 owned a small store. On the day of her murder, two members of the AUC Northern Block's Juan Andrés Álvarez Front drove up to her store in a white automobile. They ordered a bottle of liquor, drank it, and upon asking for the bill they proceeded to shoot her multiple times until she died.

51.     Jane Doe 89 is the domestic partner and legal heir of John Doe 32. Jane Doe 90, Jane Doe 95, Peter Doe 45, and Peter Doe 26 are John Doe 32's children and legal heirs. John Doe 32 was killed on August 27, 2003 in Finca Los Chaparro, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front,

31

which received knowing and substantial assistance from Drummond. Six armed members of the AUC Northern Block's Juan Andrés Álvarez Front grabbed John Doe 32, beat him, tortured him and then murdered him by shooting him in the head, on the side, thorax, and genitals.

52.    Jane Doe 91 is the wife and legal heir of John Doe 33. Jane Doe 92 and Jane Doe 93 are John Doe 33's children and legal heirs. John Doe 33 was killed on February 23, 2001 in San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 33 was at a kiosk next to the Hospital El Socorro in San Diego, Cesar, Colombia when two armed members of the AUC Northern Block's Juan Andrés Álvarez Front began to shoot. They murdered John Doe 33 and two other people present.

53.    Jane Doe 94 is the domestic partner and legal heir of John Doe 34. John Doe 34 was killed on August 14, 2001 in Finca Guanduru, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 34 was on his way to a farm to pick up milk at the entrance to the farm, when two men from the Front approached him and opened fire on John Doe 34, shooting him six times and killing him.

32

54. Jane Doe 96 is the domestic partner and legal heir of John Doe 35. Peter Doe 47, Peter Doe 48, Jane Doe 97 and Jane Doe 98 are John Doe 35's children and legal heirs. John Doe 35 was killed on February 1, 2003 on the football field called Cancha Del 21 De Enero, Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 35 was playing football when three armed members of the AUC Northern Block's Juan Andrés Álvarez Front pulled him from the game and said "this game has ended" and without further ado shot him three times in the head.

55. Jane Doe 99 and Peter Doe 49 are the parents and legal heirs to John Doe 36. Jane Doe 100, Jane Doe 101, Peter Doe 50, Jane Doe 102, Jane Doe 113, and Peter Doe 53 are John Doe 36's siblings and legal heirs. John Doe 36 was disappeared on March 5, 2000 in Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 36 left his home in Codazzi to look for work and was never seen or heard from again. Six months later a phone call was received at his mother's house saying that the AUC Northern Block's Juan Andrés Álvarez Front had killed her son.

56. Peter Doe 51 and Jane Doe 103 are the parents and legal heirs of John Doe 37. Jane Doe 104 is John Doe 37's domestic partner and legal heir. Jane Doe

33

105, Jane Doe 106 and Jane Doe 107 are John Doe 37's daughters and legal heirs. John Doe 37 was killed on September 22, 2005 in Finca Limonal, Codazzi, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 37 was forcibly pulled from his home on the farm by two members of the AUC Northern Block's Juan Andrés Álvarez Front. The two men asked for John Doe 37's cell phone and that of the surviving witness and they gave their cell phones to them. One of the AUC members was armed with a gun and a machete. The AUC members told John Doe 37 not to worry that nothing was going to happen to him, if he would take them to the town of San Jose. John Doe 37 left with the two AUC members and two hours later the witness came back to the Finca Limonal (a farm) and found John Doe 37 semi-decapitated by a machete.

57.    Jane Doe 108 is the domestic partner and legal heir of John Doe 38. Jane Doe 109 is also John Doe 38's domestic partner and legal heir. Peter Doe 52 and Jane Doe 110 are John Doe 38's children and legal heirs. John Doe 38 was killed on September 8, 2000 in Finca El Diamante, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 5:00am John Doe 38 went to his uncle's farm to fumigate the rice crops. At approximately 6:00am members of the AUC Northern

34

Block's Juan Andrés Álvarez Front arrived at the farm and told John Doe 38 and other family members to come with them into the corral where a meeting was to be held. The AUC opened fire on John Doe 38 and his five other family members. After shooting them all, the AUC thugs from the Juan Andrés Álvarez Front beat the bodies to a pulp with their weapons, killing them all.

58.     Jane Doe 111 and Jane Doe 112 are the siblings and legal heirs of John Doe 39. John Doe 39 was killed on March 21, 2002 in Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. A group belonging to the AUC Northern Block's Juan Andrés Álvarez Front arrived at John Doe 39's home. They shot John Doe 39 twice in the chest and cut his throat.

59.     Jane Doe 114 is the domestic partner and legal heir of John Doe 40. Peter Doe 55 and Peter Doe 56 are John Doe 40's children and legal heirs. John Doe 40 was killed on June 11, 2003 in Finca Chaparral, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Three members of the AUC Northern Block's Juan Andrés Álvarez Front approached John Doe 40. They told him to walk with them, and that if he did, nothing bad was going to happen to him. He started to walk with them when, without warning, they shot John Doe 40 twice in the head. One bullet entered

35

John Doe 40's left temple and the other entered through his mouth.

60.    Jane Doe 62, Jane Doe 115, and Jane Doe 116 are the siblings and legal heirs of John Doe 41. Jane Doe 117 is John Doe 41's domestic partner and legal heir. Jane Doe 118 is John Doe 41's daughter and legal heir. John Doe 41 was killed on September 8, 2000 in Finca El Diamante, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At approximately 6:00am members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at the farm and told John Doe 41 and other family members to come with them into the corral where a meeting was to be held. The AUC opened fire on John Doe 41 and his five other family members. After shooting them all, the AUC beat the bodies to a pulp with their weapons. The assailants were dressed in military camouflage.

61.    Peter Doe 57 and Jane Doe 115 are the parents and legal heirs of John Doe 42. John Doe 42 was killed on November 18, 2003 in Barrio La Victoria, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 42 was sitting in front of his home after lunchtime at around 3 o'clock in the afternoon with two of his sisters, his brother-in-law, and his dog when a member of the AUC Northern Block's Juan Andrés Álvarez Front came by the house and shot John Doe

42 multiple times, killing John Doe 42 and his dog.

62. Jane Doe 119 is the mother and legal heir of John Doe 43. Peter Doe 58, Peter Doe 59, Jane Doe 120, Peter Doe 60, Peter Doe 61, and Peter Doe 62 are John Doe 43's siblings and legal heirs. John Doe 43 was disappeared on November 14, 2003 in La Jagua de Ibirico, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 43 was pulled from his house by four members of the AUC Northern Block's Juan Andrés Álvarez Front. The four AUC members arrived in a red automobile. They were wearing jeans and blue and black sweaters. They forced John Doe 43 into their automobile and he was never seen or heard from again. John Doe 43 was last seen wearing yellow shorts. After the demobilization in 2006, a demobilized member of the AUC Northern Block's Juan Andrés Álvarez Front informed John Doe 43's mother that her son was killed in 2003. However, his body has never been found.

63. Jane Doe 119 is the domestic partner and legal heir of John Doe 44. Jane Doe 120, Peter Doe 58, Peter Doe 62, Peter Doe 59, Peter Doe 60, Peter Doe 61 are John Doe 44's children and legal heirs. John Doe 44 was killed on April 1, 2001 in La Jagua de Ibirico, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe

37

44 was sitting on the porch of his house with his domestic partner and children when a member of the AUC Northern Block's Juan Andrés Álvarez Front dressed in camouflage pulled up in a grey automobile. The AUC member got out of his vehicle, walked up to John Doe 44 and shot him point blank in the head.

64.    Jane Doe 121 is the domestic partner and legal heir of John Doe 45. Peter Doe 62A, Jane Doe 122, Peter Doe 63, Peter Doe 64, Jane Doe 123, Peter Doe 65, Jane Doe 124, and Jane Doe 125 are John Doe 45's children and also his legal heirs. Peter Doe 65A and Jane Doe 125A are John Doe 45's siblings and also his legal heirs. John Doe 45 was killed on May 9, 2001 in Cruce De Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 12 midnight, a group of armed members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at John Doe 45's house. They knocked down the door to John Doe 45's home and shot John Doe 45 when he tried to escape through the patio. They shot him in the back and the bullet exited through his chest, killing him.

65.    Jane Doe 126 is the domestic partner and legal heir of John Doe 46. Peter Doe 54, Jane Doe 127, Jane Doe 128, Jane Doe 129 are the children and legal heirs of John Doe 46. John Doe 46 was disappeared on November 28, 2004 in Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received

knowing and substantial assistance from Drummond. At around 7 o'clock in the morning, John Doe 46 was headed towards the town of La Jagua de Ibirico to visit his father. His domestic partner, Jane Doe 126 was accompanying him part of the way, as she was going to market in Codazzi. When they arrived at the market a car stopped and the men inside the car, who were members of the Juan Andrés Álvarez Front, pulled John Doe 46 inside and drove off. John Doe 46 was never heard or seen from again.

66.     Jane Doe 130 is the mother and legal heir of John Doe 47. John Doe 47 was disappeared on April 19, 2001 in Barrio Chiriaimo, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 47 was asleep at his residence when he received a phone call at 9:30 pm and left the house. His mother, Jane Doe 130, tried to follow him, but could not catch up to him. The last she saw of her son was him getting into an old-model white Renault automobile. John Doe 47 was never seen or heard from again. Less than a month later on May 17, 2001, John Doe 47's mother received a call from the AUC Northern Block's Juan Andrés Álvarez Front, telling her to tell John Doe 47's family not to go looking for him because he had been assassinated in Curumani, Cesar, Colombia.

67.     Jane Doe 131 is the domestic partner and legal heir of John Doe 48. Peter

Doe 66 is John Doe 48's son and also his legal heir. John Doe 48 was killed on June 16, 2002 in Los Brasiles, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. It was around 8 o'clock in the evening when a group of armed members of the Juan Andrés Álvarez Front arrived at Jane Doe 131 and John Doe 48's residence. They forced the family members to the floor and asked them for their full names. They then tore John Doe 48's son Peter Doe 66 (then 6 years old) from John Doe 48's arms and took John Doe 48 out of the house to a nearby pasture and shot him in the forehead, killing him.

68.    Jane Doe 132 is the domestic partner and legal heir of John Doe 49. Peter Doe 67 and Peter Doe 68 are John Doe 49's children and also his legal heirs. John Doe 49 was killed on March 2, 2000 in Barrio Buenos Aires, Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 49 was at the door to his residence at approximately 7:20 pm. He was holding his baby at the doorway to his home when members of the Juan Andrés Álvarez Front arrived and shot him several times in the face and upper-body, murdering John Doe 49 in front of his family.

69.    Jane Doe 133 is the domestic partner and legal heir of John Doe 50. Peter

40

Doe 69 is John Doe 50's son and legal heir.  John Doe 50 was killed on September 3,

1999 on the highway going from Codazzi to the township of Cuatro Vientos, Cesar,

Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received

knowing and substantial assistance from Drummond.

70.    Jane Doe 134 and Peter Doe 70 are the parents and legal heirs of John

Doe 51.  Jane Doe 135 and Peter Doe 71 are John Doe 51's children and legal heirs.

John Doe 51 was killed on April 12, 2004 on the highway about 3 kilometers outside

of Becerril, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez

Front, which received knowing and substantial assistance from Drummond. Members

of the Juan Andrés Álvarez Front pulled John Doe 51 from his home at 11:30 in the

morning and took him to Finca Doña Maria and turned him over to alias "JJ", who was

the Front commander for the town of Codazzi.  John Doe 51's dead body was found

at the farm an hour later. He had been shot.

71.    Jane Doe 136 is the domestic partner and legal heir of John Doe 52.  Jane

Doe 137 is John Doe 52's daughter and legal heir.  John Doe 52 was killed on January

10, 2003 in the entrance to the town of Poponte, Chiriguana, Cesar, Colombia by the

AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond.  John Doe 52 left his home at approximately

7:05pm when he was intercepted by an old-model Renault automobile. He was about

41

to escape when one of the men inside the automobile put a gun to John Doe 52's temple. He surrendered and was shoved in the car. His body was found early the next morning. He had been shot five times in the head and upper body.

72.     Jane Doe 138 is the mother and legal heir of John Doe 53. Jane Doe 139 and Jane Doe 140 are John Doe 53's siblings and legal heirs. Jane Doe 141 is John Doe 53's daughter and also his legal heir. John Doe 53 was killed on May 25, 2001 in Hacienda Barahona, Chiriguana,Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On May 23, 2001 at 7:10pm a group of armed members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at the Hacienda Barahona, rounded up all of the workers on the farm and demanded their full names. The armed men told John Doe 53's father, John Doe 54, to give them his motorcycle. John Doe 54 refused. The armed men returned again two days later to the farm on the evening of May 25, 2001. They forced John Doe 53 and John Doe 54 into a truck and they killed them 100 meters outside the entrance to the farm. John Doe 53 was shot five times in the head.

73.     Jane Doe 138 is the domestic partner and legal heir of John Doe 54. Jane Doe 139 and Jane Doe 140 are John Doe 54's daughters and also his legal heirs. John Doe 54 was killed on May 25, 2001 in Hacienda Barahona, Chiriguana, Cesar,

Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received

knowing and substantial assistance from Drummond. On May 23, 2001 at 7:10pm a

group of armed members of the AUC Northern Block's Juan Andrés Álvarez Front

arrived at the Hacienda Barahona, rounded up all of the workers on the farm and

demanded their full names. The armed men told John Doe 54 to give them his

motorcycle. John Doe 54 refused. The armed men returned again two days later to the

farm on the evening of May 25, 2001. They forced John Doe 54 and his son, John

Doe 53, into a truck and they killed them 100 meters outside the entrance to the farm.

John Doe 54 was shot five times in the head.

74.     Jane Doe 145 and Peter Doe 72 are the parents and legal heirs of John

Doe 55. Peter Doe 73, Jane Doe 146, and Jane Doe 147 are John Doe 55's siblings

and also his legal heirs. John Doe 55 was killed on July 2, 2002 on an un-maintained

highway called "Troncal de Caribe" in El Cruce de la Loma, Cesar, Colombia by the

AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond. John Doe 55 had just returned from a trip in

the town of MonPox in the southern part of Colombia. He then had gone to El Cruce

de la Loma to visit his brother. He was in El Cruce de la Loma trying to charter a car

to drive him to Chiriguana when two armed members of the Juan Andrés Álvarez

Front approached him and shot him multiple times in the head with a 9mm caliber

43

weapon.

75.    Jane Doe 143 is the domestic partner and legal heir of John Doe 56. Jane Doe 144, Jane Doe 142, Peter Doe 74, and Peter Doe 75 are John Doe 56's children and legal heirs. John Doe 56 was killed on March 23, 2005 in San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. John Doe 56 was assassinated at approximately 2:30 pm by two members of the Juan Andrés Álvarez Front. They intercepted him on the road and shot John Doe 56 three times in the head with a 9 mm weapon.

76.    Peter Doe 76 and Jane Doe 148 are the parents and legal heirs of John Doe 57. Jane Doe 149, 150, and 151 are John Doe 57's siblings and are also his legal heirs. John Doe 57 was taken from his home on the morning of March 24, 2004 in Bosconia, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. They shoved him in a truck and his body was found over a month later on March 24, 2004 on the right side of 855 Kilometer mark of the Drummond railway line in Fundacion, Magdalena, Colombia, entering the town of Monterubio, on the road towards La Estacion La Lleras. His body was found with two fatal gunshot wounds; one in the right eye and another in the left shoulder.

77.    Peter Doe 77, Jane Doe 152, Jane Doe 153, and Jane Doe 154, are the siblings and legal heirs of John Doe 58. John Doe 58 was killed on January 13, 2003 in Barrio Chipona, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At approximately 7:45pm John Doe 58 was talking with his cousin about a block from his home when two members of the Juan Andrés Álvarez Front armed with 9 caliber weapons approached John Doe 58 and shot him once in the neck, twice in the head, six times in the back and once in the arm, killing him.

78.    Jane Doe 155 is the sister and legal heir of John Doe 59.  John Doe 59 was killed on June 23, 2002 in Bosconia, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. It was on a Sunday, at 9pm when John Doe 59 left his residence. At 2pm the following day, his sister, Jane Doe 155, received word that her brother and legal heir, John Doe 59, had been assassinated by members of the AUC Northern Block's Juan Andrés Álvarez Front. He had been shot four times.

79.    Jane Doe 156 is the sister and legal heir of John Doe 60.  Peter Doe 78 is John Doe 60's father and also his legal heir. John Doe 60 was killed on July 9, 2001 in Santa Isabel, Curumani, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from

45

Drummond. John Doe 60 left his residence to do some shopping in the nearby town of Rinconhondo. He returned to Santa Isabel around 4:20pm to find members of the AUC Northern Block's Juan Andrés Álvarez Front waiting for him. They promptly and without words surround John Doe 60 and shot him various times, killing him.

80.     Jane Doe 157 is the mother and legal heir of John Doe 61. Jane Doe 158, Jane Doe 159, and Peter Doe 78A are John Doe 61's siblings and also his legal heirs. John Doe 61 was killed on December 5, 2001 in Agustin Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 7:45pm, John Doe 61 was with a friend in an open market in the town of Agustin Codazzi. A member of the AUC Northern Block's Juan Andrés Álvarez Front started harassing John Doe 61's friend. When John Doe 61 defended his friend, the paramilitary member, under the command of Alias J.J., left and returned armed with another armed member of the Juan Andrés Álvarez Front. They opened fire on John Doe 61, shooting him twelve times: four times in the head; twice in the right arm; and six times in his body.

81.     Jane Doe 160 is the domestic partner and legal heir of John Doe 62. Peter Doe 80 and Jane Doe 163 are John Doe 62's parents and also his legal heirs. Peter Doe 79 is John Doe 62's son and also his legal heir. Jane Doe 161, Jane Doe 162 and Peter Doe 81 are John Doe 62's siblings and also his legal heirs. John Doe 62 was

46

killed on March 28, 2002 at the Hacienda San Luis in Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 8:30pm, three cars each filled with armed members of the Juan Andrés Álvarez Front arrived at John Doe 62's home. They pulled John Doe 62 and his brother, John Doe 63, from their home. From there, the paramilitary group continued to other homes, pulling out their victims and forcing them into the cars. The following day, John Doe 62's family found John Doe 62 and his brother, John Doe 63 dead along with the bodies of two other men at the entrance to the San Luis Farm. The threats continued against John Doe 62's family after his death. The following day, March 29, 2002, during the burial two members of the Juan Andrés Álvarez Front approached John Doe 62's surviving brother and asked him if he was a relative. The family was so afraid that they didn't return to visit John Doe 62's tomb after his death. Their house began to be monitored and the family started to receive threats left under their door by the AUC's Bloque Norte. John Doe 62 had never received any death threats prior to his death. John Doe 62's siblings, out of fear for their lives, fled the area.

82.     Peter Doe 80 and Jane Doe 163 are John Doe 63's parents and also his legal heirs. Jane Doe 161, Jane Doe 162 and Peter Doe 81 are John Doe 63's siblings and also his legal heirs. Jane Doe 164 is John Doe 63's domestic partner and also his

47

legal heirs. Jane Doe 165 is John Doe 63's daughter and also his legal heir. Jane Doe 166 is John Doe 63's domestic partner and also his legal heir. John Doe 63 was killed on March 28, 2002 at the Hacienda San Luis in Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 8:30pm, three cars each filled with armed members of the Juan Andrés Álvarez Front arrived at John Doe 63's home. They pulled John Doe 63 and his brother, John Doe 62, from their home. From there, the paramilitary group continued to other homes, pulling out their victims and forcing them into the cars. The following day, John Doe 63's family found John Doe 63 and his brother, John Doe 62, dead along with the bodies of two other men at the entrance to the San Luis Farm. The threats continued against John Doe 63's family after his death. The following day, March 29, 2002, during the burial two members of the Juan Andrés Álvarez Front approached John Doe 63's surviving brother and asked him if he was a relative. The family was so afraid that they didn't return to visit John Doe 63's tomb after his death. Their house began to be monitored and the family started to receive threats left under their door by the AUC's Bloque Norte. John Doe 63 had never received any death threats prior to his death. John Doe 63's siblings, out of fear for their lives, fled the area.

48

## B. **Defendants**

83. Defendant Drummond Company, Inc. is a for-profit corporation incorporated in Alabama that is engaged primarily in the mining and shipment of coal. It is a closely-held corporation owned by the Drummond family, and is controlled in its day-to-day operations by Garry N. Drummond. Its principal place of business is located at 530 Beacon Parkway, Suite 900, Birmingham, Alabama 35209. Among other places, Drummond Company, Inc. owns and operates a large coal mine, rail line and port in Colombia, South America. The operations in Colombia are financed and managed from the Alabama headquarters of Drummond Company, Inc., and the profits from the Colombia operations revert to Drummond Company, Inc.

84. Defendant Drummond Ltd. is an Alabama company, incorporated in Jasper, Alabama, and has its principal place of business at 3000 Highway 78, Jasper, Alabama 35501. It is wholly-owned by Drummond Company, Inc. Drummond Ltd. manages the day-to-day operations of the Drummond coal operations in Colombia, but is at all times operating under the complete ownership, direction and control of Defendant Drummond Company, Inc. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity afforded the perpetrators of such violence in Colombia, Drummond Company, Inc. created Drummond Ltd. for the sole purpose of operating the Colombian mines for the sole benefit of Drummond

49

Company, Inc. while also attempting to shield Drummond Company, Inc. from liability for any and all tortious conduct committed by the management of these mines. The creation of Drummond Ltd. was a sham done for the aforesaid unlawful purpose.

85.    Defendant Augusto Jimenez is the President of Defendant Drummond Ltd. At all material times herein, Jimenez was a direct participant in Drummond's plan to make significant payments to the AUC's Juan Andres Alvarez Front to provide security and other services for Drummond's mine and to protect the rail line from the mine to the port.

86.    Defendant Alfredo Araujo is a Vice President at Drummond Ltd., and among other positions, is Director of Community Relations. He has been close friends with the AUC Commander "Jorge 40" since childhood. Defendant Araujo and his family had close ties to Jorge 40 and other AUC leaders. When the AUC formed, the Araujo family played a prominent role. Three close family members of Defendant Araujo, his cousin, Hernando Molina Araujo, a former governor of Cesar Province, another cousin, Alvaro Araujo Castor, a former Senator, and his uncle, Alvaro Araujo Noguera, a former Minister of Agriculture, are in jail for their participation in and support for the AUC. Defendant Araujo used his family relationship and connection to Jorge 40 to make the initial arrangements with the AUC to provide security for Drummond. Araujo made the plan with Jorge 40. He then used his position in the

50

company to get Defendant Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared with AUC the goal of using the ongoing civil conflict as a cover to execute leftist union leaders, including those employed by Drummond.

87.    Defendant James Atkins was the Director of Security for Drummond's operations in Colombia. Hired by Drummond from the CIA, Defendant Atkins had full knowledge of the AUC's terrorist activities at the time he was hired. Atkins reported to both Garry Drummond and other Alabama-based Drummond officers, as well as the Defendant Jimenez. On behalf of the Drummond Defendants, Defendant Atkins approved the payments to the AUC both to murder the Drummond trade union leaders and to provide "security services."

88.    Defendant Drummond Company, Inc. is jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, Drummond Ltd., acts in concert with any other person or entity in furtherance of Drummond Company, Inc.'s business interests and activities.

89.    The AUC paramilitary forces that murdered all of the decedents referenced herein were acting within the course and scope of a business relationship with Defendants with the advance knowledge, acquiescence or subsequent ratification of Defendants.

## IV. BACKGROUND FACTS CONCERNING THE CIVIL CONFLICT IN COLOMBIA AND THE GOVERNMENT OF COLOMBIA'S SYMBIOTIC RELATIONSHIP WITH THE AUC

90.     Colombia is widely-known as a country that is torn by a long-standing civil war involving armed leftist groups on the one side, and the Colombian military as well as right-wing paramilitaries on the other. It is universally acknowledged that the regular military in Colombia, and the civil government authorities, tolerate the paramilitaries, allow them to operate, and often cooperate, protect and/or work in concert with them. The extent of the civil conflict is so pervasive that the country's civil war necessarily must be governed by the rules of war so that the combatants, the right-wing paramilitaries, the leftist guerillas, and the regular military are governed by Article 3 of the Geneva Convention, which applies to "an armed conflict not of an international character." Thus, noncombatants to the Colombian civil war, including the Plaintiffs herein, standing in the place of the deceased, are protected from human rights violations and other war crimes committed by any parties to the conflict, regardless of whether the combatant parties are formally recognized as government officials. This includes the paramilitary forces which clearly are major participants in the civil conflict.

91.     The paramilitaries in Colombia, including those directly involved in the wrongful acts alleged herein, were created based on official sanction of the

52

Government of Colombia. Under "Law 48," passed in 1968, the Defense Ministry was authorized to create and provide weapons to civil patrols. Most of the paramilitary groups were created and sustained under the authority of this law. In 1989, the Colombian Supreme Court of Justice declared Law 48 unconstitutional. However, 21 years of close, lawful, and open collaboration allowed the Colombian Armed Forces and the paramilitaries to create solid and lasting relationships.

92.     Moreover, in 1994 the Colombian government effectively re-legalized paramilitary organizations in Decree 356, which established the "Special Vigilance and Private Security Services." This decree laid the foundation for the creation of the Convivir groups, officially launched in 1995 through Resolution 368. The Convivir groups are comprised of civilians who petition the government for a license to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security." Defense Ministry, Decree 356, República de Colombia, February 11, 1994, pp. 19-20; and Resolution 368, April 27, 1995. Convivir members interviewed by Human Rights Watch confirmed that they regularly supply the Colombian army with intelligence, routinely collaborate with Colombian security forces, and are supervised by a government agency within the Defense Ministry. One Convivir commander stated frankly, "We are paramilitaries, machetes,

53

or Convivir, whatever the hell you want to call us."   Human Rights Watch, *War Without Quarter: Colombia and International Humanitarian Law* (1998).

93.     Paramilitary groups continue to thrive and enjoy *de facto* approval from the government, and the Colombian military often outsources its "dirty work" to the paramilitaries in an attempt to clean up its own international image.

94.     The paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship with the Colombia government's military. As reported by Human Rights Watch, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries.   The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations."   The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include that active and retired military actually set up paramilitary units, the military provides the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries conduct missions at the request of the military.

95.     The close, symbiotic relationship between the military and paramilitaries in Colombia is so widely acknowledged that the U.S. State Department confirms this fact without reservation:

> Credible allegations of cooperation with paramilitary groups, including instances of both silent support and direct collaboration by members of the public security forces, in particular the army, continued. Evidence suggests that there were tacit arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas that were under military control or despite a significant military presence. Individual members of the security forces actively collaborated with members of paramilitary groups – passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off-duty.

96.    In the February 28, 2002 Report of the UN High Commissioner for

Human Rights on the human rights situation in Colombia ("UNHCR Report"), the

UN High Commission explains that the links between the paramilitaries and the

State continue and indeed are intensifying. As the UNHCR Report explains:

> During 2001, the Office continued to observe that paramilitary activity was strengthening and spreading throughout much of the country's territory. ... Toleration, support and complicity on the part of public servants, as well as non-fulfillment of their duty to safeguard rights, with respect to several acts by these groups, means that the State continues to bear responsibility.

97.    The UNHCR Report further relates that "the growth in paramilitary

activity has been aided by the State's inaction or slow reaction in preventing the

formation of illegal armed groups, and in keeping new territories from falling into the

de facto control of these organizations." Finally, the UNHCR explains that the growth

in paramilitary control and violence has been assisted by the impunity which human

rights violators receive in the Colombian judicial system. Thus, the UNHCR states that, throughout 2001, it "continued to receive troubling reports of ties between members of the security forces and elements of the paramilitary groups. The existence of pending criminal and disciplinary investigations of members of the security forces shows how widespread these relationships are. However, the investigations have not led to any determination of responsibility or the application of relevant sentences and punishments to ensure that these acts do not benefit from impunity."

98.     The UNHCR reached the very same conclusions in its recent, March 18, 2003 report, stating that there remain "open collusion" on the part of Colombian security forces with paramilitaries and that there is continued "expansion and consolidation of paramilitaries in several areas."

99.     Further, in *Country Reports on Human Rights Practices – Colombia* (March, 2002), the U. S. State Department, which had in September 2001 designated the AUC, the chief and largest paramilitary group as a "terrorist" group, continued to conclude that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces." The State Department reached this same conclusion in its Report of March 31, 2003, stating that "[s]ome members of the security forces collaborated with paramilitary groups that committed serious abuses."

100.   For a number of years, the location in which Defendants operate in

56

Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen. Thus, Amnesty International has reported that it "has been increasingly concerned by the escalation in human rights violations carried out in the Department of Cesar by members of the security forces and paramilitary allied to them. 'Disappearances,' extrajudicial executions and other human rights violations continue to be reported as the security forces have increased their presence and paramilitary organizations have been set up and consolidated in the region, sometimes with the support of powerful economic interests." Indeed, Drummond allowed its vast property around its coal mine to serve as a joint base for the military and AUC in that area, and there was frequent collaboration between the military and the AUC due to Drummond's provision of a safe haven for the AUC.

101. The close, symbiotic relationship between the military and paramilitaries in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia. The paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are legal creations of the government of Colombia, and they act with support from and cooperation with the official military.

102. Amnesty International, in specifically describing the human rights situation in the Cesar Province – the area in which the acts described herein took place

– explains that "[t]he systematic violation of human rights against members of popular organizations. . .in the department of Cesar corresponds to a national strategy of undermining organizations which the [state] security forces deem to be subversive." Amnesty International further finds that "[m]any violations of human rights in the [Cesar] region are committed in order to advance and protect the interests of economically powerful sectors. Labeling anyone who dares to challenge the interests of powerful economic sectors as subversive. . .and then targeting them for human rights violations provides a means for those sectors to protect their interests." Recently, the UNHCR has confirmed this assessment of Amnesty International, noting in the same breath that "members of paramilitary groups have been blamed for most of the [ ] violent deaths" suffered by trade unionists and that Cesar is one of "[t]he departments most affected by anti-union violence. . ."

103.    The paramilitaries' targeting of thousands of individuals for assassination, including the decedents described herein, as innocent civilians who happen to reside in areas with a FARC presence, constitutes war crimes. The paramilitaries are able to execute innocent civilians with impunity because of the lawless environment in Colombia created by the ongoing civil conflict and by simply accusing the civilians of being guerilla sympathizers.

104.    As a consequence of the official vilification of "leftists" and "guerilla

58

sympathizers" by the Colombian government, this serves as an open invitation to paramilitaries to target innocent civilians living in areas where there was a FARC presence with violence. Indeed, Rafael Garcia, a former DAS official, has stated under oath that the DAS worked closely with the AUC, that as a DAS official he witnessed Drummond making payments to the AUC to murder the union leaders at Drummond, and that he personally, while a DAS official also served as the political adviser for the AUC paramilitaries and also acted as liaison between DAS Director Jorge Noguera and AUC Northern Block leader, Jorge 40. He specifically stated under oath that "the AUC and the DAS worked closely together to further their joint mission of ridding Colombia of leftist guerillas."

105. As more fully explained below, the Drummond Defendants took advantage of the fact that paramilitaries can execute civilians with impunity, particularly in Cesar Province to use the AUC's Juan Andres Alvarez Front to provide "security services" and terrorize local populations living in and around the Drummond facilities. Defendants knew that, because of the lawless environment created by the civil conflict in Colombia, the paramilitaries acting as their agents, could terrorize the local population with impunity.

## V. SPECIFIC EVENTS LEADING TO THE MURDERS OF PLAINTIFFS' RELATIVES, DECEDENTS HEREIN.

106. Defendants Drummond Company, Inc. and Drummond Ltd. utilize the services of the Colombian military to protect its mining facilities, railway lines and U.S. workers in Colombia. Drummond Company, Inc. and/or Drummond Ltd. actually support a military base on company property by providing the land, as well as electricity, fuel, and equipment. The Defendant companies also maintain the local roads used by the military. Defendants do so with specific knowledge that some of the local military supported by the company cooperate with the paramilitaries that also operate on the Drummond property and act on behalf of Drummond. Further, a significant number of these military personnel also are members of the paramilitaries operating in Valledupar, Colombia and elsewhere. Further, many, if not most, of the AUC are former soldiers in the Colombian military, who join the AUC upon leaving the military.

107. In addition, Drummond Company, Inc. and Drummond Ltd., to protect its operations in the Cesar Department, engaged in a concerted effort to organize what was then a small and diffuse paramilitary operation in the region into a more powerful organization which had the capability to protect their property, assets, profits and personnel.

60

108.   In November, 1999, Defendant Araujo, on behalf of Drummond, met with Jorge 40 and other AUC members, including El Tigre, "Guerrero," "Kevin," "Cortico," "Pelo de Puya," "El Enano," "Pirulo," and "Cachaco," to discuss a plan to get major Drummond funding for the AUC and the Juan Andres Alvarez Front. Defendant Araujo explained to Jorge 40 that there had been a recent FARC attack on the Drummond rail line, but that for the Drummond executives in the U.S. to approve significant funding for the AUC, there had to be another attack. Defendant Araujo directed that the AUC should stage a new attack on the rail line, and make it look like the FARC's 41st Front had attacked the rail line again. This, Defendant Araujo assured Jorge 40, would cause the Drummond executives in Alabama to agree to make payments to the AUC for security. According to an AUC leader at the meeting, Defendant Araujo said to Jorge 40, "Drummond is willing to provide a sum of money so that your group can strengthen itself with men and arms, as long as you commit to providing security to the railroad line and the coal operations in the mine."

109.   Jorge 40 assigned El Tigre and "Pirulo" to conduct the staged attack on the Drummond rail line, which they successfully did in April, 2000. Following the attack, as per the agreement with Defendant Araujo, the AUC distributed pamphlets in the town of Loma de Potrerillo attributing the attack to FARC's 41st Front. The AUC then, in May 2000, in furtherance of the plan agreed to with Defendant Araujo,

assassinated five people near Casacara, Becerril, in Cesar, and claimed that these five were FAR collaborators who were responsible for blowing up the rail line. These five men had nothing to do with the attack, but were killed to show that the AUC could respond effectively to a FAR attack on the rail line. Their names were William Enrique Rios Villazon, Angel Maria Ospina, Ciro Alfonso Guerrero Rueda, Oscar Enrique Yance Atencio, and Edilson Julio Glavis.

110.   After the successful staging of a rail attack, Drummond made its first large payment to the AUC and its Juan Andres Alvarez Front. Jorge 40 sent El Tigre and "Amin" to the town of Las Palmitas, near the back entrance to the Drummond mine. Drummond employees whose names are not known delivered three boxes filled with U.S dollars. Amin opened the boxes to verify the contents. The funds were then delivered to Jorge 40 by his men.

111.   Once the funds were paid by Drummond, the Juan Andres Alvarez Front was able to recruit new men and went from a force of about 20 to 200. Jorge 40 purchased arms and equipment for the men directly from Carlos Castaño. From then on, under the command of El Tigre, the Juan Andres Alvarez Front provided security and intelligence to Drummond. The forces had a permanent presence around the Drummond mining facilities, as well as along the rail corridor. In providing security for Drummond, the Juan Andres Alvarez Front murdered hundreds of innocent

62

civilians and displaced thousands more because it is easier to secure an area if there are little or no people living there.

112. In 2000, while under the command of El Tigre, the Juan Andres Alvarez Front executed seven investigators from the CTI of the Public Prosecutor's Office. These men are decedents John Does 1,2,3,4,25,26,27 described herein. As part of the Justice and Peace process, El Tigre has confirmed that he and his men executed the seven CTI investigators.

113. The Juan Andres Alvarez Front, under El Tigre's command, also murdered a man named "Daniel," who Defendant Araujo specifically directed them to execute. They killed him in La Loma near the Platanal bridge.

114. El Tigre was captured by the Colombian authorities on July 19, 2000. Jorge 40 then assigned the command of the Juan Andres Alvarez Front to Tolemaida, who continued the work of providing Drummond with security and other services. As previously described, Defendant Atkins was present in November, 2000 at a meeting between Drummond officials and top AUC leaders. The meeting occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Defendant Atkins was accompanied by Defendant Araujo and Jaime Blanco, a friend of Araujo's who ran the cafeteria concession at the Drummond mine, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and several other armed

63

AUC members. At this meeting, Defendants Atkins and Araujo approved a payment to the AUC on behalf of Drummond for the assassination of the top leaders of the Drummond union, including Locarno and Orcasita. Locarno and Orcasita were murdered by the AUC on March 12, 2001. The union leaders were pulled off a company bus on their home from their shift in the Drummond mine and executed by the AUC Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Samario, participated as well.

115.   Rafael Garcia, the former DAS official, stated under oath that in early 2001, when he was working as political adviser to the AUC, he traveled to Valledupar along with Jorge Castro Pacheco of Ariguani, a municipality in Magdalena, Colombia. Jorge Castro Pacheco served as the representative for Jorge 40.  Garcia attended a meeting at the Hotel Sicarare in Valledupar with Jorge Castro Pacheco, who, at the time of the meeting was 3rd succentor to Roberto Perez, a Senator from Sucre, Colombia. Also in attendance was Guillermo Sanchez Quintero, who at the time was Mayor of Ariguani and Alfredo Araujo, who was Drummond's Director of Community Relations. At this meeting, Garcia witnessed Defendant Araujo give Jorge Castro Pacheco a suitcase filled with money. Defendant Araujo and Jorge Castro Pacheco talked openly about the purpose of this money - to take violent measures against union workers at Drummond.  Garcia heard Defendant Araujo say to Jorge Castro Pacheco

that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond. It was clear from things said in this conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Defendant Araujo and Jorge 40. Defendant Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems." Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Defendant Araujo.

116. At a subsequent meeting in early May, 2001, Defendants Atkins and Araujo met again with the top leaders of the AUC, including Jorge 40, Tolemaida, Don Luis, and several AUC operatives who worked closely with Jorge 40, including Kener, El Chino, El Toro, Samario, Machoman, and 05. The meeting was held at a farm on the road between Bosconia and Plato. In front of the entire group, including Atkins and Araujo, Jorge 40 congratulated Tolemaida for the successful operation of executing the two Drummond union leaders Locarno and Orcasita.

117. At this meeting Drummond, through Atkins and Araujo, made an agreement with Jorge 40 to make a large cash payment to the AUC of approximately $1.5 million (U.S.) and regular monthly payments of approximately $100,000 (U.S.) to continue to support the AUC troops and equipment for the Juan Andres Alvarez Front to provide security and other services for Drummond. This additional funding

was to allow the Juan Andres Alvarez Front to maintain a permanent base and to have the arms and equipment necessary to provide Drummond's rail line with ongoing security.

118. With the ongoing support from Drummond, the Juan Andres Alvarez Front continued to provide security and other services to Drummond, and in the process, continuing to terrorize, displace and murder innocent civilians who lived along Drummond's rail corridor or near the mining facilities and other Drummond facilities.

119. All of the decedents described herein were among those murdered by the Juan Andres Alvarez Front during the course of its work on behalf of Drummond to provide "security services." Drummond is responsible for establishing a major force of the AUC, the Juan Andres Alvarez Front, in Cesar, and providing the funds to arm and mobilize these AUC troops that ultimately terrorized the innocent civilians in the area of Drummond's facilities and murdered the relatives of the Plaintiffs herein.

120. Drummond also provided assistance to the AUC's drug trafficking. Drummond allowed its NAPA parts store to import the chemicals necessary to manufacture cocaine out of raw coca, and allowed its coal barges to transport cocaine from Colombia to the U.S. On information and belief, Drummond management in Colombia received a portion of the profits from the AUC's drug trade in Colombia in

66

exchange for this material assistance. The profits from the AUC's drug trafficking were a major part of the AUC's income, and allowed the AUC to support its troops, buy equipment, and generally maintain the AUC's Northern Block.

## VI. DEFENDANTS' VIOLATIONS OF LAW

121.  Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

   a) Alien Tort Claims Act, 28 U.S.C. § 1350;

   b) Torture Victim Protection Act, 28 U.S.C. § 1350;

   c) Common law of the United States of America;

   d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

   e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U. N. Doc. A/810 (1948);

   f) International Covenant on Civil and Political Rights, G.A. Res. 2220(A)(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N.Doc. A/6316 (1966);

   g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N.

67

Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984) (ratified 10/28/98);

h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

i) Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

j) International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize;

k) Article 3 of the Geneva Conventions; and

l) Statutes and common law of Colombia on wrongful death.

## VII. CAUSES OF ACTION

### First Cause of Action
**The Alien Tort Claims Act, 28 U.S.C. § 1350**
**For Extrajudicial Killing on Behalf of**
**All Plaintiffs Against All Defendants**

122. Plaintiffs incorporate by reference paragraphs 1 through 121 of this Complaint as is set forth herein.

123. Plaintiffs bringing this lawsuit are the legal heirs of decedents who were murdered as a direct and proximate result of the conduct of Defendants.

124. As a direct and proximate result of decedents' untimely deaths, Plaintiffs have been permanently deprived of the decedents' love, care, companionship, comfort, services, society, solace, contributions, financial support, physical assistance, affection and moral support and right to support, expectations of future moral support and counseling, as well as other benefits and assistance of decedent, inheritance rights and support of decedent, and thus have all suffered substantial damage.

125. By reason of the conduct of the Drummond Defendants, Plaintiffs have incurred funeral and burial expenses in such amounts as will be proven at the time of trial. Plaintiffs have lost the use of interest on the money owed from the date of this incident until judgment as follows: on funeral and burial expenses; on loss of support; and on the pecuniary value of the loss of love, care, companionship, comfort, services, society, solace and moral support.

126. Further, as a direct and proximate result of the conduct of the Drummond Defendants, as alleged herein above, the Plaintiffs identified herein were caused to suffer injuries to their persons, their mental and emotional health, their earning capacity, their property and their economic interests, and have suffered further mental and emotional distress. All of the above will be established according to proof.

127. The Drummond Defendants engaged in acts and omissions intentionally and tortuously causing their co-venturers and/or agents to murder the decedents described herein. Specifically, as is alleged above, the Drummond Defendants managers, employees and/or agents, including Defendants Jimenez, Araujo, and Atkins, engaged in joint action with, and/or conspired with, AUC paramilitary forces that were operating under color of law, and, so acting, murdered the decedents described herein. Further, through their managers, employees and/or agents, including Defendants Jimenez, Araujo, and Atkins, the Drummond Defendants knowingly aided and abetted the AUC paramilitary forces that murdered the decedents described herein by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the AUC paramilitary forces to murder the decedents, as well as hundreds, if not thousands, of other innocent civilians who lived in the area that the AUC was assigned to control and provide security for by the Drummond Defendants. Defendants realized substantial benefits from the murders described herein as they could not have operated their mine in the manner they were, without regard to the environment, without regard to health and safety of their workers, as well as those who lived in the community, unless the local population was terrorized by the AUC.

128. The aforesaid acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶121, *supra*. The acts described herein are actionable under ATS, and, if such a showing is required, were done with the complicity of state actors. The AUC paramilitary security forces in the Cesar Province are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. According to the sworn statement of Rafael Garcia, a former DAS official, the DAS coordinated activities with the AUC at the highest levels. In engaging in joint action and/or a conspiracy with such paramilitary agents and other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph ¶121, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

129. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶121, *supra*, resulted in the deaths of the decedents described herein. The Drummond Defendants are jointly and severally liable for the acts of any and all

71

subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶121, *supra*. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶121, *supra*.

130. Plaintiffs are all legal beneficiaries following the murders of their decedent relatives under federal common law, international law, and the law of Colombia, and all have standing to sue to recover their personal damages following the extrajudicial killings of their relatives. These Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as well as for the harm suffered by their murdered relatives leading up to and during their murders and for their loss of life. The Plaintiffs further seek equitable relief to prevent further human rights violations.

131. Plaintiffs bringing this lawsuit are the legal heirs of decedents who were murdered as a direct and proximate result of the conduct of Defendants.

132. As a direct and proximate result of decedents' untimely deaths, Plaintiffs have been permanently deprived of the decedents' love, care, companionship, comfort,

72

services, society, solace, contributions, financial support, physical assistance, affection and moral support and right to support, expectations of future moral support and counseling, as well as other benefits and assistance of decedent, inheritance rights and support of decedent, and thus have all suffered substantial damage.

133.   By reason of the conduct of the Drummond Defendants, Plaintiffs have incurred funeral and burial expenses in such amounts as will be proven at the time of trial. Plaintiffs have lost the use of interest on the money owed from the date of this incident until judgment as follows: on funeral and burial expenses; on loss of support; and on the pecuniary value of the loss of love, care, companionship, comfort, services, society, solace and moral support.

134.   Further, as a direct and proximate result of the conduct of the Drummond Defendants, as alleged herein above, the Plaintiffs identified herein were caused to suffer injuries to their persons, their mental and emotional health, their earning capacity, their property and their economic interests, and have suffered further mental and emotional distress. All of the above will be established according to proof.

## Second Cause of Action

### The Torture Victim Protection Act, 28 U.S.C. § 1350
### For Extrajudicial Killing on Behalf of
### All Plaintiffs Against All Defendants

135. Plaintiffs incorporate by reference paragraphs 1 through 134 of this Complaint as is set forth herein.

136. The Drummond Defendants engaged in acts and omissions intentionally and tortuously causing their co-venturers and/or agents to murder the decedents described herein. Specifically, as is alleged above, the Drummond Defendants managers, employees and/or agents, including Defendants Jimenez, Araujo, and Atkins, engaged in joint action with, and/or conspired with, AUC paramilitary forces that were operating under color of law, and, so acting, murdered the decedents described herein. Further, through their managers, employees and/or agents, including Defendants Jimenez, Araujo, and Atkins, the Drummond Defendants knowingly aided and abetted the AUC paramilitary forces that murdered the decedents described herein by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the AUC paramilitary forces to murder the decedents, as well as hundreds, if not thousands, of other innocent civilians who lived in the area that the AUC was assigned to control and provide security for by the Drummond

74

Defendants. Defendants realized substantial benefits from the murders described herein as they could not have operated their mine in the manner they were, without regard to the environment, without regard to health and safety of their workers, as well as those who lived in the community, unless the local population was terrorized by the AUC.

137.   The aforesaid acts violate the "extrajudicial killing" standard of the TVPA and were done with the complicity of state actors.   The AUC paramilitary security forces in the Cesar Province are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials.   According to the sworn statement of Rafael Garcia, a former DAS official, the DAS coordinated activities with the AUC at the highest levels. In engaging in joint action and/or a conspiracy with such paramilitary agents and other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph ¶121, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

138.   Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed

in paragraph ¶121, *supra*, resulted in the deaths of the decedents described herein. The Drummond Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the extrajudicial killing standard of the TVPA. Defendants are also vicariously liable for any violations of their employees or agents of the extrajudicial killing standard of the TVPA.

139. Plaintiffs are all legal beneficiaries following the murders of their decedent relatives under federal common law, international law, and the law of Colombia, and all have standing to sue to recover their personal damages following the extrajudicial killings of their relatives. These Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as well as for the harm suffered by their murdered relatives leading up to and during their murders and for their loss of life. The Plaintiffs further seek equitable relief to prevent further human rights violations.

## Third Cause of Action

## Wrongful Death on Behalf of All Plaintiffs Against All Defendants

140. Plaintiffs incorporate by reference paragraphs 1 through 139 of this Complaint as is set forth herein.

141. The Drummond Defendants committed, or acted in concert to commit, or

76

Defendants' employees or agents, committed acts that constitute wrongful death under the laws of Colombia, and that caused the deaths of the decedents herein.

142.   Defendants' actions and omissions were a direct and substantial cause of the deaths of the decedents herein. Defendants failed to use due care to protect them from injury and harm, thereby proximately causing their wrongful deaths.

143.   Plaintiffs are all legal beneficiaries following the murders of their relatives under federal common law, international law, and the law of Colombia and all have standing to sue for wrongful death. They have suffered damages, including emotional harm, loss of companionship and financial support, as a result of the murders of their relatives. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as a result of the murders of their relatives. The Plaintiffs further seek equitable relief to prevent further human rights violations.

## VIII. DEMAND FOR JURY TRIAL

144.   Plaintiffs demand a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a) enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b) declare that Defendants have violated Plaintiffs' human rights and the laws of the State of the United States and Colombia, as set forth herein;

(c) award Plaintiffs compensatory and punitive damages;

(d) grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other members of their communities in and around the Drummond facilities in Colombia;

(e) award Plaintiffs the costs of suit including reasonable attorneys' fees; and

(f) award Plaintiffs such other and further relief as the Court deems just under the circumstances.


Respectfully submitted this _____ day of May, 2009.

78

By _____

Garfield W. Ivey, Jr.
garve@iveylawyers.com
The Ivey Law Firm
315 West 19th Street
Jasper, AL 35502-1349
205-221-4644


Terrence P. Collingsworth
tc@conradscherer.com
Conrad & Scherer, LLP
731 8th Street, SE
Washington, DC 20003
202-543-4001

William R. Scherer
wrs@conradscherer.com
633 South Federal Highway
Ft. Lauderdale, FL 33301
954-462-5500

*Attorneys for Plaintiffs*

79