# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **JANE DOE, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:09-CV-01041-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

The court has before it the July 20, 2009 motion of Defendants Drummond Company Inc. ("DCI") and Drummond Ltd. ("DLTD") (at times collectively referred to herein as "Drummond") to dismiss the complaint (Doc. #13).  Pursuant to the court's orders of July 21 and 23, 2009, the motion to dismiss (Doc. #13) is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that the motion to dismiss has clear merit, but is due to be denied at this point in the proceedings because Plaintiffs have requested leave to amend the Complaint.  *See* FED. R. CIV. P. 15(a) (leave to amend should be freely granted when justice so requires).

## I.    <u>Relevant Procedural History and Facts</u>

Plaintiffs Jane Doe (1-166) and Peter Doe (1-81) commenced this action on May 27, 2009 by filing a complaint (Doc. #1) in this court for equitable relief and damage under the Alien Torts Claims Act ("ATS"), Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, and Colombian wrongful death law.  (*See* Compl. ¶¶ 122-44).  Plaintiffs allege that they are wives and legal heirs,

parents and legal heirs, and children and legal heirs of those "murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond to provide security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels." (Compl. ¶ 15). Plaintiffs "seek damages for the loss of their relative who was an innocent civilian murdered in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC[.]" (Compl. ¶ 15). Allegations center on the contention that Defendants DCI and DLTD paid and conspired with paramilitaries, specifically the United Self Defense Forces of Colombia ("AUC"), to harm union leaders and provide security for Drummond's rail line and facilities. (Compl. ¶ 106; *see also* Doc. #20 at 1).

Plaintiffs assert that each of the killings at issue was an "extrajudicial killing" in "violation of the law of nations" under the Alien Tort Statute and in violation of the Torture Victims Protection Act. They claim that the Defendants are liable for those killings because the paramilitaries carried them out as Defendants' "agents," and because the Defendants provided the paramilitaries with "knowing and substantial assistance," and conspired with, aided and abetted, and engaged in "joint action" with the paramilitaries in carrying out the murders. (Compl. ¶¶ 106-20).

Defendants DCI and DLTD now come before the court with the pending motion to dismiss, contending that the complaint is due to be dismissed in its entirety for the following reasons: (1) Plaintiffs have not adequately pled aiding and abetting liability, because they fail to allege facts showing that the Defendants intended, or had actual knowledge, that their purported payments for security would assist these murders; (2) Plaintiffs' conspiracy claims fail because they do not allege that anyone acting on Drummond's behalf had a "meeting of the minds" with the paramilitaries to

commit the murders; (3) Plaintiffs have failed to allege "state action" as required under the ATS and TVPA; (4) Plaintiffs have failed to exhaust adequate remedies available to them in Colombia; (5) Plaintiffs lack standing; (6) Plaintiffs' ATS claims must be dismissed because the TVPA provides the exclusive cause of action for extrajudicial killing; (7) the TVPA provides an action only for U.S. residents and the Plaintiffs all reside abroad; (8) the TVPA applies only to individuals and not to corporate defendants; and (9) the court should decline to exercise supplemental jurisdiction over Plaintiffs' claims for wrongful death under Colombian law. (Doc. #13 at 4-5).  Each possible ground for dismissal will be discussed below.

## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  A court may dismiss a complaint under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  That is, if a plaintiff "ha[s] not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.*; *see Ashcroft v. Iqbal*, 139 S.Ct. 1937, 1953 (2009) (holding that *Twombly* was not limited to antitrust cases but rather was based on an interpretation and application of Federal Rule of Civil Procedure 8).

In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)).  "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal."

*Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc)).  Further, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* [plausible] theory."[1]  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967).  Nevertheless, conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal.  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *see Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[A] plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim.  We will thus not accept as true conclusory allegations or unwarranted deductions of fact.") (internal citations omitted); *Kirwin v. Price Commc'ns. Corp.*, 274 F. Supp. 2d 1242, 1248 (M.D. Ala. 2003) ("[A]lthough the complaint must be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged."), *aff'd in part*, 391 F.3d 1323 (11th Cir. 2004).

## III.   **Analysis**

As earlier set out, Defendants maintain eight (8) grounds for the dismissal of the complaint: (1) Plaintiffs have not adequately pled aiding and abetting liability, because they fail to allege facts showing that the Defendants intended, or had actual knowledge, that their purported payments for security would assist these murders; (2) Plaintiffs' conspiracy claims fail because they do not allege that anyone acting on Drummond's behalf had a "meeting of the minds" with the paramilitaries to

---

[1] *Twombly* teaches that the correct standard is whether a plaintiff's claims are "plausible." 550 U.S. at 547.

commit the murders; (3) Plaintiffs have failed to allege "state action" as required under the ATS and

TVPA; (4) Plaintiffs have failed to exhaust adequate remedies available to them in Colombia; (5)

Plaintiffs lack standing; (6) Plaintiffs' ATS claims must be dismissed because the TVPA provides

the exclusive cause of action for extrajudicial killing;[2] (7) the TVPA provides an action only for U.S.

residents and the Plaintiffs all reside abroad; (8) the TVPA applies only to individuals and not to

corporate defendants;[3] and (9) the court should decline to exercise supplemental jurisdiction over

---

[2] The court rejects, without further discussion herein, Defendants' contention (mentioned only for the sake of preserving it for appeal) that Plaintiffs' ATS claims should be dismissed on the ground that the TVPA provides the exclusive cause of action for claims of extrajudicial killing.  (*See* Doc. #13 at 48).  The Eleventh Circuit has concluded that the TVPA is not the exclusive remedy for such claims.  *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1250-51 (11th Cir. 2005) ("To accept that the Torture Victim Protection Act provides the exclusive remedy for acts of torture is to accept that it amends the Alien Tort Act.  Such an intent to amend is not apparent from the face of the statute, and amendments by implication are disfavored.") (internal citations omitted); *see also Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1316 (11th Cir. 2008) ("As Drummond also acknowledges, the law of this Circuit suggests that the Torture Act is not the exclusive cause of action for claims of extrajudicial killing.").

[3] Defendants' two arguments which are enumerated numbers (7) and (8) are, presumably, presented only for the purpose of preserving them for appeal.  No court has ever accepted the argument that "aliens" are not covered by the TVPA, and this court does not intend to do so.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1263 (11th Cir. 2009) ("The TVPA is broader than the ATS in that the TVPA allows citizens, as well as aliens, to seek remedy in federal court for official torture.") (internal citations omitted).  S*inaltrainal* also makes clear that the TVPA applies to corporations as well as individuals.  *See id.* at 1264, n.13 ("This Court has determined 'an individual' to whom liability may attach under the TVPA also includes a corporate defendant.") (internal citations omitted).  Because *Sinaltrainal* is binding authority, this court need not give Defendants' arguments on these points any further consideration.

Plaintiffs' claims for wrongful death under Colombian law.[4]  (Doc. #13 at 4-5).  Each ground not heretofore analyzed by footnote is considered below.

### A.        Subject Matter Jurisdiction under the Alien Tort Claims Act

Federal subject-matter jurisdiction exists under the ATS when the following three elements are satisfied: (1) an alien (2) sues for a tort (3) committed in violation of the law of nations.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005)).  The first two aspects of jurisdiction are not in dispute in this case.  What is in dispute in this case, as in most ATS cases, is whether Plaintiffs have satisfactorily pled a violation of the law of nations.[5]  *See In re Sinaltrainal Litigation*, 474 F. Supp.2d 1273 (S.D. Fla. 2006) ("There is no federal subject-matter jurisdiction

---

[4] Defendants' alternative argument is that venue should be transferred from the Western Division of the Northern District of Alabama to the Southern Division of the Northern District of Alabama. (*See* Doc. #13 at 52-53).  Plaintiffs do not oppose such transfer. (*See generally* Doc. #20).  Because DCI conducts the vast majority of its business in Birmingham, Alabama, and DLTD, as a wholly owned subsidiary of DCI, does no business in the Western Division of the Northern District of Alabama, this case is due to be transferred to the Southern Division pursuant to 28 U.S.C. §§ 1404 and 1406.

[5] As with certain other kinds of claims, claims brought under the ATS are subject to a heightened pleading standard.  *See Sinaltrainal*, 256 F. Supp.2d at 1352.  The heightened pleading standard requires that the complaint identify facts showing that defendants violated a specific international law.  Jurisdictional concerns are not satisfied by merely alleging a colorable violation of the law of nations.  *See Villeda Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp.2d 1285 (S.D. Fla. 2003), *aff'd in part, vacated in part*, 416 F.3d 1242 (11th Cir. 2005) (citing *Sinaltrainal*, 256 F. Supp.2d at 1352)).  The "paucity of suits successfully maintained under [the ATS] is readily attributable to the statute's requirement of alleging a violation of the law of nations at the jurisdictional threshold." *Villeda Aldana*, 305 F. Supp.2d at 1292 (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 887-888 (2d Cir. 1980)).  Although Plaintiffs' claims raise significant issues of international law, the task before the court is not to resolve them; rather, the court must determine whether the complaint adequately pleads a violation of the law of nations.  *See Villeda Aldana*, 305 F. Supp.2d at 1292.

under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States).") (citing *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d. Cir. 1996)).

A violation of the law of nations is broadly understood as a violation of the norms of customary law. *See Sinaltrainal*, 578 F.3d at 1261. In discussing the norms of customary international law, the Supreme Court has noted the limited category of claims that federal courts could entertain at the time the ATS was enacted were "defined by the law of nations and recognized at common law." *Id.* (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004)). Offenses against the law of nations principally involved the rights or interests of whole states or nations, and did not necessarily involve the private interests of individuals seeking relief in court. *See id.* (citing *Sosa*, 542 U.S. at 720). The law of nations are defined as "[t]he standards by which nations regulate their dealings with one another." *Id.* (citing *Cohen v. Hartman*, 634 F.2d 318, 319 (5th Cir. Unit B Jan.1981) ("[T]he general consensus is that the law [of nations] deals primarily with the relationship among nations rather than among individuals.")).

The modern line of ATS cases initially involved state actors violating the law of nations, but subsequent cases have expanded that scope to impose liability on private individuals and corporations. *See Sinaltrainal*, 578 F.3d at 1262-63 (outlining the history of ATS cases); *see also Kadic*, 70 F.3d at 242 (holding that acts such as genocide and war crimes "violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."); *Romero*, 552 F.3d at 1316 ("Under the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation."). Thus, to survive the pending motion to dismiss the ATS claims, Plaintiffs must establish either that the paramilitaries

7

were state actors as defined by Eleventh Circuit law, or that the murders they have alleged constitute

war crimes.  Plaintiffs' attempt to establish a violation of the law of nations in the current Complaint

fails on both fronts.

### 1.    State Action Analysis.

Defendants initially assert that Plaintiffs' claims under the ATS should be dismissed because

the Complaint fails to allege facts showing that the paramilitaries were state actors or acting under

color of law.  (*See* Doc. #13 at 29).  Plaintiffs counter that they have presented sufficient details to

establish that the AUC (paramilitaries) acted "jointly" with the Colombian government, and that

specific government officials were involved in Drummond's plan to support the AUC leftists.  (*See*

Doc. #20 at 31).  In support of their counter-argument, Plaintiffs quote, at length, allegations of the

complaint.  What those allegations may establish (for purposes of a motion to dismiss), however, is

that there is a **_general_** relationship between the paramilitaries and the Colombian government.[6]  But

---

[6] For example, Plaintiffs have alleged that:

- Rafael Garcia was Director of the computer system office of the Colombian Administrative Department of Security (DAS).  Garcia also worked with and supported the AUC paramilitaries.  He served as the AUC's political advisor.  While serving at the DAS, he also acted as liaison between Director Jorge Noguera and the AUC Northern Block leader, Jorge 40.  The AUC and the DAS worked closely together to further their joint mission of ridding Colombia of leftist guerilas.  In early 2001, when he was working as political advisor to the AUC, Garcia traveled to Valledupar along with Jorge Castro Pacheco, who served as Jorge 40's representative. Garcia attended a meeting at the Hotel Sicarare in Valledupar with Jorge Castro Pacheco, of Ariguani, a municipality in Magdalena, Colombia . . . At this meeting, Garcia witnessed Defendant Araujo give Jorge Castro Pacheco a suitcase filled with money.  Defendant Araujo and Jorge Castro Pacheco talked openly about the purpose of this money – to take violent measures against union workers at Drummond. (Compl. ¶ 6C).
- The AUC had bases in and around the Drummond property.  (Compl. ¶ 9).
- The collaboration between the AUC and the government of Colombia goes to the highest levels and ensures that no serious action will be taken to bring to justice in

Colombia those involved in the murders alleged herein.  (Compl. ¶ 11).

- The close military-paramilitary collaboration in several regions allowed the paramilitaries to commit massacre after massacre of civilians largely unimpeded and with impunity.  (Compl. ¶ 12).

- It is universally acknowledged that the regular military in Colombia, and the civil government authorities, tolerate the paramilitaries, allow them to operate, and often cooperate, protect and/or work in concert with them.  (Compl. ¶ 90).

- Paramilitary groups continue to thrive and enjoy *de facto* approval from the government, and the Colombian military outsources its "dirty work" to the paramilitaries in an attempt to clean up its own international image.  (Compl. ¶ 93).

- The paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship with the Colombian government's military.  The facts supporting the ongoing symbiotic relationship between the military and the paramilitaries in Colombia include that active and retired military actually set up paramilitary units, the military provides the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries conduct missions at the request of the military.  (Compl. ¶ 94).

- The close, symbiotic relationship between the military and the paramilitaries in Colombia is so widely acknowledged that the U.S. State Department confirms this fact without reservation.  (Compl. ¶ 95).

- The U.N. High Commission explains that the links between the paramilitaries and the State continue and indeed are intensifying.  (Compl. ¶ 96).

- The UNHCR stated that there remains "open collusion" on the part of Colombian security forces with paramilitaries and that there is continued expansion and consolidation of paramilitaries in several areas.  (Compl. ¶ 98).

- For a number of years, the location in which Defendants operate in Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen.  Indeed, Drummond allowed its vast property around its coal mine to serve as a joint base for the military and the AUC in that area, and there was frequent collaboration between the military and the AUC due to Drummond's provision of a safe haven for the AUC. (Compl. ¶ 100).

- The close, symbiotic relationship between the military and paramilitaries in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia.  (Compl. ¶ 101).

- As a consequence of the official vilification of "leftists" and "guerilla sympathizers" by the Colombian government, this serves as an open invitation to paramilitaries to target innocent civilians living in areas where there was a FARC presence with violence.  Garcia testified that he witnessed Drummond making payments to the AUC to murder the union leaders at Drummond.  (Compl. ¶ 104).

- Defendants use the services of the Colombian military to protect its mining facilities, railway lines, and U.S. workers in Colombia.  Defendants do so with specific knowledge that some of the local military supported by the company cooperate with

the Eleventh Circuit requires more than allegations of a general, joint relationship.

> Allegations that the Colombian government tolerated and permitted the paramilitary forces to exist are insufficient to plead the paramilitary forces were state actors. The plaintiffs make the naked allegation the paramilitaries were in a symbiotic relationship with the Colombian government and thus were state actors. Nevertheless, in testing the sufficiency of the plaintiff's allegations, we do not credit such conclusory allegations as true. ***We demand allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint to satisfy the requirement of state action***.

*Sinaltrainal*, 578 F.3d at 1266 (internal citations and quotations omitted); *see also Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001)[7] ("To charge a private party with state action under this standard, the governmental body and private party must be intertwined in a symbiotic relationship . . . The Supreme Court has indicated that the symbiotic relationship must involve the specific conduct of which the plaintiff complains.") (internal citations and quotations omitted).

Plaintiffs have wholly failed to meet the standard required by the Eleventh Circuit. There is no suggestion that the Colombian government was involved in, much less aware of, the murders alleged in the complaint. *See id.* That certain individuals may have worked for the Colombian

---

the paramilitaries that also operate on the Drummond property and act on behalf of Drummond. (Compl. ¶ 106).

- The AUC paramilitary forces in the Cesar Province are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents and other state government officials, Defendants acted under color of state law. (Compl. ¶¶ 128, 137).

Of course, Plaintiffs conclusory allegations that the paramilitary forces acted under color of law are (1) not entitled to be assumed true and (2) insufficient to allege state-sponsored action. *See Sinaltrainal*, 578 F.3d at 1266 (citing *Iqbal*, 129 S. Ct. at 1951).

[7] Courts look to the jurisprudence of 42 U.S.C. § 1983 for guidance in evaluating whether state action is established under the ATS. *See Aldana*, 416 F.3d at 1247.

government, as well as the AUC, does not create state action in the face of the 67 murders that form the basis of the Complaint.[8]   In fact, there is nothing more than a "formulaic recitation" that the paramilitary forces were in a symbiotic relationship and were assisted by the Colombian government, absent any supporting factual allegations.  *See id.* at 1266.   As such, the demanding standard established by the Eleventh Circuit, here that the paramilitaries acted as an arm of the state when they murdered the decedents presented by the Complaint, has not been met.  *See Romero*, 552 F.3d at 1317-18.

### 2.      War Crimes Exception.

The court's inquiry does not stop there, however, because under the ATS Plaintiffs need not plead state action for claims of murder perpetrated in the course of war crimes.  *See Kadic*, 70 F.3d at 242-43 (holding war crimes "committed in the course of hostilities" violated fundamental international law and thus were actionable under the ATS).   Some acts, such as torture and murder committed in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual.  *Romero*, 552 F.3d 1316; *Kadic*, 70 F.3d at 239, 243 ("[T]orture and summary execution-when not perpetrated in the course of genocide or war crimes-are proscribed by international law only when committed by state officials or under color of law.").   Simply put, the war crimes exception dispenses with the state action requirement for claims brought under the ATS.  (*See* Doc. #13 at 34; *see also* Doc. #20 at 8).

The parties agree that Article 3 of the Geneva Convention makes it a violation of the law of war for a combatant to an "armed conflict not of an international character" to kill an innocent

---

[8] The murders at issue here are not alleged to involve union leaders or members.

victim.  (*See* Doc. #13 at 35; *see also* Doc. #20 at 9).   Noncombatants are protected from human rights violations committed by "all parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents."  *Kadic*, 70 F.3d at 243.  However, to establish a claim using the war crimes exception, Plaintiffs must do more than simply allege murder of an innocent person during an armed conflict.  They must establish: (1) that there was an armed conflict; (2) that the AUC and the FARC were parties to the conflict; and (3) that Plaintiffs were killed in the "course of hostilities."  *See id.* at 242 (declining to make a blanket holding that any alleged violation of Common Article 3 would be sufficient for the purposes of the ATS); *see also Saperstein v. Palestinian Authority*, 2006 WL 3804718, No. 1:04-cv-20225-PAS, at *8 (S.D. Fla. Dec. 22, 2006) ("[T]he Second Circuit in *Kadic* based much of its analysis of the definition of "war crimes" on Common Article 3. However, Plaintiffs then make the overreaching leap by stating that if the conduct falls within Common Article 3 and is prohibited thereby, then they have sufficiently alleged a violation of the law of nations for purposes of the ATS.  Essentially, Plaintiffs are saying that if they allege a murder of an innocent person during an armed conflict, then they have alleged a per se violation of the law of nations and federal courts have subject matter jurisdiction over the dispute under the ATS.  No court has so held.") (internal citations omitted).

The parties agree on the elements that are required to establish the war crimes exception, and further agree that the heart of the dispute lies in whether the acts of murder are alleged to have been committed "in the course of hostilities" between the AUC and the FARC, or rather as a means to further Drummond's security objectives.  (*See* Doc. #13 at 35; *see also* Doc. #20 at 9).   The Complaint makes clear from its very first allegation that the AUC has been involved in a "reign of terror" in areas of Colombia where FARC leftist guerillas were operating, notably the Cesar

Province, where Drummond's mine is located, and in Magdalena, where Drummond's port is located. (Compl. ¶ 1). As part of its financial strategy, it is alleged that the AUC approached business interests, *i.e.*, Drummond, with a proposal that, in exchange for financial support, the AUC would drive the FARC out of the areas of the businesses operated and provide ongoing security from the FARC. (Compl. ¶ 3). Plaintiffs allege that Drummond agreed to that proposal with the clear understanding that the AUC was to drive the FARC out of Drummond's areas and "pacify the population" – testimony from "top AUC officials" allegedly reveals that "Drummond provided substantial support to the AUC to provide security and other services to protect the Drummond mine, railroad, and other facilities from attacks by the FARC and also to pacify the local population." (Compl. ¶¶ 6, 6D). Armed with money from Drummond, the AUC's Juan Andres Alvarez Front allegedly murdered hundreds of people "solely because Drummond brought the Juan Andres Alvarez Front to the area of the railroad, provided it with substantial financial and other material support, and directed it to clear the area of suspected rebels and guerillas." (Compl. ¶ 6E).

> All of the decedents described herein [were] . . . murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond to provide security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels. The [executions were] in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC.

(Compl. ¶ 15). What is not alleged is that Drummond intentionally "took a side" in the political unrest in Colombia in order to advance one side of those interests as opposed to the other, as is required in this Circuit to state a claim under the war crimes exception to the ATS.

In *Sinaltrainal*, the plaintiffs alleged that defendants' agents committed the "tortious actions … in connection with and in furtherance of [defendant's] business interests and activities," rather than

in furtherance of war hostilities.  *In re Sinaltrainal Litigation*, 474 F. Supp.2d at 1288.  Similar to

Plaintiffs here, the *Sinaltrainal* plaintiffs made general allegations about the state of civil war in

Colombia.  But also just like Plaintiffs in this case, they utterly "fail[ed] to identify any allegations

that the acts were committed in furtherance of war hostilities." *Id.* at 1287-88.  That is, the core of

the *Sinaltrainal* complaint was that "the paramilitaries were working as agents of the corporations

doing business in Colombia," *i.e.* at 1288, and the same is the case here.  Although the Complaint

alleges that Drummond "supported" the AUC to advance self-serving business interests, it does

nothing to establish anything other than that Drummond "took advantage of a civil war to further

their business interest." *In re Sinaltrainal*, 474 F. Supp.2d at 1288-89.  This is the gravamen of the

Complaint.  *See Sinaltrainal*, 578 F.3d at 1267.  As the *Sinaltrainal* district court well-stated:

> These general allegations that Defendants took advantage of a civil war to
> further their business interest seem a far cry from the universal offenses in
> *Kadic*, where the defendant was alleged to possess "ultimate command
> authority" and where he was alleged to have "personally planned and ordered
> a campaign of murder, rape, forced impregnation, and other forms of torture
> designed to destroy the religious and ethnic groups of Bosnian Muslims and
> Bosnian Croats." 70 F.3d at 237, 243.  The Second Circuit, in discussing war
> crimes, emphasized that international law "imposes an affirmative duty on
> military commanders to take appropriate measure within their power to
> control troops under their command for the prevention of such atrocities."
> *Id.* at 243. Furthermore, the Second Circuit has also held that "indirect
> economic benefit from unlawful state action is not sufficient to support
> jurisdiction over a private party under the Alien Tort Claims Act." *Bigio v.
> Coca-Cola*, 239 F.3d 440, 449 (2d. Cir.2000).  The Defendants in the instant
> case fail to specifically identify sources of international law which afford the
> Defendants any similar affirmative duty for a private corporation to prevent
> the atrocities alleged in the Complaints.

*In re Sinaltrainal*, 474 F. Supp.2d at 1288-89.

If Plaintiffs' claims as set out in the current Complaint were sufficient to allow subject matter

jurisdiction to attach under the ATS, then whenever an innocent person was murdered during an

14

"armed conflict" anywhere in the world, whether it be Bosnia, the Middle East, Darfur, or Sudan, the federal courts would have subject matter jurisdiction over the dispute. Clearly, such an interpretation would not only tend to convert district courts into international courts of civil justice, it would be in direct contravention of the Supreme Court's specific prudential guidance admonishing lower courts to be cautious in creating new offenses under the law of nations. *See Sosa*, 542 U.S. at 725; *see also Saperstein*, 2006 WL 3804718, at *8. For these reasons, Plaintiffs have failed to establish jurisdiction under the war crimes exception to the ATS.

**B.      Secondary Liability Under the Alien Tort Claims Act**

Even had Plaintiffs sufficiently alleged ATS claims under a state action or war crimes theory, those claims would nevertheless fail. The ATS claims are premised on two theories of secondary liability – aiding and abetting and conspiracy – but neither of those theories have been sufficiently pled to survive the pending motion to dismiss. Each theory is considered in turn below.

**1.      Aiding and Abetting.**

The Eleventh Circuit has specifically held that a claim under the ATS may stand on the indirect liability theory of aiding and abetting.[9] But the exact contours of such a claim have not been fleshed out. *Cabello v. Fernandez-Larios* came the closest. 402 F.3d 1148 (11th Cir. 2005). In *Cabello*, the Eleventh Circuit quoted a jury instruction on the aiding and abetting standard: (1) one or more of the wrongful acts that comprise the claim were committed; (2) defendants substantially assisted some person or persons who personally committed or caused one or more of the wrongful

_____

[9] Defendants, while recognizing that the Eleventh Circuit binds this court to accept the premise that aiding an abetting claims are cognizable under the ATS, preserve their argument, for appeal purposes, that aiding and abetting liability is not cognizable under the ATS as a matter of law. (*See* Doc. #13 at 8, n.5).

acts that comprise the claim; and (3) Defendants knew that their actions would assist in the illegal or wrongful activity at they time they provided the assistance. *See id.* at 1158.   But that instruction was quoted without analysis because the question of the veracity of the instruction was not an issue on appeal.[10]  *See id.*; *see also Denson v. U.S.*, 574 F.3d 1318, 1350 (11th Cir. 2009) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend ...."); *Swann v. So. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004) ("[T]he prior panel rule does not extend to dicta."); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring) ("[D]icta in our opinions is not binding on anyone for any purpose.")).  As such, an essential question hangs in the balance and this court addresses that question on a clean slate in this Circuit – whether ATS aiding and abetting liability requires the element of intent.

Notwithstanding the dicta in *Cabello*, this court is convinced that the international law standard applies to aiding and abetting claims brought under the ATS.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp.2d 633, 665, n.64 (S.D. N.Y. 2006) (drawing on international law, not domestic law, for the standard to be applied to aiding and abetting claims), *aff'd* 582 F.3d 244 (2d. Cir. 2009).  In case after case, courts have consistently subjected ATS aiding and abetting claims to the international law standard. *E.g., Khulumani v. Barclay Nat'l Bank*, 504 F.3d 254, 276 (2d. Cir. 2007) (Katzman, J., concurring) (relying in part on the Rome Statute of the

---

[10] Fernandez-Larios's issues on appeal were: (1) that the plaintiffs' claims are barred by the statute of limitations; (2) that neither the TVPA, nor the ATCA provide private causes of action such as this one; (3) that he did not have any command responsibility and did not personally participate in the alleged human rights violations, and, as a result, he is not liable under the TVPA or the ATCA; and (4) that the trial court erred in admitting certain depositions into evidence and denying his pretrial motion in limine to restrict evidence as to the treatment of plaintiff.  *See Cabello*, 402 F.3d at 1151-52.

International Criminal Court, which "has been signed by 139 countries and ratified by 105, including most of the democracies of the world," for appropriate aiding and abetting standard); *Almog v. Arab Bank PLC*, 471 F. Supp.2d 257, 286, n. 33 (E.D. N.Y. 2007) (collecting cases using international law). (*See* Doc. #13 at 8-19; *see also* Doc. #20 at 14-22).[11]  Now this court does so as well.

Thus, to survive the motion to dismiss, Plaintiffs here must allege that: (1) the principal violated international law; (2) the defendant knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation. *See Presbyterian Church*, 453 F. Supp.2d at 668.  The central dispute here is whether Plaintiffs have sufficiently alleged facts to establish that Drummond *intended to assist* with the specific 67 murders alleged in the complaint. (*See* Doc. #13 at 11; *see also* Doc. #20 at 14-22).

Plaintiffs use the following timeline of events to address Drummond's conduct under the aiding and abetting standard of the ATS:

- The AUC, since 1996, has been engaged in a "reign of terror" in areas of Colombia where leftist guerillas, such as FARC, were operating on the belief that all of those who lived in FARC territory supported FARC leftist ideology. (Compl. ¶¶ 1-2).

- Top AUC leaders have stated that Drummond provided substantial support to the AUC to provide security and other services to protect the Drummond mine, railroad, and other facilities from attacks by the FARC. (Compl. ¶ 6).  For example, one of Drummond's managers arranged with "Jorge 40," the leader of AUC's Northern Block, for Drummond to make substantial payments to help establish and support the

---

[11] Although Plaintiffs quote *Cabello* as "approv[ing] a three-part test for determining aiding and abetting liability," they also note that "[u]nder international law, a similar aiding and abetting standard of knowing, substantial assistance has been applied since at least the Nuremberg cases." (Doc. #20 at 14, n. 14).

Juan Andres Alvarez Front of the AUC to provide security and other services along Drummond's rail line in Cesar Province.  (Compl. ¶ 6A).

• Defendant Atkins, on behalf of Drummond, approved a payment to the AUC for the assassination of the top leaders of the Drummond Union.  (Compl. ¶ 6B).

• In a meeting with leaders of the AUC, Drummond officials heard Jorge 40 congratulate another AUC leader, Tolemaida, for the successful operation of executing two Drummond union leaders, Locarno and Orcasita.  (Compl. ¶ 6D).  At the same meeting, Drummond, through its agents, made an agreement with Jorge 40 to make a large cash payment to the AUC, $1.5 million along with regular monthly payments of $100,000 to support new AUC troops and equipment.  (Compl. ¶ 6D).  The main assignment was to protect Drummond's rail line.  (Compl. ¶ 6D).

• From 1999, when Drummond first started providing substantial funds to the Juan Andres Alvarez Front to March 2006, when the Colombian government demobilized the AUC's Northern Block, hundreds of people were executed by the Juan Andres Alvarez Front during the course of its security operations for Drummond.  (Compl. ¶ 6E).

• Plaintiffs are family members of innocent civilians who resided or worked in the area of the Drummond rail line, and were murdered by the Juan Andres Alvarez Front as part of a campaign of terror to pacify the region for Drummond's benefit.  (Compl. ¶ 6E).  Plaintiffs are heirs of individuals who were murdered by paramilitaries who were members of the AUC.  Many of the Plaintiffs were themselves terrorized when the AUC attacked their homes and murdered their family members.  This was a strategy employed by the AUC to keep the survivors of the AUC's violent attacks on communities under the AUC's control.  (Compl. ¶ 7).

• When Drummond hired, provided material support to, and directed the overall mission of the Juan Andres Alvarez Front, Drummond knew that hundreds or even thousands of people living in the railroad corridor would be executed as part of the AUC's method for terrorizing a population.  (Compl. ¶ 9).

• In providing security for Drummond, the Juan Andres Alvarez Front murdered hundreds of innocent civilians and displaced thousands more because it is easier to secure an area if there are little or no people living there.  (Compl. ¶ 111).

• With the ongoing support from Drummond, the Juan Andres Alvarez Front continued to provide security and other services to Drummond, and in the process, continued to terrorize innocent civilians who lived along Drummond's rail corridor or near the mining facilities and other Drummond facilities.  (Compl. ¶ 118).

- Drummond is responsible for establishing a major force of the AUC, the Juan Andres Alvarez Front, in Cesar, and providing the funds to arm and mobilize these AUC troops that ultimately terrorized the innocent civilians in the area of Drummond's facilities and murdered the relatives of the Plaintiffs herein.  (Compl. ¶ 119).

Then, with their notice of supplemental factual material, Plaintiffs introduced additional facts that would have been included in the original complaint had they been available at the time of that filing. (*See* Doc. #25 at 1).  A sworn declaration of Jario Jesus Charris Castro, who was recently sentenced by Colombian authorities to 30 years in prison for his role in the assassinations of Valmore Locarno Rodriquez and Victor Hugo Orcasita Amaya,[12] is attached.  In relevant part that declaration reads:

- Mr. Jim Atkins [Drummond's head of security] asked Jaime Blanco [Drummond's food contractor] if he had ties to the AUC [the main paramilitary force] in Cesar, and Jaime Blanco responded that he knew Commander Juan Carlos, alias "Tolemaida," commander of the Juan Andres Alvarez front.  Jim Atkins told Jaime Blanco that he should talk to Commander Tolemaida, to get him to provide security for the railway and to do some other "jobs," meaning using force to get rid of the opposition from the union.  Additionally, Atkins mentioned that the decision to dismantle the union SINTRAMIENERGETICA was a direct order from Gary Drummond and Mike Tracy.  That same day, Atkins verbally gave Jaime Blanco the names of the Drummond unionists . . . so that he could give them to Commander Tolemaida. (Doc. #25, Exh. A at ¶ 7).

- In that same meeting, Jaime Blanco asked Jim Atkins which of the directors, besides Gary Drummond and Mike Tracy, knew about this "job" to get rid of the Drummond unionists.  Mr. Jim Atkins told him in addition to Mike Tracy and Gary Drummond, that Augusto Jiminez, Alfredo Araujo . . . all had the trust of the company and were all in agreement that the AUC should take the lives of these unionists.  (Doc. #25, Exh. A at ¶ 8).

- Mr. Jim Atkins told Jaime Blanco that Valmore Locarno and Victor Hugo Orcasita should be the first to be assassinated, because they were working the day shift and would leave the mine the following Monday afternoon to head to Valledupar.  Jim Atkins said that the other unionists could be killed later.  Mr. Jim Atkins said that he would give the order to Coronel Luis Carlos Rodriguez to notify Commander Tolemaida by phone when the unionists were leaving the mine.  (Doc. #25, Exh. A at ¶ 9).

---

[12] These individuals are alleged to be two of the murdered unionists at Drummond.

Defendants contend that these allegations "stop[] short of alleging that Drummond's desire for 'security services' included murder of innocent civilians" and "fail to provide any factual support for the bald assertion that the alleged murders were committed during the course of providing security for Drummond's rail line (much less that these murders were specifically intended by Drummond.)" (Doc. #13 at 12-13). Absent such allegations, it is Defendants' position that Plaintiffs have fallen short of meeting their requirement to show that Drummond intended to assist with the specific murders alleged in the Complaint.

*Presbyterian Church* considered what may constitute intent in the context of a motion for summary judgment. 453 F. Supp.2d at 669. In that case, plaintiffs claimed that defendant Talisman paid royalties to the Sudanese government, which were then used to purchase large amounts of weaponry that was turned against plaintiffs. *Id.* at 675. Although the *Presbyterian Church* plaintiffs offered evidence that Talisman "believed that the government used oil revenues to buy armaments" and that the government had previously used violence, the court cautioned that "[k]nowledge that such attacks had occurred and would likely occur again does not provide circumstantial evidence of an intent to assist in those attacks by the payment of royalties. The plaintiffs have pointed to no evidence that Talisman urged that such attacks be made . . . The connection between the payment of royalties and the Government attacks on civilians is simply too indirect to permit the payment of royalties itself to serve as circumstantial evidence of an intent to assist in the Government's commission of war crimes and crimes against humanity."). *Id.* at 676.

*Presbyterian Church* was affirmed by the Second Circuit early this month. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009). In affirming the district

court's decision that plaintiffs had not established aiding and abetting liability under the ATS, the Second Circuit specifically held that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone.  Even if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law, no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law."  *Presbyterian Church*, 582 F.3d at 259 (emphasis in original).  Because the *Presbyterian Church* cases are consistent with *Sosa*'s command that courts act as "vigilant door keep[ers]" and exercise restraint in recognizing new causes of action under the ATS, 542 U.S. at 729, this court finds them persuasive and well-reasoned, and adopts their reasoning here.

The similarities between the *Presbyterian Church* opinions and this case are readily apparent.  Plaintiffs allege that Drummond made payments to the AUC for the purpose of securing the company's rail lines and mines.  In providing those monetary resources, Drummond allegedly served, however inadvertently, to shore up the forces of the AUC such that they would be a formidable force against the FARC.  But there are no allegations even purporting to establish that Drummond "was a partisan in regional, religious, or ethnic hostilities" or that Drummond "acted with the purpose to assist persecution."  *Id.* at *17.  Rather, the Complaint as drafted alleges that Drummond acted to support its own selfish business interests and that Drummond gained economic benefit from unlawful state action.  *In re Sinaltrainal*, 474 F. Supp.2d at 1288-89.  That is the extent of the allegations, and that is not enough.  As such, the Complaint fails to state a claim for aiding and abetting liability under the ATS.

21

## 2.    Conspiracy.

Plaintiffs alternative theory of secondary liability under the ATS is that of conspiracy.  Most courts have held that international law applies the charge of conspiracy in only two circumstances: "conspiracy to commit genocide and common plan to wage aggressive war."  *Hamdan v. Rumsfeld*, 548 U.S. 557, 610 (2006).   However, in *Cabello v. Fernandez-Larios*, the Eleventh Circuit recognized conspiracy liability under the ATS for a number of violations of international law, including crimes against humanity such as extrajudicial killing.[13]   402 F.3d 1148, 1159 (11th Cir. 2005) (per curiam).

Under *Cabello*, establishing the existence of a conspiracy under the ATS requires the following: (1) two or more persons agreed to commit a wrongful act; (2) defendants joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.  *Id.* (citing *Halberstam v. Welch*, 705 F.2d 472, 481, 487 (C.A. D.C. 1983)).  The recent Second Circuit decision of *Presbyterian Church of Sudan v. Talisman Energy, Inc.* sheds further light on the practical requirements of these elements.[14] A claim of conspiracy under the ATS requires the same proof of *mens rea* as aiding and abetting claims – a showing of intent to violate the law of nations, and not merely knowledge of such a violation.  582 F.3d at 260.  Further, the *Pinkerton* doctrine – pursuant to which conspirators may

---

[13] Defendants recognize that the *Cabello* decision is binding on this court, yet preserve for appeal the issue of whether conspiracy to commit extrajudicial killing is a violation of the law of nations under the ATS.  (*See* Doc. #13 at 19, n.9).

[14] Again, while not binding, this court finds both *Presbyterian Church* opinions to be well-reasoned and well thought-out, and highly informative when considered in connection with the facts before this court.

be held liable for acts of co-conspirators that they did not intend, but which were reasonably foreseeable – is not "universally recognized" under international law, and therefore it may not be a basis for liability under the ATS.  582 F.3d at 260.

Under that framework, Plaintiffs' claims of conspiracy under the ATS fail several times over. First, Plaintiffs contend that the several alleged meetings between Drummond and the AUC (heretofore described in the aiding and abetting section),[15] resulted in Drummond's agreement to fund and arm the Juan Andres Alvarez Front, thus establishing conspiracy.[16]  (*See* Doc. #20 at 22; *see also* Compl. ¶¶ 1, 2, 6, 6A, 6D, 6E, 6F, 7, 9, 100, 111, 118, 128, 137).  But nothing in those allegations allows this court to draw a reasonable inference that Drummond is liable for the 67 murders at issue here, which do not include the murders of the union leaders.  *See Sinaltrainal*, 578

---

[15] *See* discussion, Section III.B.1, *supra*.  At one meeting, Defendant Atkins, allegedly on behalf of Drummond, approved a payment to the AUC for the assassination of the top leaders of the Drummond union (*see* Compl. ¶ 6B); at another, payment was made while the participants talked openly about the purpose of the money – "to take violent measures against union workers at Drummond" (Compl. ¶ 6C); and at the third, in May 2001, Drummond "made an agreement . . . to make a large cash payment to the AUC of approximately $1.5 million (U.S.) and regular monthly payments of approximately $100,000 (U.S.) to support new AUC troops and equipment, including arms, for the Juan Andres Alvarez Front to provide security and other services for Drummond." (Compl. ¶ 6D).

[16] The AUC and Drummond were allegedly in agreement for Drummond to pay the AUC to use violence to drive FARC out of the areas of Drummond's holdings and pacify the local population. (*See* Doc. #20 at 24).  "Killing innocent people, such as the decedents herein, who were among those 'pacified,' is an act in furtherance of the conspiracy."  (Doc. #20 at 24).  "Drummond cannot arm and empower the AUC to clear the FARC out of Drummond's areas of operation and 'pacify' the remaining civilians, and then claim ignorance that people were going to be killed in this process.  Real people were in fact killed as the AUC implemented its agreement with Drummond, and their relatives brought this case."  (Doc. #20 at 25).

F.3d at 1261 (citing *Iqbal*, 129 S. Ct. at 1949).   The reasoning of the Eleventh Circuit in

*Sinaltrainal*[17] applies here.

> [T]he Garcia plaintiffs' attenuated chain of conspiracy fails to nudge their claims across the line from conceivable to plausible. *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974. First, while the plaintiffs allege "Aponte's plan necessarily required the cooperation and complicity of the arresting police officers," we are not required to admit as true this unwarranted deduction of fact. Second, the plaintiffs' allegations of conspiracy are "based on information and belief," and fail to provide any factual content that allows us "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. Specifically, these plaintiffs allege "[t]he basis for the conspiracy was either that Aponte arranged to provide payment to the officers for their participation, or that the officers had a shared purpose with Aponte to unlawfully arrest and detain Plaintiffs because they were union officials and had been branded by Panamco officials as leftist guerillas." The premise for the conspiracy is alleged to be either payment of money or a shared ideology. The vague and conclusory nature of these allegations is insufficient to state a claim for relief, and "will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965.
>
> Furthermore, the complaint fails to allege when or with whom Aponte entered into a conspiracy to arrest, detain, and harm the plaintiffs. The scope of the conspiracy and its participants are undefined. There are no allegations the treatment the plaintiffs received at the hands of the local police and in prison was within the scope of the conspiracy . . . The Garcia plaintiffs, thus, fail to state a plausible claim for relief against the Panamco Defendants for a violation of the law of nations. *See* 28 U.S.C. § 1350.

*Sinaltrainal*, 578 F.3d at 1268-69.   Nowhere in the instant complaint do Plaintiffs here allege that

there was any discussion of, or agreement to, violate a law of the nations and murder the relatives

of the Plaintiffs.   What the Complaint does allege at most is that Drummond "supported" the AUC

to advance selfish business interests, and "took advantage of a civil war to further their business

---

[17] The *Sinaltrainal* plaintiffs were arrested by Colombian police, beaten and incarcerated until a regional prosecutor found the charges against them "completely without basis." 578 F.3d at 1268. The plaintiffs alleged that the defendants – a U.S. soft drink licensor, its Colombian subsidiary, a Colombian bottler and certain of its employees – conspired with Colombian police, in violation of the ATS, by falsely accusing the plaintiffs of planting a bomb at defendants' facilities.  *See id.*

interest." *In re Sinaltrainal*, 474 F. Supp.2d at 1288-89.  But such an agreement does not violate the law of nations nor otherwise provide support for a claim of conspiracy under the ATS.  (*See also* discussion, *supra* Section III.B.1).

Second, based upon the allegations made by Plaintiffs, not only did Defendants fail to enter into an agreement to violate the law of nations, but even if the pleadings could be read to allege they did so, the pleadings do not contain anything that suggests such an agreement was made with the *mens rea* necessary to establish conspiracy.  To survive the motion to dismiss, Plaintiffs would have had to alleged facts showing *intent* to violate the law of nations, not merely knowledge of such violation.  *See Presbyterian Church*, 582 F.3d at 260 ("[P]laintiffs conspiracy claims . . . require the same proof of *mens rea* as their claims for aiding and abetting.").

Finally, the ATS conspiracy claims fail because Drummond cannot be held responsible for the acts of the AUC under the *Pinkerton* doctrine.[18]  Although Plaintiffs spend a great deal of time

---

[18] Under *Pinkerton*, a defendant may be found guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy.  *See Pinkerton v. U.S.*, 328 U.S. 640 (1946); *see also U.S. v. Silvestri*, 409 F.3d 1311, 1335-36 (11th Cir. 2005) and *U.S. v. Diaz*, 248 F.3d 1065 (11th Cir. 2001).

arguing co-conspirator liability (*see* doc. #20 at 24-26),[19] such liability is not cognizable under the ATS.  *See Presbyterian Church*, 582 F.3d at 260.

For all of the foregoing reasons, Plaintiffs' Complaint fails to state a claim upon which relief can be granted under the Alien Tort Claims Act.

## C.   Secondary Liability and Subject Matter Jurisdiction under the Torture Victims Protection Act

### 1.   Aiding and Abetting and Conspiracy[20]

Plaintiffs' claims under the TVPA are also premised on theories of secondary liability.  (*See* Compl. ¶ 136) (alleging that Defendants "intentionally and tortuously caus[ed] their co-venturers and/or agents to murder the decedents" and that Defendants "aided and abetted" and "conspired with" the paramilitaries to commit murders).  As is the case with claims made under the ATS, the Eleventh Circuit has held that secondary liability claims are viable under the TVPA, but it has not

_____

[19] In addition to co-conspirator liability, Plaintiffs make an argument that Drummond should be responsible for the acts of the AUC under an agency theory.  (*See* Doc. #20 at 27-29).  Two allegations contained in the Complaint set out such a theory – that the "Drummond Defendants engaged in acts and omissions intentionally and tortuously causing their co-venturers and/or agents to murder the decedents described herein" (Compl. ¶ 127) and that the paramilitaries "were acting within the course and scope of a business relationship with Defendants with the advance knowledge, acquiescence or subsequent ratification of Defendants" (Compl. ¶ 89).  However, as those allegations are wholly conclusory, they are insufficient to claim the existence of an agency relationship so as to survive the motion to dismiss.  *See In re Sinaltrainal Litigation*, 474 F. Supp.2d at 1293 and n. 27 ("The allegations remain silent as to when, where, and how the Defendants established the agency relationship.").  To prove agency, Plaintiffs must show that the paramilitaries acted on Defendants' behalf and under Defendants' control, and that the 67 murders alleged in the Complaint were within the scope of that relationship.  *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 787 (11th Cir. 2005).  This Plaintiffs have not done.  (*See* discussion, Section III.A.2., *supra*, on the relationship as alleged between the AUC and Drummond; *see also* discussion, Section III.B.1. and 2., *supra*, on Drummond's "knowledge" of the specific wrongful conduct as alleged in the Complaint).

[20] *See* discussion, *supra* Section III.B.1.

established a standard for such liability. *See Cabello*, 402 F.3d at 1157. Defendants argue that the standard applied to ATS claims should also be applied to TVPA claims. (*See* Doc. #13 at 28). Plaintiffs do not address whether, or to what extent, the secondary liability standards established in ATS claims apply to TVPA claims. (*See* Doc. #20 at 8, 29).

In instances such as these, with no clear guidance coming from the statute itself, courts, including the Eleventh Circuit, generally look to the most analogous statute to fill in the gaps. *See Estate of Cabello v. Fernandez-Larios*, 157 F. Supp.2d 1345, 1355 (S.D. Fla. 2001) ("When a federal statute does not specify key details, such as standing, federal courts generally borrow analogous state law …"), *overruled on other grounds*, 416 F.3d 1242 (11th Cir. 2005). The most analogous statute to the TVPA is the ATS. *See Arce v. Garcia*, 400 F.3d 1340 (11th Cir. 2005) (adopting the TVPA's statute of limitations where ATS did not provide one "because the statutes – and the policies behind the statutes – are similar," including "purpose," "mechanism," and "location within the United States Code"), *vacated on other grounds*, 434 F.3d 1254 (11th Cir. 2006). In fact, the Eastern District of New York has recognized that the elements of secondary liability applied to ATS claims also apply to TVPA claims. *See Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 588 F. Supp.2d 375, 387 (E.D. N.Y. 2008) ("[P]laintiffs' claim of aiding and abetting a TVPA violation fails for the same reason as their aiding and abetting claim for an ATCA violation. The allegations are insufficient to show the level of participation required for aiding and abetting.").

Because Plaintiffs have not supported their claims of secondary liability under the ATS, they necessarily are not supported under the TVPA. (*See* discussion, Section III.B.1. and 2., *supra*).

### 2.    State Action[21]

Plaintiffs do not dispute that the TVPA expressly requires that the tortfeasor act "under actual or apparent authority, or color of law, of [a] foreign nation."  28 U.S.C. § 1350 Note §2 (a).  (*See* Doc. #20 at 30) ("[S]tate action [is] a requirement for the extrajudicial killing claims under the ATS and TVPA.").  Here, just as state action was not properly alleged as to the ATS claims, it has not been properly alleged as to the TVPA claims.  (*See* discussion Section III.A.1., *supra*).

### D.    Standing Under the Torture Victims Protection Act and Alien Torts Claims Act

Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies."  Moreover, the court has an ongoing obligation to, sua sponte, analyze and determine whether it has before it a justiciable case or controversy.  Whether a case or controversy exists turns on "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Wendy's Intern, Inc. v. City of Birmingham*, 868 F.2d 433, 436 (11th Cir. 1989) (quoting *Maryland Casualty Co. v. Pacific Oil Co.*, 312 U.S. 270, 273 (1941)).

As part of the case or controversy analysis, the court must evaluate a party's standing to bring a lawsuit.  Standing is a snapshot of the justiciability of a plaintiff's claims at the time of filing.  *Atlanta Gas Light Co. v. Aetna Casualty and Surety Co.*, 68 F.3d 409, 414 (11th Cir. 1995).  Standing requires, at an "irreducible minimum," that the plaintiff has an "actual or threatened injury resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action, and that the injury is likely to be redressed by favorable court disposition."  *Atlanta Gas Light Co. v. Aetna Casualty and Surety Co.*, 68 F.3d 409, 414 (11th Cir. 1995).  Standing, therefore,

---

[21] There is no "war crimes" exception to the TVPA.  *See* 28 U.S.C. § 1350 Note §2 (a).

emphasizes "whether the party invoking federal court jurisdiction has 'a personal stake in the outcome of the controversy,' and whether the dispute touches upon 'the legal relations of parties having adverse legal interests.'" *Flast v. Cohen*, 392 U.S. 83, 100-101 (1968) (internal citations omitted).  If a party lacks standing to bring a lawsuit, then the court lacks subject matter jurisdiction to hear the case, and the litigation is due to be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

### 1.      The Torture Victims Protection Act

Enacted in 1992, the TVPA provides a cause of action for official torture and extrajudicial killing.  *See Sinaltrainal,* 578 F.3d at 1263.  The House Report sets out that the TVPA "authorizes Federal courts to hear cases brought by or on behalf of a victim of any individual who subjects a person to torture or extrajudicial killing.  H.R. Rep. No. 102-367(I), 1992 U.S.C.C.A.N. 84, 87.  The note to 28 U.S.C. § 1350 explains that liability attaches for extrajudicial killing "for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death."

It is on this note that Plaintiffs rely to assert that they have standing.  They contend that under the TVPA, a wrongful death claimant is entitled to damages based on each beneficiary's *own* loss of continued economic support and, in the case of minor children, loss of economic support for their education.  (*See* Doc. #20 at 46).  Each of the Plaintiffs detail his/her relationship with and dependence upon the murdered relative, and no where do Plaintiffs dispute that they seek damages only for themselves. (*See* Compl. ¶¶ 15-82).  Contrary to those assertions, Defendants argue that the Plaintiffs lack standing under the TVPA because the statute confers standing "on the direct victim of the wrongful conduct and, where the conduct at issue is an extrajudicial killing, allow a plaintiff

29

to seek damages only *on behalf of the victim*." (Doc. #13 at 45) (emphasis in original). Thus, the relevant question is whether a wrongful death claimant under the TVPA is entitled to "traditional" wrongful death damages *or* whether the TVPA limits the types of damages recoverable to a wrongful death claimant. The court is convinced it is the latter.

The Eleventh Circuit has not had the opportunity to elucidate the standard for standing in a TVPA claim. Other courts have brushed the issue. In *Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, the District Court for the District of Columbia considered whether the siblings of individuals killed in the 1988 bombing of Pan Am Flight 103 over Scotland had standing to bring suit. 541 F. Supp.2d 46, 49-50 (D.C. Cir. 2008). The court held that the siblings lacked standing under the TVPA to sue for their own personal damages because "[t]he plain language and the legislative history of the TVPA make clear that standing is limited to the victim himself or one bringing a claim on behalf of the victim." 541 F. Supp.2d at 54. Claims on behalf of the victims themselves had already been settled in a previous suit. *See id.* The court went on to find that one of the victim's brothers could proceed as a "wrongful death beneficiary" seeking damages "on behalf of his brother." *See id.* at 55. In *Hurst v. Socialist People's Libyan Arab Jamahiriya*, the District Court for the District of Columbia again stated that "[t]he plain language and the legislative history of the TVPA make clear that standing is limited to the victim herself or one bringing a claim on behalf of a direct victim." 474 F. Supp.2d 19, 30 (D. D.C. 2007) (holding that representatives of victims of aircraft terrorism lacked standing to sue Libyan director of airline security because the TVPA allows only for suit by victims or legal representatives asserting victims' claims, and representatives in the case were asserting their own damages claims). And in *Cabello Barrueto v.*

*Fernandez Larios*,[22] the Southern District of Florida considered the issue of standing under the TVPA, and found that Congress intended to allow the surviving legal representative of a deceased torture victim to recover *on behalf of the victim's estate*.  205 F. Supp.2d 1325, 1334 (S.D. Fla. 2002) (emphasis added) (quoting H.R. Rep. No. 102-367(I), reprinted in 1992 U.S.C.C.A.N. 84, 87 (TVPA "authorizes the Federal courts to hear cases brought by or on behalf of a victim of any individual who subjects a person to torture or extrajudicial killing.").

While these cases are not binding authority on this court, they do provide some insight as to how courts generally view the standing requirements of the TVPA.  They are also persuasive.  This court is convinced that a wrongful death claimant can have no standing under the TVPA if she seeks damages on her own behalf.  There is simply nothing in the statute suggesting that damages are recoverable for anything beyond those sought "on behalf of" a victim.  Plaintiffs in this case do not allege that they themselves have been tortured or murdered – they allege only personal injuries stemming from the loss of their relative.  (*See* Doc. #20 at 46).  As such, they have done nothing to establish that they are properly claimants to an action for wrongful death, nor that such wrongful death claims are brought on behalf of the deceased victims, as this court is convinced the TVPA requires.  *See* H.R. Rep. No. 102-367, *reprinted in* 1992 U.S.C.C.A.N. 84, 87 (Nov. 25, 1991).  Therefore, as the complaint is currently drafted, Plaintiffs lack standing to bring their claims under the TVPA.

---

[22] The issue in *Cabello* was who qualified as a legal representative of the estate, such that they had standing under the TVPA.  205 F. Supp.2d at 1333-34.  Defendants argued that the TVPA precluded recovery on a torture claim by the victim's representative, but the court rejected that argument, citing the legislative history which allows federal courts to hear cases "brought by or on behalf of a victim."  *See id.* at 1334.  "The term 'beneficiary in a wrongful death action' is generally intended to [mean] those persons recognized as legal claimants in a wrongful death action under Anglo-American law."  *Id.* at 1334 (quoting S. Rep. No. 102-249, at *7).

2.      **The Alien Torts Claims Act**

As earlier set out, the First Congress enacted the ATS as part of the Judiciary Act of 1789. The ATS now provides district courts original jurisdiction "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Sinaltrainal*, 578 F.3d at 1261 (quoting 28 U.S.C. § 1350).  Federal subject matter jurisdiction exists for an ATS claim when the following three elements are satisfied: (1) an alien (2) sues for a tort (3) committed in violation of the law of nations.  *See id.* (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005)).  But the ATS provides no guidance on the issue of standing.

With the presence of such a gap, courts, including the Eleventh Circuit, generally look to the most analogous statute for guidance.  In the case of the ATS, several courts, including the Eleventh Circuit, have referenced the TVPA as the most analogous statute.  *See Arce v. Garcia*, 400 F.3d 1340 (11th Cir. 2005) (adopting the TVPA's statute of limitations where ATS did not provide one "because the statutes – and the policies behind the statutes – are similar," including "purpose," "mechanism," and "location within the United States Code"), *vacated on other grounds*, 434 F.3d 1254 (11th Cir. 2006); *see also Estate of Cabello v. Fernandez-Larios*, 157 F. Supp.2d 1345, 1355 (S.D. Fla. 2001) ("When a federal statute does not specify key details, such as standing, federal courts generally borrow analogous state law …"), *overruled on other grounds*, 416 F.3d 1242 (11th Cir. 2005).  Thus, because Plaintiffs lack standing to sue under the TVPA (*see* Section III.D.1, *supra*), they necessarily lack standing under the ATS as well.

E.    **Exhaustion of Local Remedies**[23]

The TVPA contains an express exhaustion requirement, borrowed as a general principle of international law.  *See* 28 U.S.C. § 1350 Note §2(b); *see also* S. Rep. No, 102-249, pt. 4, at 10 (1991).  "A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  28 U.S.C. § 1350 Note §2(b).  Exhaustion of remedies need not be pled in the complaint under the TVPA.  Instead, defendants bear the burden of demonstrating failure to exhaust adequate and available remedies under Colombian law.  *See Estate of Rodriguez v. Drummond Co., Inc.*, 256 F. Supp.2d 1250, 1267 (N.D. Ala. 2003) (citing *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *55-56 (S.D. N.Y. Feb. 28, 2002) (analyzing legislative history of TVPA and finding that "defendants, not plaintiffs, bear the burden of demonstrating that plaintiffs have not exhausted 'alternative and adequate' remedies")).  This is because failure to exhaust remedies is an affirmative defense.  *See Jean v. Dorelien*, 431 F.3d 776 (11th Cir. 2005) ("[T]he exhaustion requirement pursuant to the TVPA is an affirmative defense, requiring the defendant to bear the burden of proof.").

In this case, whether Defendants are entitled to the affirmative defense on exhaustion of remedies is not appropriate for decision on a motion to dismiss.  It is well established that if the facts with respect to an affirmative defense are admitted or are not controverted, or are conclusively established so that nothing further can be developed by a trial of the issue, then the matter may be

---

[23] The principle of exhaustion of local remedies applies only to the claims brought under the TVPA.  This is because the Eleventh Circuit has explicitly held that the ATS contains no exhaustion requirement.  *See Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) ("[T]he exhaustion requirement does not apply to the [ATS].").  The parties do no dispute that point.  (*See* Doc. #20 at 41; *see also* Doc. #24 at 13, n.11).

disposed of on a motion to dismiss.  *See Larter & Sons v. Dinkler Hotels Co.*, 199 F.2d 854 (5th Cir. 1952).  But here, although Plaintiffs have admitted in their Complaint that they have not exhausted available remedies in Colombia, Plaintiffs *have* alleged that seeking such redress would be futile "because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk of retaliation."  (Compl. ¶ 10; *see also* Doc. #20, Exh. 6 at 5).  This is enough to satisfy Plaintiffs' burden at the motion to dismiss stage of proceedings.  (*See* Doc. #13 at 42-44; *see also* Doc. #24 at 13-14).

### F.    Supplemental Jurisdiction

Should all federal claims presented by any amended complaint fail to survive, it would be error for this court to retain the wrongful death state-law claim.  It is well established that a district court should properly dismiss state law claims when all federal claims are dismissed before trial. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *see also Hardy v. Birmingham Bd. of Ed.*, 954 F.2d 1546, 1553 (11th Cir. 1992) (where party could pursue "difficult" state law questions in state court, absent federal claims, "pendent jurisdiction may not be exercised by a federal court") (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984)); *Faucher v. Rodziewicz*, 891 F.2d 864, 871-72 (11th Cir. 1990) ("If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims."). Even were Plaintiffs to successfully plead their federal claims, this court would nonetheless decline to exercise supplemental jurisdiction over their wrongful death claim.  Although 28 U.S.C. § 1367(a) allows courts to exercise supplemental jurisdiction over all claims related to properly-plead federal

claims, pendent jurisdiction is a doctrine of discretion, and not of right.  *See Wu v. Thomas*, 847 F.2d 1480, 1486 (11th Cir. 1988) (internal quotations omitted).  The wrongful death claim raises a novel and complex issue under the law of Colombia.  *See* 28 U.S.C. § 1367(c)(1).  Those issues are sufficiently complex that it would be impossible for this court to navigate the Colombian law requisites for a wrongful death claim.  *See Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1318 (11th Cir. 2008) ("The conclusion of the district court that the claim raised complex issues is supported by the record, and the court was well within its discretion to decline jurisdiction over that claim.").

## IV.   Conclusion

Although the motion to dismiss (Doc. #13) has merit, at this stage in the litigation it is due to be denied.  Plaintiffs have requested leave to amend the complaint, (*see* Doc. #20 at 52), and the court will grant Plaintiffs another opportunity to more carefully craft their complaint in accordance with the findings made in this memorandum opinion.  *See Van Taylor v. McSwain*, 2009 WL 1636809, No. 08-12238, at *1 ("Where it appears that a more carefully crafted complaint might state a claim upon which relief can be granted, we have held that a district court should give a plaintiff an opportunity to amend his complaint instead of dismissing it.") (citing *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir. 1998)).  A separate order will be entered.

**DONE** and **ORDERED** this ____9th____ day of November, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE