# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JANE DOE, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:09-CV-01041-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the January 8, 2010 motion of Defendants Drummond Company, Inc. ("DCI") and Drummond Ltd. ("DLTD") (collectively referred to herein as "Drummond" or "Defendants") to dismiss the amended complaint (Doc. #37). Pursuant to the court's orders of December 8, 2009, January 7, 2010, and February 18, 2010, the motion to dismiss (Doc. #37) is now under submission and is considered without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that the motion to dismiss (Doc. #37) is due to be granted in part and denied in part as set out below.

## I.   Relevant Procedural History and Facts

Plaintiffs Jane Doe (1-166) and Peter Doe (1-81) commenced this action on May 27, 2009 by filing a complaint (Doc. #1) in this court for equitable relief and damages under the Alien Tort Claims Act ("ATS"),[1] Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, and Colombian

---

[1] Over time, courts have referred variously to 28 U.S.C. § 1350 as the Alien Tort Statute (hence "ATS"), the Alien Tort Act, and the Alien Tort Claims Act. In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court referred to §1350 as the Alien Tort Statute. *See Vietnam Ass'n for Victims of Agent Orange*, 517 F.3d 104, 113, n.2 (2d. Cir. 2008).

wrongful death law.  (*See* Compl. ¶¶ 122-44).  In the original complaint, Plaintiffs alleged that they were wives and legal heirs, parents and legal heirs, and children and legal heirs of those "murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond to provide security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels." (Compl. ¶ 15).  Plaintiffs sought "damages for the loss of their relative who was an innocent civilian murdered in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC[.]" (Compl. ¶ 15).  Allegations of the original complaint centered on the contention that Defendants DCI and DLTD paid and conspired with paramilitaries, specifically the United Self Defense Forces of Colombia ("AUC"), to harm union leaders and provide security for Drummond's rail line and facilities.  (Compl. ¶ 106; *see also* Doc. #20 at 1).

In addition, the original complaint asserted that each of the killings at issue was an "extrajudicial killing" in "violation of the law of nations" under the ATS and in violation of the TVPA.  It also alleged that Defendants were liable for those killings because the paramilitaries carried them out as Defendants' "agents," and because Defendants provided the paramilitaries with "knowing and substantial assistance," and conspired with, aided and abetted, and engaged in "joint action" with the paramilitaries in carrying out the murders.  (Compl. ¶¶ 106-20).

Defendants DCI and DLTD filed a motion to dismiss the original complaint on July 20, 2009. (Doc. #13).  Upon careful consideration of the briefing on the motion to dismiss, the court felt that the motion (Doc. #13) had clear merit.  However, Plaintiffs were afforded an opportunity to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a).  (*See* Doc. #30 at 1).  After being

granted an extension of time in which to file any amended complaint, Plaintiffs did so on December

4, 2009.[2]  (*See* Docs. #32-35).  The causes of action asserted in the Amended Complaint are these:

- The Alien Tort Claims Act, 28 U.S.C. § 1350 – War Crimes
  The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were War Crimes,
  and the Drummond Defendants Aided and Abetted or Conspired with the
  AUC, or the AUC was Drummond's Agent (First Cause of Action)

- The Alien Tort Claims Act, 28 U.S.C. § 1350 – Extrajudicial Killings
  The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed
  Under Color of Authority of the Colombian Government, and the Drummond
  Defendants Aided and Abetted or Conspired with the AUC, or the AUC was
  Drummond's Agent (Second Cause of Action)

- The Alien Tort Claims Act, 28 U.S.C. § 1350 – Crimes Against Humanity
  The AUC's Mass Executions of Innocent Civilians, Including Plaintiffs'
  Decedents, Constitutes Crimes Against Humanity and the Drummond
  Defendants Aided and Abetted, or Conspired with the AUC, or the AUC was
  Drummond's Agent (Third Cause of Action)

- The Torture Victims Protection Act, 28 U.S.C. § 1350 note – Extrajudicial
  Killings
  The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed
  under Color of the Authority of the Colombian Government, and the
  Drummond Defendants Aided and Abetted or Conspired with the AUC, or
  the AUC was Drummond's Agent (Fourth Cause of Action)

Defendants filed the pending motion to dismiss (Doc. #37), contending that the First

Amended Complaint is due to be dismissed in its entirety for the following reasons: (1) Plaintiffs

have failed to allege "state action" as required under the ATS and TVPA;[3] (2) Plaintiffs' crimes

against humanity claims fail because they do not allege a widespread or systematic attack directed

---

[2] Despite footnote 1 of the First Amended Complaint, the court remains puzzled as to why Plaintiffs were unable to highlight by delineation, at least to some degree, the differences between the original and the first amended complaints.  Plaintiffs' failure to follow, or to seek relief from, the court's direct order on that point (*see* Doc. #31) has made it significantly more difficult for the court to timely rule on the pending motion to dismiss.

[3] This ground for dismissal was also pled in the first motion to dismiss.  (*See* Doc. #13 at 4).

against a civilian population; (3) Plaintiffs have failed to allege facts that would support a finding that Defendants are liable under the ATS for any "war crime;" (4) Plaintiffs have not adequately pleaded aiding and abetting liability, because they fail to allege facts showing that Defendants intended that their purported payments for security would assist these murders, or assist in any war crimes;[4] (5) Plaintiffs' conspiracy claims fail because they do not allege that anyone acting on Drummond's behalf had a "meeting of the minds" with the paramilitaries to commit these murders, or any "war crimes;"[5] (6) Plaintiffs fail to allege facts establishing that the persons who murdered the sixty seven victims acted as Defendants' agents; and (7) Plaintiffs lack standing.[6] (Doc. #37 at 4).

The court discusses each of those arguments below.

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  A court may dismiss a complaint under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  That is, if a plaintiff "ha[s] not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.*; *see Ashcroft v. Iqbal*, 139 S.Ct. 1937, 1953 (2009) (holding that *Twombly*

---

[4] This ground for dismissal was also pled in the first motion to dismiss.  (*See* Doc. #13 at 4).

[5] This ground for dismissal was also pled in the first motion to dismiss.  (*See* Doc. #30 at 4).

[6] This ground for dismissal was also pled in the first motion to dismiss.  (*See* Doc. #30 at 4).

4

was not limited to antitrust cases but rather was based on an interpretation and application of Federal Rule of Civil Procedure 8).

In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc)). Further, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* [plausible] theory."[7] *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967). Nevertheless, conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *see Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[A] plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim. We will thus not accept as true conclusory allegations or unwarranted deductions of fact.") (internal citations omitted); *Kirwin v. Price Commc'ns. Corp.*, 274 F. Supp. 2d 1242, 1248 (M.D. Ala. 2003) ("[A]lthough the complaint must

---

[7] *Twombly* teaches that the correct standard is whether a plaintiff's claims are "plausible." 550 U.S. at 547.

be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged."), *aff'd in part*, 391 F.3d 1323 (11th Cir. 2004).

## III.   <u>Analysis</u>

As earlier set out, Defendants maintain seven grounds for the dismissal of the complaint: (1) Plaintiffs have failed to allege "state action" as required under the ATS and TVPA; (2) Plaintiffs' crimes against humanity claims fail because they do not allege a widespread or systematic attack directed against a civilian population; (3) Plaintiffs have failed to allege facts that would support a finding that Defendants are liable under the ATS for any "war crime;" (4) Plaintiffs have not adequately pleaded aiding and abetting liability, because they fail to allege facts showing that Defendants intended that their purported payments for security would assist these murders, or assist in any war crimes; (5) Plaintiffs' conspiracy claims fail because they do not allege that anyone acting on Drummond's behalf had a "meeting of the minds" with the paramilitaries to commit these murders, or any "war crimes;" (6) Plaintiffs fail to allege facts establishing that the persons who murdered the 67 victims acted as Defendants' agents; and (7) Plaintiffs lack standing.[8]  (Doc. #37 at 4).  Each ground is considered below.  As appropriate, in the interest of efficiency and economy, the court has borrowed case law and analysis from its Memorandum Opinion addressing the motion to dismiss the original complaint.  (*See* Docs. #30, 31).

---

[8] Although normally an issue of standing would be analyzed at the beginning of an opinion on a motion to dismiss, in this instance it is the last point argued by the parties in their respective briefs (and is almost an afterthought).  The court has addressed this argument in the same place and order as the parties.

A.      **State Action under the Alien Tort Claims Act and Torture Victims Protection Act**

1.      **Introduction[9]**

For claims brought under the Torture Victims Protection Act, the tortfeasor must have acted "under actual or apparent authority, or color of law, of [a] foreign nation." 28 U.S.C. § 1350 note § 2(a). Similarly, subject matter jurisdiction under the Alien Tort Claims Act requires a showing, *inter alia*, that a tort was committed in violation of the law of nations. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005)). A violation of the law of nations claim under the ATS may be prosecuted in the instant case if it is properly alleged that the paramilitaries acted as state actors as defined by Eleventh Circuit law.[10] *See In re Sinaltrainal Litigation*, 474 F. Supp.2d 1273, 1285 (S.D. Fla. 2006) ("There is no federal subject-matter jurisdiction under the Alien Tort Act unless the

---

[9] *See* Doc. #30 at 6-8, 28 for a complete discussion of subject matter jurisdiction under the ATS and TVPA.

[10] Alternatively, a plaintiff may allege that the murders constitute war crimes. *See* discussion *infra* Section III.B.

As with certain other kinds of claims, claims brought under the ATS are subject to a heightened pleading standard. *See Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp.2d 1345, 1352 (S.D. Fla. 2003). The heightened pleading standard requires that the complaint identify facts showing that defendants violated a specific international law. Jurisdictional concerns are not satisfied by merely alleging generally that there has been a colorable violation of the law of nations. *See Villeda Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp.2d 1285, 1292 (S.D. Fla. 2003), *aff'd in part, vacated in part*, 416 F.3d 1242 (11th Cir. 2005) (citing *Sinaltrainal*, 256 F. Supp.2d at 1352)). The "paucity of suits successfully maintained under [the ATS] is readily attributable to the statute's requirement of alleging a violation of the law of nations at the jurisdictional threshold." *Villeda Aldana*, 305 F. Supp.2d at 1292 (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 887-888 (2d Cir. 1980)). Although Plaintiffs' claims raise significant issues of international law, the task before the court is not to resolve them on the merits; rather, the court must determine whether the complaint adequately pleads a violation of the law of nations. *See Villeda Aldana*, 305 F. Supp.2d at 1292.

7

complaint *adequately* pleads a violation of the law of nations (or treaty of the United States).")
(citing *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d. Cir. 1996) (emphasis added in *In re Sinaltrainal*),
*aff'd in relevant part*, 578 F.3d 1252.

The parties do not dispute that state action must be properly pled in order for the Second and
Fourth Causes of Action to survive the renewed motion to dismiss.[11]  (*See* Doc. #37 at 7; *see also*
Doc. #38 at 29-30).  Those causes of action specifically require an assertion that the killings "were
committed under color of authority of the Colombian government, and that Drummond aided and
abetted or conspired with the AUC, or that the AUC was Drummond's agent."  (*See* Compl. at
Second and Fourth Causes of Action).

## 2.    Analysis

As set out in this court's Memorandum Opinion of November 9, 2009, (*see* Doc. #30 at 9-
10), the Eleventh Circuit requires more than allegations of a general, joint relationship between the
government and the alleged state actor for the successful establishment of state action.

> Allegations that the Colombian government tolerated and permitted the paramilitary
> forces to exist are insufficient to plead the paramilitary forces were state actors.  The
> plaintiffs make the naked allegation the paramilitaries were in a symbiotic
> relationship with the Colombian government and thus were state actors.
> Nevertheless, in testing the sufficiency of the plaintiff's allegations, we do not credit
> such conclusory allegations as true.  ***We demand allegations of a symbiotic***
> ***relationship that involves the torture or killing alleged in the complaint to satisfy***
> ***the requirement of state action***.

---

[11] The parties do dispute, however, whether crimes against humanity as alleged in the Third
Cause of Action require state action.  Defendants contend that they do, (*see* Doc. #37 at 11),
Plaintiffs contend they do not (*see* Doc. #38 at 28).  The court need not answer that question at this
point because for purposes of the motion to dismiss, the court finds that Plaintiffs have adequately
pled state action (*see* Section III.A.2., *infra*), and that the crimes against humanity claim is due to
be dismissed on other grounds (*see* Section III.C., *infra*).

*Sinaltrainal*, 578 F.3d at 1266 (internal citations and quotations omitted) (emphasis added); *see also Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001)[12] ("To charge a private party with state action under this standard, the governmental body and private party must be intertwined in a symbiotic relationship . . . The Supreme Court has indicated that the symbiotic relationship must involve the specific conduct of which the plaintiff complains.") (internal citations and quotations omitted).  Indeed, a laundry list of allegations purporting to establish state action in the original complaint wholly failed to establish state action; instead, the allegations in the original complaint asserted, at best, that there was a ***general*** relationship between the paramilitaries and the Colombian government.[13]

The First Amended Complaint strives to allege a direct, symbiotic relationship between the Colombian government and the paramilitaries such as that required by the Eleventh Circuit:

> • There has never been a question that the regular military in Colombia, and the civil government authorities, tolerated the paramilitaries, allowed them to operate, and often cooperated with them.  Recent testimony of AUC leaders in custody after the Justice and Peace process makes this connection even more explicit – the government of Colombia worked with the leaders of the AUC to create the AUC as an informal special unit of the military for the purpose of using brutal tactics that the regular military was not permitted to use under the Geneva Conventions and other laws governing the conduct of war.  (First Amend. Compl. ¶ 94).

> • Many current and former political leaders in Colombia were directly involved in establishing the right-wing paramilitary groups in Colombia which later joined under the one umbrella of the AUC.

---

[12] Courts look to the jurisprudence of 42 U.S.C. § 1983 for guidance in evaluating whether state action is established under the ATS.  *See Aldana*, 416 F.3d at 1247.

[13] *See* Doc. #30 at 8-10.  Plaintiffs' conclusory allegations that the paramilitary forces acted under color of law were (1) not entitled to be assumed true and (2) insufficient to allege state-sponsored action.  *See Sinaltrainal*, 578 F.3d at 1266 (citing *Iqbal*, 129 S. Ct. at 1951).

Indeed, in 1996, Colombian President Alvaro Uribe was the governor of Antioquia and was instrumental in the creation of one of the first paramilitary groups in Colombia.  (*Id.* at ¶ 95).

• The AUC was expected to "out guerilla the guerillas."  (*Id.* at ¶ 96).

• The AUC, including the Northern Block units directly involved in the wrongful acts alleged herein, were created based on official sanction of the government of Colombia.  In 1994, as a way for the Colombian government to create a legal mechanism to fund the AUC, it passed Decree 356, which established the "Special Vigilance and Private Security Services."  This decree laid the foundation for the creation of Convivir groups, officially launched in 1995 through Resolution 368.  The Convivir groups are comprised of civilians who petition the government for a license "to provide their own security . . . in areas of high risk or in the public interest, which requires a high level of security."  Defense Ministry, Decree 356, Republica de Colombia, February 11, 1994, pp. 19-20; and Resolution 368, April 27, 1995. (*Id.* at ¶ 98).

• The AUC established at least 14 Convivirs in 1995-96 that were "legal" entities under the Colombian law that served as fronts for the AUC.  Landowners and private companies made payments to these Convivirs based on geographic region.  100% of the funds collected were used by the AUC for arms, supplies, and other necessities in the AUC's military campaign against the FARC.  Further, Colombian military officers met regularly with the leaders of the Convivirs to coordinate military operations and share intelligence.  The Convivir leaders were in all cases AUC commanders.  (*Id.* at ¶ 100).

• The Human Rights Watch investigators found "detailed, abundant, and compelling evidence" of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations.  (*Id.* at ¶ 101).

• The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include active and retired military who actually set up paramilitary units, the military who provide the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries who conduct missions at the request of the military.  (*Id.* at ¶ 102).

10

- [I]n *Country Reports on Human Rights Practices – Colombia* (March 2002), the U.S. State Department, which had in September 2001 designated the AUC, the chief and largest paramilitary group as a "terrorist" group, continued to conclude that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces." The State Department reached this same conclusion in its Report of March 31, 2003, stating that "[s]ome members of the security forces collaborated with paramilitary groups that committed serious abuses." (*Id.* at ¶ 107).

- The Colombian military was not able to effectively address the uprising of the FARC, so as previously alleged, the Colombian government facilitated the creation and funding of the AUC for the sole purpose of using this unofficial force to defeat the FARC . . . the Colombian military needed to use the AUC in order to defeat the FARC. (*Id.* at ¶ 120).

These allegations do markedly more to assert the joint nature of the Colombian government with the paramilitaries than did the allegations in the original complaint. The Colombian government, according to the allegations, not only tolerates the paramilitaries, but also encourages, supports, and relies on their existence. There is more than a "formulaic recitation" that the paramilitary forces were in a symbiotic relationship with the Colombian government. *See Sinaltrainal*, 578 F.3d at 1266.

Nevertheless, even these more concrete factual allegations of a symbiotic relationship do not end the inquiry of whether Plaintiffs can survive the pending motion to dismiss on state action grounds. The symbiotic relationship must involve "the torture or killing alleged in the complaint." *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008). The Eleventh Circuit has approved a district court exercising this standard by inquiring whether "the symbiotic relationship between the paramilitaries and the Colombian military had anything to do with the conduct at issue here …," *i.e.* the murders along Drummond's rail lines. *Id.* ("The relationship must involve the

subject of the complaint." and "[A] plaintiff may prove that relationship . . . by presenting evidence[14] of the active participation of a single official.").

The court concludes that Plaintiffs have done enough, for purposes of the motion to dismiss, to connect the murders along Drummond's rail lines to the paramilitaries as state actors.[15]  Although the First Amended Complaint "has retained what [this] Court has described as 'general' allegations," (*see* Doc. #38 at 30), it now also clearly alleges the following: (1) that it was the Colombian Commander of the Cordoba Battalion who first approached Drummond about providing financial support to the AUC, (*see* First Amend. Compl. at ¶ 113); (2) that the Colombian government created the legal structure for the AUC to form and collect monies from private parties (*see id.* at ¶¶ 98-100); and (3) that Drummond provided funds directly to the AUC and also to Popa Battalion Commander Colonel Mejia, who was in charge of the official Colombian military troops on the Drummond property, and that Colonel Mejia then distributed the funds supplied by Drummond to AUC leaders based on confirmed executions of suspected guerilla supporters (*see id.* at ¶ 6).  In the context of the AUC's operations around Drummond's facilities and rail lines, the First Amended Complaint alleges the connection as such:

> •   [W]hen the Drummond Defendants entered into an arrangement to support the AUC, they acted with the intent to assist the AUC's war crimes.  Drummond intended that, with its funds, the AUC would expand its war effort against the FARC and focus the AUC's military

---

[14] The evidence was considered in *Romero* because the case was decided, at least in part, at the summary judgment stage of proceedings.  552 F.3d at 1318.

[15] Now is not the time for the court to consider whether it is a reasonable conclusion that the Colombian government would have been in a symbiotic relationship for the murders of seven government employees.  (*See* Doc. #37 at 10).  The only inquiry for the court at this stage is whether there is a connection between the AUC as a state actor and the murders at issue in the First Amended Complaint.  *See Romero*, 552 F.3d at 1317.

campaign in Cesar on specific areas along the Drummond rail line where the FARC had a foothold.  In doing so, as previously alleged, Drummond had specific knowledge that the AUC would commit war crimes, including extrajudicial killings, of innocent civilians, like Plaintiffs' decedents, who lived in and around the towns Drummond required the AUC to attack and pacify.  (*Id.* at ¶ 154).

•     In November, 1999, when Drummond entered into an agreement with the AUC, the area of Drummond's coal mine was protected by a detachment of Colombian military that established a base on Drummond's property.  Approximately 300 troops from La Popa Battalion, a military unit based in Valledupar in the province of Cesar, were permanently assigned to Drummond to guard its facilities from attacks by the FARC.  In addition, Drummond used a private security firm, Viginorte, which was a front group for the AUC but did not provide security staff for Drummond's management personnel and to control access to its facilities.  Further, Drummond had an extensive in-house security staff, including Defendant Adkins and General Pena.  Drummond's main facilities and staff were thus protected by tight security.  When Drummond made the decision to join with the AUC, it was for the same reason that the Colombian government allowed for and facilitated the formation of the AUC in the first instance – to pursue the FARC in the areas where it had support and destroy it using the same violent tactics that the FARC itself employed.  (*Id.* at ¶ 155).

•     Defendant Araujo assured Jorge 40 that [were Drummond's rail lines to be attacked, that] would cause the Drummond executives in Alabama to agree to make payments to enhance the AUC's presence in the areas along the Drummond rail line.  (*Id.* at 156).

These allegations of the First Amended Complaint allege, consistent with the legal standard the court must apply here, the required connection of state action with the alleged murders.  Therefore, Plaintiffs' Second and Fourth Causes of Action, each of which require state action to be properly pled, survive the first alleged ground for dismissal.  But the inquiry does not end there – for Drummond to be liable, the First Amended Complaint must sufficiently plead a ground for such

13

liability, in the form of aiding and abetting, conspiracy, or agency.  That question is explored in Section III.D., *infra*.

      **B.**        **War Crimes under the ATS**

      The First Cause of Action of the First Amended Complaint alleges that Defendants engaged in war crimes under the ATS.  (*See generally* First Amend. Compl. at ¶¶ 119-138).  Such a claim is cognizable if Plaintiffs can establish (1) that there was an armed conflict; (2) that the AUC and the FARC were parties to the conflict; and (3) that Plaintiffs were killed in the "course of hostilities."[16] *See Kadic*, 70 F.3d at 242.  At issue here is whether Plaintiffs have sufficiently alleged that the killings referenced in the Amended Complaint were committed in the course of hostilities.  (*See* Doc. #37 at 16; *see also* Doc. #38 at 7-9).

      Case law does not presently provide an outright definition of this controlling phrase.  But the Eleventh Circuit has given us this guidance: the perpetration must be committed "because of the civil war or in the course of civil war clashes." *Sinaltrainal*, 578 F.3d at 1267; *see also In re XE Servs. Alien Tort Litigation*, 665 F.Supp.2d 569, 585 (E.D. Va. 2009) ("[I]n order to state a valid claim for

---

    [16] At various points in briefing their motion to dismiss, Defendants make vague references to the assertion that a person murdered in the course of a war crime must be an innocent civilian in order to qualify for coverage under the ATS.  (*See* Doc. #37 at 15-16) ("Common Article 3 of the Geneva Convention makes it a violation of the law of war for a combatant in an 'armed conflict not of an international character' to kill an innocent civilian."); (Doc. #37 at 25) ("The only allegations that attempt to link Defendants to the killing of innocent civilians are entirely conclusory."); (Doc. #37 at 25) ("Plaintiffs must allege facts establishing that Defendants intended the killing of innocent civilians . . .").  As discussed in Section III.C., *infra*, those murdered, while not necessarily FARC, were murdered as suspected supporters of the FARC.  Thus it is questionable whether they would meet the definition of "innocent civilian" for the purposes of war crimes.  But this court can find no authority for the contention that the definition of civilian for crimes against humanity claims applies to claims brought as war crimes, nor that civilian status is an element of a war crimes claim.  Regardless, the question of civilian status in the context of war crimes has not been raised in the motion to dismiss the First Amended Complaint, and need not be decided here.

war crimes, plaintiffs must allege that the conduct constituting war crimes occurred in the context of and in association with an ongoing armed conflict."). The initial question then is whether the murders alleged in the First Amended Complaint occurred "because of" or "in the course of" the civil unrest in Colombia. There must be more alleged than the mere fact that the conduct occurred while an armed conflict was ongoing. *See id.* at 585.

Plaintiffs contend that "the decedents were executed by the AUC as part of its overall attacks on towns that were targeted because the FARC had a foothold in these areas" and that the "AUC pursued a scorched earth policy of first driving the FARC out and then brutally murdering people who lived in these areas and were assumed to be sympathetic to the FARC." (Doc. #38 at 8). Plaintiffs include three supporting allegations in their First Amended Complaint: (1) AUC leaders are on record as stating that they attacked these specific towns (along Drummond's rail line) as part of their war with the FARC (First Amend. Compl. at ¶¶ 130-33); (2) AUC commanders have stated that Plaintiffs' decedents were executed in the manner, time frame, and locations that would have been in furtherance of the AUC's war on FARC (*id.* at ¶¶ 132-34); and (3) all of Plaintiffs' decedents were among those killed in the area of Drummond's operations as the AUC pursued its war strategy of murdering innocent civilians in former FARC areas to terrorize the remaining population (*id.* at ¶¶ 7, 126, 135-38, 169-70).

For purposes of the motion to dismiss, these factual contentions sufficiently allege that the unrest in Colombia did not merely provide the "background for the unfortunate events that unfolded" but that the civil war precipitated the violence that befell Plaintiffs. The AUC had intentions of fighting the FARC in Cesar and Magdalena Provinces, but the involvement of Drummond allowed more arms and manpower to make that area a new priority for the AUC. *See Sinaltrainal*, 578 F.3d

at 1267.  Thus, here, in contrast to the *Sinaltrainal* case (where all that was alleged was that because the civil war was raging at the time defendants were able to resort to openly violent means to advance their economic interests (*see In re XE Servs. Alien Tort Litigation*, 665 F.Supp.2d at 585-86)), Plaintiffs' contentions are sufficient to properly allege that the murders referenced in the Amended Complaint were "war crimes."  But having said that, in order for the First Cause of Action to survive the motion to dismiss, there must be a proper factual basis alleged to hold Drummond liable for those "war crimes."   In fact, all of Plaintiffs' claims require such a showing – that Drummond either (1) aided and abetted, (2) conspired, or (3) acted as an agent of the AUC.  Each potential ground for secondary liability is explored in Section III.D., *infra*.

> **C.     Crimes Against Humanity**

Plaintiffs' Third Cause of Action is brought under the Alien Tort Claims Act, 28 U.S.C. § 1350 – Crimes Against Humanity.  Defendant allege that Plaintiffs have failed to adequately plead that claim because: (1) the Eleventh Circuit has never held that a crime against humanity is an exception to the ATS's state action requirement; and (2) Plaintiffs have not properly alleged a widespread or systematic attack directed against a civilian population.  *See Aldana*, 416 F.3d at 1247 ("[T]o the extent that crimes against humanity are recognized as violations of international law, they occur as a result of a 'widespread or systematic attack' against civilian populations.") (quoting *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005)).

Defendants' first argument can be quickly dismissed.  While it is true that the Eleventh Circuit has never held that crimes against humanity are an exception to the ATS's state action requirement, it has never been presented with that issue.  And even if a proper assertion of state action were required to state a claim for crimes against humanity, for purposes of the motion to

dismiss, Plaintiffs have sufficiently alleged that the AUC acted as an arm of the state in attacking the civilian population of the Cesar and Magdalena provinces.  (*See* Section III.A., *supra*).

The remaining question then is whether Plaintiffs have sufficiently pled a widespread or systematic attack directed against a civilian population.  Crimes against humanity require "proof of numerous attacks."[17] *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 480, n.24 (S.D. N.Y. March 25, 2005).  "A widespread attack is one conducted on a large scale against many people, while a systematic attack is an organized effort to engage in the violence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp.2d 633, 670 (S.D. N.Y. 2006). The requirement of "widespread or systematic" is disjunctive, not cumulative.  *See Bowoto v. Chevron Corp.*, 2007 WL 2349343, No. 99-2506, at *3 (N.D. Cal. Aug. 14, 2007).  Neither concept has been defined by the Eleventh Circuit, but Defendants allege that the claim for crimes against humanity fails on both disjunctive counts, and because the decedents were targeted as suspected members of the FARC, and not as general members of the civilian population.  (*See* Doc. #37 at 11-15).

The concept of "widespread" action has been defined "as massive, frequent, large-scale action, carried out collectively with considerable seriousness."  *Bowoto*, 2007 WL 2349343 at *3 (internal citations and quotations omitted).  It involves "some degree of scale" and excludes "single or isolated acts."  *Id.* (internal citations and quotations omitted).  Defendants point out that here "only" sixty seven specific killings are alleged to have occurred in two provinces covering more than 47,000 square kilometers over a six year span.  (*See* Doc. #37 at 13).  But the First Amended

---

[17] This standard is in contrast to war crimes, which may be established by proof of the incident itself "such as a single wanton military attack on an undefended civilian target during wartime."  *Presbyterian Church*, 226 F.R.D. at 480, n.24.

Complaint also alleges that "hundreds" of people living in Drummond's railroad corridor were executed by the AUC, and "thousands" were displaced by violence. (*See* First Amend. Compl. at ¶¶ 7, 17, 162, 178, 197, 201, 225, 231). Thus, for purposes of the motion to dismiss, the crimes against humanity alleged in the amended complaint could fairly be read to be widespread.

And, for purposes of the motion to dismiss, the crimes against humanity alleged in the amended complaint can fairly be read to be systematic. The term "systematic refers to the organized nature of the acts of violence and the improbability of their random occurrence." *Bowoto*, 2007 WL 2349343 at *3 (internal citations and quotations omitted). It "requires a high degree of orchestration and methodical planning . . ." *Id.* (internal citations and quotations omitted). The First Amended Complaint is rife with allegations elucidating the planning and organization that precipitated the violence. (*See, e.g.* First Amend. Compl. at ¶¶ 226, 227, 228, 299).

But the problem for Plaintiffs is that they cannot eat their cake and have it, too. The "targeting of a select group of civilians – for example, the targeted killing of a number of political opponents – cannot satisfy the requirements of" crimes against humanity. *Bowoto*, 2007 WL 2349343 at *3. Plaintiffs repeatedly point out in their Amended Complaint that, although the decedents were purportedly not FARC members or supporters, they were targeted *because of* their suspected connection with the FARC, not as general members of the population. (*See* First Amend. Compl. at ¶¶ 7, 111, 126, 128, 130, 131, 132, 135, 136, 230, 231) ("None of Plaintiffs' decedents were with the FARC or supported it" and "All of the people killed by the AUC in the area of Drummond's rail line in Cesar were executed as suspected FARC members or supporters."). As such, by definition, the decedents were not regarded as members of the civilian population, but rather as military targets "suspected of engaging in certain behavior." *See Bowoto*, 2007 WL 2349343 at

18

*3-4, 10 (outlining factors that could be taken into account to determine whether an attack is widespread or systematic "vis-a-vis this civilian population" and explaining that the attack must have been against a broad category of individuals, rather than against a limited and randomly selected number of individuals) (internal citations omitted); *see also Aldana*, 416 F.3d at 1247 (holding that plaintiffs' allegations of systematic and widespread efforts against organized labor in Guatemala were too tenuous to establish a prima facie case of crimes against humanity).  Indeed, in their opposition to the motion to dismiss, Plaintiffs make no attempt to assert that the victims of the attacks meet the definition of "civilian population" for purposes of a crimes against humanity claim. (*See* Doc. #38 at 28-29).  Thus, because Plaintiffs have failed to adequately plead crimes against humanity, the Third Cause of Action is due to be dismissed.

>        **D.       Drummond's Secondary Liability**

Although the basic elements of the First, Second, and Fourth Causes of Action have been sufficiently alleged (*see* discussion *supra* Sections III. A. and B.), they cannot stand against Drummond unless there is some basis for Drummond's liability.[18]  Secondary liability may attach on any one of the following three theories: aiding and abetting, conspiracy, or agency.  Each ground for liability is contested in the pending motion to dismiss, and each is considered below.

---

[18] There is no allegation that Defendants directly or personally engaged in the atrocities alleged in the First Amended Complaint.

1.    **General Aiding and Abetting**[19] **Liability for the Second and Fourth Causes of Action**

In the Memorandum Opinion entered on November 9, 2009, this court set out the standard required for Plaintiffs to establish aider and abettor liability for claims asserted under the TVPA and the ATS.[20]   (*See* Doc. #30 at 15-21).   Drawing on the international law standard explained in *Presbyterian Church*, 453 F. Supp.2d at 665, n.64, *aff'd* 582 F.3d 244 (2d. Cir. 2009),[21] *Khulumani v. Barclay Nat'l Bank*, 504 F.3d 254, 276 (2d. Cir. 2007), and *Almog v. Arab Bank PLC*, 471 F. Supp.2d 257, 286, n. 33 (E.D. N.Y. 2007), a plaintiff is required to allege: (1) the principal violated international law; (2) the defendant knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal

---

[19] Defendants, while recognizing that the Eleventh Circuit binds this court to accept the premise that aiding an abetting claims are cognizable under the ATS, preserve their argument, for appeal purposes, that aiding and abetting liability is not cognizable under the ATS as a matter of law. (*See* Doc. #13 at 8, n.5).

[20] In the original motion to dismiss, Defendants argued that the same standard applied to ATS claims for aider and abettor liability should be applied to TVPA claims for aider and abettor liability. (*See* Doc. #13 at 28).   Plaintiffs did not disagree then (*see* Doc. #20 at 8, 29) nor do they now (*see* Doc. #38 at 9-24).   Therefore, because the ATS is the most analogous statute to the TVPA, its standards on aiding and abetting liability are properly applied to the TVPA.   (*See* Doc. #30 at 26-27; *see also* discussion Section III.E.2., *infra* on the ATS and TVPA as analogous statutes).

[21] As this court referenced in its first Memorandum Opinion on the issue, *Sosa* supports the broader principle that the scope of liability for ATS violations should be derived from international law.   *See Sosa*, 542 U.S. at 732, n. 20 (a consideration related to whether the ATS provides jurisdiction over a norm is "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual.").

20

venture; and (5) the defendant was aware that his acts assisted the specific violation.[22]  *See Presbyterian Church*, 453 F. Supp.2d at 668.  The central dispute here remains the same as it did with the original motion to dismiss (*see* Doc. #13 at 11; *see also* Doc. #20 at 14-22) – whether Plaintiffs have sufficiently alleged facts to establish that Drummond *intended to assist* with the murders alleged in the complaint.  (*See* Doc. #37 at 21; *see also* Doc. #38 at 9-10).  That is, for Defendants to be held liable under an aiding and abetting theory, the *mens rea* is "purpose rather than knowledge alone.  Even if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law, . . . no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law."[23]  *Presbyterian Church*, 582 F.3d at 259 (emphases in original) (internal citations omitted).  Therefore, to pass muster on the motion to dismiss, Plaintiffs must have allegations that Drummond purposefully assisted the murders alleged in the complaint, that

---

[22] Plaintiffs note, for appeal purposes, their disagreement that the standard set forth in *Presbyterian Church* is the proper one in the Eleventh Circuit for aiding and abetting. (*See* Doc. #38 at 16, n.10).  However, the court notes that expanding the standard as suggested by Plaintiffs "would violate *Sosa*'s command" that liability be limited to violations of international law with definite content and acceptance among civilized nations equivalent to "the historical paradigms familiar when § 1350 was enacted."  *Presbyterian Church*, 582 F.3d at 259.  "Recognition of secondary liability is no less significant a decision than whether to recognize a whole new tort in the first place."  *Id.*

[23] The *Presbyterian Church* case notes that "international law at the time of the Nuremberg trials recognized aiding and abetting liability only for purposeful conduct."  582 F.3d at 259.  "That purpose standard has been largely upheld in the modern era, with only sporadic forays in the direction of a knowledge standard."  *Id.* (*Compare Presbyterian Church*, 582 F.3d at 259 with Doc. #38 at 12-14) (arguing that the decisions of the Nuremberg tribunals hold that motive does not negate intent to assist).

defendants were aware of, and purposefully intended to assist in, particular acts of murder along Drummond's rail lines.[24]

Plaintiffs' First Amended Complaint includes many such conclusory allegations:[25] (1) as a result of Drummond's intervention in the civil conflict, hundreds of people living in Drummond's railroad corridor were executed as a way to ensure the local population would not support or sympathize with the FARC (First Amend. Compl. ¶ 7); (2) Drummond had specific knowledge that the AUC would commit extrajudicial killings of those who lived in and around the towns Drummond required the AUC to attack and pacify (*id.* at ¶ 154); and (3) Drummond is responsible for establishing a major force of the AUC, and providing the funds to arm and mobilize AUC troops that ultimately terrorized the innocent civilians in the area of Drummond's facilities and murdered the relatives of Plaintiffs (*id.* at ¶ 170).  But the First Amended Complaint also contains some, albeit scarce, allegations of Drummond's purposeful intent to assist in particular acts of murder along the rail lines:

> • El Tigre, commander of the Juan Andres Alvarez Front, stated:
> "Based on Drummond's direction to us, mainly provided through

---

[24] The court can find no authority for Defendants' contention that Drummond must have known of specific *identities* of those murdered, and have ordered the deaths of those specific individuals, in order to potentially be held liable for aiding and abetting extrajudicial killings.  Nor have Defendants cited to the court to any basis for that contention.  (*See* Doc. #37 at 21-22; *see also* Doc. #41 at 6-7).  Without such authority, this court must conclude that, at this time, Plaintiffs have done enough to sufficiently allege aiding and abetting based upon their factual contention that Drummond purposefully participated in murders along its rail lines.  (*See* Doc. #30 at 15-21).

[25] Plaintiffs' argument in opposition to the motion to dismiss as to Drummond's intent narrowly focuses on the purported intent to aid and abet war crimes, the standard that is discussed *infra* in Section III.D.2.  As far as intent to aid and abet extrajudicial killings, the opposition brief is silent.  (*See* Doc. #38 at 9-16, 29-32).  The court, therefore, was forced to parse through the argument on aiding and abetting war crimes for factual allegations that might be relevant to the somewhat different standard for aiding and abetting extrajudicial killings.

Alfredo Araujo, we prioritized our operations to have a major focus on the towns along Drummond's rail line where we had information that the FARC was operating or had supporters." (*Id.* at ¶ 132).

- According to El Tigre, Defendant Araujo said to Jorge 40, "Drummond is willing to provide a sum of money so that your group can strengthen itself with men and arms, so long as you commit to providing security to the railroad line and the coal operations in the mines." Further, according to El Tigre, who was at the meeting, "we were told by Araujo that the areas along the Drummond rail line that had a FARC presence had to be attacked and pacified. We all understood this. We were not talking about physical protection of property. We were talking about doing what the AUC was created to do and that is destroy the FARC and its supporters. Sometimes people from Drummond used words like "security" and we did too – it was a euphemism for going after the FARC and its supporters. We also used 'operation' as a way to say we were going to attack a FARC area. The Colombian army provided the stationary guards for Drummond's property. The AUC's role was to hunt and destroy the FARC and its supporters." (*Id.* at ¶ 157).

- [T]he Drummond representatives, including Adkins and Araujo, directed that the AUC focus on the towns along Drummond's rail line where the FARC had a presence. (*Id.* at ¶ 168).

- Drummond, through Defendant Araujo and members of the security staff, made a direct arrangement to raise funds and provide them to Colonel Mejia of the Popa Battalion so that he could pay the AUC based on the number of people killed that were suspected of being guerillas. (*Id.* at ¶ 206).

Whether or not these allegations can survive a Rule 56 motion is a matter that remains to be seen. But for now, on the pending motion to dismiss, they are sufficiently alleged. Plaintiffs' allegations go beyond merely asserting that Drummond had "[k]nowledge that such attacks had occurred and would likely occur again." *Presbyterian Church*, 453 F.Supp.2d at 676. Now they have alleged that Drummond "urged that such attacks be made." *Id.* Accordingly, the Second and Fourth Causes of Action survive the pending motion to dismiss.

2.      **Aiding and Abetting Liability for War Crimes, the First Cause of Action**[26]

The standard for holding a third party liable for war crimes under a theory of aiding and abetting is slightly different than it is for extrajudicial killings.  To constitute "war crimes," the killings alleged by Plaintiffs must have been carried out by the AUC for the purpose of advancing the AUC's interests over the FARC's in the political unrest in Colombia.  While that standard has been met for purposes of the motion to dismiss (*see* discussion Section III.B., *supra*), it must also be alleged that the Drummond Defendants, as potential aiders and abettors, shared the same *purpose* – to advance the AUC's interests over the interests of the FARC.  *See Presbyterian Church*, 582 F.3d at 259 (secondary liability may be imposed only on individuals who *purposefully* aid and abet a violation of international law).

Drummond argues that its intent in providing assistance to the AUC was merely to protect its business and not to take a side in the Colombian political unrest.  (*See* Doc. #37 at 17).  Indeed, the First Amended Complaint maintains allegations that Defendants had business motives for "join[ing] with the AUC to defeat the FARC."  (First Amend. Compl. ¶ 5).  The allegation is that Drummond began to support the AUC only after the AUC (falsely) demonstrated that it could be useful to defendants' business interests.  (*See id.* at ¶ 156).  Plaintiffs contend that there can be no fair argument from Defendants that they did not know that their provisions to the AUC were going to be used to drive out the FARC.  But two questions remain.  First, was it Defendants' *purpose* and *intent* to engage in war crimes?  (*See* Doc. #38 at 10) ("Plaintiffs need only show that Drummond's

---

[26] *See* footnote 23, *supra*.

intent was to assist war crimes . . .").  Second, what does it mean to purposefully and intentionally engage in war crimes, and to what extent may profit motive negate involvement in war crimes?

The Eleventh Circuit has not directly spoken to these issues, but case law does provide some insight.  In *In re Sinaltrainal*, the district court held that the plaintiffs had not stated a claim for war crimes in part because the plaintiffs in that case did not allege that those murdered were, or were suspected of being, supporters of any side of the Colombian civil war.  474 F.Supp.2d at 1287-88 (the allegations in *Sinaltrainal* were that plaintiffs "were non-combatants in the civil war" and that those plaintiffs were "targeted for violence to further Defendants' business interest in becoming union-free, and the paramilitaries, acting on behalf of Defendants, were able to use violence to accomplish this end with impunity because there is a raging civil war that creates a lawless environment.").  As discussed in Section III.B., *supra*, the situation in this case is different.  Those murdered are specifically alleged to have been murdered because of their suspected connection with the FARC – the suspected connection with the FARC now *coincides* with Drummond's business motives.  That Drummond did not have a military objective for inserting itself into the conflict is not dispositive of this motion.  This is the case because lack of motive does not negate intent to assist the underlying acts that may be war crimes.  *See In re XE Services Alien Tort Litigation*, 665 F.Supp.2d at 587 ("Defendants would require that the conduct allegedly constituting a war crime be committed in direct furtherance of a military objective.  Under this standard, an ATS action would not lie where defendants were motivated by ideology or the prospect of financial gain, as plaintiffs allege here.  Indeed under defendants' proposed rule, it is arguable that nobody who receives a paycheck would ever be liable for war crimes.").

Plaintiffs have asserted that Defendants hired the AUC to oust from around Drummond's rail lines suspected FARC members; therefore, they have sufficiently alleged that Drummond chose a side in the Colombian political unrest.  It is immaterial that the company may not have chosen the side of the AUC to further a military objective (indeed, Plaintiffs seem to contend that it allowed its desire for money profits to cloud its judgment).  Even if there was a lack of military objectives, Plaintiffs have sufficiently alleged that Drummond *purposefully* and *intentionally* inserted itself in the civil unrest raging in Colombia.  The allegations of the First Amended Complaint clearly allege that the company could have hired and maintained a private security firm to maintain security along its rail lines but, instead, purposefully hired the AUC to defeat suspected members of the FARC in the areas in which it conducted business.  (*See* First Amend. Compl. ¶¶ 4 (Drummond initially stated that it would remain neutral in the civil conflict between the leftist guerillas – in a September 13, 1995 memo from Defendant Adkins to Mike Tracy, the President of Drummond, Adkins as head of security for Drummond, suggested that the short run goal for the company should be to keep its head down and mine coal); ¶ 5 (By no later than 1999, Drummond formally took a side in the civil conflict and joined with the AUC to defeat the FARC and drive its remnants out of Cesar and Magdalena Provinces.  For its part, Drummond financed a significant expansion of the AUC's Juan Andres Alvarez Front, based in Cesar Province.  Along with providing this Front funds to arm and supply over 165 new soldiers, Drummond provided it with its day-to-day operating expenses.); ¶ 6 (Drummond re-prioritized and directed the strategy of the Front, conditioning ongoing support on requiring it to focus on defeating the FARC and eliminating its supporters and sympathizers in the area of Drummond's railroad line going through Cesar and Magdalena Provinces.  During the first year of Drummond's formal relationship with the AUC, Drummond escalated its own role and began

coordinating the collection of funds from other companies and individuals in the area.); ¶ 131 (Drummond's ultimate decision in November, 1999 to provide the AUC's Juan Andres Alvarez Front substantial payments allowed the AUC to have more arms and men when attacking those areas); ¶ 132 (based on Drummond's direction, provided through Alfredo Araujo, the AUC prioritized their operations to have a major focus on the towns along Drummond's rail line); ¶ 134 (providing security for Drummond meant fighting the AUC's military enemy, the FARC, because the FARC viewed Drummond as a military target); ¶ 179 (A former solider in the Popa Battalion stationed on the Drummond property, Edwin Guzman, stated under oath that the chief of security for Drummond at the mine property, retired Colonel Rodriguez, met regularly with Samario and with Cebolla, two paramilitary commanders.  Rodriguez gave information to these commanders and encouraged them to do more to pursue the guerillas that were attacking the rail lines.  Further, as previously alleged, Drummond made its own agreement to provide funds to Popa Battalion commander Colonel Mejia, so that he could pay the AUC funds based exclusively on how many suspected guerillas were executed.)).

    More than merely claiming that Drummond took advantage of the political unrest in Colombia for selfish business motives and "indirect" economic benefit, these allegations cross an important line.  There are now accusations that Defendants "precipitated" and "orchestrated" the violence as opposed to merely "capitalizing on the hostile environment," and that the killings were carried out to advance the AUC's military and political goals (in addition to advancing Drummond's business motives).  *See In re Sinaltrainal*, 474 F.Supp.2d at 1289; *see also Sinaltrainal*, 578 F.3d at 1266 and *In re Xe Services Alien Tort Litigation*, 665 F.Supp.2d at 587, 585 ("[P]laintiffs must plead that the alleged conduct was perpetrated in the context of, and in association with, the armed

conflict;" and a murder committed "for reasons unrelated to the conflict" by one who "merely takes advantage of the civil disorder that invariably accompanies an armed conflict" cannot be a war crime.).  Simply stated, Plaintiffs contend that Defendants redirected the focus of the civil unrest, and "took the side" of the AUC because the FARC viewed Drummond as a military target.  *See Presbyterian Church*, 453 F. Supp.2d at 676.  Thus, unlike the plaintiffs in *Presbyterian Church* who pointed to no evidence that Talisman urged that attacks be made, here we have allegations that Drummond urged the attacks.  And similarly, unlike the plaintiffs in *Presbyterian Church*, who pointed to activities of the company that "generally accompany any natural resource development business or the creation  of any industry," here we have allegations that Drummond provided increased support specifically to the AUC).  Plaintiffs, at least for now, do not need direct evidence of purpose.  *See Presbyterian Church*, 582 F.3d at 263 ("[I]ntent must often be demonstrated by the circumstances, and there may well be an ATS case in which a genuine issue of fact as to a defendant's intent to aid and abet the principal could be inferred . . .");[27] *see also In re Xe Services Alien Tort Litigation*, 665 F.Supp.2d at 587, 585 ("[F]actors such as temporal and geographic proximity to the armed conflict, the nature of the conduct, and the identity of the victims must . . . be considered" in the question of whether a defendant acted with a purpose related to the objectives of the armed conflict. ).  There may not be sufficient evidence to support these allegations and Plaintiffs may not be able to clear the hurdle of a motion for summary judgment on the issue of

---

[27] Intent could not be inferred in the *Presbyterian Church* case on the following reasoning: "[I]f ATS liability could be established by knowledge of those abuses coupled with such commercial activities as resource development, the statute would act as a vehicle for private parties to impose embargos or international sanctions through civil actions in the United States courts.  Such measures are not in the province of private parties but are, instead, properly reserved to governments and multinational organizations."  582 F.3d at 264.

Drummond's intent to participate in the "course of hostilities." But that is a question for the future. It simply is not in play now on a motion to dismiss.

Because *Sosa*'s command is now met – *i.e.*, Plaintiffs have sufficiently alleged a substantial nexus between the armed conflict and the alleged conduct of Drummond – Plaintiffs' First Cause of Action survives the renewed motion to dismiss. *See Sosa*, 542 U.S. at 729.

### 3.   Conspiracy

Plaintiffs also seek to hold Drummond liable under the secondary liability theory of conspiracy. In *Cabello v. Fernandez-Larios*, the Eleventh Circuit recognized conspiracy liability under the ATS for a number of violations of international law.[28] 402 F.3d at 1159 (11th Cir. 2005). Although the Eleventh Circuit has not spoken to what standard for conspiracy liability applies under the TVPA, this court has previously held that the standard used in the ATS applies to the TVPA. (*See* Doc. #30 at 27) ("In instances such as these, with no clear guidance coming from the statute itself, courts, including the Eleventh Circuit, generally look to the most analogous statute to fill in the gaps.").

A showing of conspiracy requires the following: (1) two or more persons agreed to commit a wrongful act; (2) defendants joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy. *Cabello*, 402 F.3d at 1159 (citing *Halberstam v. Welch*, 705 F.2d 472, 481, 487 (C.A. D.C. 1983)). The existence of a conspiracy agreement does not have to be proven by direct evidence. "Instead,

---

[28] Defendants recognize that the *Cabello* decision is binding on this court, yet preserve for appeal the issue of whether conspiracy to commit extrajudicial killing is a violation of the law of nations under the ATS. (*See* Doc. #13 at 19, n.9; *see also* Doc. #37 at 26, n. 12).

it can be inferred from the conduct of the alleged participants or from circumstantial evidence of the scheme." *See In re Chiquita Brands Internat'l, Inc.*, 2010 WL 432426, Nos. 08-01916-MD, 08-20641-CIV-KAM at *12 (S.D. Fla. Feb. 4, 2010) (internal citations and quotations omitted).

The recent Second Circuit decision of *Presbyterian Church* sheds further light on the practical requirements of these elements. A claim of conspiracy under the ATS/TVPA requires the same proof of *mens rea* as aiding and abetting claims – a showing of intent, and not merely knowledge.[29] 582 F.3d at 260. And further because the same standards control on the issue of intent in the conspiracy context as apply in the area of aiding and abetting, and because Defendants have argued only that they did not have the requisite intent to meet those particular standards, (*see* Doc. #37 at 27-30, 30-32; *see also* Doc. #41 at 7-8) the court concludes that the First, Second, and Fourth Causes of Action may proceed on theories of conspiracy.

### 4.    Agency

Defendants also challenge that Plaintiffs' claims can stand on a theory of agency. (*See* Doc. #37 at 32-33). Both parties agree that to prove agency, Plaintiffs must show that the paramilitaries acted on Defendants' behalf and under Defendants' control, and that the sixty seven murders alleged in the First Amended Complaint were within the scope of that relationship. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 787 (11th Cir. 2005). The Restatement (Second) of Agency further explains the formation of the relationship between principal and agent as follows: "The principal must in some manner indicate that the agent is to act for him, and the agent must agree to

---

[29] While the *Cabello* decision and the *Presbyterian Church* decision do not agree on the standard which should be applied to determine conspiracy (the *Cabello* decision applies domestic law while *Presbyterian Church* applies international law), even the domestic law standard requires proof that the defendant "joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it." *Presbyterian Church*, 582 F.3d at 260, n. 11.

act on the principal's behalf and subject to his control." *Ware v. Timmons*, 954 So.2d 545, 552-53 (Ala. 2006) (quoting Restatement (Second) of Agency § 1 cmt. a (1958)).

While there are sufficient allegations in the First Amended Complaint that Drummond directed the AUC to redirect its focus on the towns around Drummond's rail lines (*see* First Amend. Compl. at ¶¶ 132, 134) and that certain murders along the rail lines were within the scope of the relationship between the AUC and Drummond (*see id.* at ¶ 179), what is wholly missing from the First Amended Complaint are any allegations that the AUC acted "under the control of" Drummond. *See Wilson v. Direct Cable Techs., Inc.*, 964 F.Supp. 1548, 1553 (M.D. Ala. 1997) (noting that agency requires that the defendant reserved the right to direct not only what shall be done, but how it shall be done). To the contrary, the Amended Complaint appears to concede that Drummond's support of the AUC did not in any way alter the AUC's mission in the areas in which the FARC had established a stronghold (*see* First Amend. Compl. at ¶¶ 130, 131, 132, 134) or change the AUC's targets or methods (*see id.* at ¶¶ 134, 137).

But what are present in the First Amended Complaints are allegations that Defendants ratified the conduct of the AUC in providing security to Drummond. (*See id.* at ¶ 203). Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act as to some or all persons is given effect as if originally authorized by him." *Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F.Supp.2d 1269, 1283 (M.D. Ala. 1999) (quoting Restatement (second) of Agency § 94). More specifically, a principal ratifies the acts of his agent when the principal: (1) had actual knowledge of the wrongful conduct; (2) knew or should have known that the conduct constituted a tort; and (3) armed with that knowledge, failed to take adequate steps to remedy the situation. *See id*. Plaintiffs allege that Drummond's ongoing payments

to the AUC, with full knowledge of the specific acts of violence and terror committed in and around Drummond's rail line, constitute ratification.  (*See* First Amend. Compl. ¶¶ 138, 141-53; *see also* Doc. #38 at 27).

In response, Defendants argue that the theory of ratification is insufficiently pled in the First Amended Complaint, lacking allegations that Defendants were made aware that the violent acts were done "on behalf of" Drummond and lacking evidence of the benefits Drummond gained from the AUC's acts.  (*See* Doc. #41 at 10).  While the opposition to the motion to dismiss does not specifically set out those elements (*see* Doc. #38 at 27-28), the First Amended Complaint does.  (*See* First Amend. Compl. ¶¶ 132, 168 (alleging that Drummond directed the commander of the Juan Andres Alvarez Front to focus on the towns around Drummond's rail lines), 154 (alleging that Drummond wanted the AUC to pacify the population in and around its rail lines), 206 (alleging that Drummond made payments to the AUC based on the number of suspected guerillas executed).  Therefore, at least for now, Plaintiffs' agency claims may stand on a theory of ratification.

### E.  Standing Under the Torture Victims Protection Act and Alien Torts Claims Act

Article III of the Constitution limits federal court jurisdiction to "cases" and "controversies." Whether a case or controversy exists turns on "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Wendy's Intern, Inc. v. City of Birmingham*, 868 F.2d 433, 436 (11th Cir. 1989) (quoting *Maryland Casualty Co. v. Pacific Oil Co.*, 312 U.S. 270, 273 (1941)).

As part of the case or controversy analysis, the court must evaluate a party's standing to bring a lawsuit.  Standing is a snapshot of the justiciability of a plaintiff's claims at the time of filing.

*Atlanta Gas Light Co. v. Aetna Casualty and Surety Co.*, 68 F.3d 409, 414 (11th Cir. 1995).

Standing requires, at an "irreducible minimum," that a plaintiff have an "actual or threatened injury

resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action,

and that the injury is likely to be redressed by favorable court disposition." *Id*.  The concept

emphasizes "whether the party invoking federal court jurisdiction has 'a personal stake in the

outcome of the controversy,' and whether the dispute touches upon 'the legal relations of parties

having adverse legal interests.'" *Flast v. Cohen*, 392 U.S. 83, 100-101 (1968) (internal citations

omitted).  If a party lacks standing to bring a lawsuit, then the court lacks subject matter jurisdiction

to hear the case, and the litigation is due to be dismissed pursuant to Rule 12(b)(2) of the Federal

Rules of Civil Procedure.

### 1.    The Torture Victims Protection Act

The TVPA "authorizes Federal courts to hear cases brought by or on behalf of a victim of

any individual who subjects a person to torture or extrajudicial killing." H.R. Rep. No. 102-367(I),

1992 U.S.C.C.A.N. 84, 87.  The note to 28 U.S.C. § 1350 explains that liability attaches for

extrajudicial killing "for damages to the individual's legal representative, or to any person who may

be a claimant in an action for wrongful death."  It is on this note that Plaintiffs rely to assert that they

have standing.  (*See* Doc. #38 at 32).

Plaintiffs contend that they have amended their complaint to "remove all claims for their own

personal damages, leaving for each decedent a single legal representative, in most cases the surviving

spouse, and in all cases the person who is the legal representative for the decedent under the law of

Colombia."  Defendants contend that such allegations remain deficient because they do not

"affirmatively allege that Plaintiffs seek damages on behalf of the victims."  (*See* Doc. #41 at 14).

33

In addition, Defendants contend that the First Amended Complaint fails to establish that Plaintiffs are the personal representatives of the decedents' estates under Alabama law and thus proper claimants to an action for wrongful death.  (*See* Doc. #37 at 34; Doc. #41 at 14-15).

The First Amended Complaint does allege that Plaintiffs "seek damages for war crimes, extrajudicial killings and crimes against humanity under the ATS and TVPA committed against their relatives who were innocent civilians murdered in furtherance of the civil conflict between the AUC and the FARC."  (First Amend. Compl. ¶ 17).  There are no claims for personal damages, as those have all been omitted.  *See Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp.2d 46, 54, 55 (D.C. Cir. 2008) ("The plain language and the legislative history of the TVPA make clear that standing is limited to the victim himself or one bringing a claim on behalf of the victim."); *see also Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp.2d 19, 30 (D. D.C. 2007) (holding that representatives of victims of aircraft terrorism lacked standing to sue Libyan director of airline security because the TVPA allows only for suit by victims or legal representatives asserting victims' claims, and representatives in the case were asserting their own damages claims).  The claims now revolve around the fact that Plaintiffs are wrongful death beneficiaries[30] seeking damages on behalf of the allegedly murdered victims.  (*See* First Amend. Compl. ¶¶ 18-84).

---

[30] The court is not willing, at this stage in the proceedings, to declare that because Plaintiffs have failed to allege that the are the personal representatives of the decedents under Alabama law, they lack standing to bring their claims.  (*See* Doc. #37 at 34) ("Under Alabama law, Plaintiffs can be claimants to an action for wrongful death only if appointed by the probate court as the personal representative of the decedent.") (internal citations and quotations omitted).  All Plaintiffs have alleged their relationship with the deceased victim.  In most cases that person is the surviving spouse, and in all cases Plaintiffs contend that they are each the legal representative for a decedent under Colombian law.  (*See* First Amend Compl. ¶¶ 17-84).  Plaintiffs are not required at this stage of the proceedings to prove that they have been declared the personal representatives of the decedents' estates.

While the court agrees with Defendants that the First Amended Complaint could be clearer on the subject, for now, on a motion to dismiss, Plaintiffs have done enough to establish standing. The facts as alleged now demonstrate that Plaintiffs' First Amended Complaint falls "within the zone" of interests protected by the statute. *See Bischoff v. Osceola County*, 222 F.3d 874, 883 (11th Cir. 2000); *see also CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (noting that each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof "*i.e.* with the manner and degree of evidence required at the successive stages of the litigation.") (internal citations and quotations omitted). Therefore, Plaintiffs have standing to bring their claims under the Torture Victims Protection Act.

### 2.        The Alien Torts Claims Act

As earlier set out (*see* Section III.A., *supra*) the Alien Tort Claims Act  provides district courts original jurisdiction "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  *Sinaltrainal*, 578 F.3d at 1261 (quoting 28 U.S.C. § 1350).  Federal subject matter jurisdiction exists for an ATS claim when the following three elements are satisfied: (1) an alien (2) sues for a tort (3) committed in violation of the law of nations. *See id.* (citing *Aldana*, 416 F.3d at 1246).   But the ATS provides no guidance on the issue of standing.

With the presence of such a gap, courts generally look to the most analogous statute for guidance.  In the case of the ATS, several courts, including the Eleventh Circuit, have referenced the TVPA as the most analogous statute.  *See Arce v. Garcia*, 400 F.3d 1340, 1345 (11th Cir. 2005) (adopting the TVPA's statute of limitations where ATS did not provide one "because the statutes – and the policies behind the statutes – are similar," including "purpose," "mechanism," and "location within the United States Code"), *vacated on other grounds*, 434 F.3d 1254 (11th Cir.

2006); *see also Estate of Cabello v. Fernandez-Larios*, 157 F. Supp.2d 1345, 1355 (S.D. Fla. 2001) ("When a federal statute does not specify key details, such as standing, federal courts generally borrow analogous state law …"), *overruled on other grounds*, 416 F.3d 1242 (11th Cir. 2005).  Thus, because Plaintiffs have standing to sue under the TVPA (*see* Section III.E.1, *supra*), they necessarily have standing under the ATS as well.

**IV.**      **Conclusion**

For the foregoing reasons, the motion to dismiss (Doc. #37) is due to be granted in part and denied in part as follows: (1) that portion of Defendants' motion seeking dismissal of the First, Second, and Fourth Causes of Action is due to be denied but (2) the motion is due to be granted to the extent it seeks dismissal of the Third Cause of Action.  A separate order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this ____30th____ day of April, 2010.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

36