FILED

2011 Mar-11  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CLAUDIA BALCERO GIRALDO, et al.,** | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:09-CV-1041-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC.; DRUMMOND LTD.; AUGUSTO JIMENEZ; ALFREDO ARAUJO; and JAMES ADKINS,** | } | |
| | } | |
| | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the September 15, 2010 Motion to Dismiss (Doc. #78) filed by Defendant James L. Adkins and the December 23, 2010 Motion to Dismiss the Second Amended Complaint (Doc. #109) filed by Defendant Alfredo Araujo.  The court also has before it the September 15, 2010 Motion to Dismiss (Doc. #81) filed by Defendant Augusto Jimenez.  Pursuant to the court's orders of July 21, 2009, September 22, 2010, December 28, 2010, and January 14, 2011, the motions to dismiss (Docs. #78,  81, 109) are under submission and are considered herein after having heard oral argument on March 8, 2011.  (Doc. #130).

Having considered the briefs and evidentiary submissions, the court finds that Defendant Adkins' motion to dismiss (Doc. #78) and Defendant Araujo's motion to dismiss (Doc. #109) are both due to be granted, but that Defendant Jimenez's motion to dismiss (Doc. #81) is due to be denied.

## I.   <u>Relevant Procedural History and Facts</u>

The extended procedural history and facts relevant to this case have been fleshed out extensively in this court's previous Memorandum Opinions (Docs. #30, 43, 45, 112) addressing various motions to dismiss and will not be set out at length again herein.  However, for purposes of the pending motions to dismiss (Docs. #78, 81, 109) currently before the court for review, it is worth reiterating that the Second Amended Complaint contains allegations that a total of five defendants should be held liable to Plaintiffs on theories of aiding and abetting, conspiracy, and/or agency for committing violations of the law of nations.  Three counts (Counts I, II, and III) are pled under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and Count IV is pled under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, note.  Three of the five defendants named in the complaint are individuals – Augusto Jimenez, Alfredo Araujo, and James Adkins.  Each of those individual defendants have filed motions to dismiss.  (Docs. #78, 81, 109).  In support of his motion to dismiss, James Adkins argues that: (1) there is no personal jurisdiction over him in this court; (2) this court lacks subject-matter jurisdiction over Count II for failure to allege a widespread or systematic attack directed against a civilian population; (3) Plaintiffs' theories of secondary liability as to Adkins are insufficient to support subject-matter jurisdiction under the ATS (Counts I and II), or to state a claim under the TVPA (Count IV); and (4) the case against Adkins should be dismissed pursuant to the international comity doctrine.  (*See generally* Doc. #79).  In support of his motion to dismiss, Alfredo Araujo argues that: (1) there is no personal jurisdiction over him in this court; and (2) the claims should be dismissed on the grounds of international comity.  (*See generally* Doc. #109).  And in support of his motion to dismiss, Augusto Jimenez argues that: (1) the Second

Amended Complaint fails to allege a claim against Mr. Jimenez; and (2) this court should abstain from deciding these claims based on principles of international comity.[1]  (*See generally* Doc. #81).

The court discusses the pending motions (Docs. #78, 81, 109) of Adkins, Araujo, and Jimenez below.

## II.    <u>Standard of Review</u>

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a defendant. *See* FED. R. CIV. P. 12(b)(2).  "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir.2009); *see also Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir.1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction.").  If the plaintiff satisfies his initial burden and the defendant then challenges personal jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.  *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268 (11th Cir.2002); *see also Posner*, 178 F.3d at 1214 ("The plaintiff bears the burden of proving 'by affidavit the basis upon which jurisdiction may be obtained' only if the defendant challenging jurisdiction files 'affidavits in support of his position.'" (citation omitted)). When the issue of personal jurisdiction is decided on the evidence, but without a discretionary hearing, a plaintiff demonstrates a "prima facie

---

[1]  During oral argument on March 8, 2011, counsel for Jimenez conceded that the comity argument could be affected by what the Eleventh Circuit does in *Baloco v. Drummond Co.*, No. 09-16216, 2011 WL 321646 (11th Cir. Feb. 3, 2011).  Therefore, for purposes of this memorandum opinion, the court addresses only whether Plaintiffs have stated a claim against Jimenez.

case of personal jurisdiction" by submitting evidence sufficient to defeat a motion made pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir.2006). At this evidentiary juncture, the court construes the complaint's allegations as true if they are uncontroverted by affidavits or deposition testimony, *id.* at 1317, and where there are conflicts, the court "construe[s] all reasonable inferences in favor of the plaintiff." *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 199 Fed. Appx. 738, 741 (11th Cir.2006) (quoting *Meier*, 288 F.3d at 1269).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). A court may dismiss a complaint under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). That is, if a plaintiff "ha[s] not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.*; *see Ashcroft v. Iqbal*, 139 S.Ct. 1937, 1953 (2009) (holding that *Twombly* was not limited to antitrust cases but rather was based on an interpretation and application of Federal Rule of Civil Procedure 8).

In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc)). Further, "[a] complaint may not be dismissed because

4

the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* [plausible] theory."[2] *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)).   Nevertheless, conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal.  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *see Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[A] plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim.  We will thus not accept as true conclusory allegations or unwarranted deductions of fact.") (internal citations omitted); *Kirwin v. Price Commc'ns. Corp.*, 274 F. Supp. 2d 1242, 1248 (M.D. Ala. 2003) ("[A]lthough the complaint must be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged."), *aff'd in part*, 391 F.3d 1323 (11th Cir. 2004).

**III.    Analysis of Adkins and Araujo's Motions**

    **A.    Personal Jurisdiction**[3]

---

[2] *Twombly* teaches that the correct standard is whether a plaintiff's claims are "plausible." 550 U.S. at 547.

[3] This court is bound to address the issue of personal jurisdiction first.  "A defendant may join objections to jurisdiction under Rule 12(b)(2) with a motion to dismiss for failure to state a claim or any other defenses that are assertable by motion without waiving the jurisdictional defense . . . As a general rule, when the court is confronted by a motion raising a combination of 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was stated by the complaint."  C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d*, § 1351 at 243-44; *see also Arrowsmith v. United Press Int'l.*, 320 F.2d 219, 221 (2d. Cir. 1963) (holding that it was error for district court to dismiss action for failure to state a claim prior to addressing challenges to personal jurisdiction and venue, because dismissal on the former ground would be with prejudice, while dismissal for either of the two latter grounds would be without prejudice).

The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis. *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir.1990); *see also Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989). First, the jurisdictional question under the state long-arm statute is considered.[4] *See Cable/Home Communication Corp.*, 902 F.2d at 855; *see also Alexander Proudfoot Co.*, 877 F.2d at 919. If there is a basis for the assertion of personal jurisdiction under the state statute, that is, minimum contacts with the forum, the next determination to be made is whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Cable/Home Communication Corp.*, 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919. The nature and quality of the contacts may vary depending on whether the type of jurisdiction being asserted is specific or general. *See Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant.

The reach of the Alabama long-arm statute is a matter of Alabama law. Federal courts are required to construe it as would the Alabama Supreme Court. *See Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890-891 (11th Cir. 1983). Alabama's long-arm

---

[4] When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, as are the ATS and the TVPA, the Federal Rules of Civil Procedure direct this court to look to the state long-arm statute in order to determine the existence of personal jurisdiction. *Cable/Home Communication Corp.*, 902 F.2d at 855.

statute permits personal jurisdiction to the extent it "is not inconsistent with the constitution of this state or the Constitution of the United States." ALA. R. CIV. P. 4.2(b). Thus, the question here is whether assertion of personal jurisdiction over the individual defendants comports with the Fourteenth Amendment's Due Process Clause. *See Olivier v. Merritt Dredging Co., Inc.*, 979 F.2d 827 (11th Cir. 1992) (citing *Alabama Waterproofing Co., Inc. v. Hanby*, 431 So.2d 141, 145 (Ala. 1983)). Compliance with the Fourteenth Amendment's Due Process Clause exists where the defendant has minimum contacts with the forum state, and where the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." *Olivier*, 979 F.2d at 830-831; *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (quoting *International Shoe*, 326 U.S. at 316).

There are two types of personal jurisdiction: specific and general. Specific jurisdiction is based on a party's contacts with the forum state that arise out of or are related to the cause of action. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *see also Consolidated Dev.*, 216 F.3d at 1291. Plaintiffs contend that this court has jurisdiction over James Adkins and Alfredo Araujo based upon specific jurisdiction. (*See* Doc. #91 at 29) ("Plaintiffs' assertion of jurisdiction over Adkins is based on specific jurisdiction . . ."); (*see also* Doc. #114 at 5) ("The court has specific jurisdiction over Araujo"); (Doc. #123 at 1) ("Having conceded that there is no general jurisdiction over Mr. Araujo, Plaintiffs offer two theories of specific jurisdiction . . .").

The exercise of specific jurisdiction is proper over a nonresident defendant when he has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 473, 475 (1985) (internal citations omitted); *Consolidated Dev.*, 216 F.3d at 1291 ("Specific jurisdiction

7

arises out of a party's activities in the forum that are related to the cause of action in the complaint. It has long been recognized that a court has the minimum contacts to support specific jurisdiction only where the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'") (internal citations omitted). The requirement that there be minimum contacts is grounded in fairness. It assures that "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In cases of international defendants, the court should consider "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system." *Asahi Metal Indust. Co., Ltd. v. Superior Court*, 480 U.S. 102, 114 (1987).

To show that a litigation "arises out of" the activities in the forum state, the Eleventh Circuit does not use "mechanical or quantitative" tests, *see Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222 (11th Cir. 2009); however, it is "not enough that there be some similarity between the activities that connect the defendant to the forum and the plaintiff's claim." *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 n. 3 (11th Cir. 2008). The defendant's contacts with the forum must be related to the "operative facts of the controversy." *Id.* Questions of specific jurisdiction are examined in the context of the particular claims asserted – here, those claims are grounded in intentional tort. To properly determine jurisdiction, "a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 783 (1984) (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

It is under this rubric that the court considers whether it has personal jurisdiction over James Adkins and Alfredo Araujo.

**B.      The Second Amended Complaint Fails to Allege Facts Establishing this Court's Specific Personal Jurisdiction over James Adkins**

The Second Amended Complaint makes the following allegations against James Adkins:

•        Defendant James Adkins was the Director of Security for Drummond's operations in Colombia.   Hired by Drummond from the CIA, Defendant Adkins had full knowledge of the AUC's terrorist activities at the time he was hired.  Adkins reported to both Gary Drummond and other Alabama-based Drummond officers, as well as the Defendant Jimenez.  On behalf of the Drummond Defendants, Defendant Adkins approved the payments to the AUC as described herein.  (Doc. #55, ¶ 135).

•        Further, from 1995-99, Defendant Adkins, using personnel of his extensive and experienced security department, as well as his regular briefings with the military personnel based on the Drummond property, and through meetings with Defendant Araujo, Jaime Blanco and others with direct links to the AUC had detailed and extensive knowledge of the operations of the AUC, the FARC, other leftist guerilla groups, and the military.  From 1995 on, Adkins prepared detailed intelligence reports for Drummond, and he reported his findings to Drummond officers, including Defendant Jimenez, Mike Tracey and Gary Drummond.  Thus, in 1999 when Drummond made a formal arrangement with the AUC to provide substantial support to the Northern Block and the Juan Andres Alvarez Front, Drummond had specific and detailed knowledge of the AUC's brutal methods and tactics.  (Doc. #55, ¶ 191).

•        According to Jairo Jesus Charris Castro, who was until March 1999 the Security Coordinator for Viginorte, the private security company used by Drummond in Colombia that also was a front group for the AUC, he regularly observed security meetings involving not only Defendants Adkins and Araujo with General Pena and Colonel Lineros in 1998-99, but that Gary Drummond, the chief executive officer of Drummond, Mike Tracy, the President of Drummond, and Defendant Augusto Jimenez, among others, participated in security briefings that included discussions of the activities of the AUC and the FARC as they related to Drummond's areas of operation in Colombia.  (Doc. #55, ¶ 197).

•        Even if Drummond was somehow ignorant of the AUC's record of extreme violence at the moment it began funding the AUC on a large scale in 1999, from that moment on, Defendant Adkins and Araujo, on behalf of Drummond, closely monitored the AUC's actions and were fully aware of the violence that was done by the units directly supported by Drummond.  They reported their observations in regular briefings to Defendant Jimenez, Mike Tracy, and Gary Drummond.  Further, in September 2001, the AUC was formally and publicly designated as a terrorist

9

organization by the U.S. State Department. Drummond was aware of this designation and continued to fund the AUC until 2006, when the AUC formally demobilized. The violent acts from 1996-2001 that led to the AUC's designation as a terrorist organization were widely reported and were certainly known to Drummond through Defendants Araujo and Adkins. (Doc. #55, ¶ 198).

• Defendant Araujo and his friend Jorge 40, and thereafter . . . Defendant Adkins and Jorge 40 and his representatives agreed that the initial and later monthly payments were to be used to recruit at least 165 new soldiers so that the Juan Andres Alvarez Front would be able to successfully attack and destroy the FARC and its supporters in the areas along Drummond's rail line. (Doc. #55, ¶ 206).

• Drummond, Araujo, and Adkins did not make a general contribution to the AUC's overall treasury. Rather, the funds were specifically [and solely] dedicated by Drummond's direction to buy arms and supplies to equip more than 165 additional men to add to the Juan Andres Alvarez Front so that it could effectively attack and defeat the FARC. (Doc. #55, ¶ 207-08).

• El Tigre was captured by the Colombian authorities on July 19, 2000. Jorge 40 then assigned the command of the Juan Andres Alvarez Front to Tolemaida, who continued the AUC's war against the FARC. After the change in power, Defendant Adkins participated in a November, 2000 meeting between Drummond officials and top AUC leaders. The meeting occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Defendant Adkins was accompanied by Defendant Araujo and Jaime Blanco, the previously described friend of Defendant Araujo's who ran the cafeteria concession at the Drummond mine, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and several other armed AUC members. At this meeting, Defendants Adkins and Araujo approved a payment to the AUC on behalf of Drummond for the assassination of the top leaders of the Drummond union, including Locarno and Orcasita. Locarno and Orcasita were murdered by the AUC on March 12, 2001. The union leaders were pulled off a company bus on their way home from their shift in the Drummond mine and executed by the AUC. Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Samario, participated as well. (Doc. #55, ¶ 211).

• In early May 2001, Defendants Adkins and Araujo met again with the top leaders of the AUC. (Doc. #55, ¶ 213). At this meeting Drummond, through Adkins and Araujo, made an agreement with Jorge 40 to make an additional large cash payment to the AUC of approximately $1.5 million (U.S.) and regular monthly payments of approximately $100,000 (U.S.) to continue to support the AUC troops and equipment for the Juan Andres Alvarez Front to continue to attack and destroy the FARC . . . [and] to maintain a permanent base . . . (Doc. #55, ¶ 214).

- As a further example that Drummond and the AUC had a specific shared purpose of using violent means to exterminate leftist guerillas suspected of being associated with the FARC, both Defendants Adkins and Araujo, as well as one other Drummond executive from the Alabama headquarters who will be identified following discovery of travel records, met with the top leaders of the AUC and directed that the AUC assassinate the two top union leaders at Drummond, Valmore Locarno Rodriguez (hereinafter Locarno) and Victor Hugo Orcasita Amaya (hereinafter Orcasita). Locarno and Orcasita were murdered by the AUC on March 12, 2001, after being pulled off a company bus. (Doc. #55, ¶ 227).

- The meeting between Defendants Adkins, Araujo, and another Drummond executive and the AUC leaders was in November, 2000. The meeting occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Defendants Adkins and Araujo were also accompanied by Jaime Blanco, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and several other armed AUC members. At this meeting, Defendant Adkins, on behalf of Drummond, approved a payment to the AUC for the assassination of Locarno and Orcasita. Also present was Jaime Blanco's head of security, Jairo Jesus Charris Castro. (Doc. #55, ¶ 228).

- In addition to the meetings between Drummond and the AUC between November 1999 and April 2006 that allowed Drummond to receive updates on the progress of the AUC's war against the FARC, Drummond's own security staff, including Defendant Adkins and his employees and agents, gathered detailed intelligence on executions and other acts of violence carried out by the AUC in furtherance of Drummond's agreement with the AUC. Defendant Adkins made regular reports to the officers of Drummond based in Alabama, including Mike Tracy and Gary Drummond. (Doc. #55, ¶ 242).

Plaintiffs attempt to use these allegations, along with Adkins' concession that "he has had regular contacts with the state of Alabama in connection with his work for the Drummond Defendants,"[5] as grounds for this court to assert specific personal jurisdiction over James Adkins. (*See* Doc. #91 at 29). The argument proceeds to raise additional unsupported contentions that are

---

[5] Plaintiffs argue that Adkins had regular contacts with the state of Alabama because he stated in his declaration that he "traveled to Alabama intermittently to meet with Drummond officials." (Doc. #91 at 29). Neither the English language nor the court equate the word "regular" with "intermittent."

simply absent from the Second Amended Complaint – that Adkins' had meetings with Drummond officials in Alabama which "gave rise to Plaintiffs' claims of human rights abuses" (Doc. #91 at 29) and that "while in Alabama, Defendant Adkins engaged in planning and obtaining approval for specific actions, which resulted in injuries to Plaintiffs in Colombia" (Doc. #91 at 36, 38). Instead of alleging that the murders were planned in Alabama, the Second Amended Complaint clearly focuses (as set out at length above) on Adkins' conduct within the borders of Colombia. It was in that country, Colombia, that Adkins allegedly worked as the Director of Security for Drummond, approved payments to the AUC, engaged in regular briefings with military personnel, prepared intelligence reports on executions and other acts of violence carried out by the AUC, participated in security briefings, monitored the AUC's actions, approved payments to the AUC, and met with top leaders of the AUC, (Doc. #55, ¶¶ 135, 191, 197, 198, 211, 227, 242). In fact, the *only* alleged contacts Adkins had with the state of Alabama were to report intelligence findings to Drummond officers who, presumably, were sitting in the state when the reports were made. (*See* Doc. #91 at 29).

These allegations are simply insufficient to satisfy Plaintiffs' prima facie burden of presenting evidence of personal jurisdiction. *See Madara*, 916 F.2d at 1514 (the prima facie burden is satisfied when a plaintiff presents "enough evidence to withstand a motion for directed verdict"); *see also Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) ("Plaintiffs' burden in alleging personal jurisdiction is to plead sufficient material facts to establish the basis for exercise of such jurisdiction."). There is *nothing* in the Second Amended Complaint to even suggest that on any of his intermittent trips to Alabama, James Adkins discussed intelligence in furtherance of Drummond's agreement with the AUC (much less plotted while in Alabama with Drummond

officials to pay the AUC to commit murder).   (*Cf.* Doc. #91 at 29-30).   To the contrary, the allegations of the Second Amended Complaint uniformly set out actions of Adkins *in Colombia*. (*See* Doc. #55, ¶¶ 190-191, 206-207, 211, 213, 214, 221, 227-228, 231).   The court cannot conclude that the allegations of the Second Amended Complaint are sufficient such that Adkins' contacts with Alabama could be related to Plaintiffs' cause of action or give rise to it.   *See Vermeulen v. Renault U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993); *see also GCIU-Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1024 (7th Cir. 2009) (under "operative facts" test, the "action must *directly arise* out of the specific contacts between the defendant and the forum state") (internal citation and quotation omitted) (emphasis in original).[6]

Further, there is nothing in the Second Amended Complaint to suggest that Adkins has purposefully availed himself of the benefits of the forum state, or that he should reasonably expect to be haled into court here in Alabama.   *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010).   It is clear that Plaintiffs allege that Adkins purposefully availed himself of Colombia – what is not present in the Second Amended Complaint is any allegation that Adkins purposefully availed himself of Alabama.   *See Calder*, 465 U.S. at 789 (holding that because California was "the focal point both

---

[6] Moreover, even if there was some allegation in the pleadings (as opposed to argument in the briefs) that Adkins communicated to Drummond executives about murders carried out in Colombia while those executives were sitting in Alabama (and to be clear there is not), the Supreme Court has cautioned against using this type of contact in minimum contacts analysis because it does not show Adkins' decision to take advantage of the forum state; rather, he was merely communicating with his supervisor and could not dictate where those communications took place. *See Burger King*, 471 U.S. 475 (citing *Kulko v. California Superior Court*, 436 U.S. 84, 93 (1978) (forbidding the exercise of personal jurisdiction over divorced husband whose only connection to forum was created by his former spouse's decision to settle there)); *see also Dole Food Co. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002) ("Nor do we believe that personal jurisdiction may be asserted whenever a foreign employee communicates with a corporation's headquarters about foreign operations.").

of the story and the harm suffered," the non-resident defendant had purposefully availed himself of the jurisdiction and was subject to personal jurisdiction in California); *see also Consolidated Dev.*, 216 F.3d at 1292 (rejecting specific jurisdiction because "the cause of action involves properties in Cuba, which were expropriated by the Cuban government, and which have allegedly been developed by the Canadian defendants."); *Licciardello*, 544 F.3d at 1285-88 (summarizing cases employing *Calder* test and concluding that non-resident was subject to jurisdiction in Florida because his out-of-state conduct was calculated to cause injury to a person in Florida); *Norment Security Group, Inc. v. Granger Northern, Inc.*, 2009 U.S. Dist. LEXIS 13724 at *49 (M.D. Ala. Feb. 23, 2009) (Watkins, J.) (analyzing assertion of specific jurisdiction and holding that the "alleged tort wrongdoing by these Defendants was wrought by them in states other than Alabama," and therefore that the "focal point" was not Alabama but New England).

Perhaps recognizing that their Second Amended Complaint fails to allege any actions by Adkins which would connect him to the forum state, Plaintiffs make an alternative argument that they should be afforded the opportunity to take jurisdictional discovery which "would allow this court to make a better-informed decision before taking the drastic step of cutting loose a key defendant from this litigation at such an early stage." (Doc. #91 at 30). The Eleventh Circuit allows and, when warranted, favors jurisdictional discovery in certain circumstances. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997) ("Resolution of a pretrial motion that turns on findings of fact – for example, a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) – may require some limited discovery before a meaningful ruling can be made."); *see also Majd-Pour v. Georgiana Community Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984) ("Although the plaintiff bears the burden of proving the court's jurisdiction, the plaintiff

14

should be given the opportunity to discover facts that would support his allegations of jurisdiction . . . . We recognize that the district court has discretion to determine the scope of discovery.").

In order for jurisdictional discovery to be appropriate, however, there must be a genuine question of fact to be resolved. *See Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 n. 7 (11th Cir. 1982) (explaining that jurisdictional discovery is most helpful where the jurisdictional question is genuinely in dispute) (internal citations and quotations omitted). Jurisdictional discovery is simply not appropriate on Plaintiffs' unplead, speculative "hunch" that Adkins' limited contacts with Alabama had something to do with the cause of action alleged in the Second Amended Complaint. *See Instabrook Corp. v. Instantpublisher.com*, 469 F. Supp.2d 1120, 1127 (M.D. Fla. 2006) (denying jurisdictional discovery where "Plaintiff has only generally requested such discovery, without explaining how such discovery would bolster its contentions."). Plaintiffs have made no allegation (nor have they proffered any contravention of Adkins' testimony) on the subject of jurisdiction from which the court could even begin to draw a favorable inference for Plaintiffs on the issue of jurisdiction, despite the fact that this is the Second Amended Complaint (*i.e.*, their third pleading) in this the third case brought by their counsel based upon similar facts. Short of dreaming up outlandish scenarios that could justify allowing jurisdictional discovery inquiring whether Adkins' conduct in Alabama was related in some way to Plaintiffs' cause of action, the court can envision no set of facts discovered at jurisdictional discovery that could possibly equate to Adkins' *purposeful availment* of *this* forum. And Plaintiffs have pointed to nothing to convince the court that any set of facts could establish Adkins' purposeful availment of Alabama. While they argue that granting them "the opportunity to flesh out their allegations by establishing even more facts showing that Defendant Adkins took part in meetings in Alabama regarding plans to pay the AUC would not be

futile"(*see* Doc. #91 at 32), Adkins' business ties with Alabama (even assuming he has some more than what has already been alleged in the Second Amended Complaint), "would not [on their own] be enough to overcome all of the other factors which weigh against jurisdiction." *See Vesuna v. CSCS Intern. N.V.*, Slip Copy, 2010 WL 5064462, No. 10-10042 at *2 (11th Cir. Dec. 13, 2010).

Perhaps it is even more telling that Plaintiffs have already had a flavor of what jurisdictional discovery would bring forth in this case, and the answer is nothing new.  Plaintiffs took Adkins' deposition in the *Romero* case and, at the hearing, it was disclosed that the Drummond Defendants have been providing documentary discovery and answering interrogatories in this case.  Discovery has failed to reveal even one meeting in Alabama which Adkins participated in which would permit a fact-based argument of his purposeful availment of the forum state.  That alone closes the door on the question of whether jurisdictional discovery would be appropriate here.

While the court agrees with Plaintiffs that some courts have struggled with *Calder*'s import, what is clear from *Calder* is that courts generally deny specific jurisdiction in a forum that does not hold the "focal point" of the injury.  There is nothing in the Second Amended Complaint alleging that Adkins purposefully directed any of his allegedly tortious conduct toward Alabama or that he purposefully availed himself of the protection of the forum, and thus this case stands in stark contrast to the contract decisions cited by Plaintiffs on purposeful availment (including *Burger King*, which was referenced at the hearing).  (*See* Doc. #91 at 35) (citing *In re Oil Spill by Amoco Cadiz off Cost of France on March 16, 1978*, 699 F.2d 909, 917 (7th Cir. 1983) and *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 (5th Cir. 1981) ("Logically, there is no reason why a tort cannot grow out of a contractual contract.  In a case like this, a contractual contract is a 'but for' causative factor for the tort since it brought the parties within tortious 'striking distance' of one another.").

16

Therefore, the court concludes jurisdictional discovery is not appropriate in this case and it is not a close question.[7]  *See Majd-Pour*, 724 F.2d at 903 ("Although the plaintiff bears the burden of proving the court's jurisdiction, the plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction."); *see also Schutz Container Sys., Inc. v. Mauser Corp.*, No. 1:09-cv-03609-RWS, 2010 WL 5087865 at *4 (N.D. Ga. Dec. 7, 2010) (denying jurisdictional discovery where allegations in complaint "fail to suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between the party and the forum state' necessary to justify such jurisdictional discovery.") (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d. Cir. 2003)).  Defendant James L. Adkins' Motion to Dismiss (Doc. #78) is due to be granted.[8]

**C.    The Second Amended Complaint Also Fails to Allege Facts Establishing this Court's Specific Personal Jurisdiction over Alfredo Araujo**

The Second Amended Complaint makes the following allegations against Alfredo Araujo:[9]

_____

[7] Had Plaintiffs been able to establish both the relatedness and purposeful availment prongs of the specific jurisdiction inquiry, the burden would have shifted to Adkins to present a "compelling case" that the exercise of jurisdiction would be unreasonable.  *See Burger King Corp.*, 471 U.S. at 476-78.  In deciding whether the assertion of jurisdiction over the defendant comports with traditional notions of fair play and substantial justice, the court considers multiple factors such as: the burden on the defendant, the forum state's interest in adjudicating the dispute, the Plaintiffs' interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of several states in furthering fundamental substantive social policies.  *See id.* at 477.  The court notes that Adkins is a resident of West Virginia, has not had any contacts with Alabama for ten years, and that the primary jurisdiction with an interest in adjudicating any claims brought against Adkins is Colombia, the site of the alleged wrongs and as the forum of the Plaintiffs.

[8] Because this court lacks personal jurisdiction over Adkins, it is unnecessary, and would be imprudent, for this court to consider Adkins' additional grounds for his dismissal from this lawsuit.  *See* footnote 3, *supra*.

[9] Some allegations against Araujo have heretofore been outlined in the analysis of specific personal jurisdiction related to Adkins and will not be reiterated in this section.  (*See* Section III.B., *supra*).

- Defendant Alfredo Araujo is a Vice President of Drummond Ltd., and among other positions, is Director of Community Relations. He has been close friends with the AUC Commander "Jorge 40" since childhood. Defendant Araujo and his family had close ties to Jorge 40 and other AUC leaders. As is described more fully below, when the AUC formed, the Araujo family played a prominent role. Three close family members of Defendant Araujo, his cousin, Hernando Molina Araujo, a former governor of Cesar Province, another cousin, Alvaro Araujo Castor, a former Senator, and his uncle, Alvaro Araujo Noguera, a former Minister of Agriculture, are in jail for their participation in and support for the AUC. Defendant Araujo used his family relationship and connection to Jorge 40 to make the initial arrangements for Drummond to make substantial payments to the AUC. Araujo made the plan with Jorge 40. He then used his position in the company to get Defendant Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared with AUC the goal of eradicating the FARC and other leftist guerillas and prevailing in the ongoing civil conflict. (Doc. #55, ¶ 134).

- The Drummond Defendants have a personal and direct connection to the origin of the AUC. Defendant Alfredo Araujo was a close friend since childhood of Rodrigo Tovar Pupo, alias Jorge 40, who was one of the original founders of the AUC along with Carlos Castano and Salvatore Mancuso. Several of Defendant Araujo's close relatives joined Jorge 40 as active members of the AUC. Defendant Araujo served the AUC by leading efforts to garner financial support for the AUC from multinational companies, including Araujo's eventual employer, Drummond. (Doc. #55, ¶ 160).

- . . . Even the unionists we killed for Drummond . . . we killed because Alfredo Araujo Castro, who had an important position with Drummond, told Tolemaida and me they were leftist guerillas who were helping the FARC. (Doc. #55, ¶ 179).

- In 1999, when Drummond made a formal arrangement with the AUC to provide substantial financial support to the Northern Block and the Juan Andres Alvarez Front, Defendant Araujo, acting as Drummond's primary contact with the AUC, had specific and detailed knowledge of the AUC's record of terror due to his discussions with Jorge 40, Tolemaida, and Jaime Blanco, and other AUC leaders with whom he had a personal relationship. (Doc. #55, ¶ 189).

- In November 1999, Defendant Araujo, on behalf of Drummond, met with Jorge 40 and other AUC members, including El Tigre, "Guerrero," "Kevin," "Cortico," "Pelo de Puya," "El Enano," "Pirulo," and "Cachaco," to discuss a plan to get major Drummond funding for the AUC and the Juan Andres Alvarez Front. Defendant Araujo explained to Jorge 40 that there had been a recent FARC attack on the Drummond rail line, but that for the Drummond executive in the U.S. to approve significant funding for the AUC, there had to be another attack, and the AUC had to

demonstrate that it could respond effectively with a swift and violent counterattack on the FARC.  Defendant Araujo directed that the AUC should stage a new attack on the rail line, and make it look like FARC's 41st Front had attacked the rail line again.  This, Defendant Araujo assured Jorge 40, would cause the Drummond executives in Alabama to agree to make payments to enhance the AUC's presence in the areas along the Drummond rail line.  (Doc. #55, ¶ 202).

•     Jorge 40 assigned El Tigre and "Pirulo" to conduct the staged attack on the Drummond line, which they successfully did in April 2000.  Following the attack, as per the agreement with Defendant Araujo, the AUC distributed pamphlets in the town of Loma de Potrerillo attributing the attack to the FARC's 41st Front . . . (Doc. #55, ¶ 204).

•     After the successful staging of a rail attack, Drummond made its first large payment to the AUC and its Juan Andres Alvarez Front.  Jorge 40 sent El Tigre and "Amin" to the town of Las Palmitas, near the back entrance to the Drummond mine.  Drummond employees whose names are not known delivered three boxes filled with US dollars.  Amin opened the boxes to verify the contents.  The funds were then delivered to Jorge 40 by his men.  (Doc. #55, ¶ 205).

•     The Juan Andres Alvarez Front, under El Tigre's command, also murdered a man named "Daniel," who Defendant Araujo specifically directed them to execute based on Araujo's assertion that Daniel was a guerilla.  They killed him in La Loma near the Platanal bridge.  (Doc. #55, ¶ 210).

•     . . . At [a] meeting [in Valledupar] Garcia witnessed Defendant Araujo give Jorge Castro Pacheco a suitcase filled with money.  Defendant Araujo and Jorge Castro Pacheco talked openly about the purpose of this money – to take violent measures against union workers at Drummond.  Garcia heard Defendant Araujo say to Jorge Castro Pacheco that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond.  It was clear from things said in this conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Defendant Araujo and Jorge 40.  Defendant Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems."  Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Defendant Araujo.  (Doc. #55, ¶ 212).

•     When Drummond first agreed to provide substantial support to the AUC in November 1999, Drummond, through Defendant Araujo, provided the specific targets for the AUC's attacks on towns along the Drummond rail corridor.  Plaintiffs' decedents were executed because Drummond specifically directed the AUC to these areas.  (Doc. #55, ¶ 220).

- Defendant Araujo met with the AUC leaders frequently due to his personal friendships with Jorge 40, Tolemaida and Jaime Blanco. On several occasions, Araujo provided names of persons to be executed in furtherance of the agreement between Drummond and AUC to eliminate persons suspected of being members of supporters of FARC. As previously alleged, Defendant Araujo provided at least 40 names to the AUC of persons to be executed as suspected guerillas in furtherance of the agreement between Drummond and the AUC. Further, according to Samario, hundreds of other civilians were murdered as the AUC implemented its agreement with Drummond to destroy the FARC and pacify the towns along the rail corridor. Further, as previously alleged, Drummond also made a specific agreement in early 2000 to assume a larger role in assisting the AUC and its mission by raising funds from other businesses and individuals and channeling some of these funds to the Popa Battalion so that Colonel Mejia had funds to pay the AUC based on the number of executions it tallied. Plaintiffs' decedents were among those killed as part of the AUC's operations funded by Drummond. (Doc. #55, ¶ 243).

In addition to these allegations, Plaintiffs assert that Araujo has "many other Alabama contacts." (Doc. #114 at 3). In support of this assertion, Plaintiffs point to (1) Araujo's deposition in the *Romero v. Drummond* case wherein Araujo testified that he spoke with Gary Drummond on some occasions in the United States, at least once for the purpose of discussing work; (2) in 2007, Araujo met with Drummond's lawyers in Alabama to discuss the *Romero* case; (3) Araujo indirectly participated in the *Romero* trial when the parties read excerpts from Araujo's testimony into the record at trial; and (4) Araujo reports directly to Augusto Jimenez, the President of the Colombian branch of Drummond, who has a residence in Florida. (Doc. #114 at 3-5).

To recap, personal jurisdiction over a non-resident defendant is only appropriate if the defendant has sufficient minimum contacts with the forum, and if the exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." *International Shoe Co.*, 326 U.S. at 316. Plaintiffs bear the burden of making a prima facie showing that minimum contacts exist. *See Oldfield*, 558 F.3d at 1217. Specific jurisdiction, the type Plaintiffs allege this court has over Araujo here (*see* Doc. #114 at 5-8), "arises out of a party's activities in the

forum that are related to the cause of action alleged in the complaint." *Consolidated Dev.*, 216 F.3d at 1291. The defendant must purposefully avail himself of the privilege of conducting activities in the forum state, and defendant's contacts with the forum must relate to the cause of action or give rise to it. *See Oldfield*, 558 F.3d at 1220 (internal citations omitted). The parties do not dispute that this is the standard governing the personal jurisdiction inquiry as to Araujo. (*See* Doc. #109 at 6; *see also* Doc. #114 at 2). Instead, they focus their arguments on whether Araujo has sufficient minimum contacts with Alabama to satisfy the test.[10]

Plaintiffs first assert that Araujo's contacts with Alabama "both from inside and outside the state" are closely related to their claims. (Doc. #114 at 5). To support that allegation, Plaintiffs point to their contentions that Araujo: (1) plotted a fake FARC attack on the Drummond rail line with AUC members with the express intent to get Drummond's Alabama executives to begin payments to the AUC (Doc. #55, ¶ 202-205; *see also* Doc. #114 at 6) ("That meeting was the direct cause of the decision made in Alabama to finance the AUC, which ultimately led to all of the murders described in the [Second Amended Complaint].")); (2) met with Drummond officials in Alabama (Araujo Decl., ¶ 11); (3) met with Alabama lawyers in connection with the *Romero* case (Araujo Decl., ¶¶ 10, 13); and (4) provided testimony in the *Romero* trial. (Doc. #114 at 5). But only the first two grounds for jurisdiction are potentially related to the claims in *this* case.[11] (*See also* Doc.

---

[10] Plaintiffs correctly state that in his motion to dismiss, Araujo argues only that his contacts with Alabama had nothing to do with the alleged cause of action. He does not allege that the purposeful availment prong of the specific jurisdiction inquiry is unmet. (*See* Doc. #109 at 6 ("There can be no specific personal jurisdiction in this case because Plaintiffs do not allege any conduct by Mr. Araujo in Alabama related to Plaintiffs' claims."); (*see also* Doc. #114 at 5, n. 3).

[11] *See United States v. Subklew*, No. 003518CIVGRAHAM, 2001 WL 896473 at *2 (S.D. Fla. June 5, 2001) (finding that party's defense of a prior similar suit in the forum could not be a basis for personal jurisdiction in a later suit).

#123 at 2).  Paragraphs 202 through 205 of the Second Amended Complaint allege that Araujo was involved in a plan "to get major Drummond funding for the AUC and the Juan Andres Alvarez Front" and that in order "for the Drummond executives in the U.S. to approve significant funding for the AUC, there had to be another attack."  (Doc. #55, ¶ 202).  Staging an attack on Drummond's rail line "would cause the Drummond executives in Alabama to agree to make payments to enhance the AUC's presence in the areas along the Drummond rail line."  (Doc. #55, ¶ 202).  Thus, Plaintiffs allege, it was Araujo's intent to cause Drummond's Alabama executives to act in a certain way – by having such intent, Araujo allegedly purposefully directed his activities to Alabama and the injuries alleged in the complaint arose out of that activity.  (*See* Doc. #114 at 6).

But even taking as true the allegations of the complaint, the court can find no case law supporting Plaintiffs' contention that Araujo's intent to get Alabama executives to act in Colombia is sufficient to establish Araujo's purposeful availment of Alabama as a forum.[12]  *See, e.g., Burger King Corp.*, 471 U.S. at 482 (holding that intent may be sufficient where contacts with the forum state are direct and substantial).  Perhaps more importantly, as it was the single ground against personal jurisdiction raised by Araujo himself, there is nothing in the Second Amended Complaint to even suggest that Araujo's visits to or other contacts with the state of Alabama had anything to do with the allegations of the complaint.  To satisfy the requirements for specific jurisdiction, Plaintiffs must allege contacts by Araujo with Alabama that somehow led (or were sufficiently related) to the

---

[12] Plaintiffs cite *Asahi* for the contention that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State . . . . Additional conduct of the defendant [indicating] an intent or purpose to serve the market in the forum State [is necessary]."  480 U.S. at 112.  While Plaintiffs have alleged an intent or purpose to shape intentions in Alabama, there is no allegation that that intent was to serve the Alabama market.  On a more basic level, the *Asahi* theory does not apply here because Araujo is not alleged to have placed any product into the stream of commerce in Alabama.

killings of Colombian citizens in Colombia.  But it has never been alleged that Araujo personally conducted himself in (or even toward) Alabama in a way related to this case (*e.g.*, finance the AVC's presence in the areas along the Drummond rail line).  Not only do the allegations of the complaint focus on actions Araujo took in Colombia in a purported attempt to have Alabama executives act in a certain way, but on an even more fundamental level, Plaintiffs do not allege that Araujo ever contacted anyone in Alabama with regard to the killings alleged in the complaint.  (*See* Doc. #123 at 4).  Therefore, Plaintiffs cannot establish personal jurisdiction against Araujo in Alabama because there is no allegation (and, even more importantly, no showing) that he engaged in activities in Alabama that are related to the cause of action alleged in the Second Amended Complaint.  *See Oldfield*, 558 F.3d at 1220.

1. **Plaintiffs' alternative argument that Araujo is subject to jurisdiction under Federal Rule of Civil Procedure 4(k)(2) also fails.**

Because Plaintiffs have not established personal jurisdiction over Araujo under Alabama's long arm statute, the court must address their alternative argument that Araujo is subject to this district court's jurisdiction under the "national long arm statute," Federal Rule of Civil Procedure 4(k)(2).  (*See* Doc. #114 at 12-15).

> Where, as here, a defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one state, Rule 4(k)(2) permits a court to aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claims must "arise under federal law;" and (2) the exercise of jurisdiction must be "consistent with the Constitution and laws of the United States."

*Consolidated Dev.*, 216 F.3d at 1291 (quoting Fed. R. Civ. P. 4(k)(2)).  In such cases, the rule "authorizes a district court to 'aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claims must 'arise under

federal law,' and (2) the exercise of jurisdiction must 'be consistent with the Constitution and laws of the United States.'" *Oldfield*, 558 F.3d at 1216.

Since Araujo contends that he is not subject to jurisdiction in Alabama, *see Oldfield*, 558 F.3d at 1220, n.22, and has not identified another jurisdiction in which suit would be possible, the relevant inquiry is whether Araujo's contacts with the United States in general are sufficient to establish specific jurisdiction. *See Oldfield*, 558 F.3d at 1220 n.25. As grounds for jurisdiction under the national long arm statute, Plaintiffs point to the following contacts between Araujo and the United States: (1) his 2005 deposition for the prior litigation taken in Washington, D.C. regarding Araujo's working relationship with the Colombian military, his knowledge of paramilitary groups in Cesar province, meetings concerning the deaths of Drummond union leaders, and his relationship with Jaime Blanco; (2) two meetings with the company's lawyers to discuss the prior litigation in states other than Alabama; and (3) "likely" substantial contacts with his supervisor, Jimenez, while Jimenez was living in Florida. (Doc. #114 at 14).

The problem for Plaintiffs is that their Second Amended Complaint is silent regarding what is now their strongest contention for establishing specific jurisdiction under the national long arm statute[13] – that Araujo had repeated contacts with his supervisor, Jimenez, while Jimenez was living in Florida. Nor can the court find any allegation in the Second Amended Complaint that those purported contacts with Jimenez in Florida had anything to do with the harm as alleged. Even assuming these contacts did have something to do with the harm as alleged, the Supreme Court has cautioned against using this type of contact in minimum contacts analysis because it does not show

---

[13] Araujo's participation in a deposition in Washington D.C. in which he discussed facts of a prior case are clearly insufficient to establish jurisdiction. *See* discussion *supra* on personal jurisdiction under Alabama's long-arm statute.

Araujo's decision to take advantage of the forum state; rather, he was merely communicating with his supervisor and could not dictate where those communications took place. *See Burger King*, 471 U.S. 475 (citing *Kulko*, 436 U.S. at 93 (forbidding the exercise of personal jurisdiction over divorced husband whose only connection to forum was created by his former spouse's decision to settle there)); *see also Dole Food Co.*, 303 F.3d at 1112 ("Nor do we believe that personal jurisdiction may be asserted whenever a foreign employee communicates with a corporation's headquarters about foreign operations."). This is clearly not a case where any plan allegedly hatched in the United States was intended to have any effect in the United States. *See Mwani v. bin Laden*, 417 F.3d 1, 4 (D.C. Cir. 2005) (Defendants' intention was "to cause pain and sow terror in the embassy's home country"). Therefore, this court cannot exercise jurisdiction over Araujo under Federal Rule of Civil Procedure 4(k)(2).

> **2.    Even assuming that Plaintiffs had established the case for specific personal jurisdiction over Araujo under either the Alabama long-arm statute or the national long arm statute, the motion to dismiss Araujo would nevertheless be due to be granted because the exercise of personal jurisdiction over Araujo in Alabama would offend traditional notions of fair play and substantial justice.**[14]

The fairness and justice inquiry requires the court to evaluate (1) the burden on the defendant of litigating in the forum, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, and (4) the judicial system's interest in resolving

---

[14] It is because subjecting Araujo to this court's jurisdiction would violate traditional notions of fair play and substantial justice that jurisdictional discovery is not appropriate in the case of Mr. Araujo. There is no combination of new facts that could come to light during jurisdictional discovery which would remedy the fact that the exercise of personal jurisdiction over Araujo in Alabama would offend traditional notions of fair play and substantial justice. *See Instabrook Corp.*, 469 F. Supp.2d at 1127 (denying jurisdictional discovery where "Plaintiff has only generally requested such discovery, without explaining how such discovery would bolster its contentions.").

the dispute.  *See Licciardello*, 544 F.3d at 1288; *see also Burger King*, 471 U.S. at 477.  The analysis

of these factors clearly establish that this court should not exercise jurisdiction over Araujo.

Araujo would be subject to a substantial burden if he were to be hailed into an Alabama

court.  Araujo is a Colombian citizen who has always lived and worked in Colombia.  (Araujo Decl.,

¶¶ 3, 4).  He has worked for Drummond Ltd. in Colombia since 1989, reporting to Augusto Jimenez,

the president of the Colombian branch of Drummond Ltd., in Colombia.  (Araujo Decl., ¶¶ 5, 6).

Araujo has only visited Alabama three times in his lifetime, and none of those visits had anything

to do with the allegations contained in the Second Amended Complaint.  (Araujo Decl., ¶¶ 9-12).

Certainly the burden on Araujo, should he be forced to defend himself in a foreign legal system,

would be severe.  *See Asahi*, 480 U.S. at 114 ("The unique burdens placed upon one who must

defend oneself in a foreign legal system should have significant weight in assessing the

reasonableness of stretching the long arm of personal jurisdiction over national borders.").   The

court does not find convincing Plaintiffs' argument that because Araujo testified at the *Romero* trial

"there is no need to think that sporadic trips to Alabama for deposition and trial would pose an undue

burden." (Doc. #114 at 9).  Araujo himself was not on trial in the *Romero* case.  Despite Plaintiffs'

refusal to acknowledge the point, without question defending oneself in a foreign judicial system is

wholly different than being a witness for one's employer in a foreign judicial system.

Further, because Plaintiffs are not Alabama residents, Alabama's legitimate interests in the

dispute are considerably diminished.  The Plaintiffs are Colombian.  The dispute between Plaintiffs

and all Defendants, Araujo included, is about murders committed *in Colombia* along Drummond's

rail lines *in Colombia*.  *See Asahi*, 480 U.S. at 115 ("Because the plaintiff is not a California resident,

California's legitimate interests in the dispute have considerably diminished."); *see also Madara*, 916

F.2d at 1519 (taking into account location of the plaintiffs in deciding whether Florida had an interest in adjudicating the suit). Alabama was not the focal point of the inception of the alleged harm, nor where the harm was actually carried out. Plaintiffs' arguments as to why Alabama has an interest in the dispute have more to do with why Alabama has an interest in litigating the claims against the Drummond Defendants, not why the state would have an interest in litigating the claims against the individual Defendants. For example, Plaintiffs state that Drummond's operations in Colombia are financed and managed through Alabama headquarters and that Alabama headquarters manages the day to day operations in Colombia. (*See* Doc. #114 at 10). These allegations simply do not tie Araujo to Alabama in any way. Thus, Alabama's interest in litigating the dispute is minimal at best.

Plaintiffs also have little interest in having their dispute litigated in Alabama. None of the Plaintiffs live in Alabama, nor do they have any connection to the state at all. *See Madara*, 916 F.2d at 1519 (noting as relevant to convenience factor that Florida was not a convenient forum for plaintiff because plaintiff did not live in Florida). All of the Plaintiffs are Colombian citizens who live in Colombia. That Plaintiffs believe the United States judicial system may be "more effective" than the Colombian judicial system in adjudicating their claims simply does not overcome the fact that Alabama is an inconvenient forum for Plaintiffs.[15] (*See* Doc. #114 at 10).

Finally, the United States' interest in litigating this dispute is decidedly less compelling than Colombia's interest over the same dispute. Colombia, as the site of civil unrest between the AUC

---

[15] That the position of prestige held by the Araujo family in Colombia "likely" would subject Plaintiffs to an uneven playing field in the Colombian courts is rank speculation. (*See* Doc. #114 at 11). And simply because the Northern District of Alabama oversaw a different case against corporate defendants operating in Colombia does not lend credence to the fact that the Northern District of Alabama is a convenient forum for a wholly different set of Plaintiffs to bring claims against individual foreign defendants. (*See* Doc. #114 at 11).

and the FARC, is not only best equipped to understand an individual's potential role in that dispute, but also to remedy the wrongs purportedly brought against the Plaintiffs.  Plaintiffs' argument for meeting this prong of the analysis seems to focus once again on the United States' interest in litigating the dispute between the Plaintiffs and the corporate defendants, not between the Plaintiffs and Alfredo Araujo.  (*See* Doc. #114 at 12) (citing *Doe v. Exxon Mobil Corp.*, No. Civ. A. 01-1357, 2006 WL 516744 at *2 (D. D.C. March 2, 2006) ("[T]he United States, the leader of the free world, has an overarching, vital interest in the safety, prosperity, and consequences of the behavior of its citizens, particularly its super-corporations conducting business in one or more foreign countries.")).

"Considering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff[s] and the forum state, the exercise of personal jurisdiction by a[n] [Alabama] court over [Araujo] in this instance would be unreasonable and unfair." *Asahi*, 480 U.S. at 116.  Because the facts do not establish minimum contacts such that the exercise of personal jurisdiction over Araujo is consistent with fair play and substantial justice, the claims against Defendant Araujo are due to be dismissed.

## IV.   Analysis of Jimenez's Motion

The allegations of the Second Amended Complaint contend that Jimenez violated the Alien Tort Statute ("ATS") and Torture Victims Protection Act ("TVPA") by aiding and abetting, conspiring, or ratifying the AUC paramilitaries in executions of Plaintiffs' decedents. (*See* Doc. #91 at 20).  According to the Second Amended Complaint, Jimenez, as President of Drummond Ltd. was "a direct participant in Drummond's plan to make significant payments to the AUC's Juan Andres Alvarez Front." (Doc. #55, ¶ 133).  The facts as alleged involve Jimenez's receipt of information concerning the paramilitaries' actions (Doc. #55, ¶¶ 135, 191), Jimenez's participation in security

28

briefings including discussions of the activities of the AUC and the FARC as they related to Drummond's areas of operation in Colombia (Doc. #55, ¶¶ 197, 198), and Jimenez's approval of the plan to make substantial payments to the AUC (Doc. #55, ¶ 134).  While such allegations, standing alone, would appear insufficient to overcome a motion under Federal Rule of Civil Procedure 56, for now, Plaintiffs have nudged their claims against Jimenez across the line from the conceivable to the plausible, allowing for reasonable inferences to be drawn in favor of jurisdiction.  Reading the Second Amended Complaint as a whole, Jimenez knew of the AUC's record of engaging in the Colombian civil conflict and agreed to pay that organization on behalf of Drummond.  (Doc. #55, ¶¶ 202-208).  While the Second Amended Complaint does not flesh out Jimenez's state of mind or his motivation for approving payments to the AUC, such allegations are not required at this stage of the proceedings, and a reasonable inference can be made that Jimenez's motives for approving payments to the AUC were for the purpose of participating in the murders as alleged.  *See Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct as alleged."); *see also Santiago v. Wells*, 599 F.3d 749, 759 (7th Cir. 2010) ("We think that this allegation is sufficient, at the pleading stage, to state a claim that Warden Wells actually knew or consciously turned a blind eye to an obvious risk. [Plaintiff] cannot know for certain what Warden Wells knew without discovery.").

For the foregoing reasons, Defendant Augusto Jimenez's Motion to Dismiss the Complaint (Doc. #81) is due to be denied.

V.      **Conclusion**

For the foregoing reasons, the motions to dismiss (Docs. #78, 109) of Defendants James

Adkins and Alfredo Araujo are due to be granted.  The motion to dismiss (Doc. #81) of Augusto

Jimenez is due to be denied.  A separate order will be entered dismissing all claims against

Defendant Adkins and Araujo.

       **DONE** and **ORDERED** this _____11th_____ day of March, 2011.

                               **R. DAVID PROCTOR**
                               UNITED STATES DISTRICT JUDGE