FILED
2011 Sep-29  AM 09:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CLAUDIA BALCERO GIRALDO, et al. | ) | |
| | ) | Case No. 7:09-cv-1041-RDP |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Drummond Company, Inc.; | ) | |
| Drummond Ltd; Augusto Jimenez; | ) | |
| James Adkins; Mike Tracy, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## THIRD AMENDED COMPLAINT

## I. INTRODUCTION

1.      Plaintiffs are all lawful legal representatives for and/or wrongful death beneficiaries of the 144 decedents described herein who were executed by the Juan Andres Alvarez Front of the Northern Block of the United Self Defense Forces of Colombia ("AUC"), the umbrella paramilitary group in Colombia. Plaintiffs, in their capacities as legal representatives of the estates of the decedents and/or as wrongful death beneficiaries, bring claims for damages on behalf of the decedents and for their own damages incurred as a result of the executions of the decedents based on war crimes and extrajudicial killings under the Alien Tort Statute

("ATS") and for extrajudicial killing under the Torture Victim Protection Act

("TVPA"), 28 U.S.C. § 1350, against Defendants Drummond Company, Inc.

("DCI");  Drummond Ltd. ("DLTD");  the President of DLTD, Augusto Jiménez;

James Adkins, former Director of Security for DCI; and Mike Tracy, President of

DCI Mining Operations (hereinafter collectively referred to as "Drummond" or

"Defendants" unless otherwise specified).

2.     Drummond's Colombian coal mine is located in La Loma, Cesar

Province, and "Puerto Drummond", where it ships the coal, is located 120 miles

away in Santa Marta, Magdalena Province.  Drummond obtained the mining rights

in the mid 1980's, but did not start real production until 1995. By then, both mine

and port areas were essentially under the control of the main leftist guerilla group

in Colombia, the FARC (the Revolutionary Armed Forces of Colombia). From the

outset of its operation, Drummond, like virtually all landowners and large

businesses in these areas of Colombia, suffered attacks by the FARC. As a

communist-inspired organization, the FARC sought to overthrow the Colombian

government with violent means, seize large private lands and privately-owned

natural resources, such as Drummond's vast coal mine, and redistribute this wealth

to the Colombian peasants who lived in poverty.

3.     The AUC began establishing a presence in Cesar and Magdalena for

the sole purpose of attacking and defeating the FARC in these areas where there were important and powerful business interests and where the FARC had established a significant foothold. By 1997, the areas of Cesar and Magdalena became embroiled in the civil conflict that had engulfed Colombia as the Colombian military and the AUC joined forces to battle the FARC.

4.     Drummond initially stated that it would remain neutral in the civil conflict between the leftist guerillas, particularly the FARC, and the Colombian military and its AUC paramilitary proxies. In a September 13, 1995 memo from Defendant Adkins to Defendant Tracy, the President of Mining Operations for DCI, Adkins as head of security for Drummond indicated that he was perplexed as to why the guerillas had yet to make a significant attack on Drummond. He suggested that the short run goal for the company should be to keep its head down and mine coal. However, according to Drummond security reports, the company was formally declared a military target by the guerillas.

5.     After considering the various options, Drummond chose to enter the conflict. By no later than 1999, Drummond formally took a side in the civil conflict and joined with the AUC to defeat the FARC and drive its remnants out of Cesar and Magdalena Provinces. For its part, Drummond financed a significant expansion of the AUC's Juan Andres Alvarez Front, based in Cesar Province.

Along with providing this Front funds to arm and supply over 165 new soldiers, Drummond provided it with its day-to-day operating expenses.

6.     Further, Drummond re-prioritized and directed the strategy of the Front, conditioning ongoing support on requiring it to focus on defeating the FARC and eliminating its supporters and sympathizers in the area of Drummond's railroad line going through Cesar and Magdalena Provinces. During the first year of Drummond's formal relationship with the AUC, Drummond escalated its own role and began coordinating the collection of funds from other companies and individuals in the area. Drummond provided funds directly to the AUC and also to Popa Battalian Commander Colonel Mejia, who was in charge of the official Colombian military troops on the Drummond property. Colonel Mejia then distributed the funds supplied by Drummond to AUC leaders based on confirmed executions of suspected guerilla supporters.

7.     As a result of Drummond's direct intervention in the civil conflict in these areas, hundreds of people living in Drummond's railroad corridor were executed as the AUC utilized its well-known scorched earth methodology as a way to terrorize the local population and ensure they would no longer support or sympathize with the FARC.  Among those killed by the AUC in these operations were Plaintiffs' decedents described herein. These executions were war crimes, and

extrajudicial killings in violation of the ATS, as well as extrajudicial killings under the TVPA.

8.      The Justice and Peace process, which started yielding new facts in 2007, changed the dynamic of the prior bond and shared mission between the AUC, the Government of Colombia and the business community operating in Colombia, including Drummond. Many of the AUC leaders are now speaking freely about their relationship with the elites of the Colombian business community, particularly the Drummond Defendants, and their direct collaboration with the Colombian military, because, among other things, the AUC leaders have expressed that they were betrayed by their former government and business partners. The AUC leaders are in prison for their role in a shared crime, while the businessmen and politicians who were their partners remain free and are enjoying the substantial fruits of their criminal enterprise.

9.      The key AUC leaders and members who worked directly with Drummond are now in custody or have already served their time as part of the Justice and Peace process in Colombia, and are giving testimony and speaking to government and human rights lawyers about their alliance with Drummond. These include Salvatore Mancuso, the former head of the AUC,  Rodrigo Tovar Pupo, alias "Jorge 40," the leader of the AUC's Northern Block, Jhon Jairo Esquivel

Cuadrado, alias "El Tigre," a former commander of the Juan Andres Alvarez Front

assigned to Drummond, Alcides Manuel Mattos Tabares, alias "Samario", a former

subcommander of Juan Andres Alvarez Front,  Jairo Jesus Charris Castro, a former

AUC member who was just sentenced to 30 years in prison for his role in

murdering the union leaders at Drummond, and Rafael Garcia, a high official of the

Colombian Administrative Department of Security (Spanish Acronym: DAS;

similar to the FBI), who was also a political advisor to the top leaders of the AUC.

While many of these and other witnesses have expressed concern that they or their

family members will suffer violent retaliation for speaking out about Drummond's

relationship with the AUC, they have provided new details about Drummond to

allow justice to be served. The evidence continues to mount, but the facts alleged

by Plaintiffs herein at this time are more than sufficient to state their claims against

Drummond.


## II. <u>JURISDICTION AND VENUE</u>

10.    This Court has federal jurisdiction pursuant to 28 U.S.C. §1331, based

on the ATS and TVPA, 28 U.S.C. §1350, for the violations of international human

rights law.  Supplemental jurisdiction exists over the claim for wrongful death

under Colombian law, pursuant to 28 U.S.C. §1367, although the Court has declined to exercise this jurisdiction. Order at 34-35.

11.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) as Defendants Drummond Company, Inc. and Drummond Ltd. are Alabama corporations, with their principal places of business in Alabama.

### III.  <u>EXHAUSTION OF REMEDIES FOR TVPA CLAIMS</u>

12.     This Court has already confirmed that the law in the Eleventh Circuit is that the ATS has no requirement to exhaust local, Colombian remedies. *See* Order at 33, n. 23.  Conversely, the TVPA has an express exhaustion requirement, and Defendants have the burden of raising and establishing lack of exhaustion as an affirmative defense. Plaintiffs have met their initial burden of articulating that they had no local remedies that were not futile.  *See id.* at 33-34.

13.     Plaintiffs do not have access to an independent or functioning legal system within Colombia to raise their TVPA complaints.  Any efforts by Plaintiffs to seek redress would be futile because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk of retaliation.   In particular, there is almost complete legal impunity for murders committed in Cesar Province by the AUC.

7

14.     In fact, the collaboration between the AUC and the government of Colombia goes to the highest levels and ensures that no serious action will be taken to bring to justice in Colombia those involved in the murders alleged herein. Indeed, the administration of former Colombian President Alvaro Uribe was under pressure from outside Colombia, including from the U.S., due to the ongoing "para-political" scandal which has implicated numerous high-ranking government officials, including 60 congressional representatives aligned with Uribe, and high-ranking military officers in collaborating with paramilitaries and shielding paramilitaries from justice. However, within Colombia, it is business as usual. According to a Human Rights Watch (HRW) report issued in November, 2008, entitled, *Breaking the Grip? Obstacles to Justice for Paramilitary Mafias in Colombia*, Human Rights Watch explains that

> In Colombia, more than in almost any country in the Western hemisphere, violence has corroded and subverted democracy. Too often, killings and threats - not free elections or democratic dialogue - are what has determined who holds power, wealth in the country. Nowhere is this more evident than in the relationship between paramilitary groups and important sectors of the political system, the military and the economic elite.

> Paramilitary groups have ravaged much of Colombia for two decades. Purporting to fight the equally brutal guerillas of the left, they have massacred, tortured, forcibly 'disappeared,' and sadistically killed countless men, women, and children. Wherever they have gone, they have eliminated anyone who opposed them, including thousands of trade unionists, human rights defenders, community leaders, judges and ordinary civilians.

15.     In this same report, HRW blames the "para-political" phenomenon for the extensive paramilitary violence throughout the country. As HRW explains, "[t]he close military-paramilitary collaboration in several regions allowed the paramilitaries to commit massacre after massacre of civilians largely unimpeded and with impunity." HRW further relates that former President Uribe himself has been a major obstacle to the efforts of the Colombian Supreme Court to investigate and punish government officials for collaborating with the paramilitaries. As HRW states, "President Uribe has [r]epeatedly launched personal attacks on the Supreme Court and its members in what increasingly looks like a concerted campaign to smear and discredit the Court; [o]pposed and effectively blocked meaningful efforts to reform the Congress to eliminate paramilitary influence; [p]roposed constitutional reforms that would remove the 'parapolitics' investigations from the jurisdiction of the Supreme Court."

16.     Wholly apart from the danger of retaliation and the likelihood of undue influence in any case that might be brought by Plaintiffs in Colombia, the legal process in Colombia also makes it impossible to bring a civil action for tort damages against a corporation, and any civil action that could possibly be brought against individual Drummond Defendants would require first that they be present in Colombia and that the Colombian authorities first bring a criminal case against

these individuals. Neither of these conditions was met at the time Plaintiffs filed

their initial Complaint in this Court. Thus, Plaintiffs had no local Colombian

remedies that could have been exhausted.

## IV. PARTIES

### A.    Plaintiffs

17.    All of the decedents described herein are among the hundreds, or even

thousands, of persons murdered by the AUC's Juan Andres Alvarez Front in

furtherance of its agreement with Drummond to confront the FARC, pacify the

areas where the FARC had a foothold, and otherwise ensure that the civilian

population in and around the Drummond mine and its railroad line would not in

any way provide support or cooperation to the FARC or other leftist rebels. The

following Plaintiffs in this action, as the legal representatives of the estates and/or

as wrongful death beneficiaries, bring claims for damages on behalf of the

decedents and for their own damages incurred as a result of the executions of the

decedents based on war crimes and extrajudicial killings under the ATS and for

extrajudicial killing under the TVPA. All plaintiffs of the decedents have standing

to bring these claims, including under the ATS and TVPA, 28 U.S.C. § 1350.

18.    Claudia Jadith Balcero Giraldo is the wife and legal representative of

the Estate of Israel Alberto Roca Martinez under the laws of Colombia, and is also

a legal heir to Israel Alberto Roca Martinez under the laws of Colombia. Christian

Andres Roca Balcero and Sebastian Jose Roca Balcero are Israel Alberto Roca

Martinez's children and are also legal heirs under the laws of Colombia, but do not

act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all

wrongful death beneficiaries of Israel Alberto Roca Martinez. Plaintiffs seek all

damages permitted under the law on behalf of the decedent and all damages each

of them suffered as a result of the execution of the decedent. Israel Alberto Roca

Martinez was disappeared on March 9, 2000 in Mingillo, Cesar, Colombia by the

AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond.  Israel Alberto Roca Martinez worked as a

crime specialist in dactylography with the Cuerpo Técnico de Investigación

(Technical Investigation Team)(hereinafter "CTI" ).[1]  He was working on an

exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La

Holandesa." Men under the command of Juan Andrés Álvarez Front leader El

Tigre arrived and disappeared Israel Alberto Roca Martinez along with the other

---

[1] The CTI is a division of the *Fiscalía General de la Nación* (Office of the Attorney General of Colombia).  The CTI advises the Attorney General on policies and strategies regarding criminal investigations, forensic and genetic services, and in the management of technical and legal information as relevant to criminal investigations.

CTI colleagues who were present. He was officially proclaimed dead on March 9,
2002.

19.     Paulina Cecilia Gutierrez Mejia is the wife and legal representative of
the Estate of Hugo Alberto Quintero Solano under the laws of Colombia, and is
also a legal heir to Hugo Alberto Quintero Solano under the laws of Colombia.
Hugo Alberto Quintero Gutierrez is Hugo Alberto Quintero Solano's son; Hilda L.
Quintero de Baron, Martha Rosa Quintero Solano, Emiliano J. Quintero Solano,
Javier Quintero Solano, and Jesus Eduardo Quintero Solano are Hugo Alberto
Quintero Solano's siblings; and are also legal heirs under the laws of Colombia,
but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein
are all wrongful death beneficiaries of Hugo Alberto Quintero Solano. Plaintiffs
seek all damages permitted under the law on behalf of the decedent and all
damages each of them suffered as a result of the execution of the decedent. On
March 9, 2000, Hugo Alberto Quintero Solano was disappeared in Mingillo, Cesar,
Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which
received knowing and substantial assistance from Drummond.  Hugo Alberto
Quintero Solano worked as a legal technician with the CTI. He was working on an
exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La
Holandesa." Men under the command of Juan Andrés Álvarez Front leader El

Tigre arrived and disappeared Hugo Alberto Quintero Solano along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

20.    Karina Eugenia Saavedra Zuleta is the wife and legal representative of the Estate of Jaime Elias Barros Ovalle under the laws of Colombia, and is also a legal heir to  Jaime Elias Barros Ovalle under the laws of Colombia. Lucy del Rosario Martinez de Pineda, Olga Cecilia Martinez Ovalle, Carlos Alberto Barros Ovalle are Jaime Elias Barros Ovalle's siblings; Olga Ovalle de Barros is Jaime Elias Barros Ovalle's mother; Oscar Claro Barros Martinez is Jaime Elias Barros Ovalle's nephew; Andrea Karina Barros Saavedra is Jaime Elias Barros Ovalle's child; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of  Jaime Elias Barros Ovalle. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 9, 2000,  Jaime Elias Barros Ovalle was disappeared in Mingillo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jaime Elias Barros Ovalle worked as a dental surgeon with the CTI. He was working on an exhumation of the body of Mr. Tiberio Rivera

Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared  Jaime Elias Barros Ovalle along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

21.     Edna Margarita Carrillo Quiroz is the wife and legal representative of the Estate of Edilberto Linares Correa under the laws of Colombia, and is also a legal heir to Edilberto Linares Correa under the laws of Colombia. Justa Rufina Correa Venera is Edilberto Linares Correa's mother; Wilmer Campo Correa and Luis Javier Correa Venera are Edilberto Linares Correa's siblings; Carlos Jose Linares Carrillo is Edilberto Linares Correa's son; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Edilberto Linares Correa. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 9, 2000, Edilberto Linares Correa was disappeared in Mingillo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Edilberto Linares Correa worked as a legal investigator with the CTI.  He was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm

14

of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader

El Tigre arrived and disappeared Edilberto Linares Correa along with the other CTI

colleagues who were present. He was officially proclaimed dead on March 9, 2002.

22.     Marina Barbosa is Candido Jose Mendez Cochero's domestic partner

and legal heir. Miguelina Esther Orta Montecristo is also Candido Jose Mendez

Cochero's domestic partner and legal heir. They act jointly as the legal

representatives of the Estate of Candido Jose Mendez Cochero. Maira Marlene

Mendez Barboza, Tatiana Mendez Orta, Lila Mendez Orta, and Rafael Arturo

Mendez Barboza are Candido Jose Mendez Cochero's children, and are also legal

heirs under the laws of Colombia, but do not act as legal representatives of his

Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of

Candido Jose Mendez Cochero. Plaintiffs seek all damages permitted under the law

on behalf of the decedent and all damages each of them suffered as a result of the

execution of the decedent. On February 19, 2001, Candido Jose Mendez Cochero

was killed in Cruce De Chiriguana, Cesar, Colombia by the AUC Northern Block's

Juan Andrés Álvarez Front, which received knowing and substantial assistance

from Drummond.  Candido Jose Mendez Cochero was murdered in front of his

home at 1:45am. Paramilitaries from the Juan Andrés Álvarez Front knocked down

the front door of Candido Jose Mendez Cochero's residence, pulled him outside and shot him multiple times.

23.     Sabina Montecristo de Orta is the mother and legal representative of the Estate of Orlando Vicente Orta Montecristo under the laws of Colombia, and is also a legal heir to Orlando Vicente Orta Montecristo under the laws of Colombia. Miguelina Esther Orta Montecristo, Sol Beatriz Orta Montecristo, Jose Miguel Orta Montecristo, Maria Francisca Orta Montecristo, Nuris Maria Orta Montecristo, Cielo Orta Montecristo, Facundo Orta Montecristo, Marciano Orta Montecristo, and Alex Manuel Orta Montecristo are Orlando Vicente Orta Montecristo's siblings, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Orlando Vicente Orta Montecristo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On November 24, 2000, Orlando Vicente Orta Montecristo was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Members of the Juan Andrés Álvarez Front arrived at Orlando Vicente Orta Montecristo's residence at 1:45am, knocked down the door

and pulled him out of his house. They tied him up and later murdered him where the road forks between Santa Isabel and San Roque, Cesar, Colombia.

24.     Jhon Esneider Aranche Fernandez is the son and legal representative of the Estate of Ingrid Fernandez Angarita under the laws of Colombia, and is also a legal heir to Ingrid Fernandez Angarita under the laws of Colombia. Gilma Angarita Montagut is Ingrid Fernandez Angarita's mother; Wendys Tatiana Ballesteros Fernandez and Diofer Jesus Ballesteros Fernandez are Ingrid Fernandez Angarita's children; Gabriel Vicente Fernandez Angarita is Ingrid Fernandez Angarita's brother; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Ingrid Fernandez Angarita. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 2, 2003, Ingrid Fernandez Angarita was killed on an unmaintained road known as Siberia in Bosconia, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 1:00pm Ingrid Fernandez Angarita was traveling on a bus from Bosconia, Cesar, Colombia to the town of Valledupar, Cesar, Colombia, when members from the Juan Andrés Álvarez stopped the bus, pulled her off and shot her multiple times in the head.

17

25.     Jhon Esneider Arnache Fernandez is the son and legal representative of the Estate of Fernando Arnache Cadena under the laws of Colombia, and is also a legal heir to Fernando Arnache Cadena under the laws of Colombia. Jhon Esneider Arnache Fernandez is the wrongful death beneficiary of Fernando Arnache Cadena. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. On April 2, 2003, Fernando Arnache Cadena was killed on an unmaintained road known as Siberia in Bosconia, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 1:00pm, Fernando Arnache Cadena was traveling on a bus from Bosconia, Cesar, Colombia to the town of Valledupar, Cesar, Colombia, when members from the Juan Andrés Álvarez stopped the bus, pulled him off and shot him multiple times in the head.

26.     Jaime Nieto Cuello is the brother and legal representative of the Estate of Jowes Isaac Nieto Cuello under the laws of Colombia, and is also a legal heir to Jowes Isaac Nieto Cuello under the laws of Colombia. Jerardith Nieto Cuello is Jowes Isaac Nieto Cuello's sister, and is also his legal heir under the laws of Colombia, but does not act as legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of  Jowes Isaac Nieto Cuello.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On November 14, 2002, at 7:00pm  Jowes Isaac Nieto Cuello's friend arrived in a white car to  Jowes Isaac Nieto Cuello's residence. His friend told him that there was a car that had broken down on the side of the road and that the owners were in the car. Jowes Isaac Nieto Cuello accompanied his friend, but when he arrived he was assaulted, tortured and  his arm was broken when he struggled for his life. He was shot three times in the head, once in the thorax and once in the spinal cord. His family found him the next day at 9:00am.

27.     Selva Maria Orta Ditta is the domestic partner and legal representative of the Estate of Graciano Barrios Benavides under the laws of Colombia, and is also a legal heir to Graciano Barrios Benavides under the laws of Colombia. Maria Alejandra Barrios Orta, Maria Angelica Barrios Orta, Mary Luz Barrios Orta, and Luz Marly Barrios Orta are Graciano Barrios Benavides's children, and are also his legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Graciano Barrios Benavides. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 24, 2002, Graciano Barrios Benavides was

disappeared on the road leaving Rinconhondo, Cesar, Colombia going towards Curumani, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Graciano Barrios Benavides needed to travel to Curumani to get money for an operation.  He chartered a car to drive him from Rinconhondo to Curumani, but when the car arrived at 4:00pm there was no sign of him. Graciano Barrios Benavides was never seen or heard from again.

28.    Graciela del Carmen Botello is the domestic partner and legal representative of the Estate of Victor Rafael De La Hoz Mercado under the laws of Colombia, and is also a legal heir to Victor Rafael De La Hoz Mercado under the laws of Colombia. Graciela del Carmen Botello is the wrongful death beneficiary of Victor Rafael De La Hoz Mercado. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On July 17, 2004, Victor Rafael De La Hoz Mercado was killed in Poponte, Chiriguana, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 10:00pm two men from the Front arrived at Victor Rafael De La Hoz Mercado's residence and knocked on his door. Victor Rafael De La Hoz Mercado opened the door and the men told him that he needed to leave with them.

20

The men took him and within 15 minutes his family heard the fatal shot that took Victor Rafael De La Hoz Mercado's life.  The following day the men came back to the house and told Victor Rafael De La Hoz Mercado's family that he was dead and to go pick up the body.

29.     Vianny Manjarrez Melo is the domestic partner and legal representative of the Estate of Fradid Enrique Yepes Mure under the laws of Colombia, and is also a legal heir to Fradid Enrique Yepes Mure under the laws of Colombia. Leider Enrique Yepes Manjarez, Lucellys Johana Yepes Manjarrez, and Angie Paola Yepes Manjarrez are Fradid Enrique Yepes Mure's children and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Fradid Enrique Yepes Mure. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On May 5, 2005, Fradid Enrique Yepes Mure was disappeared on Santa Isabel Farm in Curumani, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Fradid Enrique Yepes Mure left for work the night before with his son, Fradid Enrique Yepes Manjarrez, and never returned home. When his family went to look for him the next day on the farm they encountered

the AUC Northern Block's Juan Andrés Álvarez Front. They knew it was the AUC because the members wore armbands that said AUC. They detained the family along with Fradid Enrique Yepes Mure and then separated them; taking Fradid Enrique Yepes Mure and Fradid Enrique Yepes Manjarrez out of town.  Neither was seen or heard from again.

30.     Vianny Manjarrez Melo is the mother and legal representative of the Estate of Fradid Enrique Yepes Manjarrez under the laws of Colombia, and is also a legal heir to Fradid Enrique Yepes Manjarrez under the laws of Colombia. Vianny Manjarrez Melo is the wrongful death beneficiary of Fradid Enrique Yepes Manjarrez. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On May 5, 2005, Fradid Enrique Yepes Manjarrez was disappeared on Santa Isabel Farm in Curumani, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Fradid Enrique Yepes Manjarrez left for work the night before, with his father, Fradid Enrique Yepes Mure, and never returned home. When his family went to look for him the next day on the farm they encountered the AUC Northern Block's Juan Andrés Álvarez Front. They knew it was the AUC because the members wore armbands that said AUC. They detained the family along with Fradid Enrique

22

Yepes Manjarrez and then separated them; taking Fradid Enrique Yepes Manjarrez and Fradid Enrique Yepes Mure out of town. Neither was seen or heard from again.

31.     Doralis Esther Lopez Ardila is the daughter and legal representative of the Estate of Jose De La Trinidad Lopez under the laws of Colombia, and is also a legal heir to Jose De La Trinidad Lopez under the laws of Colombia. Alix Maria Lopez Ardila is also Jose De La Trinidad Lopez's daughter, and legal heir under the laws of Colombia, but does not act as legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jose De La Trinidad Lopez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On July 29, 2002, Jose De La Trinidad Lopez was killed in Poponte, Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 9:00pm that evening Jose De La Trinidad Lopez was accosted and assassinated. His body was taken and left in a field.

32.     Ludis Benis Cardenas Narvaez is the domestic partner and legal representative of the Estate of Didier Jose Vera Niebles under the laws of Colombia, and is also a legal heir to Didier Jose Vera Niebles under the laws of

Colombia.  Nancy Niebles De Vera and Prospero Vera Pava are Didier Jose Vera

Niebles's parents; Yancy Yuliana Vera Cardenas is Didier Jose Vera Niebles's

daughter; and are also legal heirs under the laws of Colombia, but do not act as

legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful

death beneficiaries of Didier Jose Vera Niebles. Plaintiffs seek all damages

permitted under the law on behalf of the decedent and all damages each of them

suffered as a result of the execution of the decedent. On March 12, 2002, Didier

Jose Vera Niebles was killed in Rinconhondo, Cesar, Colombia by the AUC

Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond. At 6:00am two men arrived at Didier Jose

Vera Niebles's residence with the story that they would take him to a man that

owed him money. They took Didier Jose Vera Niebles to a site called Los Tupes

and shot him.

33.     Carlos Eduard Castrillo Caamano is the son and legal representative

of the Estate of Tonibel Emilio Castrillo Mieles under the laws of Colombia, and is

also a legal heir to Tonibel Emilio Castrillo Mieles under the laws of Colombia.

Justa Maria Mieles Benjumea is Tonibel Emilio Castrillo Mieles's mother; Yina

Sofia Barahona Mieles, Sol Maira Castrillo Mieles, Gloria Amanda Barahona

Mieles, Dina Luz Barahona Mieles, and Yomelis Barahona Mieles are Tonbiel

24

Emilio Castrillo Mieles's sisters; Nayla Milena Castrillo Villadiego is Tonibel
Emilio Castrillo Mieles's daughter; and are also legal heirs under the laws of
Colombia, but do not act as legal representatives of his Estate in this lawsuit.
Plaintiffs herein are all wrongful death beneficiaries of Tonibel Emilio Castrillo
Mieles. Plaintiffs seek all damages permitted under the law on behalf of the
decedent and all damages each of them suffered as a result of the execution of the
decedent. On January 14, 2001, Tonibel Emilio Castrillo Mieles was killed 5
meters from his home on El Hatillo Path in Rinconhondo, Cesar, Colombia by the
AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and
substantial assistance from Drummond.  At 7:00pm Tonibel Emilio Castrillo
Mieles went out to close the gate to his home.  There he was grabbed by two men
and pushed 5 meters from his home where he was shot twice in the mouth, the
bullets exiting through the back of the brain.

34.     Maria Herminda Cupitra Rodriguez is the mother and legal
representative of the Estate of Gilberto Chico Cupitra under the laws of Colombia,
and is also a legal heir to Gilberto Chico Cupitra under the laws of Colombia.
Sindy Johana Chico Cupitra, Maria Edith Chico Cupitra, and Dixon Humberto
Infante Cupitra are Gilberto Chico Cupitra's siblings, and are also legal heirs under
the laws of Colombia, but do not act as legal representatives of his Estate in this

25

lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Gilberto Chico Cupitra. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 19, 2003, Gilberto Chico Cupitra was disappeared in Poponte, Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Gilberto Chico Cupitra left the house at 7:00pm to look for work. The following day the family heard from witnesses in the area that Gilberto Chico Cupitra had been taken away by members of the AUC. Gilberto Chico Cupitra was never seen or heard from again.

35.    Sulay Del Carmen Pineda is the domestic partner and legal representative of the Estate of Israel Quintero Luqueta under the laws of Colombia, and is also a legal heir to Israel Quintero Luqueta under the laws of Colombia. Sulys Maria Quintero Pineda is Israel Quintero Luqueta's daughter, and is also a legal heir under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Israel Quintero Luqueta. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 22, 2000, Israel Quintero Luqueta was killed

in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 8:00pm Israel Quintero Luqueta was asleep at his residence with his family. Members of the AUC arrived at his residence and banged on the door. Israel Quintero Luqueta's domestic partner opened the door and the AUC members entered and threw Israel Quintero Luqueta face down on the floor, hitting and injuring him. They took Israel Quintero Luqueta and threw him in a car and drove to an area called Los Chorros in Rinconhondo where the AUC members shot him.

36.     Kelis Lizeth Castillo Castrillo is the niece and legal representative of the Estate of Jose De La Cruz Ospino under the laws of Colombia, and is also a legal heir to Jose De La Cruz Ospino under the laws of Colombia. Jairo Jose Ospino Hernandez and Zenaida Ospino Hernandez are Jose de la Cruz Ospino's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are the wrongful death beneficiaries of Jose De La Cruz Ospino. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On February 5, 2003, Jose De La Cruz Ospino was disappeared in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond.  At approximatly 6:30pm, three AUC members arrived on a motorcycle at Jose De La Cruz Ospino's residence in Rinconhondo. They entered the home and turned off all the lights and remained inside with Jose De La Cruz Ospino for a half hour. The AUC members then left on the motorcycle and returned with a white car and then left again after 5 minutes. After they left, Kelis Lizeth Castillo Castrillo and her family went to Jose De La Cruz Ospino's residence, but he was nowhere to be found. Jose De La Cruz Ospino was never heard or seen from again.

37.     Hermis Mojica is the mother and legal representative of the Estate of Rodrigo Mojica Guerra under the laws of Colombia, and is also a legal heir to Rodrigo Mojica Guerra under the laws of Colombia. Hermis Mojica is the wrongful death beneficiary of Rodrigo Mojica Guerra. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On October 24, 2004, Rodrigo Mojica Guerra was disappeared in Rinconhondo by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Desperate for work, Rodrigo Mojica Guerra left with a man who said he could get him a job. Rodrigo Mojica Guerra was never seen or heard from again.

38.     Merari Guevara Sanchez is the son and legal representative of the Estate of Merari Guevara Trillos under the laws of Colombia, and is also a legal heir to Merari Guevara Trillos under the laws of Colombia. Yamile Guevara Sanchez and Luz Miriam Guevara Sanchez are Merari Guevara Trillos's daughters, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Merari Guevara Trillos. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 22, 2000, Merari Guevara Trillos was killed in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  The AUC arrived at Merari Guevara Trillos's residence at 7:30pm. They pulled him from his home, beat him and forced him into a truck. At 5:30 the next morning, his family found his dead body.

39.     Tilsia Ortiz Ruiz Diaz is the domestic partner and legal representative of the Estate of Fernando Cadena Polo under the laws of Colombia, and is also a legal heir to Fernando Cadena Polo under the laws of Colombia. Ninfa Isabel Cadena Ortiz and Luis Fernando Cadena Ortiz are Fernando Cadena Polo's children, and are also legal heirs under the laws of Colombia, but do not act as

legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful

death beneficiaries of Fernando Cadena Polo. Plaintiffs seek all damages permitted

under the law on behalf of the decedent and all damages each of them suffered as a

result of the execution of the decedent. On November 22, 2003, Fernando Cadena

Polo was killed on the Pacho Prieto Path in Chiriguana, Cesar by the AUC

Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond.  At 5:00pm Fernando Cadena Polo left his

residence for work. While on his way to work, on the road, he came across two

members of the AUC who took him further down the road, past where he was

going. At 12:00pm they assassinated him with two shots to the head.

      40.     Omaira Esther Nieto Florez  is the domestic partner and legal

representative of the Estate of Santana Beleño Rios under the laws of Colombia,

and is also a legal heir to Santana Beleño Rios under the laws of Colombia.

Darisnel Beleño Nieto, Claudia Rosa Beleño Nieto, Liseth Patricia Beleño Nieto,

Duvier Beleño Nieto, Janier Saith Beleño Nieto, Jahn Carlos Beleño Nieto are

Santana Beleño Rios's children, and are also legal heirs under the laws of

Colombia, but do not act as legal representatives of his Estate in this lawsuit.

Plaintiffs herein are all wrongful death beneficiaries of Santana Beleño Rios.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and

all damages each of them suffered as a result of the execution of the decedent. On

August 19, 2000, Santana Beleño Rios was killed between Santa Isabel and San

Roque, Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés

Álvarez Front, which received knowing and substantial assistance from

Drummond.  The AUC arrived at Santana Beleño Rios's residence at 11:30pm.

They beat him, cracked his skull, tied him up, put him in a vehicle and took him

away. They shouted at his domestic partner and put a gun to her chest. Then the

AUC members locked Santana Beleño Rios's domestic partner and their children

in the house and tied them up so they couldn't leave.  The next day, in the earlier

hours of the morning, Santana Beleño Rios's domestic partner, Omaira Esther

Nieto Florez, was able to escape and found Santana Beleño Rios's corpse in an

area which lies between Santa Isabel and San Roque, Rinconhondo, Cesar.

41.     Genoveva Diaz Ballestero is the mother and legal representative of the

Estate of Santo Benito Olivares Diaz under the laws of Colombia, and is also a

legal heir to Santo Benito Olivares Diaz under the laws of Colombia.  Yennis

Olivares Diaz, Celene Olivares Diaz, Amalfy Olivares Diaz and Ferney Olivares

Diaz are Santo Benito Olivares Diaz's siblings, and are also legal heirs under the

laws of Colombia, but do not act as legal representatives of his Estate in this

lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Santo Benito

Olivares Diaz. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Santo Benito Olivares Diaz was killed on August 19, 2000 between the townships of Santa Isabel and San Roque, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Santo Benito Olivares Diaz left his house at 8:30 in the evening to attend a dance. He was walking along the highway when the AUC stopped and forced him into their truck.  They brought him to a political event where other people were forced into the truck. They were then all taken to Curumani, Cesar, Colombia where Santo Benito Olivares Diaz was shot in the head.

42.     Elvira Avendaño Padilla is the mother and legal representative of the Estate of Carlos Arturo Miranda Avendaño under the laws of Colombia, and is also a legal heir to Carlos Arturo Miranda Avendaño under the laws of Colombia. Manuel Miranda Mejia is Carlos Arturo Miranda Avendaño's father; Gladys Miranda Avendaño, Manuel Miranda Avendaño, Erika Patricia Miranda Avendaño, Rita Marcela Miranda Avendaño, Jesus Manuel Miranda Avendaño, and Harol Andres Miranda Avendaño are Carlos Arturo Miranda Avendaño's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal

32

representatives of his Estate in this lawsuit. Plaintiffs herein are the wrongful death beneficiaries of Carlos Arturo Miranda Avendaño. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Carlos Arturo Miranda Avendaño was killed on March 29, 2003 in Santa Isabel, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  It was 9:00 pm when Carlos Arturo Miranda Avendaño was murdered by the AUC. He was playing in a billiards club with some friends and from there eight AUC members of the Juan Andrés Álvarez Front took him to a place about a kilometer outside of Rinconhondo, Cesar, Colombia and assassinated him.

43.     Lucy Cristina Anillo Trocha is the sister and legal representative of the Estate of Mario Abel Anillo Trocha under the laws of Colombia, and is also a legal heir to Mario Abel Anillo Trocha under the laws of Colombia. Mario Rafael Anillo Arrieta is Mario Abel Anillo Trocha's father; Petrona Del Carmen Trocha de Anillo is Mario Abel Anillo Trocha's mother; Vilma Maria Anillo Trocha, Olga Regina Anillo Trocha, Rosana Marcela Anillo Trocha, and Martin Alexander Anillo Trocha  are Mario Abel Anillo Trocha's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in

this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Mario Abel Anillo Trocha. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Mario Abel Anillo Trocha was disappeared on March 9, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Mario Abel Anillo Trocha was a member of the CTI. He was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared Mario Abel Anillo Trocha along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

44.     Rosa Cecilia Osorio Calderon is the domestic partner and legal representative of the Estate of Danilo Javier Carrera Aguancha  under the laws of Colombia, and is also a legal heir to Danilo Javier Carrera Aguancha under the laws of Colombia. Hernando Javier Carrera Osorio and Karen Lorena Carrera Osorio are Danilo Javier Carrera Aguancha's children; Marina Maria Aguancha Mendoza is Danilo Javier Carrera Aguancha's mother; Imera Elena Carrera Aguancha, Marina Liliana Carrera Aguancha, and Teresa Del Carmen Carrera Agunancha are Danilo Javier Carrera Aguancha's siblings; and are also legal heirs

under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Danilo Javier Carrera Aguancha. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Danilo Javier Carrera Aguancha was disappeared on March 9, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Danilo Javier Carrera Aguancha was a member of the CTI. He was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared Danilo Javier Carrera Aguancha along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

45.     Luis Ibarra Ramirez is the father and legal representative of the Estate of Carlos Arturo Ibarra Bernal under the laws of Colombia, and is also a legal heir to Carlos Arturo Ibarra Bernal under the laws of Colombia. Matilde Bernal Arenas is Carlos Arturo Ibarra Bernal's mother; Amadali Ibarra Bernal, Nancy Ibarra Bernal, Edinson Enrique Ibarra Bernal, Jairo Ibarra Casadiego and William Ibarra Casadiego are Carlos Arturo Ibarra Bernal's siblings; and are also legal heirs under

the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Carlos Arturo Ibarra Bernal. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Carlos Arturo Ibarra Bernal was disappeared on March 9, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Carlos Arturo Ibarra Bernal was a member of the CTI. He was working on an exhumation of the body of Mr. Tiberio Rivera Palencia on the farm of "La Holandesa." Men under the command of Juan Andrés Álvarez Front leader El Tigre arrived and disappeared Carlos Arturo Ibarra Bernal along with the other CTI colleagues who were present. He was officially proclaimed dead on March 9, 2002.

46.     Vanessa Carolina Cantillo Torrecilla is the mother and legal representative of the Estate of Jairy Manuel Cantillo Torrecilla under the laws of Colombia, and is also a legal heir to Jairy Manuel Cantillo Torrecilla under the laws of Colombia.  Vanessa Carolina Cantillo Torrecilla is the wrongful death beneficiary of Jairy Manuel Cantillo Torrecilla. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a

result of the execution of the decedent. Jairy Manuel Cantillo Torrecilla was killed on June 23, 2002 in San Roque, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 6:00pm, Jairy Manuel Cantillo Torrecilla was pulled out of his house located in the town of San Roque in the township of Chiriguana by two members of by the AUC Northern Block's Juan Andrés Álvarez Front. They took him to the entrance of the town of Piponte, Chiriguana. Two other men, who were also to be assassinated alongside Jairy Manuel Cantillo Torrecilla, accompanied Jairy Manuel Cantillo Torrecilla in the vehicle. His body was found at 2am the following morning at the entrance to the town of Piponte, Chiriguana.

47.    Manuel Eusebio Munive Ospino is the father and legal representative of the Estate of Carlos Enrique Munive Guzman under the laws of Colombia, and is also a legal heir to Carlos Enrique Munive Guzman under the laws of Colombia. Manuel Eusebio Munive Ospino is the wrongful death beneficiary of Carlos Enrique Munive Guzman. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. Carlos Enrique Munive Gusman was killed on December 17, 2000 in El Paso, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Carlos

Enrique Munive Guzman was tricked into coming out of his home by two members of the AUC Northern Block's Juan Andrés Álvarez Front saying that they were friends that owed him money.  When Carlos Enrique Munive Guzman stepped out of his house he was shot three times in the head.

48.    Dubis Warnes Mayorga is the domestic partner and legal representative of the Estate of Benito Jose Camaaño Lopez under the laws of Colombia, and is also a legal heir to Benito Jose Camaaño Lopez under the laws of Colombia.  Mercy Rocibe Camaaño Lopez, Usmel Leonardo Camaaño Lopez, and Betty Leonor Camaaño Lopez are Benito Jose Camaaño Lopez's siblings; Neidys Patricia Camaaño Warnes, Belkis Margarita Camaaño Warnes, Yaniris Camaaño Warnes and Jose Leonardo Camaaño Marin are Benito Jose Camaaño Lopez's children; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Benito Jose Camaaño Lopez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Benito Jose Camaño Lopez was killed on September 20, 2002 in Rinconhondo, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  The AUC Northern Block's Juan Andrés

Álvarez Front told Benito Jose Camaaño Lopez they had set an appointment to meet with him. He had attended a meeting with the AUC previously and when he left for the second meeting, he left without informing his immediate family. Two cousins and a friend accompanied him to the meeting and when they arrived the AUC members asked him "Are you afraid, Professor?" and then shot him in the head and in the face.

49.     Damaris Del Carmen Guzman Muñoz is the mother and legal representative of the Estate of Juan Carlos Machuca Guzman under the laws of Colombia, and is also a legal heir to Juan Carlos Machuca Guzman under the laws of Colombia. Damaris Del Carmen Guzman Muñoz is the wrongful death beneficiary of Juan Carlos Machuca Guzman. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Juan Carlos Machuca Guzman was killed on August 10, 2001 in Cruce de Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Juan Carlos Machuca Guzman was forcibly taken from his home at 11:30 am by the AUC Northern Block's Juan Andrés Álvarez Front and was forced into a white automobile where he was taken to Cruce de Chiriguana and shot twice in the head.

50.     Carlos Manuel Gil Cordoba is the son and legal representative of the Estate of Sol Marina Cordoba Fragozo under the laws of Colombia, and is also a legal heir to Sol Marina Cordoba Fragozo under the laws of Colombia. Paulina Fragozo is Sol Marina Cordoba Fragozo's mother; Miriam Esther Cordoba Fragazo, Edilia Maria Cordoba Fragozo, Adis Mariela Cordoba Mendoza, Milena Cordoba Mendoza, Jorge Luis Cordoba Mendoza, and Armando Cordoba Mendoza are Sol Marina Cordoba Fragozo's siblings; Mario Julio Gil Cordoba and Paulina Del Rosario Gil Cordoba are Sol Marina Cordoba Fragozo's children and are also legal heirs under the laws of Colombia, but do not act as legal representatives of her Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Sol Marina Cordoba Fragozo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Sol Marina Cordoba Fragozo was killed on September 27, 2000 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Sol Marina Cordoba Fragozo was a nurse and helped the sick and injured in the area. Juan Andrés Álvarez Front commander alias "El Tigre" once told her that when if anything every happened to him, the AUC would kill her.  "El Tigre" was arrested on July 19, 2000. Almost exactly two months later at

40

approximately midnight on the night of September 27th, a group of members belonging to the AUC Northern Block's Juan Andrés Álvarez Front arrived in military gear and knocked on the door of Sol Marina Cordoba Fragozo's home. Sol Marina Cordoba Fragozo opened the door and they told her that they needed her to come with them to provide first aid to one of their wounded men. She left with needles, medicine and other medical instruments telling her family not to worry, and that she would return soon. Shortly thereafter her family members found her dead body. She had been shot three times in the head.

51.     Evangelista Enrique Gil Ochoa is the brother and legal representative of the Estate of Eufrosina Gil Ochoa under the laws of Colombia, and is also a legal heir to Eufrosina Gil Ochoa under the laws of Colombia. Juan Evangelista Gil Carcamo is Eufrosina Gil Ochoa's father; Carmenza Luz Gil Ochoa, Mercelena Ochoa Gil, and Jaime Enrique Gil Ochoa are Eufrosina Gil Ochoa's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of her Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Eufrosina Gil Ochoa. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent.  Eufrosina Gil Ochoa was killed on January 25, 2002 in Minguillo, La Paz, Cesar, Colombia by the AUC Northern Block's Juan

41

Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Eufrosina Gil Ochoa was a daughter of a witness of crimes committed by the AUC Northern Block's Juan Andrés Álvarez Front, specifically by Front commander "El Tigre" and his men. She was murdered because of her relationship to the witness. Eufrosina Gil Ochoa was washing clothes when "El Tigre" and his men approached her and asked where her relative (the witness) was hiding. Eufrosina Gil Ochoa said that she did not know the whereabouts of the witness. "El Tigre" and his men proceeded to tie up Eufrosina Gil Ochoa's husband and locked her children in the house. They murdered Eufrosina Gil Ochoa with a blow to the head.

52.     Fenix Maria Soto Ramirez is the daughter and legal representative of the Estate of Arida Ramirez Soto under the laws of Colombia, and is also a legal heir to Arida Ramirez Soto under the laws of Colombia. Fenix Maria Soto Ramirez is the wrongful death beneficiary of Arida Ramirez Soto. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. Arida Ramirez Soto was killed on June 3, 2002 in Vereda La Bodega, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Arida Ramirez Soto owned a small store.

On the day of her murder, two members of the AUC Northern Block's Juan Andrés Álvarez Front drove up to her store in a white automobile. They ordered a bottle of liquor, drank it, and upon asking for the bill they proceeded to shoot her multiple times until she died.

53.     Janis Rojas Rio is the domestic partner and legal representative of the Estate of Policarpo Simanca Altamar under the laws of Colombia, and is also a legal heir to Policarpo Simanca Altamar under the laws of Colombia. Eli Tatiana Simanca Rojas, Jhoannys Patricia Simanca Rojas, Luis Miguel Simanca Rojas, and Camilo Andres Simanca Rojas are Policarpo Simanca Altamar's children and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Policarpo Simanca Altamar. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Policarpo Simanca Altamar was killed on August 27, 2003 in Finca Los Chaparro, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Six armed members of the AUC Northern Block's Juan Andrés Álvarez Front grabbed Policarpo Simanca Altamar, beat him, tortured him and then murdered him by shooting him in the head, on the side, thorax, and

genitals.

54.     Neida Victoria Jaimes Arias is the wife and legal representative of the Estate of Benedicto Caceres Bautista under the laws of Colombia, and is also a legal heir to Benedicto Caceres Bautista under the laws of Colombia. Carmelina Bautista de Caceres is Benedicto Caceres Bautista's mother; Felix Antonio Caceres Bautista, Humberto Caceres Bautista, Pedro Caceres Bautista, Josefito Caceres Bautista, Ariostol Caceres Bautista, and Fermin Caceres Bautista are Benedicto Caceres Bautista's siblings; Sindy Patricia Caceres Jaimes and Esther Magdiel Caceres Jaimes are Benedicto Caceres Bautista's children; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Benedicto Caceres Bautista. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Benedicto Caceres Bautista was killed on February 23, 2001 in San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Benedicto Caceres Bautista was at a kiosk next to the Hospital El Socorro in San Diego, Cesar, Colombia when two armed members of the AUC Northern Block's Juan Andrés Álvarez Front began to shoot. They murdered Benedicto Caceres Bautista

and two other people present.

55.     Nancy Cecilia Perez Villafañe is the domestic partner and legal representative of the Estate of Marcos Jose Orozco Iceda under the laws of Colombia, and is also a legal heir to Marcos Jose Orozco Iceda under the laws of Colombia. Jose Guillermo Orozco Perez and Llina Paola Orozco Perez are Marco Jose Orozco Iceda's children, and are also his legal heirs under the laws of Colombia,  but do not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Marcos Jose Orozco Iceda. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Marcos Jose Orozco Iceda was killed on August 14, 2001 in Finca Guanduru, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Marcos Jose Orozco Iceda was picking up milk at the farm when armed AUC members approached him and opened fire on him, shooting him and killing him.

56.     Diana Karina Guette Rincones is the domestic partner and legal representative of the Estate of Alvaro Francisco Murgas under the laws of Colombia, and is also a legal heir to Alvaro Francisco Murgas under the laws of Colombia.  Yonatanth Andres Murgas Guette, Anais Humberto Murgas Guette,

Evangelina Rosa Murgas Guette and Zaira Carolina Murgas Guette are Alvaro Francisco Murgas's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Alvaro Francisco Murgas. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Alvaro Francisco Murgas was killed on January 2, 2003 on the football field called Cancha Del 21 De Enero, Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Alvaro Francisco Murgas was playing football when three armed members of the AUC Northern Block's Juan Andrés Álvarez Front pulled him from the game and said "this game has ended" and without further ado shot him three times in the head.

57.    Jose De Jesus Nieves is the father and legal representative of the Estate of Jose Gregorio Nieves Carrillo under the laws of Colombia, and is also a legal heir to Jose Gregorio Nieves Carrillo under the laws of Colombia. Pabla Raimunda Carrillo Villareal is Jose Gregorio Nieves Carrillo's mother; Verlidis Nieves Carrillo, Teresa De Jesus Nieves Carrillo, Marcos Jose Nieves Carrillo, Auris Isabel Nieves Carrillo, Nelvis Esther Nieves Carrillo, and Moises David

Nieves Carrillo are Jose Gregorio Nieves Carrillo's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jose Gregorio Nieves Carrillo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Jose Gregorio Nieves Carrillo was disappeared on March 5, 2000 in Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Jose Gregorio Nieves Carrillo left his home in Codazzi to look for work and was never seen or heard from again. Six months later a phone call was received at his mother's house saying that the  AUC Northern Block's Juan Andrés Álvarez Front had killed her son.

58.     Nicolasa Teresa Iglesia Polo is the domestic partner and legal representative of the Estate of Leonardo Fabio Ramos Bocanegra under the laws of Colombia, and is also a legal heir to Leonardo Fabio Ramos Bocanegra under the laws of Colombia. Pedro Armengol Ramos Ustariz and Magdalena Bocanegra Rua are Leonardo Fabio Ramos Bocanegra's parents; Fabiola Marcela Ramos Iglesia, Carmen Alicia Ramos Iglesia and Gisella Maria Ramos Iglesia are Leonardo Fabio Ramos Bocanegra's daughters; and are also legal heirs under the laws of Colombia,

47

but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Leonardo Fabio Ramos Bocanegra. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Leonardo Fabio Ramos Bocanegra  was killed on September 22, 2005 in Finca Limonal, Codazzi, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Leonardo Fabio Ramos Bocanegra  was forcibly pulled from his home on the farm by two members of the AUC Northern Block's Juan Andrés Álvarez Front. The two men asked for Leonardo Fabio Ramos Bocanegra's cell phone and that of the surviving witness and they gave their cell phones to them. One of the AUC members was armed with a gun and a machete.  The AUC members told Leonardo Fabio Ramos Bocanegra not to worry that nothing was going to happen to him, if he would take them to the town of San Jose. He left with the two AUC members and two hours later the witness came back to the Finca Limonal (a farm) and found Leonardo Fabio Ramos Bocanegra semi-decapitated by a machete.

59.     Elsi Leonor Padilla Rosado is the domestic partner and legal heir of Jesus Enrique Fragozo Araujo. Ana Elena Perez Arzuaga is also Jesus Enrique

48

Fragozo Araujo's domestic partner and legal heir. They act jointly as the legal representatives of the Estate of Jesus Enrique Fragozo Araujo. Juan Rafael Fragoso Padilla, Marieth Fragozo Perez, and Elkin Miguel Fragozo Perez are Jesus Enrique Fragozo Araujo's children; Judith Fragozo Araujo, Maria Teresa Araujo Fragozo, Gloria Esther Fragozo Araujo, Ibeth Fragozo Araujo, Rafael Francisco Fragozo Araujo, Danis Fragozo Araujo, and Elsy Leonor Fragozo Araujo are Jesus Enrique Fragozo Araujo's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jesus Enrique Fragozo Araujo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Jesus Enrique Fragozo Araujo was killed on September 8, 2000 in Finca El Diamante, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 5:00am Jesus Enrique Fragozo Araujo went to his uncle's farm to fumigate the rice crops. At approximately 6:00am members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at the farm and told Jesus Enrique Fragozo Araujo and other family members to come with them into the *corral* where a meeting was to be held. They AUC opened fire on Jesus Enrique Fragozo Araujo and his five other family

members. After shooting them all, the AUC thugs from the Juan Andrés Álvarez Front beat the bodies to a pulp with their weapons, killing them all.

60.     Juana Manuela Cabarcas De La Hoz is the sister and legal representative of the Estate of Jose del Rosario Cabarca de la Hoz under the laws of Colombia, and is also a legal heir to Jose del Rosario Cabarca de la Hoz under the laws of Colombia. Ener Mercedes Cabarcas De La Hoz is also Jose del Rosario Cabarca de la Hoz's sister, and legal heir under the laws of Colombia, but does not act as legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jose del Rosario Cabarca de la Hoz. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Jose del Rosario Cabarca de la Hoz was killed on March 21, 2002 in Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. A group belonging to the AUC Northern Block's Juan Andrés Álvarez Front arrived at Jose del Rosario Cabarca de la Hoz. They shot him twice in the chest and cut his throat.

61.     Magalis Maria Barrios Rua is the domestic partner and legal representative of the Estate of Javier Enrique Torres Castillo under the laws of Colombia, and is also a legal heir to Javier Enrique Torres Castillo under the laws

50

of Colombia. Enrique Javier Torres Barrios and Manuel Jose Torres Barrios are Javier Enrique Torres Castillo's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Javier Enrique Torres Castillo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Javier Enrique Torres Castillo was killed on June 11, 2003 in Finca Chaparral, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Three members of the AUC Northern Block's Juan Andrés Álvarez Front approached Javier Enrique Torres Castillo. They told him to walk with them, and that if he did, nothing bad was going to happen to him. He started to walk with them when, without warning, they shot Javier Enrique Torres Castillo twice in the head. One bullet entered Javier Enrique Torres Castillo's left temple and the other entered through his mouth.

62.     Meredith Padilla Rosado is the domestic partner and legal representative of the Estate of Romelio Araujo Arzuaga under the laws of Colombia, and is also a legal heir to Romelio Araujo Arzuaga under the laws of Colombia. Ligia Elena Araujo Arzuaga, Belisa Maria Araujo Arzuaga, Rosa

Pastora Araujo de Araujo, and Cesar Enrique Araujo Arzuaga are Romelio Araujo Arzuaga's siblings; Karen Margarita Araujo Padilla is Romelio Araujo Arzuaga's daughter; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Romelio Araujo Arzuaga. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Romelio Araujo Arzuaga was killed on September 8, 2000 in Finca El Diamante, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At approximately 6:00am members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at the farm and told Romelio Araujo Arzuaga and other family members to come with them into the corral where a meeting was to be held.  The AUC opened fire on Romelio Araujo Arzuaga and his five other family members. After shooting them all, the AUC beat the bodies to a pulp with their weapons. The assailants were dressed in military camouflage.

63.     Carlos Segundo Guerra Padilla is the father and legal representative of the Estate of Oliberto Guerra Araujo under the laws of Colombia, and is also a legal heir to Oliberto Guerra Araujo under the laws of Colombia. Belisa Araujo

Arzuaga is Oliberto Guerra Araujo's mother; Elber Enrique Guerra Araujo, Jorge

Elicier Guerra Araujo, Jose Calixto Guerra Araujo, Rosa Mireya Guerra Araujo,

Carlos Alberto Guerra Araujo, and Nolvis Esther Guerra Araujo are Oliberto

Guerra Araujo's siblings; and are also legal heirs under the laws of Colombia, but

do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are

all wrongful death beneficiaries of Oliberto Guerra Araujo. Plaintiffs seek all

damages permitted under the law on behalf of the decedent and all damages each

of them suffered as a result of the execution of the decedent. Oliberto Guerra

Araujo was killed on November 18, 2003 in Barrio La Victoria, San Diego, Cesar,

Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which

received knowing and substantial assistance from Drummond.  Oliberto Guerra

Araujo was sitting in front of his home after lunchtime at around 3 o'clock in the

afternoon with two of his sisters, his brother-in-law, and his dog when a member of

the AUC Northern Block's Juan Andrés Álvarez Front came by the house and shot

Oliberto Guerra Araujo multiple times, killing him and his dog.

      64.      Marelbis Del Socorro Ramos Ruiz is the mother and legal

representative of the Estate of Fermin Ospino Ramos under the laws of Colombia,

and is also a legal heir to Fermin Ospino Ramos under the laws of Colombia. Luis

Alberto Ospino Ramos, Jorge Elicier Ospino Ramos, Dannys Milena Ospino

Ramos, Francisco Javier Ospino Ramos, William Enrique Ospino Ramos, and Jose

Antonio Ospino Acuña are Fermin Ospino Ramos's siblings, and are also legal

heirs under the laws of Colombia, but do not act as legal representatives of his

Estate in this lawsuit.  Plaintiffs herein are all wrongful death beneficiaries of

Fermin Ospino Ramos. Plaintiffs seek all damages permitted under the law on

behalf of the decedent and all damages each of them suffered as a result of the

execution of the decedent. Fermin Ospino Ramos was disappeared on November

14, 2003 in La Jagua de Ibirico, Cesar, Colombia by the AUC Northern Block's

Juan Andrés Álvarez Front, which received knowing and substantial assistance

from Drummond.  Fermin Ospino Ramos was pulled from his house by four

members of the AUC Northern Block's Juan Andrés Álvarez Front. The four AUC

members arrived in a red automobile. They were wearing jeans and blue and black

sweaters. They forced Fermin Ospino Ramos into their automobile and he was

never seen or heard from again. He was last seen wearing yellow shorts. After the

demobilization in 2006, a demobilized member of the AUC Northern Block's Juan

Andrés Álvarez Front informed Fermin Ospino Ramos's mother that her son was

killed in 2003. However, his body has never been found.

65.    Marelbis Del Socorro Ramos Ruiz is the domestic partner and legal

representative of the Estate of Medardo Ospino Quintero under the laws of

Colombia, and is also a legal heir to Medardo Ospino Quintero under the laws of Colombia.  Dannys Milena Ospino Ramos, Luis Alberto Ospino Ramos, Jose Antonio Ospino Acuña, Jorge Elicier Ospino Ramos, Francisco Javier Ospino Ramos, William Enrique Ospino Ramos are Medardo Ospino Quintero's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Medardo Ospino Quintero. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Medardo Ospino Quintero was killed on April 1, 2001 in La Jagua de Ibirico, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Medardo Ospino Quintero was sitting on the porch of his house with his domestic partner and children when a member of the AUC Northern Block's Juan Andrés Álvarez Front dressed in camouflage pulled up in a grey automobile. The AUC member got out of his vehicle, walked up to Medardo Ospino Quintero and shot him point blank in the head.

66.     Gertrudis Muñoz Beleño is the domestic partner and legal representative of the Estate of Omar Revuelta Pedrozo under the laws of Colombia, and is also a legal heir to Omar Revuelta Pedrozo under the laws of Colombia.

Omar Enrique Revuelta Muñoz, Yajaira Alejandra Revuelta Muñoz, Roberto Carlos Revuelta Muñoz, Carlos Julio Revuelta Muñoz, Saida Revuelta Muñoz, Juan Gabriel Revuelta Muñoz, Liliana Mercedes Revuelta Muñoz, and Ximena Gertrudis Revuelta Muñoz are Omar Revuelta Pedrozo's children; Jose Maria Revuelta Pedrozo and Ana Elena Revuelta Pedrozo are Omar Revuelta Pedrozo's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Omar Revuelta Pedrozo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Omar Revuelta Pedrozo was killed on May 9, 2001 in Cruce De Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At midnight, a group of armed members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at Omar Revuelta Pedrozo's house. They knocked down the door to Omar Revuelta Pedrozo's home and shot him when he tried to escape through the patio. They shot him in the back and the bullet exited through his chest, killing him.

67.    Lisbeth Mairoth Cuentas Narvaez is the domestic partner and legal representative of the Estate of Leonit Alfredo Lopez under the laws of Colombia,

and is also a legal heir to Leonit Alfredo Lopez under the laws of Colombia.

Leiker Lopez Cuentas, Ledys Lopez Cuentas, Laidelyn Lopez Cuentas, Lineth

Lopez Cuentas are Leonit Alfredo Lopez's children, and are also legal heirs under

the laws of Colombia, but do not act as legal representatives of his Estate in this

lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Leonit Alfredo

Lopez. Plaintiffs seek all damages permitted under the law on behalf of the

decedent and all damages each of them suffered as a result of the execution of the

decedent. Leonit Alfredo Lopez was disappeared on November 28, 2004 in

Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez

Front, which received knowing and substantial assistance from Drummond.  At

around 7 o'clock in the morning, Leonit Alfredo Lopez was headed towards the

town of La Jagua de Ibirico to visit his father.  His domestic partner, Lisbeth

Mairoth Cuentas Narvaez, was accompanying him part of the way, as she was

going to market in Codazzi.  When they arrived at the market a car stopped and the

men inside the car, who were members of the Juan Andrés Álvarez Front,  pulled

Leonit Alfredo Lopez inside and drove off.  He was never heard or seen from

again.

68.     Doralva Cristina Cardenas Lobo is the mother and legal representative

of the Estate of Jader Rafael Simanca Cardenas under the laws of Colombia, and is

also a legal heir to Jader Rafael Simanca Cardenas under the laws of Colombia.

Doralva Cristina Cardenas Lobo is the wrongful death beneficiary of Jader Rafael

Simanca Cardenas. Plaintiffs seek all damages permitted under the law on behalf of

the decedent and all damages each of them suffered as a result of the execution of

the decedent. Jader Rafael Simanca Cardenas was disappeared on April 19, 2001 in

Barrio Chiriaimo, San Diego, Cesar, Colombia by the AUC Northern Block's Juan

Andrés Álvarez Front, which received knowing and substantial assistance from

Drummond. Jader Rafael Simanca Cardenas was asleep at his residence when he

received a phone call at 9:30 pm and left the house. His mother, Doralva Cristina

Cardenas Lobo, tried to follow him, but could not catch up to him. The last she saw

of her son was him getting into an old-model white Renault automobile.  Jader

Rafael Simanca Cardenas was never seen or heard from again.  Less than a month

later on May 17, 2001, Jader Rafael Simanca Cardenas's mother received a call

from the AUC Northern Block's Juan Andrés Álvarez Front, telling her to tell

Jader Rafael Simanca Cardenas's family not to go looking for him because he had

been assassinated in Curumani, Cesar, Colombia.

69.     Amarilys Aroca Orozco is the domestic partner and legal

representative of the Estate of Manuel Antonio Sierra Vergara under the laws of

Colombia, and is also a legal heir to Manuel Antonio Sierra Vergara under the laws

of Colombia.  Juan Manuel Sierra Aroca and Milibeth Marioth Mendoza Aroca are

Manuel Antonio Sierra Vergara's children, and are also his legal heirs under the

laws of Colombia, but do not act as a legal representative of his Estate in this

lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Manuel Antonio

Sierra Vergara. Plaintiffs seek all damages permitted under the law on behalf of the

decedent and all damages each of them suffered as a result of the execution of the

decedent. Manuel Antonio Sierra Vergara was killed on June 16, 2002 in Los

Brasiles, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés

Álvarez Front, which received knowing and substantial assistance from

Drummond.   It was around 8 o'clock in the evening when a group of armed

members of the Juan Andrés Álvarez Front arrived at Amarylis Aroca Orozco and

Manuel Antonio Sierra Vergara's residence. They forced the family members to

the floor and asked them for their full names. They then tore Manuel Antonio

Sierra Vergara's son Juan Manuel Sierra Aroca (then 6 years old) from Manuel

Antonio Sierra Vergara's arms and took Manuel Antonio Sierra Vergara out of the

house to a nearby pasture and shot him in the forehead, killing him.

70.    Auris Esthela Quiñones Arango is the domestic partner and legal

representative of the Estate of Desiderio Martínez García under the laws of

Colombia, and is also a legal heir to Desiderio Martínez García under the laws of

Colombia.  Juan Carlos Martinez Quiñones and Jose David Martinez Quiñones are Desiderio Martínez García's children, and are also his legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Desiderio Martínez García. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Desiderio Martínez Garcíawas killed on March 2, 2000 in Barrio Buenos Aires, Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Desiderio Martínez García was at the door to his residence at approximately 7:20 pm. He was holding his baby at the doorway to his home when members of the Juan Andrés Álvarez Front arrived and shot him several times in the face and upper-body, murdering Desiderio Martínez García in front of his family.

71.     Amparo De Jesus Florez Torres is the domestic partner and legal representative of the Estate of Engelver Garcia Pallares under the laws of Colombia, and is also a legal heir to Engelver Garcia Pallares under the laws of Colombia.  Julian Andres Garcia Florez is Engelver Garcia Pallares's son, and is also a legal heir under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death

beneficiaries of Engelver Garcia Pallares. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Engelver Garcia Pallares was killed on September 3, 1999 on the highway going from Codazzi to the township of  Cuatro Vientos, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.

72.     Justino Leon is the father and legal representative of the Estate of Germain Enrique Leon Perez under the laws of Colombia, and is also a legal heir to Germain Enrique Leon Perez under the laws of Colombia. Ederlina Perez Ariza is Germain Enrique Leon Perez's mother; Darwin Helmuth Leon Perez, Yesica Pastora Leon Perez and Sandra Milena Leon Perez are Germain Enrique Leon Perez's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are are all wrongful death beneficiaries of the decedent. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Germain Enrique Leon Perez was killed on April 12, 2004 on the highway about 3 kilometers outside of Becerril, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Members of the

Juan Andrés Álvarez Front pulled Germain Enrique Leon Perez from his home at

11:30 in the morning and took him to Finca Doña Maria and turned him over to

alias "JJ", who was the Front commander for the town of Codazzi.  Germain

Enrique Leon Perez's dead body was found at the farm an hour later. He had been

shot.

73.     Elma Maria Cordoba Peña is the domestic partner and legal heir of

Luis Alberto Sanchez Vera.  Rosa Maria Maestre Nieto is also the domestic partner

and legal heir of Luis Alberto Sanchez Vera. They act jointly as the legal

representatives of the Estate of Luis Alberto Sanchez Vera. Angela Sanchez

Cordoba, Lina Fernanda Sanchez Maestre, and Jenifer Sanchez Maestre are Luis

Alberto Sanchez Vera's daughters, and are also a legal heirs under the laws of

Colombia, but do not act as a legal representatives of his Estate in this lawsuit.

Plaintiffs herein are all wrongful death beneficiaries of Luis Alberto Sanchez Vera.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and

all damages each of them suffered as a result of the execution of the decedent. Luis

Alberto Sanchez Vera was killed on January 10, 2003 in the entrance to the town

of Poponte, Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan

Andrés Álvarez Front, which received knowing and substantial assistance from

Drummond.  Luis Alberto Sanchez Vera left his home at approximately 7:05pm

when he was intercepted by an old-model Renault automobile. He was about to escape when one of the men inside the automobile put a gun to his temple. He surrendered and was shoved in the car. His body was found early the next morning. Luis Alberto Sanchez Vera had been shot five times in the head and upper body.

74.     Guillermina Cataño Mendoza is the mother and legal representative of the Estate of Elkis Fabian Urrutia Cataño under the laws of Colombia, and is also a legal heir to Elkis Fabian Urrutia Cataño under the laws of Colombia. Miladis Matilde Urrutia Cataño and Neira Luz Urrutia Cataño are Elkis Fabian Urrutia Cataño's siblings; Silalys Daniela Urrutia Jimenez is Elkis Fabian Urrutia Cataño's daughter; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Elkis Fabian Urrutia Cataño. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Elkis Fabian Urrutia Cataño was killed on May 25, 2001 in Hacienda Barahona, Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  On May 23, 2001 at 7:10pm a group of armed members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at the Hacienda Barahona, rounded up all of the workers on the farm and

demanded their full names. The armed men told Elkis Fabian Urrutia Cataño's

father, Julio Francisco Urrutia Cataño, to give them his motorcycle. Julio Francisco

Urrutia Cataño refused.  The armed men returned again two days later to the farm

on the evening of May 25, 2001. They forced Elkis Fabian Urrutia Cataño and

Julio Francisco Urrutia Cataño into a truck and they killed them 100 meters outside

the entrance to the farm. Elkis Fabian Urrutia Cataño was shot five times in the

head.

75.    Guillermina Cataño Mendoza is the domestic partner and legal

representative of the Estate of Julio Francisco Urrutia Cataño under the laws of

Colombia, and is also a legal heir to  Julio Francisco Urrutia Cataño under the laws

of Colombia. Elda Cristina Urrutia Cataño, Ciria Esther Urrutia Cataño, and Leonil

de Maria Urrutia Cataño are Julio Francisco Urrutia Cataño's siblings; Miladis

Matilde Urrutia Cataño and Neira Luz Urrutia Cataño are Julio Francisco Urrutia

Cataño's daughters, and are also legal heirs under the laws of Colombia, but do not

act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all

wrongful death beneficiaries of  Julio Francisco Urrutia Cataño.  Plaintiffs seek all

damages permitted under the law on behalf of the decedent and all damages each

of them suffered as a result of the execution of the decedent. Julio Francisco

Urrutia Cataño was killed on May 25, 2001 in Hacienda Barahona, Chiriguana,

Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On May 23, 2001 at 7:10pm a group of armed members of the AUC Northern Block's Juan Andrés Álvarez Front arrived at the Hacienda Barahona, rounded up all of the workers on the farm and demanded their full names. The armed men told  Julio Francisco Urrutia Cataño to give them his motorcycle. Herefused.  The armed men returned again two days later to the farm on the evening  of May 25, 2001. They forced Julio Francisco Urrutia Cataño and his son, Elkis Fabian Urrutia Cataño, into a truck and they killed them 100 meters outside the entrance to the farm.  Julio Francisco Urrutia Cataño was shot five times in the head.

76.     Fabio José Duran Farfan is the father and legal representative of the Estate of Francisco José Durán Ballesteros under the laws of Colombia, and is also a legal heir to Francisco José Durán Ballesteros under the laws of Colombia. Yeris Elena Ballesteros Pallares  is Francisco José Durán Ballesteros's mother; Reinel Antonio Gomez Ballesteros, Odelis Castrillo Ballesteros, and Dairis Lisbeth Duran Ballesteros are Francisco José Durán Ballesteros's siblings;  and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Francisco José Durán Ballesteros. Plaintiffs seek all damages permitted under the law on behalf of

the decedent and all damages each of them suffered as a result of the execution of the decedent. Francisco José Durán Ballesteros was killed on July 2, 2002 on an un-maintained highway called "Troncal de Caribe" in El Cruce de la Loma, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Francisco José Durán Ballesteros had just returned from a trip in the town of MonPox in the southern part of Colombia.  He then had gone to El Cruce de la Loma to visit his brother. He was in El Cruce de la Loma trying to charter a car to drive him to Chiriguana when two armed members of the Juan Andrés Álvarez Front approached him and shot him multiple times in the head with a 9mm caliber weapon.

77.     Rubis Esther Oñate Martinez is the domestic partner and legal representative of the Estate of Hernan Antonio Soto Nieve under the laws of Colombia, and is also a legal heir to Hernan Antonio Soto Nieve under the laws of Colombia.  Maholis Edith Soto Oñate, Maulieth Soto Oñate, Hernan Mauricio Soto Oñate, and Vicente Hernan Soto Oñate are Hernan Antonio Soto Nieve's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Hernan Antonio Soto Nieve. Plaintiffs seek all damages permitted

under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Hernan Antonio Soto Nieve was killed on March 23, 2005 in San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Hernan Antonio Soto Nieve was assassinated at approximately 2:30 pm by two members of the Juan Andrés Álvarez Front. They intercepted him on the road and shot him three times in the head with a 9 mm weapon.

78.     Jose Teocrito Machado is the father and legal representative of the Estate of Hector Jesus Machado Santiago under the laws of Colombia, and is also a legal heir to Hector Jesus Machado Santiago under the laws of Colombia. Eva Maria Santiago Sanchez is Hector Jesus Machado Santiago's mother; Ilia Rosa Machado Santiago, Virgelma Machado Santiago, Leida Machado Santiago, and Eva Maria Machado Santiago are Hector Jesus Machado Santiago's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Hector Jesus Machado Santiago. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Hector Jesus Machado Santiago was taken from his home on the morning of March 24, 2004 in Bosconia,

67

Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. They shoved him in a truck and his body was found over a month later on March 24, 2004 on the right side of the 855 Kilometer mark of the Drummond railway line in Fundacion, Magdalena, Colombia, entering the town of Monterrubio, on the road towards La Estacion La Lleras. His body was found with two fatal gunshot wounds; one in the right eye and another in the left shoulder.

79. Nilo Alfonso Marquez Becerra is the father and legal representative of the Estate of Jose Luis Marquez Arzuaga under the laws of Colombia, and is also a legal heir to Jose Luis Marquez Arzuaga under the laws of Colombia. Nohemy Dolores Arzuaga Maya is Jose Luis Marquez Arzuaga's mother; Freddy Alfonso Calderon Arzuaga, Iralith Del Socorro Murgas Arzuaga, Fanny Maria Becerra Arzuaga, Olga Maris Marquez Arzuaga, and Daniel Alfonso Marquez Arzuaga are Jose Luis Marquez Arzuaga's siblings, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jose Luis Marquez Arzuaga. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Jose Luis Marquez Arzuaga was killed on January 13, 2003 in Barrio

Chipona, San Diego, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At approximately 7:45pm he was talking with his cousin about a block from his home when two members of the Juan Andrés Álvarez Front armed with 9 caliber weapons approached Jose Luis Marquez Arzuaga and shot him once in the neck, twice in the head, six times in the back and once in the arm, killing him.

80.    Alexandra Gutierrez Navarro is the sister and legal representative of the Estate of Alfranio Rafael Gutierrez Navarro under the laws of Colombia, and is also a legal heir to Alfranio Rafael Gutierrez Navarro under the laws of Colombia. Telvis Esther Gutierrez Navarro is also the sister and legal heir of Alfranio Rafael Gutierrez Navarro under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are the wrongful death beneficiaries of Alfranio Rafael Gutierrez Navarro. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Alfranio Rafael Gutierrez Navarro was killed on June 23, 2002 in Bosconia, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. It was on a Sunday, at 9pm when Alfranio

Rafael Gutierrez Navarro left his residence. At 2pm the following day, his sister,

Alexandra Gutierrez Navarro, received word that her brother and legal heir,

Alfranio Rafael Gutierrez Navarro, had been assassinated by members of the AUC

Northern Block's Juan Andrés Álvarez Front.  He had been shot four times.

81.    Gonzalo Aroca Ortiz is is the father and legal representative of the

Estate of Luis Alfredo Aroca Chico under the laws of Colombia, and is also a legal

heir to Luis Alfredo Aroca Chico under the laws of Colombia. Maria Diva Ortiz

Chico is Luis Alfredo Aroca Chico's sister, and is also a legal heir under the laws

of Colombia, but does not act as a legal representative of his Estate in this lawsuit.

Plaintiffs herein are all wrongful death beneficiaries of Luis Alfredo Aroca Chico.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and

all damages each of them suffered as a result of the execution of the decedent.

Luis Alfredo Aroca Chico was killed on July 9, 2001 in Santa Isabel, Curumani,

Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which

received knowing and substantial assistance from Drummond.  Luis Alfredo Aroca

Chico left his residence to do some shopping in the nearby town of Rinconhondo.

He returned to Santa Isabel around 4:20pm to find members of the AUC Northern

Block's Juan Andrés Álvarez Front waiting for him. They promptly and without

words surrounded Luis Alfredo Aroca Chico and shot him various times, killing him.

82.     Maria Marlene Cocuy De Agudelo is the mother and legal representative of the Estate of Jhon Carlos Agudelo Cocuy under the laws of Colombia, and is also a legal heir to Jhon Carlos Agudelo Cocuy under the laws of Colombia.  Deicy Janeth Agudelo Cocuy, Shirley De La Cruz Argote Cucuy, and Darley Fernando Argote Cocuy are Jhon Carlos Agudelo Cocuy's siblings, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jhon Carlos Agudelo Cocuy.  Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Jhon Carlos Agudelo Cocuy was killed on December 5, 2001 in Agustin Codazzi, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  At 7:45pm, Jhon Carlos Agudelo Cocuy was with a friend in an open market in the town of Agustin Codazzi.  A member of the AUC Northern Block's Juan Andrés Álvarez Front started harassing Jhon Carlos Agudelo Cocuy's friend. When Jhon Carlos Agudelo Cocuy defended his friend, the paramilitary member, under the command of Alias J.J., left and returned armed with another armed

member of the Juan Andrés Álvarez Front.  They opened fire on Jhon Carlos

Agudelo Cocuy, shooting him twelve times: four times in the head; twice in the

right arm; and six times in his body.

83.     Noralba Luz Zambrano is the domestic partner and legal

representative of the Estate of Jaime Enrique Ochoa Aguilar under the laws of

Colombia, and is also a legal heir to Jaime Enrique Ochoa Aguilar under the laws

of Colombia. Jesnaider Ochoa Zambrano is Jaime Enrique Ochoa Aguilar's son;

Antonio Ochoa De La Rosa and Maria Felipa Aguilar Fonseca are Jaime Enrique

Ochoa Aguilar's parents; Jainedis Francisca Ochoa Aguilar, Janny Esther Ochoa

Aguilar, and Jorge Enrique Ochoa Aguilar are Jaime Enrique Ochoa Aguilar's

siblings; and are also legal heirs under the laws of Colombia, but do not act as legal

representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death

beneficiaries of Jaime Enrique Ochoa Aguilar. Plaintiffs seek all damages

permitted under the law on behalf of the decedent and all damages each of them

suffered as a result of the execution of the decedent. Jaime Enrique Ochoa Aguilar

was killed on March 28, 2002 at the Hacienda San Luis in Chiriguana, Cesar,

Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which

received knowing and substantial assistance from Drummond.  At 8:30pm, three

cars each filled with armed members of the Juan Andrés Álvarez Front arrived at

his home.  They pulled Jaime Enrique Ochoa Aguilar and his brother, Jairo Enrique Ochoa Aguilar, from their home. From there, the paramilitary group continued to other homes, pulling out their victims and forcing them into the cars. The following day, Jaime Enrique Ochoa Aguilar's family found him and his brother, Jairo Enrique Ochoa Aguilar, dead along with the bodies of two other men at the entrance to the San Luis Farm. The threats continued against Jaime Enrique Ochoa Aguilar's family after his death. The following day, March 29, 2002, during the burial two members of the Juan Andrés Álvarez Front approached Jaime Enrique Ochoa Aguilar's surviving brother and asked him if he was a relative.  The family was so afraid that they didn't return to visit Jaime Enrique Ochoa Aguilar's tomb after his death. Their house began to be monitored and the family started to receive threats left under their door by the AUC's Bloque Norte.  Jaime Enrique Ochoa Aguilar had never received any death threats prior to his death.  His siblings, out of fear for their lives, fled the area.

84.     Teresa De Jesus Cadena Martinez is Jairo Enrique Ochoa Aguilar's domestic partner and his legal heir. Maria Eugenia Hernandez Cogollo is also Jairo Enrique Ochoa Aguilar's domestic partner and legal heir. They act jointly as the legal representatives of the Estate of Jairo Enrique Ochoa Aguilar. Antonio Ochoa De La Rosa and Maria Felipa Aguilar Fonseca are Jairo Enrique Ochoa Aguilar's

parents; Jainedis Francisca Ochoa Aguilar, Janny Esther Ochoa Aguilar and Jorge Enrique Ochoa Aguilar are Jairo Enrique Ochoa Aguilar's siblings; Janne Janeth Ochoa Cadena, Johanna Teresa Ochoa Cadena, and Jairo Jose Ochoa Hernandez are Jairo Enrique Ochoa Aguilar's children; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jairo Enrique Ochoa Aguilar. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Jairo Enrique Ochoa Aguilar was killed on March 28, 2002 at the Hacienda San Luis in Chiriguana, Cesar, Colombia by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. At 8:30pm, three cars each filled with armed members of the Juan Andrés Álvarez Front arrived at his home. They pulled Jairo Enrique Ochoa Aguilar and his brother, Jaime Enrique Ochoa Aguilar, from their home. From there, the paramilitary group continued to other homes, pulling out their victims and forcing them into the cars. The following day, Jairo Enrique Ochoa Aguilar's family found him and his brother, Jaime Enrique Ochoa Aguilar, dead along with the bodies of two other men at the entrance to the San Luis Farm. The threats continued against Jairo Enrique Ochoa Aguilar's family after his death. The

following day, March 29, 2002, during the burial two members of the Juan Andrés Álvarez Front approached Jairo Enrique Ochoa Aguilar's surviving brother and asked him if he was a relative. The family was so afraid that they didn't return to visit Jairo Enrique Ochoa Aguilar's tomb after his death. Their house began to be monitored and the family started to receive threats left under their door by the AUC's Bloque Norte. Jairo Enrique Ochoa Aguilar had never received any death threats prior to his death. His siblings, out of fear for their lives, fled the area.

85.    Luis Rafael Peinado Ditta is the father and legal representative of the Estate of Jaime Luis Peinado Orozco under the laws of Colombia, and is also a legal heir to Jaime Luis Peinado Orozco under the laws of Colombia. Maria Concepción Orozco Bolaño is Jaime Luis Peinado Orozco's mother, and also legal heir under the laws of Colombia, but does not act as legal representative of his estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 21, 2002, Jaime Luis Peinado Orozco was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  Mr. Peinado was at a party with friends when members of the Juan Andrés Álvarez Front arrived and began to threaten

75

people and take them away. Jaime Luis Peinado Orozco was found shot the next morning in the area known as "La Curva de la Virgen" in the municipality of Chiriguana, Cesar.

86.    Laudith Mercedes Talco Pacheco is the sister and legal representative of the Estate of Andres Talco Arias under the laws of Colombia, and is also a legal heir to Andres Talco Arias under the laws of Colombia. Clara Ibet Talco Arias and Emy Luz Talco Pacheco are also Andres Talco Arias' sisters and legal heirs under the laws of Colombia, but do not act as legal representatives of his estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On November 5, 2005, Andres Talco Arias was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Andres Talco Arias left at 6:00am that morning to collect coffee, and was taken out of his car on the road towards "Pueblo Bello" in Valledupar, Cesar by members of the AUC following orders of commander, "Alias 39." He was shot in the head and stabbed. On October 31, 2006, the municipal deputy of Valledupar issued a statement confirming that Andres Talco Arias was killed for ideological and political reasons in the context of the internal armed conflict.

76

87.     Maria del Carmen Pallares is the domestic partner and legal representative of the Estate of Senen Vega under the laws of Colombia, and is also a legal heir to Senen Vega under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On April 26, 2005, Senen Vega was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, a group of heavily armed members of the AUC arrived at Senen Vega's house in the township of Santa Isabel, municipality of Curumani, and told him to accompany them. Soon after shots were heard. On September 5, 2005, the municipal deputy of Curumani issued a statement confirming that Senen Vega was killed for ideological and political reasons in the context of the internal armed conflict.

88.     Darys Soreida Saravia Chinchilla is the domestic partner and legal representative of the Estate of Jose Manuel Cante Enrrique under the laws of Colombia, and is also a legal heir to Jose Manuel Cante Enrrique under the laws of Colombia. Marco Jose Cante Saravia, Yeidis Patricia Cante Saravia and Maria Judith Cante Saravia are Jose Manuel Cante Enrrique's children, and are also his legal heirs under the laws of Colombia, but do not act as legal representatives of

77

his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On January 10, 2004, Jose Manuel Cante Enrrique was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, several armed members of the AUC arrived at the plantation where he worked in the township of Santa Isabel and without saying a word shot him multiple times.

89.    Henry Donado Perez is the domestic partner and legal representative of the Estate of Marlene Alvarez Sanchez under the laws of Colombia, and is also a legal heir to Marlene Alvarez Sanchez under the laws of Colombia. Ayiseth Dayani Alvarez Donado is Marlene Alvarez Sanchez's daughter, and also legal heir under the laws of Colombia, but does not act as legal representative of her Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On June 25, 2002, Marlene Alvarez Sanchez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Marlene Alvarez Sanchez was working at the ticketing office of

78

the San Diego Terminal. Two armed AUC members bought tickets from her and while waiting for the bus, one of them approached her again and shot her twice in the head.

90.     Yohanny Araujo Arias is the sister and legal representative of the Estate of Luis Alberto Araujo Arias under the laws of Colombia, and is also a legal heir to Luis Alberto Araujo under the laws of Colombia. Elena Mercedes Araujo Arias and Xiomary Araujo Arias are also Luis Alberto Araujo Arias' sisters and legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. Luis Alberto Araujo Arias was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Luis Alberto Araujo had gone on a trip to Valledupar, but it had been 12 days since his family heard from him. On February 12, 2004, his body was found with multiple bullet wounds on the banks of the river Guatapuri on the plantation "Las Cucambas" in Valledupar.

91.     Lilena Patricia Arzuaga Arias is the domestic partner and legal representative of the Estate of Cesar Augusto Araujo Navarro under the laws of

Colombia, and is also a legal heir to Cesar Augusto Araujo Navarro under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On September 8, 2000, Cesar Augusto Araujo Navarro was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 7:00am, several armed members of the AUC arrived at the plantation "El Diamente" in San Diego and killed Cesar Augusto Araujo Navarro and five of his relatives.

92. Monica Villalobos Martinez is the domestic partner and legal representative of the Estate of Richar Baquero Quintero under the laws of Colombia, and is also a legal heir to Richar Baquero Quintero under the laws of Colombia. Maria Edilma Quintero is Richar Baquero Quintero's mother; Laura Vanesa Baquero Villalobos, Leidys Viviana Baquero Villalobos, and Heidys Carolina Baquero Martinez are Richar Baquero Quintero' daughters; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the

decedent. On April 21, 2001, Richar Baquero Quintero was killed by the AUC

Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond. On said day around 7:00am, members of

the AUC set up a roadblock on the road between San Diego and Media Luna. They

stopped several vehicles, setting one on fire, and killed four people including

Richar Baquero Quintero.

93.     Rafael Francisco Fragozo Araujo is the brother and legal

representative of the Estate of Alexander Fragozo Araujo under the laws of

Colombia, and is also a legal heir to Alexander Fragozo Araujo under the laws of

Colombia. Luis Alberto Fragozo Araujo, Judith Fragozo Araujo, Maria Teresa

Fragozo Araujo, Gloria Esther Fragozo Araujo, Ibeth Fragozo Araujo, Danis

Fragozo Araujo and Elsy Leonor Fragozo Araujo are Alexander Fragozo Araujo's

siblings, and also legal heirs under the laws of Colombia, but do not act as legal

representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death

beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law

on behalf of the decedent and all damages each of them suffered as a result of the

execution of the decedent. On April 21. 2001, Alexander Fragozo Araujo was

killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received

knowing and substantial assistance from Drummond. On said day around 7:00am,

members of the AUC set up a roadblock on the road between San Diego and Media Luna. They stopped several vehicles, setting one on fire, and killed four people including Alexander Fragozo Araujo.

94.     Lidys del Socorro Murgas is Alejandro de Jesus Amaya Becerra's domestic partner and legal heir. Omaira Muñoz Guerra is also Alejandro de Jesus Amaya Becerra's domestic partner and legal heir. They act jointly as the legal representatives of the Estate of Alejandro de Jesus Amaya Becerra. Maria Marcela Amaya Murgas, Jaime Leonardo Amaya Muñoz, Mario Alejandro Amaya Muñoz, Luis David Amaya Muñoz are Alejandro de Jesus Amaya Becerra's children, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On January 17, 2003, Alejandro de Jesus Amaya Becerra died from wounds inflicted by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Around 7:00pm on January 13, 2003, Mr. Amaya was riding his bike in San Diego, Cesar when he stopped to talk to a friend. Two armed AUC members walked by and began shooting at them. Mr. Amaya was shot and was taken to El Socorro de San Diego

Hospital. He was transferred to the Medical Clinic Ltda. in Valledupar, where he died four days later.

95.     Maria Teresa Araujo Fragoso is Danilo Jose Araujo Lopez's domestic partner and legal heir. Omaira Josefa Lopez Murgas is also Danilo Jose Araujo Lopez's domestic partner and legal heir. They act jointly as the legal representatives of the Estate of Danilo Jose Araujo Lopez. Lilineth Araujo Fragoso, Marly Cecilia Araujo Fragoso, Karen Lucia Araujo Fragoso, Carmen Elena Araujo Cervantes, Danilo Jose Araujo Lopez and Rafael Jose Araujo Araujo are Danilo Jose Araujo Lopez's children; Jairo Enrique Araujo Lopez is Danilo Jose Araujo Lopez's brother;  and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On February 22, 2001, Danilo Jose Araujo Lopez was disappeared by the AUC Northern's Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 5:00am, Danilo Jose Araujo Lopez was driving from the Municipality of San Diego, Cesar to a nearby plantation. He was intercepted by a group of armed AUC members who pulled him out of the car and

took him away. To date, his whereabouts are unknown.

96.     Rosalba Montero de Garcia is the mother and legal representative of the Estate of Aldemar Garcia Montero under the laws of Colombia, and is also a legal heir to Aldemar Garcia Montero under the laws of Colombia. Manuel Santiago Garcia Arrieta is Aldemar Garcia Montero's father; Angel Enrique Garcia Montero, Gustavo Adolfo Garcia Montero, Ever Gustavo Garcia Montero, Yobanis Garcia Montero, Manuel Garcia Montero and Araceli Garcia Montero are Aldemar Garcia Montero's siblings; and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On February 23, 2001, Aldemar Garcia Montero was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 6:50pm, a group of armed AUC members arrived to the kiosk of El Socorro Hospital in San Diego and killed three people, including Aldemar Garcia Montero.

97.     Gloria Mercedes Navarro Amaya is the domestic partner and legal representative of the Estate of Emiro Antenor Araujo Arzuaga under the laws of Colombia, and is also a legal heir to Emiro Antenor Araujo Arzuaga under the laws

of Colombia. Hernando Rafael Araujo Arzuaga, Jesus Francisco Araujo Arzuaga, Ana Socorro Araujo Arzuaga, Jose Calixto Araujo Arzuaga, Ligia Elena Araujo Arzuaga, Belisa Araujo Arzuaga, Rosa Pastora Araujo de Araujo and Cesar Enrique Araujo Arzuaga are Emiro Antenor Araujo Arzuaga' siblings; Oscar Jose Araujo Navarro, Emiro Antonio Araujo Navarro, Diego Armando Araujo Navarro, Miguel Angel Araujo Navarro, and Sindy Patricia Araujo Navarro are Emiro Antenor Araujo Arzuaga's children; and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On September 8, 2000 Emiro Antenor Araujo Arzuaga was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 7:00am, several armed members of the AUC arrived at the plantation "El Diamente" in San Diego and killed Emiro Antenor Araujo Arzuaga and five of his relatives.

98.     Elias Jose Guerra Villeros is the brother and legal representative of the Estate of Alciviades Zuleta Guerra under the laws of Colombia, and is also a legal heir to Alciviades Zuleta Guerra under the laws of Colombia. Plaintiff herein is a

wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. On February 16, 2003, Elias Jose Guerra Villeros was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Alciviades Zuleta Guerra went to attend a meeting in Villa Matilde organized by AUC members under false pretenses. They grabbed him before he got to the meeting and killed him.

99.     Alba Lidia Real Lopez is the mother and legal representative of the Estate of Eldiber Antonio Echeverri Real under the laws of Colombia, and is also a legal heir to Eldiber Antonio Echeverri Real under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On January 14, 2005, Eldiber Antonio Echeverri Real was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Eldiber Antonio Echeverri Real went to "Barrio Altos del Divino" in the municipality of Becerril, Cesar to visit a friend. Hours later, news came that he had been shot multiple times and killed.

100.    Ruth Maria Lopez Contreras is the domestic partner and legal representative of the Estate of Beymar de Jesus Luquez Martinez under the laws of Colombia, and is also a legal heir to Beymar de Jesus Luquez Martinez under the laws of Colombia. Ana Elvira Torres Martinez is Beymar de Jesus Luquez Martinez's mother; Naibis Lorena Luquez, Thalia del Mar Luquez Lopez and Beymar David Luquez Lopez are Beymar de Jesus Luquez Martinez's children; and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On June 9, 2002, Beymar de Jesus Luquez Martinez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  On said day, Beymar de Jesus Luquez Martinez was driving along "Vereda el Paraiso" in the municipality of Augustin Codazzi, Cesar when he reached a roadblock of armed AUC members. With list in hand, they asked his name and killed him. On October 1, 2002, the municipal deputy of Agustin Codazzi issued a statement confirming that Beymar de Jesus Luquez Martinez was killed for ideological and political reasons in the context of the internal armed conflict.

101.   Juana Manuela Cabarcas de la Hoz is the domestic partner and legal representative of the Estate of Reyes Herrera Batista under the laws of Colombia, and is also a legal heir to Reyes Herrera Batista under the laws of Colombia. Elder Alfonso Herrera Cabarcas, Nancy Beatriz Herrera Cabarca, Yameris Herrera Cabarca, Mercy Luz Herrera Cabarcas and Amaurys Herrera Salcedo are Reyes Herrera Batista's children, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 21, 2001, Reyes Herrera Batista was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  On said day at noon, a group of armed AUC members killed Reyes Herrera Batista in Casacara, municipality of Agustin Codazzi, Cesar.

102.   Beatriz Elena Perez Avendaño is the domestic partner and legal representative of the Estate of Fredy Jose Palmera Ortega under the laws of Colombia, and is also a legal heir to Fredy Jose Palmera Ortega under the laws of Colombia. Jhon Fredy Palmera Perez, Valentina Vanessa Palmera Perez and Camila Andrea Palmera Perez are Fredy Jose Palmera Ortega's children, and also

legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On January 18, 2003, Fredy Jose Palmera Ortega was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 4:45am, Fredy Jose Palmera Ortega was with some friends at "Texas Discoteca" in the municipality of Becerril, Cesar. He was heading home when a group of armed AUC members shot him.

103.   Gladis Esther Carvajalino Quintero is the domestic partner and legal representative of the Estate of Wilmer Alfredo Rivero Villar under the laws of Colombia, and is also a legal heir to Wilmer Alfredo Rivero Villar under the laws of Colombia. Oscar Javier Rivero Carvajalino, Yasleidy Rivero Carvajalino, Arelis Rivero Carvajalino, Sol Sireth Rivero Carvajalino, Elis Johana Rivero Carvajalino, Yadiris Rievro Carvajalino, Esther Cecilia Rivero Carvajalino, Luisa Ramona Rivero Carvajalino and Yuslenis Rivero Carvajalino are Wilmer Alfredo Rivero Villar's children, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful

death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On June 6, 2003, Wilmer Alfredo Rivero Villar was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Wilmer Alfredo Rivero Villar was selling watermelons on the main road in San Diego, Cesar when an AUC member shot him several times from behind.

104.    Rosa Elena Beleño Paba is the mother and legal representative of the Estate of Jose Alfredo Beleño Paba under the laws of Colombia, and is also a legal heir to Jose Alfredo Beleño Paba under the laws of Colombia. Osmen Fonseca Beleño, Adriana Cristina Beleño Paba, Francy Lorena Carreño Beleño, Sharyck Andrea Medina Beleño and Jhonnys Fabian Arrieta Beleño are Jose Alfredo Beleño Paba's siblings, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 27, 2002, Jose Alfredo Beleño Paba was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  On said day,

a group of armed AUC members arrived to the town of San Roque in Cesar and visited several houses. A man running from the armed group barged into the Beleño's house to hide. The AUC paramilitaries came in and took him away, but also asked Jose Alfredo Beleño Paba, who was in the same room, to come outside. They asked his name and discussed what to do with him. Jose Alfredo Beleño Paba was then tied up and taken away on a truck. Several of the men that had been taken away turned up dead the following day, but Jose Alfredo Beleño Paba's whereabouts are still unknown.

105.   Gloria Mercedes Navarro Amaya is the mother and legal representative of the Estate of Luis Alejandro Araujo Navarro under the laws of Colombia, and is also a legal heir to Luis Alejandro Araujo Navarro under the laws of Colombia. Sindy Patricia Araujo Navarro, Oscar Jose Araujo Navarro, Emiro Antonio Araujo Navarro, Diego Armando Araujo Navarro and Miguel Angel Araujo Navarro are Luis Alejandro Araujo Navarro's siblings, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On September 8, 2000 Luis Alejandro Araujo Navarro was killed by the AUC

Northern Block's Juan Andrés Álvarez Front, which received knowing and

substantial assistance from Drummond. On said day around 7:00am, several armed

members of the AUC arrived at the plantation "El Diamente" in San Diego and

killed Luis Alejandro Araujo Navarro and five of his relatives.

106.    Maikel Dayana Hernandez Castillo is the domestic partner and legal

representative of the Estate of Luis Fernando Florez Barrios under the laws of

Colombia, and is also a legal heir to Luis Fernando Florez Barrios under the laws

of Colombia. Luis Felipe Florez Martinez is Luis Fernando Florez Barrios' son;

Fernando Florez Daza and Sara Maria Barrios Suarez are Luis Fernando Florez

Barrios' parents; Luis Carlos Florez Barrios, Carmen Helena Florez Barrios,

Ismelia Maria Florez Barrios, Yucelis Florez Barrios, Ismael Carmelo Florez

Barrios, Fernando Barrios, Rodrigo Alfonso Barrios Suarez and Siomara

Hernandez Barrios are Luis Fernando Florez Barrios' siblings; and also legal heirs

under the laws of Colombia, but do not act as legal representatives of his Estate in

this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and

all damages each of them suffered as a result of the execution of the decedent. On

August 29, 2004, Luis Fernando Florez Barrios was killed by the AUC Northern

Block's Juan Andrés Álvarez Front, which received knowing and substantial

assistance from Drummond. On said day around 10:30pm, Luis Fernando Florez

Barrios was at a bazaar in Becerril, Cesar with his cousins. When he stepped

outside, three armed AUC members shot him 6 times.

107.   Zoila Perez Lozano is the domestic partner and legal representative of

the Estate of Eduardo Cuartas Franco under the laws of Colombia, and is also a

legal heir to Eduardo Cuartas Franco under the laws of Colombia. Edilson Cuartas

Perez and Suleima Patricia Cuartas Perez are Eduardo Cuartas Franco's children,

and also legal heirs under the laws of Colombia, but do not act as legal

representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death

beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law

on behalf of the decedent and all damages each of them suffered as a result of the

execution of the decedent. On December 12, 2004, Eduardo Cuartas Franco was

killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received

knowing and substantial assistance from Drummond. On said day around 8:00am,

Eduardo Cuartas Franco left the house because he received a call about a meeting

for coffee growers. He did not return that night and the following day, his partner

found him dead on the side of the road in Agustin Codazzi, Cesar.

108.   Maribel Agudelo Gomez is the domestic partner and legal

representative of the Estate of Albeiro Luis Amaya Ovalle under the laws of

Colombia, and is also a legal heir to Albeiro Luis Amaya Ovalle under the laws of

Colombia. Lisanyuris Maria Amaya Agudelo is Albeiro Luis Amaya Ovalle's

daughter, and also legal heir under the laws of Colombia, but does not act as legal

representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death

beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law

on behalf of the decedent and all damages each of them suffered as a result of the

execution of the decedent. On October 6, 2000, Albeiro Luis Amaya Ovalle was

killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received

knowing and substantial assistance from Drummond. Albeiro Luis Amaya Ovalle

was a bus driver between Codazzi and Cuatro Vientos. On said day around

6:30pm, a group of armed AUC members took him off the bus and shot him in the

head.

109.   Rita Maria Castro Araujo is the wife and legal representative of the

Estate of Alonso Ojeda Araujo under the laws of Colombia, and is also a legal heir

to Alonso Ojeda Araujo under the laws of Colombia. Lucia Marcela Ojeda Castro,

Karen Margarita Ojeda Castro, Estevan David Ojeda Castro and Alonso Carlos

Ojeda Castro are Alonso Ojeda Araujo's children, and also legal heirs under the

laws of Colombia, but do not act as legal representatives of his Estate in this

lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On May 19, 2001, Alonso Ojeda Araujo was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Alonso Ojeda Araujo was heading home when a group of armed AUC members killed him at the intersection between the town of Tocaima and La Bodega community.

110.    Ana Ines Ortega is the mother and legal representative of the Estate of Alexander Serna Ortega under the laws of Colombia, and is also a legal heir to Alexander Serna Ortega under the laws of Colombia. Karen Mendoza Ortega, Mabelys Maria Mendoza Ortega and Albeidys Alberto Mendoza Ortega are Alexander Serna Ortega's siblings, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On September 17, 2001, Alexander Serna Ortega was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.  On said day, Alexander Serna Ortega left Agustin, Codazzi to go play

a soccer game in Sabana Alta when a group of armed AUC members came and took him away. His body was found in front of the Marconia plantation the following day.

111.   Grimalda Charris Borrero is the wife and legal representative of the Estate of Lucas Rafael Aragon Ramos under the laws of Colombia, and is also a legal heir to Lucas Rafael Aragon Ramos under the laws of Colombia. Elias Aragon Charris, Enis Aragon Charris and Elizabeth Aragon Charris are Lucas Rafael Aragon Ramos's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are the wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On November 24, 2003, Lucas Rafael Aragon Ramos was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Lucas Rafael Aragon Ramos and his wife were on their motorcycle on the way to their plot of land when a group of armed AUC members stopped them, tied them up, and took them back to the house. They asked where they kept the cattle and firearms and his wife replied they didn't have any firearms.  They locked her in the bathroom and questioned

96

Lucas Rafael Aragon Ramos. She heard the sound of the motorcycle and when she came out, they had taken her husband. His whereabouts are still unknown.

112.    Nuvia Esther Zarate Ortega is the domestic partner and legal representative of the Estate of Manuel del Carmen Castillo Romero under the laws of Colombia, and is also a legal heir to Manuel del Carmen Castillo Romero under the laws of Colombia. Katherine Castillo Zarate and Jeison Fabian Castillo Zarate are Manuel del Carmen Castillo Romero's children, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On October 12 2002, Manuel del Carmen Castillo Romero was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 12:30pm, Manuel del Carmen Castillo Romero left his house to go wash the garbage truck of the municipality of Bosconia. A group of heavily armed AUC members drove by and made him get in the car. His whereabouts are still unknown to this day.

113.    Juvenal Caro Cardena is the father and legal representative of the Estate of Juvenal Caro Latorre under the laws of Colombia, and is also a legal heir

to Juvenal Caro Latorre under the laws of Colombia. Julia Emma Latorre Cortes is Juvenal Caro Latorre's mother; Juvenal Caro Cardenas, Taia Latorre and Carlos Alberto Caro Latorre are Juvenal Caro Latorre's siblings; and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On June 29, 2002, Juvenal Caro Latorre was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Juvenal Caro Latorre was talking with his neighbors in the neighborhood "Los Mayales," when an armed AUC member started shooting at him without saying a word. Juvenal Caro Latorre was shot five times of which four were directly to his head. He died instantly.

114.   Aljadis Seelene Gonzalez Corzo is the sister and legal representative of the Estate of Merquis Lenin Gonzalez Corzo under the laws of Colombia, and is also a legal heir to Merquis Lenin Gonzalez Corzo under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On December 26, 2002,

Merquis Lenin Gonzalez Corzo was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Merquis Lenin Gonzalez Corzo was at work at the Telecom facilities in the municipality of Agustin Codazzi when a group of armed AUC members came and shot him.

115.   Olides Iveth Avendaño Robles is the wife and legal representative of the Estate of Eliecer Romero Vega under the laws of Colombia, and is also a legal heir to Eliecer Romero Vega under the laws of Colombia. Yuneida Romero Avendaño, Osiris Romeros Avendaño and Sol Miriam Romero Avendaño are Eliecer Romero Vega's daughters; Ana Fidelina Vega Gil is Eliecer Romero Vega's mother; Luz Marina Romero Vega is Eliecer Romero Vega's sister; and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 13, 2001, Eliecer Romero Vega was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 7:30pm, Eliecer Romero Vega was at work at the Mechanic shop "La Victoria" when three armed

AUC members drove by and took him away. His whereabouts are still unknown.

116.   Merys Orduz Tirado is the domestic partner and legal representative of the Estate of Algemiro Jose Barahona Guzman under the laws of Colombia, and is also a legal heir to Algemiro Jose Barahona Guzman under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On September 29, 2000, Algemiro Jose Barahona Guzman was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 2:00pm, Algemiro Jose Barahona Guzman was at home when a group of armed AUC members took him out of his house and killed him. On November 8, 2000, the municipal deputy of Curumani-Cesar issued a statement confirming that Algemiro Jose Barahona Guzman was killed for ideological and political reasons in the context of the internal armed conflict.

117.   Ramon Florez Torres is the brother and legal representative of the Estate of Cristobal Florez Torres under the laws of Colombia, and is also a legal heir to Cristobal Florez Torres under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted

under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent On November 29, 2000, Cristobal Florez Torres was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Cristobal Florez Torres was working in the Guarquiria Plantation when a group of AUC members beat him and took him away.

118.   Rosalia Martinez Larios is the mother and legal representative of the Estate of Darigel Jose Mendoza Martinez under the laws of Colombia, and is also a legal heir to Darigel Jose Mendoza Martinez under the laws of Colombia. Alberto Manuel Mendoza Martinez is Darigel Jose Mendoza Martinez's brother, and also legal heir under the laws of Colombia, but does not act as legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 8, 2002, Darigel Jose Mendoza Martinez was killed in La Jagua de Ibirico, Cesar by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond.

119.   Angel Maria Peña Carmona is the brother and legal representative of the Estate of Antonio Carlos Peña Carmona under the laws of Colombia, and is

also a legal heir to Antonio Carlos Peña Carmona under the laws of Colombia. Eliana Paola Peña Carmona and Blanca Nieves Peña Carmona are Antonio Carlos Peña Carmona's sisters, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On January 22, 2003, Antonio Carlos Peña Carmona was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Antonio Carlos Peña Carmona went out that morning and never returned. His body was later found with bullet wounds.

120.   Idania Isabel Duica Cantillo is the mother and legal representative of the Estate of Samir Jesus Budiño Duica under the laws of Colombia, and is also a legal heir to Samir Jesus Budiño Duica under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent On February 11, 2005, Samir Jesus Budiño Duica was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around

6:00am, Samir Jesus Budiño Duica left in a bicycle taxi to take a woman to the hospital. Around lunchtime, his mother went to look for him and got the news that her son was dead. Samir Jesus Budiño Duica's mother transported the body back home.

121.    Deila Cecilia Amaya Polanco is the mother and legal representative of the Estate of Roberto Carlos Orozco Amaya under the laws of Colombia, and is also a legal heir to Roberto Carlos Orozco Amaya under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On April 13, 2003, Roberto Carlos Orozco Amaya was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 9:00am, Roberto Carlos Orozco Amaya was at work in "Los Venedos" plantation when a group of AUC members took him away. His body was found dead a few days later in the place known as "El Tigre" on the way to Bosconia, Cesar.

122.    Juana Betty Bonilla Rosado is the domestic partner and legal representative of the Estate of Silvio Raul Rueda Fernandez under the laws of Colombia, and is also a legal heir to Silvio Raul Rueda Fernandez under the laws

of Colombia. Leonor Ibeth Rueda Bonilla is Silvio Raul Rueda Fernandez's daughter, and also legal heir under the laws of Colombia, but does not act as legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 13, 2003, Silvio Raul Rueda Fernandez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day around 8:00am, Silvio Raul Rueda Fernandez went to work at "La Estancia" plantation. He was talking with his co-workers when two armed AUC members came in a motor-cycle and asked for his ID. The AUC members took him away and shots were heard ten minutes later.

123.   Jose Antonio Martinez Pallares is the son and legal representative of the Estate of Jose de Jesus Martinez Martinez under the laws of Colombia, and is also a legal heir to Jose de Jesus Martinez Martinez under the laws of Colombia. Rosa Liliana Martinez Pallares, Aidaris Martinez Pallares and Nolvis Maria Martinez Pallares are  Jose de Jesus Martinez Martinez's daughters, and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the

deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 10, 2003, Jose de Jesus Martinez Martinez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jose de Jesus Martinez Martinez was at a store in Palmitas, Cesar when a group of armed AUC members arrived in a truck and shot him several times.

124.    Maria Enelda Carvajalino Carvajalino is the sister and legal representative of the Estate of Rafael Antonio Ruedas Carvajalino under the laws of Colombia, and is also a legal heir to Rafael Antonio Ruedas Carvajalino under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of the deceased. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On October 25, 2000, Rafael Antonio Ruedas Carvajalino was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Rafael Antonio Ruedas Carvajalino was in Curumani, Cesar when a group of AUC members beat him and took him away. His whereabouts are still unknown.

125.    Faustino Ortiz Camargo is the father and legal representative of the

Estate of Libert Antonio Ortiz Bello under the laws of Colombia, and is also a legal heir to Libert Antonio Ortiz Bello under the laws of Colombia. Mari Lenis Ortiz Bello is Libert Antonio Ortiz Bello's sister, but does not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On January 6, 2000, Libert Antonio Ortiz Bello was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Libert Antonio Ortiz Bello left work and was waiting for the bus in Becerril, Cesar when a group of armed AUC members drove by and took him away. His whereabouts are still unknown.

126.   Rosa Irma Medina Mahecha is the mother and legal representative of the Estate of Heriberto de Jesus Martinez Medina under the laws of Colombia, and is also a legal heir to Heriberto de Jesus Martinez Medina under the laws of Colombia. Heriberto Martinez Rodriguez is Heriberto de Jesus Martinez Medina's father, and is also a legal heir under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are the wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of

the execution of the decedent On October 14, 2002, Heriberto de Jesus Martinez Medina was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Heriberto de Jesus Martinez Medina was at the plantation in "Vereda Tierra" in Becerril when a group of AUC members tied him up and took him away. His mother heard that he had been killed, but the body has not been found. His whereabouts are still unknown.

127.   Alfonso Lozano Jaramillo is the brother and legal representative of the Estate of Freddy Lozano Jaramillo under the laws of Colombia, and is also a legal heir to Freddy Lozano Jaramillo under the laws of Colombia. Gustavo Lozano Jaramillo is Freddy Lozano Jaramillo's brother, and also legal heir under the laws of Colombia, but does not act as legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 17, 2002, Freddy Lozano Jaramillo was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Freddy Lozano Jaramillo was at home having dinner with his brother when two armed AUC members rang the door and came in. They

asked for him and when he stood up, they shot him three times, two to the chest and one to the head.

128.   Ceila Luz Ortiz is the wife and legal representative of the Estate of Javier Lozano Jaramillo under the laws of Colombia, and is also a legal heir to Javier Lozano Jaramillo under the laws of Colombia. Javier Lozano Ortiz, Jeisson Lozano Ortiz, and Mayra Lozano Ortic are Javier Lozano Jaramillo's children; Alfonzo Lozano Jaramillo and Gustavo Lozano Jaramillo are Javier Lozano Jaramillo's brothers; and also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of the deceased. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 17, 2002, Javier Lozano Jaramillo was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. On said day, Javier Lozano Jaramillo was at home having dinner with his brother when two armed AUC members rang the door and came in. They asked for his brother and when he stood up, they shot him three times. Javier Lozano Jaramillo tried to go after the men, but they shot him.

129.   Doris Sanguino Perez is the sister and legal representative of the

Estate of Alcides Sanguino Perez under the laws of Colombia, and is also a legal heir to Alcides Sanguino Perez under the laws of Colombia. Gumercinda Perez Estrada is Alcides Sanguino Perez's mother; Elsida Sanguino Perez, Jose de Dios Sanguino Perez, Juan de Dios Sanguino Perez, Nubia Maria Sanguino Perez, Luis Alberto Sanguino Perez, Daniel Sanguino Perez, Delia Rosa Sanguino Perez, and Ana Sanguino Perez are Alcides Sanguino Perez's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Alcides Sanguino Perez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 16, 2002, Alcides Sanguino Perez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Alcides Sanguino Perez's mother-in-law had gone out to buy *panela*. When she was heading back she heard several shots, and saw a couple of AUC paramilataries leave their farm in Curumani, Cesar. She found Alcides Sanguino Perez dead.

130.   Luz Dary Perez Velasquez is the domestic partner and legal representative of the Estate of Daniel Alberto Sanchez Acosta under the laws of Colombia, and is also a legal heir to Daniel Alberto Sanchez Acosta under the laws

of Colombia. Carlos Daniel Sanchez Torres and Maria Yolanda Acosta de Sanchez

are Daniel Alberto Sanchez Acosta's parents; Yesica Johana Sanchez Perez,

Daniela Abigail Sanchez Perez, Ronald Yailson Sanchez Perez, Carlos Mario

Sanchez Rodriguez, and Carlos Daniel Sanchez Rodriguez are Daniel Alberto

Sanchez Acosta's children; and are also legal heirs under the laws of Colombia, but

do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are

wrongful death beneficiaries of Daniel Alberto Sanchez Acosta. Plaintiffs seek all

damages permitted under the law on behalf of the decedent and all damages each

of them suffered as a result of the execution of the decedent. On April 22, 2002,

Daniel Alberto Sanchez Acosta was killed by the AUC Northern Block's Juan

Andrés Álvarez Front, which received knowing and substantial assistance from

Drummond. Daniel Alberto Sanchez Acosta was at home in Curumani, Cesar when

a group of heavily armed AUC members arrived and forced him to hand over the

cattle. He never came back home and his body was later found with his head

chopped off.

131.   Luz Marina Gonzalez de Murcia is the mother and legal representative

of the Estate of Edgar Batista Gonzalez under the laws of Colombia, and is also a

legal heir to Edgar Batista Gonzalez under the laws of Colombia. Petrona Batista

Gonzalez is the sister of Edgar Batista Gonzalez, and is also a legal heir under the

110

laws of Colombia, but does not act as a legal representative in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Edgar Batista Gonzalez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On or about April 16, 2003, Edgar Batista Gonzalez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Edgar Batista Gonzalez was home when an AUC member arrived and took him away. His body later turned up at the morgue in Chiriguana, Cesar.

132.   Luis Carlos Lopez Villalobos is the father and legal representative of the Estate of Edgar Lopez Rangel under the laws of Colombia, and is also a legal heir to Edgar Lopez Rangel under the laws of Colombia. Edilma Rangel Avila is the mother of Edgar Lopez Rangel, and is also a legal heir, but does not act as a legal representative in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Edgar Lopez Rangel. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On September 27, 2003, Edgar Lopez Rangel was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Edgar Lopez Rangel

called his father from Valledupar to let him know he was coming home to pick up his brother to go collect coffee. A friend dropped off Edgar Lopez Rangel at the bus terminal, and no one ever heard from him again. His whereabouts are still unknown, but his disappearance occurred when there was a heavy AUC presence in the area.

133.   Eugenio Domingo Carrillo is the father and legal representative of the Estate of Eugenio Domingo Carrillo Torres under the laws of Colombia, and is also a legal heir to Eugenio Domingo Carillo Torres under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Eugenio Domingo Carrillo Torres. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. On November 2, 2002, Eugenio Domingo Carrillo Torres was disappeared by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Eugenio Domingo Carrillo Torres left work and dropped off a friend, but never made it home. His whereabouts are still unknown to date, but his disappearance occurred when there was a heavy AUC presence in the area. In addition, the day after his disappearance, a group of AUC members arrived at his father's house and threatened his father, telling him that if he did not leave the area, they would come back to kill him.

134.    Elver Crisanto Cardona Hoyos is the brother and legal representative of the Estate of Fernando de Jesus Cardona Hoyos under the laws of Colombia, and is also a legal heir to Fernando de Jesus Cardona Hoyos under the laws of Colombia. Guillermo Cardona Hoyos, Nubia Cardona Hoyos, Sigilfredo Cardona Hoyos, Zaida Cardona Hoyos, and Rodrigo Cardona Hoyos are Fernando de Jesus Cardona Hoyos' siblings, and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Fenando de Jesus Cardona Hoyos. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 6, 2001, Fernando de Jesus Cardona Hoyos was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Fernando de Jesus Cardona Hoyos was headed to *Los Ranchos* plantation in Curumani, Cesar, when a couple of armed AUC members stopped the car and made everyone get out. The AUC paramilataries asked for ID and shot Fernando de Jesus Cardona Hoyos several times.

135.    Clara Ines Valencia Usme is the domestic partner and legal representative of the Estate of Fernando Reina under the laws of Colombia, and is also a legal heir to Fernando Reina under the laws of Colombia. Bayron Alexander

Reina Valencia and Jose Fernando Reina Valencia are Fernando Reina's sons, and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Fernando Reina. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 23, 2003, Fernando Reina was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Fernando Reina was transporting passengers when he reached an AUC roadblock in Sabanas del Valle, Santa Isabel. The armed paramilitaries took him out of the vehicle and killed him.

136.   Ana Isabel Uribe de Noriega is the mother and legal representative of the Estate of German Alberto Noriega Uribe under the laws of Colombia, and is also a legal heir to German Alberto Noriega Uribe under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of German Alberto Noriega Uribe. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On February 11, 2001, German Alberto Noriega Uribe was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. German Alberto Noriega Uribe was at a store with some friends

114

in Curumani, Cesar. He went outside to get a bucket of water and ran into a group of AUC paramilitaries. German Alberto Noriega Uribe accidentally splashed one of the men who then shot him several times.

137.   Maria Rocio Ospina Quintero is the domestic partner and legal representative of the Estate of Guillermo Rojas Suarez under the laws of Colombia, and is also a legal heir to Guillermo Rojas Suarez under the laws of Colombia. Luz Angela Rojas Ospina and Javier Rojas Ospina are Guillermo Rojas Suarez's children, and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Guillermo Rojas Suarez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On June 26, 2002, Guillermo Rojas Suarez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Guillermo Rojas Suarez was riding his horse towards the farm when a heavily armed group of AUC members pulled him off the horse. They asked for his name and ID number twice. Guillermo Rojas Suarez made a mistake the second time, and the armed paramilitaries beat him, tied him up with the horses' reigns, and killed him in the municipality of Becerril, Cesar.

138.   Diofanol Garcia Martinez is the father and legal representative of the Estate of Ismael Garcia Arambula under the laws of Colombia, and is also a legal heir to Ismael Garcia Arambula under the laws of Colombia. Nellis Maria Arambula de Garcia is Ismael Garcia Arambula's mother; Yanelis Garcia Arambula, Yonelis Maria Garcia Arambula, Yuleidys Julieth Garcia Arambula, Yasmely Karina Garcia Arambula, and Wilfran Enrique Garcia Arambula are Ismael Garcia Arambula's siblings; and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Ismael Garcia Arambula. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 28 2002, Ismael Garcia Arambula was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Ismael Garcia Arambula was in the store, La Fortuna, when a group of armed AUC members tied him up, took him away, and killed him.

139.   Alma Rosa Diaz Vasquez is the sister and legal representative of the Estate of Jesus David Melo Vasquez under the laws of Colombia, and is also a legal heir to Jesus David Melo Vasquez under the laws of Colombia. Xenia Diaz Vasquez and Maria del Carmen Melo are Jesus Davis Melo Vasquez's sisters, and

116

are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Jesus Davis Melo Vasquez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On November 29, 2004, Jesus David Melo Vasquez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jesus David Melo Vasquez was doing a delivery at a store in the neighborhood, *Camilo Torres,* in Codazzi, Cesar, when a group of armed AUC members took him away in a motorcycle and killed him.

140.   Ludys Leonor Mejia de Mattos is the wife and legal representative of the Estate of Jose Francisco Mattos Fuentes under the laws of Colombia, and is also a legal heir to Jose Francisco Mattos Fuentes under the laws of Colombia. Yeris Pahola Mattos Mejia, Jose Luis Mattos Mejia, Yolanda Mattos Mejia and Jorge Luis Mattos Mejia are Jose Francisco Mattos Fuentes' children, and are also legal heirs, but do not act as legal representatives of his Estate. Plaintiffs herein are wrongful death beneficiaries of Jose Francisco Mattos Mejia. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 17 2002, Jose Francisco Mattos Fuentes was disappeared by the AUC Northern Block's

117

Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jose Francisco Mattos Fuentes went out to collect honey in the *Garanta* plantation in Codazzi, Cesar when a group of paramilitaries arrived and took him away. His whereabouts are still unknown to date.

141.    Sonia Esther Sanchez Parra is the mother and legal representative of the Estate of Jose Gregorio Sanchez Parra under the laws of Colombia, and is also a legal heir to Jose Gregorio Sanchez Parra under the laws of Colombia. Maria del Carmen Monterrosa Sanchez is Jose Gregorio Sanchez Parra's sister, and is also a legal, but does not act as a legal representative of his Estate in this lawsuit. Plantiffs herein are wrongful death beneficiaries of Jose Gregorio Sanchez Parra. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On January 15, 2004, Jose Gregorio Sanchez Parra was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jose Gregorio Sanchez Parra was driving towards San Diego, Cesar when he was intercepted by a group of armed AUC members who took him out of the car. His body was later found dead near the *Argelia* plantation.

142.    Olinta Maria Ascanio Ascanio is the mother and legal representative of the Estate of Jose Uriel Reyes Ascanio under the laws of Colombia, and is also a

legal heir to Jose Uriel Reyes Ascanio under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jose Uriel Reyes Ascanio. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On April 12, 2002, Jose Uriel Reyes Ascanio was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jose Uriel Reyes Ascanio and his co-workers were heading home from work in Becerril, Cesar when a group of armed AUC members intercepted the truck. They made everyone get out of the truck and asked for their ID. When the paramilitaries asked for Jose Uriel Reyes Ascanio's identification, they beat him and shot him.

143.    Ana Dolores Obregon is the domestic partner and legal representative of the Estate of Leonidas Hernandez Perez under the laws of Colombia, and is also a legal heir to Leonidas Hernandez Perez under the laws of Colombia. Bialys Zulay Hernandez Obregon, Wilfredo Hernandez Obregon, Jesus Alberto Hernandez Obregon, and Leonardo Hernandez Obregon are Leonidas Hernandez Perez's children, and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Leonidas Hernandez Perez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of

119

the decedent. On or about July 2, 2002, Leonidas Hernandez Perez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Leonidas Hernandez Perez and his family were driving to *La Vereda San Pedro,* when they reached an AUC roadblock. The AUC members made him get out of the car and told his family to keep driving. His body was found dead the following day on the side of the road between Curumani and Pailitas, Cesar.

144.   Lidubina Carpio Cardenas is the domestic partner and legal representative of the Estate of Libardo Galvis Sanchez under the laws of Colombia, and is also a legal heir to Libardo Galvis Sanchez under the laws of Colombia. Zoraida Galvis Carpio, Rosiris Galvis Carpio, Virgelina Galvis Carpio, Oneida Galvis Carpio, Luznelly Galvis Carpio and Jorge Luis Galvis Carpio are Libardo Galvis Sanchez's children, and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Libardo Galvis Sanchez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On July 16, 2005, Libardo Galvis Sanchez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Libardo Galvis

Sanchez was at *El Rey* billiard in Becerril, Cesar. Late in the night, an armed AUC member came up to him and shot him in the ear.

145. Luz Mery Ramirez Guerra is the domestic partner and legal representative of the Estate of Manuel Enrique Ardiles Vasquez under the laws of Colombia, and is also a legal heir to Manuel Enrique Ardiles Vasquez under the laws of Colombia. Andy Fabian Ardiles Ramirez is Manuel Enrique Ardiles Vasquez's son; Edilma Vasquez Centeno is Manuel Enrique Ardiles Vasquez's mother; and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Manuel Enrique Ardiles Vasquez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On February 20, 2002, Manuel Enrique Ardiles Vasquez was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Manuel Enrique Ardiles Vasquez was transporting merchandise, when a group of armed AUC members intercepted him in Curumani, Cesar. They tried to take the merchandise, and when he opposed, they killed him. On March 13, 2002, the municipal deputy of Curumani issued a statement confirming that Manuel Enrique Ardiles Vasquez was killed for ideological and political reasons in the context of the internal armed conflict.

146.   Dalgis Benavides Cadena is the domestic partner and legal representative of the Estate of Miguel Angel Rios Manzano under the laws of Colombia, and is also a legal heir to Miguel Angel Rios Manzano under the laws of Colombia. Luis Miguel Rios Benavides, Mauricio Rios Benavides and Luz Elena Rios Benavidez are Miguel Angel Rios Manzano's children, and are also legal heirs, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Miguel Angel Rios Manzano. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On April 3, 2001, Miguel Angel Rios Manzano was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Miguel Angel Rios Manzano was working in his store at home in Valledupar, when an armed AUC member came to buy something. When Miguel Angel Rios Manzano turned around, he was shot several times.

147.   Reinel Alfonso Sanchez Villa is the son and legal representative of the Estate of Renel Sanchez Ramos under the laws of Colombia, and is also a legal heir to Renel Sanchez Ramos under the laws of Colombia. Margarita Ramos Centeno is Renel Sanchez Ramos' sister; Mayra Alejandra Sanchez Villa, Katerine Sanchez Villa and Victoria Sanchez Villa are Renel Sanchez Ramos' daughters; and are also

legal heirs, but do not act as legal representatives of his Estate in this lawsuit.

Plaintiffs herein are wrongful death beneficiaries of Renel Sanchez Ramos.

Plaintiffs seek all damages permitted under the law on behalf of the decedent and all

damages each of them suffered as a result of the execution of the decedent. On

March 9, 2003, Renel Sanchez Ramos was killed by the AUC Northern Block's

Juan Andrés Álvarez Front, which received knowing and substantial assistance

from Drummond. Renel Sanchez Ramos was at home in Becerril, Cesar when a

group of armed paramilitaries arrived. Before he could show his ID, they shot him

several times. On March 31, 2003, the municipal deputy of Becerril issued a

statement confirming that Renel Sanchez Ramos was killed for ideological and

political reasons in the context of the internal armed conflict.

148.    Sorcelina Sandoval Acosta is the domestic partner and legal

representative of the Estate of Roque Niño Rincon under the laws of Colombia, and

is also a legal heir to Roque Niño Rincon under the laws of Colombia. Deyner Niño

Sandoval, Edith Niño Sandoval, Yennys Niño Sandoval, and Roque Niño Sandoval

are Roque Niño Rincon's children; Julian Niño Rincon, Enrique Niño Rincon,

Hector Niño Rincon, Aura Maria Niño Rincon, Simon Niño Rincon, and Edgar

Niño Rincon are Roque Niño Rincon's siblings; and are also legal heirs, but do not

act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are

wrongful death beneficiaries of Roque Niño Rincon. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 26, 2001, Roque Niño Rincon was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Roque Niño Rincon was at the *El Palacio de Mondongo* Plaza in Curumani, Cesar. A group of armed AUC members arrived asking for Roque Niño Rincon. When the paramilitaries found him, they shot him several times.

149.   Ilse Esther Villa Rosado is the domestic partner and legal representative of the Estate of Ruben Peralta Rojas under the laws of Colombia, and is also a legal heir to Ruben Peralta Rojas under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Ruben Peralta Rojas. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On June 23, 2004, Ruben Peralta Rojas was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Ruben Peralta Rojas was heading back from planting corn. He was found by the side of the road with a gunshot to the head. The AUC had a major presence in the area where he was killed.

150.    Ana Victoria Oñate Ruiz is the daughter and legal representative of the Estate of Victor Antonio Oñate Bello under the laws of Colombia, and is also a legal heir to Victor Antonio Oñate Bello under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Victor Antonio Oñate Bello. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On July 8, 2003, Victor Antonio Oñate Bello was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Victor Antonio Oñate Bello was on the *Marta Alicia* plantation in Jagua de Ibirico, Cesar, when a group of armed paramilitaries shot him several times.

151.    Rosa Isabel Buelvas Garcia is the domestic partner and legal representative of the Estate of Victor Manuel Mendoza Chole under the laws of Colombia, and is also a legal heir to Victor Manuel Mendoza Chole under the laws of Colombia. Jose Joaquin Mendoza Buelvas is Victor Manuel Mendoza Chole's son, and is also a legal heir, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Victor Manuel Mendoza Chole. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On March 3, 2002, Victor Manuel Mendoza Chole was killed by the

AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Victor Manuel Mendoza Chole was driving back with other passengers from his plantation in Becerril, Cesar transporting coffee, when a group of armed paramilitaries took him out of the vehicle and killed him.

152. Saul Rico Rivera is the domestic partner and legal representative of the Estate of Nelly Esperanza Caseres Portillo under the laws of Colombia, and is also a legal heir to Nelly Esperanza Caseres Portillo under the laws of Colombia. Jorge Leonardo Rico Caseres, Kelly Rico Caseres, Neife Esperanza Rico Caseres, Tatiana Marcela Rico Caseres, Jader Alberto Rico Caseres, Karina Rico Caseres, Sandra Patricia Rico Caseres, Saul Armando Rico Caseres are Nelly Esperanza Caseres Portillo's children, and are also legal heirs, but do not act as legal representatives of her Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Nelly Esperanza Caseres Portillo. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On July 24, 2004, Nelly Esperanza Caseres Portillo was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Ms. Caceres was on a public bus from going San Diego to Media Luna, Cesar, when a group of armed

paramilitaries stopped the bus. They asked the driver and Nelly for their ID, and made the other people walk away on foot. The other people on the bus later heard shots as they were walking away. The body of Nelly Esperanza Caseres Portillo was found on the side of the road.

153. Jose Enrique Olivero Galvis is the son and legal representative of the Estate of Jose de la Cruz Olivero Machado under the laws of Colombia, and is also a legal heir to Jose de la Cruz Olivero Machado under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jose de la Cruz Olivero Machado. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. On August 22, 2000, Jose de la Cruz Olivero Machado was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Mr. Olivero was at home in the evening, when a group of heavily armed paramilitaries arrived and tied his hands with shoelaces, forcing him to get in their car. His body was later found in the outskirts of Rinconhondo in Chiriguana, Cesar. On October 11, 2000, the municipal deputy of Chiriguana issued a statement confirming that Jose de la Cruz Olivero Machado was killed for ideological and political reasons in the context of the internal armed conflict.

154. Miguel Antonio Rua Navarro is the father and legal representative of the

127

Estate of Luis Miguel Rua Navarro under the laws of Colombia, and is also a legal heir to Luis Miguel Rua Navarro under the laws of Colombia. Elizabeth Navarro Restrepo is Luis Miguel Rua Navarro's mother; Elizabeth Rua Navarro, Alba Marina Rua Navarro, Francy Yolima Rua Navarro, Mayra Alejandra Rua Navarro and Jhon Carlos Rua Navarro are Luis Miguel Rua Navarro's siblings; and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Luis Miguel Rua Navarro. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 8, 2002, Luis Miguel Rua Navarro was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Luis Miguel Rua Navarro was around the corner of his house in Augustin Codazzi, Cesar  with two friends, when an armed paramilitary, known in the town by the alias El Guajiro, came up to them. The paramilitary asked for Luis Miguel Rua Navarro and shot him, leaving him dead in the middle of the street.

155. Ana Isai Solano Carrascal is the mother and legal representative of the Estate of Armando Luis Mejia Solano under the laws of Colombia, and is also a legal heir to Armando Luis Mejia Solano under the laws of Colombia. Plaintiff

herein is a wrongful death beneficiary of Armando Luis Mejia Solano. Plaintiff

seeks all damages permitted under the law on behalf of the decedent and all

damages she suffered as a result of the execution of the decedent. On October 17,

2002, Armando Luis Mejia Solano was killed by the AUC Northern Block's Juan

Andrés Álvarez Front, which received knowing and substantial assistance from

Drummond. On that morning, Armando Luis Mejia Solano was at a hardware store

in Codazzi, Cesar, when a group of armed paramilitaries arrived and tried to forced

him to get into their car. When he refused, the paramilitaries shot him, killing him

on the spot.

156. Jose de las Nieves Fonseca Gonzalez is the father and legal

representative of the Estate of Jhon Jairo Fonseca Ortiz under the laws of Colombia,

and is also a legal heir to Jhon Jairo Fonseca Ortiz under the laws of Colombia. Ana

Raquel Ortiz Beleño is Jhon Jairo Fonseca Ortiz's mother; Jose Daniel Fonseca

Ortiz, Ingrys Marcela Fonseca Ortiz and Juleinys Fonseca Ortiz are Jhon Jairo

Fonseca Ortiz's siblings; Julian Andres Fonseca Chedravis is Jhon Jairo Fonseca

Ortiz's son; and are also legal heirs under the laws of Colombia, but do not act as

legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful

death beneficiaries of Jhon Jairo Fonseca Ortiz. Plaintiffs seek all damages

permitted under the law on behalf of the decedent and all damages each of them

suffered as a result of the execution of the decedent. On September 22, 2003, Jhon Jairo Fonseca Ortiz was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Jhon Jairo Fonseca Ortiz was fishing with a couple of friends when a group of paramilitaries came asking for him. When he identified himself, the paramilitaries beat him and took him away towards the town of Sapatosa in Chimiguagua, Cesar. His body was later found dead on the side of the road in an area known as Matebarrio.

157. Gabriel Granados Arengas is the father and legal representative of the Estate of Marco Antonio Granados Quintero under the laws of Colombia, and is also a legal heir to Marco Antonio Granados Quintero under the laws of Colombia. Juana Quintero Aguilar is Marco Antonio Granados Quintero's mother, and is also a legal heir, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are wrongful death beneficiaries of Marco Antonio Granados Quintero. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On May 19, 2001, Marco Antonio Granados Quintero was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. Marco Antonio Granados Quintero was on

his way to work near Codazzi, Cesar, when a group of armed paramilitaries stopped the vehicle and forced Marco Antonio Granados Quintero and other passengers to get out. Marco Antonio Granados Quintero's body was found dead on the side of the road.

158. Nancy Isabel Erazo Rubiano is the domestic partner and legal representative of the Estate of Jorge Eliecer Guerrero Hernandez under the laws of Colombia, and is also a legal heir to Jorge Eliecer Guerrero Hernandez under the laws of Colombia. Jorge Mario Guerrero Erazo and Lohen Jholayne Guerrero Erazo are Jorge Eliecer Guerrero Hernandez's children, and are also legal heirs under the laws of Colombia, but do not act as legal representatives of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Jorge Eliecer Guerrero Hernandez. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On August 22, 2003, Jorge Eliecer Guerrero Hernandez was killed by the AUC Northern Block's William Rivas Front, which received knowing and substantial assistance from Drummond. On August 21, 2003, Mr. Guerrero, a maintenance railworker for *Ferroatlantico*, was at home when a co-worker came to look for him to go fix a bridge. When he arrived to the site, a group of armed paramilitaries were waiting for him. Mr. Guerrero was forced to work on the bridge.

131

His body was found the following day in the area known as *La Vuelta de Cacao*, in Aracataca. In 2008, Jose Gregorio Mangonez Lugo, alias Carlos Tijeras, confessed to the murder of Jorge Eliecer Guerrero Hernandez. On November, 20, 2003, the municipal deputy of the *Zona Bananera* issued a statement confirming that Jorge Eliecer Guerrero Hernandez was killed for ideological and political reasons in the context of the internal armed conflict.

159. Luis Daniel Contreras Molina is the brother and legal representative of the Estate of Jaime Antonio Contreras Molina under the laws of Colombia, and is also a legal heir to Jaime Antonio Contreras Molina under the laws of Colombia. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages he suffered as a result of the execution of the decedent. On April 16, 2002, Jaime Antonio Contreras Molina was killed by the AUC Northern Block's Juan Andrés Álvarez Front, which received knowing and substantial assistance from Drummond. In the early morning hours, Mr. Contreras was at his house in a group of paramilitaries arrived at house, knocked down the door, and took him away. His body was found with other dead bodies in a park in the town of Sabana in Jagua de Iberico, Cesar.

160. Aida del Rosario Mendoza Llerena is the domestic partner and legal representative of the Estate of Franklin Rafael Martinez Reyes under the laws of

Colombia, and is also a legal heir to Franklin Rafael Martinez Reyes under the laws of Colombia. Catalina Reyes Marriaga is the mother of Franklin Rafael Martinez Reyes, and is also a legal heir under the laws of Colombia, but does not act as a legal representative of his Estate in this lawsuit. Plaintiffs herein are all wrongful death beneficiaries of Franklin Rafael Martinez Reyes. Plaintiffs seek all damages permitted under the law on behalf of the decedent and all damages each of them suffered as a result of the execution of the decedent. On December 21, 2002, Franklin Rafael Martinez Reyes was killed by the AUC Northern Block, which received knowing and substantial assistance from Drummond. Mr. Martinez worked as a security guard for Drummond's railroad through a security company, *Interglobal Seguridad y Vigilancia, Ltda*. On that day, he was assigned to patrol a different post on the railroad. While he was patrolling, a few paramilitaries came up to him and killed him. His body was found in Santa Rosa de Lima, Fundacion.

161. Alba Luz Caballero Gomez is the domestic partner and legal representative of the Estate of Jairo de Jesus Ponzon Rua under the laws of Colombia, and is also a legal heir to Jairo de Jesus Ponzon Rua under the laws of Colombia. Plaintiff herein is a wrongful death beneficiary of Jairo de Jesus Ponzon Rua. Plaintiff seeks all damages permitted under the law on behalf of the decedent and all damages she suffered as a result of the execution of the decedent. On

January 26, 1997, Jairo de Jesus Ponzon Rua was killed by the AUC Northern

Block, which received knowing and substantial assistance from Drummond. Mr.

Ponzon worked as a security supervisor for the company Odebrecht, a Drummond

contractor hired to do maintenance on the railroad. On the day Mr. Ponzon was

killed, he was patrolling his usual route from Aracataca to La Loma de Potrerillo.

He never came back and his body was found in la Loma del Balsamo, Fundacion.

Soon before his death, a group of paramilitaries had threatened him to quit his job,

but he refused.

## B.    Defendants

162.    Defendant Drummond Company, Inc. is a for-profit corporation

incorporated in Alabama that is engaged primarily in the mining and shipment of

coal. It is a closely-held corporation owned by the Drummond family, and is

controlled in its day-to-day operations by Garry N. Drummond. Its principal place

of business is located at 530 Beacon Parkway, Suite 900, Birmingham, Alabama

35209. Among other places, Drummond Company, Inc. owns and operates a large

coal mine, rail line and port in Colombia, South America. The operations in

Colombia are financed and managed from the Alabama headquarters of Drummond

Company, Inc., and the profits from the Colombia operations revert to Drummond

Company, Inc.

163.   Defendant Drummond Ltd. is an Alabama company, incorporated in Jasper, Alabama, and has its principal place of business at 3000 Highway 78, Jasper, Alabama 35501.  It is wholly-owned by Drummond Company, Inc. Drummond Ltd. manages the day-to-day operations of the Drummond coal operations in Colombia, but is at all times operating under the complete ownership, direction and control of Defendant Drummond Company, Inc. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity afforded to the perpetrators of such violence in Colombia, Drummond Company, Inc. created Drummond Ltd. for the sole purpose of operating the Colombian mines for the sole benefit of Drummond Company, Inc. while also attempting to shield Drummond Company, Inc. from liability for any and all tortious conduct committed by the management of these mines.  The creation of Drummond Ltd. was a sham done for the aforesaid unlawful purpose.

164.   Defendant Augusto Jimenez is the President of Defendant Drummond Ltd. At all material times herein, Jimenez was a direct participant in Drummond's plan to make significant payments to the AUC's Juan Andres Alvarez Front, as described herein.

165.   Defendant James Adkins was the Director of Security for Drummond's operations in Colombia. Hired by Drummond from the CIA, Defendant Adkins had

135

full knowledge of the AUC's terrorist activities at the time he was hired. Adkins

reported to both Garry Drummond and Defendant Mike Tracy, as well as other

Alabama-based Drummond officers and Defendant Jimenez. On behalf of the

Drummond Defendants, Defendant Adkins approved the payments to the AUC as

described herein. During his years of service for Drummond, between 1995-2002,

Defendant Adkins traveled to Alabama every 4-6 weeks to brief Garry Drummond,

Mike Tracy, and other Drummond officials on security issues, including

Drummond's support for the AUC. Adkins regularly told the AUC leaders and their

intermediaries that he went to Alabama regularly to brief Garry Drummond and

obtain his consent to key strategic issues, including providing support to the AUC.

Adkins obtained consent in Alabama from Garry Drummond to provide substantial

support to the AUC.

166. At all times relevant to the allegations herein, Defendant Mike Tracy

was the President of Mining Operations for Defendant Drummond Company, Inc.

In this position, Defendant Tracy oversaw the start up of operations for

Drummond's mine in Colombia. Defendant Tracy was in charge of all aspects of

the Drummond mining operation in Colombia and reported directly to Garry

Drummond. Defendant Tracy was fully briefed by Defendant Adkins of the

agreements made with the AUC, and he approved of Drummond's direct

collaboration with the AUC terrorists. On numerous occasions, Defendant Tracy himself met with AUC commanders to discuss the status of the AUC's work on Drummond's behalf.

167.   Defendant Drummond Company, Inc. is jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, Drummond Ltd., acts in concert with any other person or entity in furtherance of Drummond Company, Inc.'s business interests and activities.

168.   The AUC paramilitary forces that murdered all of the decedents referenced herein were acting within the course and scope of a business relationship with Defendants with the advance knowledge, acquiescence or subsequent ratification of Defendants.

## V.  FACTS CONCERNING THE CIVIL CONFLICT IN COLOMBIA AND THE GOVERNMENT OF COLOMBIA'S DIRECT RELATIONSHIP WITH THE AUC

169.   Colombia is widely-known as a country that is torn by a long-standing civil war involving armed leftist groups, primarily the FARC on the one side, and the Colombian military and the AUC on the other. Other leftist guerilla groups active in 1995-96 when the paramilitary groups began consolidating include the National Liberation Army ("ELN").

137

170.   The AUC, officially formed in late 1996 by Carlos Castaño as an umbrella group to consolidate the various paramilitary groups into one major force to defeat the FARC, was created by Colombian landowners, military officers and politicians for the sole purpose of serving as a brutal military unit to engage and defeat the leftist guerilla groups that had formed to overthrow the Government of Colombia. The main such group, the FARC had been successful in its military campaigns of the early to mid-1990s and controlled large areas of Uraba, Magdalena and Cesar Provinces. These areas under FARC control were among the most valuable in Colombia, as Uraba and Magdalena were the primary banana-growing regions of Colombia, and Cesar had significant natural resources, particularly coal.

171.   There never has been a question that the regular military in Colombia, and the civil government authorities, tolerated the paramilitaries, allowed them to operate, and often cooperated with them. Recent testimony of AUC leaders in custody under the Justice and Peace process makes this connection even more explicit – the government of Colombia worked with the leaders of the AUC to create the AUC as an informal special unit of the military for the purpose of using brutal tactics that the regular military was not permitted to use under the Geneva Conventions and other laws governing the conduct of war.

138

172.   Many current and former political leaders in Colombia were directly involved in establishing the right-wing paramilitary groups in Colombia which later joined under the one umbrella of the AUC. Indeed, in 1996, former Colombian President Alvaro Uribe was the governor of Antioquia and was instrumental in the creation of one of the first paramilitary groups in Colombia.

173.   The sole purpose of creating the AUC was to have a military organization that was capable and willing to use extreme violence and brutal means to defeat the FARC and drive it out of the areas where it was interfering with important business interests in Colombia. The regular Colombian military was completely ineffective in dealing with the FARC. There are a number of documented reasons for this. Most military observers agree that the leadership of the Colombian military, drawn from the elites of Colombia, were simply unwilling to risk life and limb to engage a ferocious guerilla group like the FARC. The AUC's mission was to "out guerilla the guerillas" as one former U.S. military advisor to the Colombian army put it. The AUC was expected to use terror and violence to defeat the FARC.

174.   The initial supporters of the AUC in the private sector were wealthy Colombian landowners who had been victims of the FARC's violence. For example, former Colombian President Uribe's family owned a large farm. Uribe's

father was executed by the FARC, and the family plantation was crippled by the FARC's violent attacks in the area. Likewise, Raul Hasbun's family owned and operated a banana plantation in Uraba. When Hasbun's father was killed by the FARC, he not only organized his community to support the AUC, he himself became a commander in the AUC, using the *nom de guerre* Pedro Bonito.

175.   The AUC, including the Northern Block units directly involved in the wrongful acts alleged herein, were created based on official sanction of the Government of Colombia. In 1994, as a way for the Colombian government to create a legal mechanism to fund the AUC, it passed Decree 356, which established the "Special Vigilance and Private Security Services."  This decree laid the foundation for the creation of the Convivir groups, officially launched in 1995 through Resolution 368.   The Convivir groups are comprised of civilians who petition the government for a license to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security."  Defense Ministry, Decree 356, República de Colombia, February 11, 1994, pp. 19-20; and Resolution 368, April 27, 1995.

176.   When former Colombian President Uribe was still the Governor of Antioquia he implemented the plan to establish the government-registered front groups called "Convivirs" to allow the AUC to collect government and private

funds to support the military activities of the AUC. Further, the Convivirs provided legal status to the AUC and allowed the Colombian government to coordinate activities with it.

177.   The AUC established at least 14 Convivirs in 1995-96 that were "legal" entities under Colombian law that served as fronts for the AUC. Landowners and private companies made payments to these Convivirs based on geographic region. 100% of the funds collected were used by the AUC for arms, supplies and other necessities in the AUC's military campaign against the FARC. Further, Colombian military officers met regularly with the leaders of the Convivirs to coordinate military operations and share intelligence. The Convivir leaders were in all cases AUC commanders. All of these arrangements are documented by the Human Rights Watch Report, *War Without Quarter: Colombia and International Humanitarian Law* (1998).

178.   As a result of the Convivir structure, as well as the fact that most of the AUC members had been in the Colombian military, the AUC had a close, mutually-beneficial, symbiotic relationship with the Colombian military.  As reported by Human Rights Watch, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries.  The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing

close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations."

179.   The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include active and retired military who actually set up paramilitary units, the military who provide the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries who conduct missions at the request of the military.

180.   The close, symbiotic relationship between the military and paramilitaries in Colombia is so widely acknowledged that the U.S. State Department confirms this fact without reservation:

> Credible allegations of cooperation with paramilitary groups, including instances of both silent support and direct collaboration by members of the public security forces, in particular the army, continued.  Evidence suggests that there were tacit arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas that were under military control or despite a significant military presence.  Individual members of the security forces actively collaborated with members of paramilitary groups – passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off-duty.

181.   In the February 28, 2002 Report of the UN High Commissioner for Human Rights on the human rights situation in Colombia ("UNHCR Report"), the UN High Commission explains that the links between the paramilitaries and the

State continue and indeed are intensifying.  As the UNHCR Report explains:

> During 2001, the Office continued to observe that paramilitary activity was strengthening and spreading throughout much of the country's territory. … Toleration, support and complicity on the part of public servants, as well as non-fulfillment of their duty to safeguard rights, with respect to several acts by these groups, means that the State continues to bear responsibility.

182.   The UNHCR Report further relates that "the growth in paramilitary activity has been aided by the State's inaction or slow reaction in preventing the formation of illegal armed groups, and in keeping new territories from falling into the de facto control of these organizations."  Finally, the UNHCR explains that the growth in paramilitary control and violence has been assisted by the impunity which human rights violators receive in the Colombian judicial system.  Thus, the UNHCR states that, throughout 2001, it "continued to receive troubling reports of ties between members of the security forces and elements of the paramilitary groups.  The existence of pending criminal and disciplinary investigations of members of the security forces shows how widespread these relationships are.  However, the investigations have not led to any determination of responsibility or the application of relevant sentences and punishments to ensure that these acts do not benefit from impunity."

183.   The UNHCR reached the very same conclusions in its March 18, 2003

report, stating that there remains "open collusion" on the part of Colombian security forces with paramilitaries and that there is continued "expansion and consolidation of paramilitaries in several areas."

184.   Further, in *Country Reports on Human Rights Practices – Colombia* (March, 2002), the U. S. State Department, which had in September 2001 designated the AUC, the chief and largest paramilitary group as a "terrorist" group, continued to conclude that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces."  The State Department reached this same conclusion in its Report of March 31, 2003, stating that "[s]ome members of the security forces collaborated with paramilitary groups that committed serious abuses."

185.   For a number of years, the location in which Defendants operate in Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen.  Thus, Amnesty International has reported that it "has been increasingly concerned by the escalation in human rights violations carried out in the Department of Cesar by members of the security forces and paramilitary allied to them.  'Disappearances,' extrajudicial executions and other human rights violations continue to be reported as the security forces have increased their

presence and paramilitary organizations have been set up and consolidated in the region, sometimes with the support of powerful economic interests." Indeed, Drummond allowed its vast property around its coal mine to serve as a joint base for the military and AUC in that area, and there was frequent collaboration between the military and the AUC due to Drummond's provision of a safe haven for the AUC.

186.   Amnesty International, in specifically describing the human rights situation in the Cesar Province – the area in which the acts described herein took place – explains that "[t]he systematic violation of human rights against members of popular organizations. . .in the department of Cesar corresponds to a national strategy of undermining organizations which the [state] security forces deem to be subversive." Amnesty International further finds that "[m]any violations of human rights in the [Cesar] region are committed in order to advance and protect the interests of economically powerful sectors. Labeling anyone who dares to challenge the interests of powerful economic sectors as subversive. . .and then targeting them for human rights violations provides a means for those sectors to protect their interests." Recently, the UNHCR has confirmed this assessment of Amnesty International, noting in the same breath that "members of paramilitary groups have been blamed for most of the [ ] violent deaths" suffered by trade

unionists and that Cesar is one of "[t]he departments most affected by anti-union violence. . ."

187.   As a consequence of the official vilification of "leftists" and "guerilla sympathizers" by the Colombian government, this served as an open invitation to paramilitaries to target innocent civilians living in areas where there was a FARC presence with violence. Indeed, Rafael Garcia, a former DAS official,  has stated under oath that the DAS worked closely with the AUC, that as a DAS official he witnessed Drummond making payments to the AUC to murder the union leaders at Drummond, and that he personally, while a DAS official also served as the political adviser for the AUC paramilitaries and also acted as liaison between DAS Director Jorge Noguera and AUC Northern Block leader, Jorge 40.  He specifically stated under oath that "the AUC and the DAS worked closely together to further their joint mission of ridding Colombia of leftist guerillas."

188.   From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were

146

sympathetic to the FARC and systematically murdered thousands of them. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerillas in their villages.

189.   On September 5, 2001, the U.S. Department of State designated the AUC a terrorist organization. *See* 66 Fed. Reg. 47,054. This designation was based on the acts of the AUC from 1996-2001 in which it used extreme violence to terrorize innocent civilians and ensure that they did not sympathize with the FARC.

190.   The fact that the Colombian military and government had a major role in the formation and financing of the AUC is conclusively established by the September 13, 1995 memo of Defendant Adkins to Defendant Tracy. Adkins reported to Tracy that the Cordoba Battalion Commander of the Colombian military visited him to request funds from Drummond to support the formation of a paramilitary group under the Colombian government's Convivir program to combat the guerillas. At that time, Adkins concluded, correctly, that it would be illegal for Drummond to make such a contribution.

147

## VI.  DRUMMOND'S ROLE IN CREATING AND SUPPORTING THE AUC AND ITS WAR ON THE FARC

191.   The Drummond Defendants have a personal and direct connection to the origin of the AUC. Alfredo Araujo, Drummond's Director of Community Relations, was a close friend since childhood of Rodrigo Tovar Pupo, alias Jorge 40, who was one of the original founders of the AUC along with Carlos Castaño and Salvatore Mancuso. Several of Araujo's close relatives joined Jorge 40 as active members of the AUC. Three close family members of Araujo, his cousin, Hernando Molina Araujo, a former governor of Cesar Province, another cousin, Alvaro Araujo Castor, a former Senator, and his uncle, Alvaro Araujo Noguera, a former Minister of Agriculture, are in jail for their participation in and support for the AUC. Araujo used his family relationship and connection to Jorge 40 to make the initial arrangements for Drummond to make substantial payments to the AUC. Araujo made the plan with Jorge 40. He then used his position in the company to get Defendant Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared with AUC the goal of eradicating the FARC and other leftist guerillas and prevailing in the ongoing civil conflict.

192.   Araujo was also a friend of Jaime Blanco Maya, who had close ties to

both the AUC and to the government. Araujo brought Blanco into the Drummond fold by awarding his company, ISA, the food concession for the workers at the Drummond mine. Blanco was close friends with Oscar Jose Ospino Pacheco, alias "Tolemaida", one of the AUC Northern Block's top commanders under Jorge 40. At the same time, Blanco's half-brother, Edgardo Maya, was until recently the Government of Colombia's Inspector General. He is now in prison for his ties to the AUC.

193.   While Carlos Castaño is either dead or disappeared, the other two AUC founders, Salvatore Mancuso and Jorge 40, both now in prison in the United States and awaiting trial on drug trafficking charges, have stated that Drummond was one of the U.S. multinationals that provided substantial support to the AUC that allowed it to buy arms and equipment and join the war effort to defeat the FARC. The other major companies that Mancuso and Jorge 40 have mentioned as major initial supporters of the AUC are Chiquita Brands International and Dole Foods, Inc.

194.   In 2007, after years of denials and coverups, Chiquita pled guilty to a federal felony of providing material support to a terrorist organization. In its factual proffer to the Justice Department, attached hereto as Exhibit A, Chiquita admitted that it was a financial founder of the AUC and made regular payments to the AUC from 1996-2004, when a self-reporting member of the board of directors informed

the Justice Department of Chiquita's payments to the AUC, a designated terrorist organization. This is a rare glimpse into the world of the relationship between the AUC and U.S. multinationals. Chiquita conformed that it made its payments to a Convivir set up as a front for the AUC.

195.   The Drummond Defendants provided support to the AUC well beyond what Chiquita provided, and are equally guilty of providing knowing and substantial support to a terrorist organization. As is described in ¶¶ 237-240, *infra*, Drummond provided millions of dollars to the AUC to support its war with the FARC, and  Drummond established, equipped, supported, and directed the AUC's Juan Andres Alvarez Front in its actions in engaging the FARC in the towns along Drummond's 120-mile railroad line from its mine in La Loma to "Puerto Drummond" in Santa Marta. Drummond became a major supporter of the AUC war effort to defeat the FARC and provided the support from 1999 to 2006, when the AUC formally began a demobilization following its efforts to destroy and contain the FARC were largely successful.

# VII.  CAUSES OF ACTION

## First Cause of Action

**The Alien Tort Claims Act, 28 U.S.C. § 1350 – War Crimes
The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were War Crimes,
and the Drummond Defendants Aided and Abetted or Conspired With the
AUC, or the AUC Was Drummond's Agent**

## All Plaintiffs Against All Defendants

196.   Plaintiffs incorporate by reference paragraphs 1 through 196 of this

Complaint as is set forth herein.

## The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were War Crimes

197.   The Colombian military was not able to effectively address the

uprising of the FARC, so as previously alleged, the Colombian government

facilitated the creation and funding of the AUC for the sole purpose of using this

unofficial force to defeat the FARC. As one high commander of the AUC told

Plaintiffs' representatives, "the Colombian military felt itself bound to the Geneva

Conventions. The AUC was not."  Further, as Colonel Mejia, the commander of the

Popa Battalian at all times material to this action, stated, the Colombian military

needed to use the AUC in order to defeat the FARC.

151

198.   The extreme brutality practiced by the AUC that earned it the terrorist moniker by the U.S. Department of State was from the outset a planned strategy to effectively confront and defeat the FARC.

199.   Article 3 of the Geneva Convention, which applies to "an armed conflict not of an international character," applies to the civil conflict in Colombia. Thus, noncombatants to the Colombian civil war, including the Plaintiffs' decedents,  are covered, and the war crimes committed by any parties to the conflict, including the AUC, are actionable under the ATS.

200.   The three elements of "war crimes" are well-established and not in dispute. As this Court held (Slip Opp at 12, citing *Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995)), the elements are:

(1) that there was an armed conflict;

(2) that the AUC and the FARC were parties to the conflict; and

(3) that Plaintiffs were killed in the "course of hostilities."

201.   ***As to the first element***, there is no dispute that Colombia has been devastated by a raging civil conflict since the early 1990's. This has been widely documented and has never been disputed in this or any other case. For example, the 1997 State Department Human Rights Report notes that the Colombian government's control of national territory "has been increasingly challenged by

152

longstanding and widespread internal armed conflict and rampant violence. . ." *Id.*
at 1.  As AUC Commander Carlos Tijeras described the nature of the conflict in a
sworn statement, "at the time I was acting as Commander of the William Rivas
Front I was a major participant in a civil war that was being fought over the future
direction of my country. I was on the side of democracy and capitalism and we were
fighting communists and guerillas."

202.    ***As to the second element***, once the AUC consolidated the various
paramilitary groups in late 1996 under the leadership of Carlos Castaño, the AUC
became the most visible armed opposition to the FARC, which, by late 1996, had
become the prominent leftist rebel group. As previously alleged, *see* ¶¶ 169-190
*supra*, acting in the place of the Colombian military, the AUC directly engaged the
FARC in an extremely brutal and violent struggle that left thousands of innocent
civilians dead, displaced and terrorized. *See generally* R. Kirk, *More Terrible Than
Death: Massacres, Drugs, and America's War in Colombia* (2003); S. Dudley,
*Walking Ghosts: Murder and Guerilla Politics in Colombia* (2006).

203.   ***As to the third and final element***, all of the violent acts against
civilians alleged herein occurred in the "course of hostilities." All of Plaintiffs'
decedents were executed by the AUC as it used tactics of terror and violence,
particularly in the areas that the FARC had a stronghold. These areas included

Cesar [where Drummond's mine is located] and Magdalena [where Drummond's port is located] Provinces. In these areas, the AUC pursued a scorched earth policy of first driving the FARC out and then brutally murdering and torturing people who lived in these areas and were assumed by the AUC to be sympathetic to the FARC. As Jose Gregorio Mangones Lugo, alias "Carlos Tijeras," who was an AUC commander in Magdalena where Drummond's port is located, stated, "we not only drove the guerilla groups out of the area, but our tactics made sure the local people would never entertain the idea of supporting or joining the guerillas. We made clear with our actions that anyone who supported the FARC was our enemy and would be dealt with accordingly."

204.   The AUC used extremely violent means to take back areas held by the FARC and used tactics of violence and terror to depopulate areas of innocent civilians merely because the AUC presumed that civilians in areas previously held by the FARC were sympathetic to the leftist guerillas. This military tactic is documented by the U.S. Department of State. For example, the 1997 State Department Report noted that "[t]he many paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . *An active policy of depopulation, pursued by some paramilitary groups against*

*communities suspected of guerilla support*, was the primary cause of the growing

internal displacement problem."*Id.* at 2 (emphasis added).

205.   As the U.S. Department of State reported in 1999, the year that

Drummond  formally joined forces with the AUC:

> Paramilitary groups and guerillas were responsible for the vast majority of
> political and extrajudicial killings during the year. **Throughout the country,
> paramilitary groups killed, tortured and threatened civilians suspected
> of sympathizing with guerillas in an** <u>**orchestrated campaign**</u> **to terrorize
> them into fleeing their homes, thereby depriving guerillas of civilian
> support.  The AUC paramilitary umbrella organization . . . exercised
> increasing influence during the year, extending its presence through
> violence and intimidation into areas previously under guerilla control**.

1999 State Department Report at 2 (emphasis added).

206.   These consistent and reliable reports by the State Department of the

AUC's tactics in terrorizing villagers are exactly what happened in this case when

the AUC attacked the villages where Plaintiffs reside and Plaintiffs' decedents were

executed.

207.   According to Jhon Jairo Esquivel Cuadrado, alias "El Tigre," the

commander of the Juan Andres Alvarez Front from 1996-2000, prior to the formal

arrangements made for Drummond to provide major support to the AUC in

November 1999, the Juan Andres Alvarez Front was operating in the municipalities

of Bosconia, El Paso, La Jagua de Ibirico, Becerril, Agustín Codazzi, San Diego, La

Paz, and Chiriguaná, which are the major towns in Cesar along the route of

155

Drummond's rail line. As El Tigre stated, "the AUC was there because these were known FARC strongholds, and the AUC's mission was to eradicate the FARC wherever we found it."

208.   El Tigre has further stated that as the commander of the Juan Andres Alvarez Front of the AUC, he viewed the towns along the Drummond rail line as important strategic areas for the FARC as the populations in those areas had been providing housing, supplies and recruits to the FARC. In his words, "the AUC had every intention of attacking these areas and using our methods to make sure that the people in these areas would never again support the FARC. Drummond's ultimate decision in November, 1999 to provide the AUC's Juan Andres Alvarez Front substantial payments allowed us to have more arms and men when we attacked these areas."

209.   El Tigre further stated that "I have reviewed the facts of what happened to those who were killed as described in Plaintiffs' Complaint that was filed on May 19, 2009. While many of those events occurred after I was captured by police on July 19, 2000 and taken out of service with the AUC, the places that are described are areas that were FARC strongholds and that we had targeted for attack. The violent acts that are described are typical of what we in the AUC did to ensure that villagers would not provide any form of support to the FARC. While I was

156

commander of the Juan Andres Alvarez Front we infiltrated the communities where the FARC had a presence, identified persons we suspected of being guerillas and then hunted them down and killed them. We used brutal methods to ensure that the survivors would be clear that if they assisted the FARC in any way, a brutal death would be their fate. Drummond's support for our Front and the Northen Block did not change our military targets or methods, but did prioritize the order and timing of the areas we targeted, and of course, allowed us to be more effective because Drummond's funds provided us with more men, arms and supplies. Based on Drummond's direction to us, mainly provided through Alfredo Araujo, we prioritized our operations to have a major focus on the towns along Drummond's rail line where we had information that the FARC was operating or had supporters."

210.   Alcides Manuel Mattos Tabares, alias "Samario", was from mid 2000 until May 2002 the chief of security for Oscar Jose Ospino Pacheco, alias "Tolemaida," who in July, 2000 replaced El Tigre as the Commander of the Juan Andres Alvarez Front. Samario was jailed from May-December, 2002, and when released, was made the third Commander of the Front and was in charge of "urban people," the AUC's term for hit men. As the person directly responsible for processing orders to execute people from December 2002 until April 9, 2005, when he again went to prison, Samario had full knowledge of the targets and the reasons

for executions carried out by the AUC's  Juan Andres Alvarez Front. Samario, consistent with the assertions of El Tigre, has stated that the Front focused a lot of its operations against the FARC in the areas around Drummond's rail line in Cesar, particularly  in the municipalities of Bosconia, El Paso, La Jagua de Ibirico, Becerril, Agustín Codazzi, San Diego, La Paz, and Chiriguaná. This was, according to Samario, "because the FARC was very successful in these areas and this is where we had to fight them and root out their supporters." Further, Samario stated that, "every execution order that passed through my hands was to kill someone we thought was a member or supporter of the FARC, or we thought was a leftist guerilla who was on the same side of the war as the FARC. Sometimes others were killed in villages when we went after our targets because they were in the way, or we needed to make a strong example to the people. Even the unionists we killed for Drummond [discussed in ¶¶ 244-45, 259-65, *infra*] we killed because Alfredo Araujo Castro, who had an important position with Drummond, told Tolemaida and me they were leftist guerillas who were helping the FARC."

211.   Samario also is on record stating that "any executions that occurred after December 2002 most certainly would have been ordered by my superiors and then implemented by me and my men. We worked in all of the towns that were along the Drummond rail corridor because they were FARC areas. We killed people

in these areas because they were with the FARC or we believed they supported the FARC, our enemy. Our methods of killing were intended by us to ensure that everyone was clear that we would be back and do the same to them if they assisted the FARC. Drummond's major support for the Juan Andres Alvarez Front did not alter in any way our mission or the areas we needed to operate, because that was determined by where FARC had established a foothold. Drummond's direction and support to us did require that we prioritize our resources and focus our efforts on the towns along the Drummond rail line in Cesar, but for us this was consistent with our mission because we were pursuing the FARC and its supporters in these areas. When I've said we provided 'security' for Drummond, this means that we were fighting our military enemy, the FARC, that viewed Drummond and other wealthy companies as legitimate military targets. In my view, the FARC came to these areas because Drummond was there, and we then came to fight the FARC where it was based. Drummond's support was essential to our military success because we added at least 165 fully-equipped men to the Front and supported them with food and supplies with the funds Drummond provided us."

212.   Based on the statements of El Tigre and Samario, as well as other AUC leaders who have testified in the Justice and Peace process in Colombia or have otherwise given statements, all of the people killed by the AUC in the area of

Drummond's rail line in Cesar were executed as suspected FARC members or supporters and thus were killed in the "course of hostilities."

213.   While none of Plaintiffs' decedents were with the FARC or provided it with support, merely being suspected of either by the AUC was enough to get them killed. All of the Plaintiffs' decedents were merely innocent civilians executed in the course of the conflict between the AUC and the FARC. There has never been any evidence or credible assertion after any of their deaths that any of Plaintiffs' decedents were members or supporters of the FARC.

214.   Both El Tigre and Samario have stated that they are confessing the murders they had a role in as part of the Justice and Peace process, and that every person killed by them and their associates in the Juan Andres Alvarez Front was a military target when the AUC attacked FARC strongholds. This includes the Plaintiffs' decedents, all of whom were killed in villages in the areas where the leaders of the Juan Andres Alvarez Front have stated they conducted operations to defeat the FARC and its supporters.

215.   All of the 144 Plaintiffs' decedents herein were killed by the Juan Andres Alvarez Front during either the time that El Tigre was commander of the Front or when Samario was in charge of executions for Tolemaida, when he took over the Front from El Tigre. The Justice and Peace process is ongoing, but all of

the Plaintiffs' decedents have either been officially declared to be a civilian victim

of the civil conflict, or they have been identified by either El Tigre or Samario as

civilians who they were responsible for executing during the course of the civil

conflict. All of the executions of the Plaintiffs' decedents occurred between

November 1999, when Drummond made its first agreement with the AUC as

described herein, and April 2006, when Drummond stopped providing direct

support to the AUC. By definition, war crimes include the executions of innocent

civilians who are in the area of a civil conflict, regardless of whether the

perpetrators intended to target the specific individuals who were killed.

## Drummond Aided and Abetted the AUC's War Crimes

216.   Citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453

F.Supp. 2d 633, 668 (S.D. N.Y. 2006), this Court held that the standard for aiding

and abetting is "(1) the principal violated international law; (2) the defendant knew

of the specific violation; (3) the defendant acted with the intent to assist that

violation – that is, the defendant specifically directed his acts to assist in the specific

violation; (4) the defendant's acts had a substantial effect upon the success of the

criminal venture; and (5) the defendant was aware that his acts assisted the specific

violation."[2] Order at 17.

217.    *As to the first element*, Plaintiffs have established in ¶¶ 197-215,

*supra*, that the AUC, the principal, violated international law by engaging in war

crimes.

218.    *As to the second element*, Plaintiffs allege that the Drummond

Defendants had actual knowledge of the AUC's specific war crimes violations.  The

AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent

civilians living in areas under FARC control was well known in Colombia and was

widely reported in the press in Colombia and the United States.  In 1997, for

example, the State Department Report noted that  "[t]he many paramilitary groups

took the offensive against the guerillas, often perpetrating targeted killings,

massacres, and forced displacements of the guerrillas' perceived or alleged civilian

support base . . . *An active policy of depopulation, pursued by some paramilitary*

_____

[2] Plaintiffs note for the record that their position is that the binding standard for aiding and abetting was stated by the Eleventh Circuit in *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005) as: (1) "one or more of the wrongful acts that comprise the claim were committed," (2) the Defendants "substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim," and (3) Defendants "knew that [their] actions would assist in the illegal or wrongful activity at the time [they] provided the assistance." This test is virtually identical to that adopted by the RESTATEMENT (SECOND) OF TORTS, § 876(b). Further, under international law, a similar aiding and abetting standard of knowing, substantial assistance has been applied since at least the Nuremberg cases. *See, e.g., U. S. v. Friedrich Flick*, 6 *Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10* (1952).

***groups against communities suspected of guerilla support***, was the primary cause

of the growing internal displacement problem."*Id.* at 2 (emphasis added).

219.   In 1999, the year that Drummond formally made an agreement to join

with the AUC, the State Department Report stated:

> Paramilitary groups and guerillas were responsible for the vast majority of
> political and extrajudicial killings during the year. **Throughout the country,**
> **paramilitary groups killed, tortured and threatened civilians suspected**
> **of sympathizing with guerillas in an <u>orchestrated campaign</u> to terrorize**
> **them into fleeing their homes, thereby depriving guerillas of civilian**
> **support.  The AUC paramilitary umbrella organization . . . exercised**
> **increasing influence during the year, extending its presence through**
> **violence and intimidation into areas previously under guerilla control**.

1999 State Department Report at 2.

220.   In 1999, when Drummond made a formal arrangement with the AUC

to provide substantial financial support to the Northern Block and the Juan Andres

Alvarez Front, Araujo, acting as Drummond's primary contact with the AUC, had

specific and detailed knowledge of the AUC's record of terror due to his

discussions with Jorge 40, Tolemaida, and Jaime Blanco, and other AUC leaders

with whom he had a personal relationship.

221.   In 1999, when Drummond made a formal arrangement with the AUC

to provide substantial financial support to the Northern Block and the Juan Andres

Alvarez Front, Defendant Adkins, in his capacity as director of security for

Drummond and as a former CIA agent with extensive experience in Latin America

including Colombia, had specific and detailed knowledge of the AUC's record of terror due to his review of all major reports of AUC atrocities, including U.S. State Department Human Rights Reports on Colombia, and his discussions with Jorge 40, Tolemaida, and Jaime Blanco, and other AUC leaders with whom he met. Further, he was briefed in regular meetings by Araujo, as well as the Colombian security officials employed by Drummond, including those described in ¶¶ 283-292, *infra*. Adkins regularly briefed Defendant Mike Tracy on the status and activities of the AUC in and around the Drummond facilities.

222.   Further from 1995-99, Defendant Adkins, using personnel of his extensive and experienced security department, as well as his regular briefings with the military personnel based on the Drummond property, and through meetings with Alfredo Araujo, Jaime Blanco and others with direct links to the AUC, had detailed and extensive knowledge of the operations of the AUC, the FARC, other leftist guerilla groups, and the military. From 1995 on, Adkins prepared detailed intelligence reports for Drummond, and he reported his findings to Drummond officers, including Defendant Jimenez, Defendant Mike Tracy and Garry Drummond. Thus, in 1999 when Drummond made a formal arrangement with the AUC to provide substantial financial support to the Northern Block and the Juan Andres Alvarez Front, Drummond had specific and detailed knowledge of the

AUC's brutal methods and tactics.

223.   As an example of Defendant Adkins' detailed knowledge that he communicated to other Drummond officials, in an August 10, 1995 report for Drummond, Adkins lists the towns along the Drummond rail route and provides details of guerilla attacks, identifies the 19th Front of the FARC as "a particular threat to Drummond," and lists the real names and the aliases of the leaders of the19th Front of the FARC. He also lists the names and some aliases for "ordinary combatants" of the 19th Front of the FARC. He lists also the weapons the 19th Front has as its disposal, communication equipment, and that the 19th Front is both a military unit and a political unit, "charged with recruiting and gaining sympathizers."  This detailed knowledge only improved each year until Drummond made the formal decision in 1999 to join the AUC to defeat the FARC, which had been succeeding in its mission of gaining sympathizers in the towns along Drummond's rail line.

224.   In his September 13, 1995 memo to Defendant Mike Tracy, Defendant Adkins expressly stated his knowledge of the tactics of the paramilitary group at the time it was forming. In declining at that time to provide support to the nascent paramilitary group, Adkins stated, "***such a program will bring with it egregious human rights violations that preclude Drummond from ever participating***."

(emphasis added). When in 1999, Drummond made the formal decision to join with

the AUC in its war with the FARC, its leaders had specific knowledge of the tactics

that would be employed by the AUC as it pursued the FARC in the towns along

Drummond's rail lines. Defendant Mike Tracy approved the decision to formally

engage the AUC.

225.   In 1999, when Drummond made a formal arrangement with the AUC

to provide substantial financial support to the Northern Block and the Juan Andres

Alvarez Front, General (ret.) Rafael Peña Ríos, the head of security for Drummond

in Colombia, based on his past military experience and his own direct interactions

with the AUC and its predecessor paramilitary organizations, had specific

knowledge of the AUC's record of terror and its tactic of executing innocent

civilians in areas of FARC influence as a way to discourage others from supporting

the FARC. On at least one occasion, he told *El Tiempo* newspaper in Colombia that

he, like the paramilitary groups, viewed trade unions and the leftist guerillas as one

and the same thing,  and he excused the violence of the right-wing paramilitaries as

necessary to confront the guerillas. General Peña reported directly to Defendant

Adkins, and the two of them discussed the AUC and its tactics in confronting the

FARC in Cesar.

226.   According to a June 28, 1995 Drummond report, "[t]here is no lack of

resources for intelligence collection. Drummond has access to military and police reporting thanks mainly to General Peña."

227.   In November, 1999, when Drummond made a formal arrangement with the AUC to provide substantial financial support to the Northern Block and the Juan Andres Alvarez Front, the head of security at the Drummond mine was Colonel (ret.) Ricardo Lineros.  Based on his past military experience and his own direct interactions with the AUC and its predecessor paramilitary organizations, he had specific knowledge of the AUC's record of terror and its tactic of executing innocent civilians in areas of FARC influence as a way to discourage others from supporting the FARC. Colonel Lineros regularly met with and briefed Defendant Adkins and General Peña.

228.   According to Jairo Jesus Charris Castro, who was until March 1999 the Security Coordinator for Viginorte, the private security company used by Drummond in Colombia that also was a front group for the AUC, he regularly observed security meetings involving not only Defendant Adkins and Alforedo Araujo with General Peña and Colonel Lineros in 1998-99, but that Garry Drummond, the chief executive officer of Drummond, Defendant Mike Tracy, and Defendant Augusto Jimenez, among others, participated in security briefings that included discussions of the activities of the AUC and the FARC as they related to

Drummond's areas of operation in Colombia.

229.   Even if Drummond was somehow ignorant of the AUC's record of extreme violence at the moment it began funding the AUC on a large scale in 1999, from that moment on, Defendant Adkins and Alfredo Araujo, on behalf of Drummond, closely monitored the AUC's actions and were fully aware of the violence that was done by the units directly supported by Drummond. They reported their observations in regular briefings to Defendant Jimenez, Defendant Tracy and Garry Drummond. Further, in September 2001, the AUC was formally and publicly designated a terrorist organization by the U.S. State Department. Drummond was aware of this designation and continued to fund the AUC until 2006, when the AUC formally demobilized. The violent events from 1996-2001 that led to the AUC's designation as a terrorist organization were widely reported and were certainly known to Drummond through Defendants Araujo and Adkins.

230.   Defendant Mike Tracy had his own contacts with AUC members. Between 1998-2000 he met with AUC representatives on several occasions at an apartment in Santa Marta that was in front of the Ecopetrol building. The apartment was on the 5th floor and it was rented from a Colombian named Mauricio Avellaneda. He also met with AUC commanders at the Drummond port area.  AUC members were given free access to the Drummond port and were waived through the

security gates by Drummond Security forces.  Defendant Tracy was often there and met with the AUC forces. Defendant Tracy also on numerous occasions had drinks with AUC members at a bar in Santa Marta called the Golden Mendihuaca Caribbean Resort.  Tracy was known to enjoy a local drink made from Zapote juice, with no seeds, and very cold milk. During these informal meetings, Defendant Tracy would receive briefings from the AUC on the status of their security operations for Drummond.

231.   After the AUC was designated a terrorist organization, at least some of Drummond's payments were made to Viginorte, the security company that served as a front for the AUC with the assistance of Alfredo Araujo's close friend, Jaime Blanco. These funds were channeled to the AUC by Blanco. Drummond's payments to the AUC in cash and through front companies are direct evidence of Drummond's knowledge that it was paying for illegal activity. Drummond also, according to the Popa Battalion's commander Colonel Mejia, began channeling money to Colonel Mejia to distribute to the AUC as a way of hiding and legitimizing the payments.

232.   ***As to the third element***, when the Drummond Defendants entered into an arrangement to support the AUC, they acted with the intent to assist the AUC's war crimes. Drummond intended that, with its funds, the AUC would expand its war effort against the FARC and focus the AUC's military campaign in Cesar on specific

169

areas along the Drummond rail line where the FARC had a foothold. In doing so, as previously alleged, Drummond had specific knowledge that the AUC would commit war crimes, including extrajudicial killings, of innocent civilians, like Plaintiffs' decedents, who lived in and around the towns Drummond required the AUC to attack and pacify.

233.   In November, 1999, when Drummond entered into an agreement with the AUC, the area of Drummond's coal mine was protected by a detachment of Colombian military that established a base on Drummond's property. Approximately 300 troops from La Popa Battalion, a military unit based in Valledupar in the province of Cesar, were permanently assigned to Drummond to guard its facilities from any attacks by the FARC. In addition, Drummond used a private security firm, Viginorte, which was a front group for the AUC but did provide security staff for Drummond's management personnel and to control access to its facilities. Further, Drummond had an extensive in-house security staff, including Defendant Adkins and General Peña. Drummond's main facilities and staff were thus protected by tight security. When Drummond made the decision to join with the AUC, it was for the same reason that the Colombian government allowed for and facilitated the formation of the AUC in the first instance – to pursue the FARC in the areas where it had support and destroy it using the same violent tactics that the FARC itself

employed.

234.   In November, 1999, Alfredo Araujo, on behalf of Drummond, met with Jorge 40 and other AUC members, including El Tigre, "Guerrero," "Kevin," "Cortico," "Pelo de Puya," "El Enano," "Pirulo," and "Cachaco," to discuss a plan to get major Drummond funding for the AUC and the Juan Andres Alvarez Front. Araujo explained to Jorge 40 that there had been a recent FARC attack on the Drummond rail line, but that for the Drummond executives in the U.S. to approve significant funding for the AUC, there had to be another attack, and the AUC had to demonstrate that it could respond effectively with a swift and violent counterattack on the FARC. Araujo directed that the AUC should stage a new attack on the rail line, and make it look like the FARC's 41st Front had attacked the rail line again. This, Araujo assured Jorge 40, would cause the Drummond executives in Alabama to agree to make payments to enhance the AUC's presence in the areas along the Drummond rail line.

235.   According to El Tigre, Araujo said to Jorge 40, "Drummond is willing to provide a sum of money so that your group can strengthen itself with men and arms, as long as you commit to providing security to the railroad line and the coal operations in the mine." Further, according to El Tigre, who was at the meeting, "we were told by Araujo that the areas along the Drummond rail line that had a FARC

presence had to be attacked and pacified. We all understood this. We were not talking about physical protection of property. We were talking about doing what the AUC was created to do and that is destroy the FARC and its supporters. Sometimes people from Drummond used words like "security" and we did too – it was a euphemism for going after the FARC and its supporters. We also used "operation" as a way to say we were going to attack a FARC area. The Colombian army provided the stationary guards for Drummond's property. The AUC's role was to hunt and destroy the FARC and its sympathizers."

236.   Jorge 40 assigned El Tigre and "Pirulo" to conduct the staged attack on the Drummond rail line, which they successfully did in April, 2000. Following the attack, as per the agreement with Araujo, the AUC distributed pamphlets in the town of Loma de Potrerillo attributing the attack to the FARC's 41st Front. The AUC then, in May 2000, in furtherance of the plan agreed to with Araujo, assassinated five people near Casacara, Becerril, in Cesar, and claimed that these five were FARC collaborators who were responsible for blowing up the rail line. These five men had nothing to do with the attack, but were killed to show that the AUC could respond effectively to a FARC attack on the rail line and find and execute FARC members on their own territory. Their names were William Enrique Rios Villazon, Angel Maria Ospina, Ciro Alfonso Guerrero Rueda, Oscar Enrique Yance Atencio, and

Edilson Julio Glavis.

237.   After the successful staging of a rail attack, Drummond made its first large payment to the AUC and its Juan Andres Alvarez Front. Jorge 40 sent El Tigre and "Amin" to the town of Las Palmitas, near the back entrance to the Drummond mine. Drummond employees whose names are not known delivered three boxes filled with US dollars. Amin opened the boxes to verify the contents. The funds were then delivered to Jorge 40 by his men.

238.   When Drummond supplied the initial payment and thereafter made regular monthly payments to the AUC, it was explicitly agreed, initially between Araujo and his friend Jorge 40, and thereafter between Defendant Adkins and Jorge 40 and his representatives, that the funds were to be used to recruit at least 165 new soldiers so that the Juan Andres Alvarez Front would be able to successfully attack and destroy the FARC and its supporters in the areas along Drummond's rail line. In fact, the funds provided by Drummond were the sole source of funds for these new troops and arms, and these new troops and arms converted the Juan Andres Alvarez Front into a major force that was able to successfully defeat the FARC in the areas along Drummond's rail line.

239.   According to El Tigre, Drummond, through Araujo and Defendant Adkins, did not make a general contribution to the AUC's overall treasury. Rather,

the funds were specifically dedicated by Drummond's direction to buy arms and

supplies to equip more than 165 additional men to add to the Juan Andres Alvarez

Front so that it could effectively attack and defeat the FARC.

240.   Once the funds were paid by Drummond, the Juan Andres Alvarez

Front was able to recruit new men and went from a force of about 20 to 200.

According to El Tigre, Jorge 40 used Drummond's funds, and only Drummond's

funds, to purchase arms and equipment for the new AUC men directly from Carlos

Castaño. From then on, under the command of El Tigre, the Juan Andres Alvarez

Front became a major fighting force in the war against the FARC. The forces created

a permanent based from which they patrolled the towns in and around the

Drummond facilities and the rail corridor and pursued their mission of destroying

the FARC and its sympathizers. In fulfilling this mission, the Juan Andres Alvarez

Front murdered hundreds of innocent civilians and displaced thousands more

because, according to El Tigre,  the best way to prevent civilians from assisting the

FARC in an area is to get rid of the people living there. This was the AUC's well-

known and established method of operation.

241.   In 2000, while under the command of El Tigre, the Juan Andres

Alvarez Front executed seven investigators from the CTI of the Public Prosecutor's

Office. These men are decedents Israel Alberto Roca Martinez, Hugo Alberto

174

Quintero Solano, Jaime Elias Barros Ovalle, Edilberto Linares Correa, Mario Abel Anillo Trocha, Danilo Javier Carrera Aguancha, and Carlos Arturo Ibarra Bernal described herein. As part of the Justice and Peace process, El Tigre has specifically confessed that he and his men executed the seven CTI investigators during the course of the civil conflict because they threatened to disrupt the AUC's war effort against the FARC.

242. The Juan Andres Alvarez Front, under El Tigre's command, also murdered a man named "Daniel," who Araujo specifically directed them to execute based on Araujo's assertion that Daniel was a guerilla. They killed him in La Loma near the Platanal bridge.

243. El Tigre was captured by the Colombian authorities on July 19, 2000. Jorge 40 then assigned the command of the Juan Andres Alvarez Front to Tolemaida, who continued the AUC's war against the FARC.  After the change in power, Defendant Adkins participated in a November, 2000 meeting between Drummond officials and top AUC leaders. The meeting occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Defendant Adkins was accompanied by Araujo and Jaime Blanco, the previously described friend of Araujo's who ran the cafeteria concession at the Drummond mine, and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and

several other armed AUC members. At this meeting, Defendant Adkins and Araujo approved a payment to the AUC on behalf of Drummond for the assassination of the top leaders of the Drummond union, including Locarno and Orcasita. Locarno and Orcasita were murdered by the AUC on March 12, 2001. The union leaders were pulled off a company bus on their home from their shift in the Drummond mine and executed by the AUC. Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Samario, participated as well.

244.   Rafael Garcia, the former DAS official, stated under oath that in early 2001, when he was working as political adviser to the AUC, he traveled to Valledupar along with Jorge Castro Pacheco of Ariguani, a municipality in Magdalena, Colombia.  Jorge Castro Pacheco served as the representative for Jorge 40.  Garcia attended a meeting at the Hotel Sicarare in Valledupar with Jorge Castro Pacheco, who, at the time of the meeting was 3rd succentor to Roberto Perez, a Senator from Sucre, Colombia. Also in attendance was Guillermo Sanchez Quintero, who at the time was Mayor of Ariguani and Alfredo Araujo, who was Drummond's Director of Community Relations. At this meeting, Garcia witnessed Araujo give Jorge Castro Pacheco a suitcase filled with money. Araujo and Jorge Castro Pacheco talked openly about the purpose of this money - to take violent measures against

union workers at Drummond.   Garcia heard Araujo say to Jorge Castro Pacheco that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond.  It was clear from things said in this conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Araujo and Jorge 40. Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems." Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Araujo.

245.   At a subsequent meeting in early May, 2001, Defendant Adkins and Araujo met again with the top leaders of the AUC, including Jorge 40, Tolemaida, Don Luis, and several AUC operatives who worked closely with Jorge 40, including Kener, El Chino, El Toro, Samario, Machoman, and 05. The meeting was held at a farm on the road between Bosconia and Plato. In front of the entire group, including Adkins and Araujo, Jorge 40 congratulated Tolemaida for the successful operation of executing the two Drummond union leaders Locarno and Orcasita.

246.   At this meeting Drummond, through Adkins and Araujo, made an agreement with Jorge 40 to make an additional large cash payment to the AUC of approximately $1.5 million (U.S.) and regular monthly payments of approximately $100,000 (U.S.) to continue to support the AUC troops and equipment for the Juan Andres Alvarez Front to continue to attack and destroy the FARC. This additional

funding was to allow the Juan Andres Alvarez Front to maintain a permanent base and to continue its ongoing and successful war against the FARC. Once again, the Drummond representatives, including Defendant Adkins and Araujo, directed that the AUC focus on the towns along Drummond's rail line where the FARC had a presence.

247.   On or about the time of this meeting, at the instigation of Araujo, Drummond escalated its own role in the development and support of the AUC and began raising funds from other businesses and individuals to make payments to the AUC. A portion of these funds were provided to the Popa Battalion commander, Colonel Mejia, who made payments to the AUC based on executions of suspected guerillas. With the ongoing support from Drummond, the Juan Andres Alvarez Front continued to confront the FARC in the areas around the Drummond rail line, and in the process, continued to terrorize, displace and murder innocent civilians who lived along Drummond's rail corridor or near the mining facilities and other Drummond facilities.

248.   All of the decedents described herein were among those murdered by the Juan Andres Alvarez Front during the course of its war with the FARC in the areas in and around Drummond's facilities. Drummond is responsible for establishing a major force of the AUC, the Juan Andres Alvarez Front, in Cesar, and

providing the funds to arm and mobilize these AUC troops that ultimately terrorized the innocent civilians in the area of Drummond's facilities and murdered the relatives of the Plaintiffs herein.

249.   ***As to the fourth element***, Drummond's acts had a substantial effect upon the success of the criminal venture, the AUC's war crimes, including extrajudicial killings of the Plaintiffs' decedents. Both El Tigre and Samario have provided statements that, but for Drummond's infusion of support, the AUC's Juan Andres Alvarez Front would have remained a small band of 20 poorly-armed men without the means to accomplish their mission. Drummond's funds, and only Drummond's funds, allowed the Front to expand to nearly 200 men and to purchase arms, equipment and supplies to attack the FARC in the towns along the Drummond rail corridor. The expanded and well-armed and supplied Front then was responsible for the executions of Plaintiffs' decedents.

250.   According to Samario, "[w]ith these new men and arms [acquired with Drummond's funds], we were able to have real success in defeating the FARC in the towns along the Drummond rail route. By the time I was captured on April 9, 2005, we had largely been successful in destroying the FARC in these areas and driving many of the FARC's supporters out of the region."

251.   ***As to the fifth and final element***, the Drummond Defendants were

179

aware that their acts assisted the specific war crimes violations alleged herein. As alleged in ¶¶ 218-231, *supra*, Drummond had specific knowledge that the AUC would, when directed by Drummond to attack specific villages, destroy the FARC and its supporters, and pacify the villages, the AUC would execute innocent civilians, like Plaintiffs' decedents, because that is how the AUC operated. This method of operation was precisely what Drummond expected to receive for its support that was directly earmarked for men, arms and supplies to allow the AUC to have the capacity to attack the FARC in the villages where Plaintiffs' decedents were executed.

252.   When Drummond first agreed to provide substantial support to the AUC in November 1999, Drummond, through Alfredo Araujo, provided the specific targets for the AUC's attacks on towns along the Drummond rail corridor. Plaintiffs' decedents were executed because Drummond specifically directed the AUC to these areas.

253.   When Drummond met again with the AUC leaders in May, 2000, the AUC  demonstrated with a specific report to Drummond from November 1999, when Drummond made its first major payments, to May, 2000 what Drummond's funds were accomplishing. At subsequent meetings between Defendant Adkins, Araujo, and other Drummond managers, the AUC leaders reported on their progress

against the FARC. On at least three occasions, in May and November 2000 and May 2001, Drummond re-confirmed its payment arrangements with the AUC following discussions of progress made in the AUC's effort to destroy the FARC.

254.   In September 2001, the AUC was designated a terrorist organization by the U.S. State Department. This was widely publicized in both the U.S. and Colombia. Drummond officials, particularly Defendant Adkins, whose key function was to provide Drummond with intelligence on the AUC and its conflict with FARC, must have known of this designation. Knowing of the AUC's status as a terrorist organization, Drummond continued to provide it with substantial support for an five additional years, until April 2006.

255.   According to both Samario and El Tigre, on several occasions, during the course of the meetings between Drummond and the AUC on the progress of the war against FARC, Araujo provided specific names of suspected FARC guerillas to be executed. On each of these occasions, the AUC executed the individuals named by Araujo. According to Samario,  "even the unionists we killed for Drummond we killed because Alfredo Araujo Castro, who had an important position with Drummond, told me that they were leftist guerillas who were helping the FARC. We were not common murders. We were the vanguard of the nation's fight with the FARC and its supporters."

256.   According to Samario, many of the executions in the area of Drummond's operations were carried out based on orders from Araujo: "I estimate that there were 40 or more people that Tolemaida directed me to execute based on information from Drummond that they were FARC members or supporters. That information always came to us through Araujo or his friend Jaime Blanco to Tolemaida. Further, there were hundreds more we executed as part of our own information and operations, and consistent with our direction from Drummond to wipe out the FARC in these areas [along the rail corridor]."

257.   A former solider in the Popa Battalion stationed on the Drummond property, Edwin Guzman, stated under oath that the chief of security for Drummond at the mine property, retired Colonel Rodriguez, met regularly with Samario and with Cebolla, two paramilitary commanders. Rodriguez gave information to these commanders and encouraged them to do more to pursue the guerillas that were attacking the rail lines. Further, as previously alleged, Drummond made its own agreement to provide funds to Popa Battalion commander Colonel Mejia, so that he could pay the AUC funds based exclusively on how many suspected guerillas were executed. This is conclusive on the issue of whether Drummond knew that its funds were being used to kill civilians.

258.   Drummond's role in the expansion and support of the AUC's Juan

Andres Alvarez Front was a major factor in the AUC's success in its war with the FARC in Cesar. Drummond had a shared purpose with the AUC in destroying the FARC, and but for Drummond's major support for that shared purpose, the AUC's Juan Andres Alvarez Front would have remained a small band of 20 poorly-armed men without the means to accomplish their mission. Drummond's intent is a question of fact, but Plaintiffs' allegations herein demonstrate Drummond had no reason to provide millions of dollars to the AUC other than accomplishing their shared purpose of defeating and destroying the FARC.

259.   As a further example that Drummond and the AUC had a specific shared purpose of using violent means to exterminate leftist guerillas suspected of being associated with the FARC, both Defendant Adkins and Alfredo Araujo, as well as one other Drummond executive from the Alabama headquarters who will be identified following discovery of travel records, met with the top leaders of the AUC and directed that the AUC assassinate the two top union leaders at Drummond, Valmore Locarno Rodriguez (hereinafter Locarno) and Victor Hugo Orcasita Amaya (hereinafter Orcasita). Locarno and Orcasita were murdered by the AUC on March 12, 2001, after being pulled off a company bus.

260.   The meeting between Defendants Adkin, Araujo and another Drummond executive and the AUC leaders was in November, 2000. The meeting

occurred at the entrance to Drummond's mine in La Loma at approximately 2 p.m. Defendants Adkin and Araujo were also accompanied by Jaime Blanco,  and a contingent of bodyguards. For the AUC, Jorge 40 was present, along with Tolemaida, and several other armed AUC members. At this meeting, Defendant Adkins, on behalf of Drummond,  approved a payment to the AUC for the assassination of Locarno and Orcasita. Also present was Jaime Blanco's head of security, Jairo Jesus Charris Castro.

261.   In early 2001, another meeting was held to make the payment from Drummond to the AUC for the execution of the union leaders. Rafael Garcia, a high official of the Colombian government, was present at this meeting. He was Director of the computer system office of the Colombian Administrative Department of Security (Spanish Acronym: DAS). DAS is, among other things, responsible for providing security to Colombian state institutions and individuals.  As is common with many government officials, Garcia also worked with and supported the AUC. He served as the AUC's political adviser. While serving at the DAS, he also acted as liaison between DAS Director Jorge Noguera and the AUC Northern Block leader, Jorge 40.  The AUC and the DAS worked closely together, in Garcia's words, " to further their joint mission of ridding Colombia of leftist guerillas."

262.   The early 2001 Drummond meeting occurred when Garcia was working

as political adviser to the AUC. Garcia traveled to Valledupar in Cesar Province, along with Jorge Castro Pacheco, who was a government official in Ariguani, a municipality in Magdalena, Colombia.  He served as 3rd succentor to Roberto Perez, a Senator from Sucre, Colombia.  While holding this position, he also served as an official representative of Jorge 40.  The meeting was held at the Hotel Sicarare in Valledupar. Along with Garcia and Jorge Castro Pacheco, also in attendance were Guillermo Sanchez Quintero, who at the time was Mayor of Ariguani and Araujo. Garcia witnessed Araujo give Jorge Castro Pacheco a suitcase filled with money. Araujo and  Jorge Castro Pacheco talked openly about the purpose of this money - to execute the union leaders at Drummond.   Garcia heard Araujo say to Jorge Castro Pacheco that the money was to be given to Jorge 40 to carry out the killings of certain union leaders at Drummond.  It was clear from things said in this conversation that the plan to violently attack the union leaders had been made some time before and had been a matter of discussion between Araujo and Jorge 40. Araujo specifically said that he wanted the AUC's "help with these guys that were causing problems." Garcia specifically recalls the names Orcasita and Locarno mentioned as targets by Araujo.

263.   In furtherance of this agreement, on March 12, 2001, Locarno and Orcasita were pulled off a company bus on their way home from their shift in the

Drummond mine and executed by the AUC. Tolemaida was in charge of the operation, following the orders of Jorge 40, and one of Tolemaida's key commanders, Samario, participated as well.  At a subsequent meeting in early May, 2001, Defendant Adkins and Araujo met again with the top leaders of the AUC, including Jorge 40, Tolemaida, "Don Luis," who was Jorge 40's chief financial officer, and several AUC operatives who worked closely with Jorge 40, including "Kener, ""El Chino," "El Toro," "Samario," "Machoman", and "05." The meeting was held at a farm on the road between Bosconia and Plato. In front of the entire group, including Adkins and Araujo, Jorge 40 congratulated Tolemaida for the successful operation of executing the two Drummond union leaders Locarno and Orcasita.

264.   Although there are now numerous witnesses who have testified in Colombia about the role of Drummond and Defendant Adkins and Araujo, as well as Jaime Blanco,  in the murders of the union leaders, no action has been taken against Drummond or any of the individuals. Blanco's body guard, Charris, was recently sentenced to 30 years in prison for his very minor role in the executions in a classic example of using a less powerful fall guy. During the years between the murders and the arrest of Charris, Drummond provided him with substantial financial support in exchange for his silence.

265.    Tolemaida, who all concerned agree was the head of the AUC operation to execute the union leaders at Drummond's request, was a fugitive in hiding in Venezuela once the AUC demobilization began. According to reports from Charris and others, Drummond provided Tolemaida with approximately one million U.S. dollars that he was to use to support himself in Venezuela and to keep him and his execution team quiet about Drummond's role in the murders, as well as Drummond's role in the other violence that the AUC visited upon the towns along the Drummond rail corridor. Tolemaida kept most of the money for himself when he fled to Venezuela. In December 2009, Tolemaida was captured in Venezeula and was extradited to Colombia, where he is now in custody at the Picota prison outside Bogota. He has through intermediaries attempted to bribe or threaten those who have given evidence of Drummond's collaboration with the AUC. In exchange for Drummond's support, he provided an August 11, 2011 declaration claiming that Drummond had no role in the AUC's financing.

266.    Drummond's shared mission with the AUC also extended to providing direct and substantial assistance to the AUC's drug trafficking operations. Drummond allowed its NAPA parts store to import the chemicals necessary to manufacture cocaine out of raw coca, and allowed its coal barges to transport cocaine from Colombia to the U.S. These funds also allowed the AUC to support its

troops, buy equipment, and generally maintain the AUC's Northern Block. Further, Drummond's coal barges served to transport cocaine to the U.S. and Europe.

267.   All the forms of direct and indirect support Drummond provided to the AUC were specifically intended to further the joint purpose of eliminating the FARC and its supporters from the areas in and around the towns that lined the Drummond rail line.

### Drummond Conspired With the AUC to Commit War Crimes

268.   Plaintiffs incorporate by reference paragraphs 1 through 267 of this Complaint as is set forth herein.

269.   In *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005)*,* the Eleventh Circuit held that the three elements for conspiracy are: (1) "two or more persons agreed to commit a wrongful act," (2) Defendants "joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it," and (3) "one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." *See* Order at 22.

270.   ***As to the first element***, based on ¶¶ 169-190, 218-231, *supra*, which are incorporated herein by reference, the AUC was formed based on agreement between its leaders, government backers, and private supporters, to attack areas where the

FARC had strongholds. The express purpose of the AUC's mission was to use violent means, including war crimes and extrajudicial killings, to accomplish its mission.

271.  ***As to the second element***, based on ¶¶ 218-231, *supra*, which are incorporated herein by reference, the Drummond Defendants at first declined to join the AUC and support its mission, but in November 1999, formally agreed to join the AUC's mission of eradicating the FARC using violence that amounted to  war crimes, including extrajudicial killings.

272.  ***As to the third element***, based on ¶¶ 217-267, *supra*, which are incorporated herein by reference, both the AUC and Drummond Defendants committed acts in furtherance of the conspiracy. The agreement was that Drummond would fund and direct the AUC's war efforts in the areas in and around the Drummond rail line. Both parties fulfilled their obligations under the agreement.

273.  The coordination and funding meetings between the AUC and Drummond served to monitor, renew, refine and otherwise ensure that the parties continued to meet their obligations under the agreement. These meetings and the ongoing monthly funding provided by Drummond demonstrates that Drummond was satisfied that the AUC was meeting its specific obligations under the agreement made between the parties. This arrangement continued, according to Samario, from

November 1999 until approximately April 2006, when the leaders of the AUC's

Northern Block formally demobilized.

274.   In addition to the meetings between Drummond and the AUC between

November 1999 and April 2006 that allowed Drummond to receive updates on the

progress of the AUC's war against the FARC, Drummond's own security staff,

including Defendant Adkins and his employees and agents, gathered detailed

intelligence on executions and other acts of violence carried out by the AUC in

furtherance of Drummond's agreement with the AUC. Defendant Adkins made

regular reports to the officers of Drummond based in Alabama, including Defendant

Mike Tracy and Garry Drummond.

275.   Alfredo Araujo met with the AUC leaders frequently due to his

personal friendships with Jorge 40, Tolemaida and Jaime Blanco. On several

occasions, Araujo provided names of persons to be executed in furtherance of the

agreement between Drummond and AUC to eliminate persons suspected of being

members or supporters of FARC. As previously alleged, Arajuo provided at least 40

names to the AUC of persons to be executed as suspected guerillas in furtherance of

the agreement between Drummond and the AUC. Further, according to Samario,

hundreds of other civilians were murdered as the AUC implemented its agreement

with Drummond to destroy the FARC and pacify the towns along the rail corridor.

Further, as previously alleged, Drummond also made a specific agreement in early 2000 to assume a larger role in assisting the AUC and its mission by raising funds from other businesses and individuals and channeling some of these funds to the Popa Battalion so that Colonel Mejia had funds to pay the AUC based on the number of executions it tallied. Plaintiffs' decedents were among those killed as part of the AUC's operations funded by Drummond.

### The AUC Acted as Drummond's Agent When it Committed War Crimes

276.   Plaintiffs incorporate by reference paragraphs 1 through 275 of this Complaint as is set forth herein.

277.   The elements of agency are that (1) Drummond had a relationship with the AUC; (2) in committing the acts alleged, the AUC was acting on Drummond's behalf and under its control; and (3) the executions of the 144 Plaintiffs' decedents were within the scope of the relationship. *See* Order at 26, n. 19.

278.   ***As to the first element***, based on ¶¶ 217-267, *supra*, which are incorporated herein by reference, Drummond entered into a specific agreement with the AUC that Drummond would provide substantial support to the AUC to purchase weapns and supplies to equip at least 165 new men for the Juan Andres Alvarez Front. In exchange, the AUC would pursue the FARC and destroy its strongholds in the towns along the Drummond rail line.

279.   *As to the second element*, based on ¶¶ 208-210, 223,  253-256, *supra*, which are incorporated herein by reference, Drummond provided specific direction to the AUC on the towns to be attacked, and in some cases, the people to be executed. With respect to the hundreds of innocent civilians who were executed in the towns along the Drummond rail corridor, including Plaintiffs' decedents, all of them were killed in the course of the AUC's attacks on the towns that Drummond identified as places to be attacked and pacified.

280.   *As to the third element*, based on ¶¶ 213, 255-258, *supra*, which are incorporated herein by reference, all of the 144 Plaintiffs' decedents were killed by the Juan Andres Alvarez Front in furtherance of its operations on behalf of Drummond in the towns along the railroad corridor. All of the 144 Plaintiffs' decedents herein were killed by the Juan Andres Alvarez Front during either the time that El Tigre was commander of the Front or when Samario was in charge of executions for Tolemaida, when he took over the Front from El Tigre. The Justice and Peace process is ongoing, but all of the Plaintiffs' decedents have either been officially declared to be a civilian victim of the civil conflict, or they have been identified by either El Tigre or Samario as civilians who they were responsible for executing during the course of the civil conflict. All of the executions of the Plaintiffs' decedents occurred between November 1999, when Drummond made its

first agreement with the AUC as described herein, and April 2006, when Drummond stopped providing direct support to the AUC.

281.   Drummond's ongoing regular payments to the AUC from November 1999-April 2006, with full knowledge by Drummond of the specific acts of violence and terror committed each month by the AUC in the areas in and around the Drummond rail line, constitutes ratification of these acts.

## Second Cause of Action

### The Alien Tort Claims Act, 28 U.S.C. § 1350 – Extrajudicial Killings

### The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed Under Color of the Authority of the Colombian Government, and the Drummond Defendants Aided and Abetted or Conspired With the AUC, or the AUC Was Drummond's Agent

## All Plaintiffs Against All Defendants

282.   Plaintiffs incorporate by reference paragraphs 1 through 281 of this Complaint as is set forth herein.

## The AUC Was Acting Under Color of the Authority of the Colombian Government

283.   Drummond ensured close cooperation from the Colombian military by hiring influential military officers for its security operations. In all cases, these

military officers also had a relationship with or were supporters of the AUC. As previously alleged in ¶¶ 220-233, which are incorporated by reference herein, in 1999,  General (ret.) Rafael Peña Ríos was the head of security for Drummond in Colombia, and was openly supportive of the AUC's mission of eliminating leftist guerillas.

284.   During most or all of the time period in which Plaintiffs' decedents were executed, the head of security at the Drummond mine was Colonel (ret.) Luis Carlos Rodriguez, who had good relations with both the military from the Popa Battalian stationed on the Drummond property, but also with the leaders of the AUC in that area, particularly Samario and Cebolla. According to one solider in the Popa Battalian, Colonel Rodriguez coordinated the activities of the regular military and the AUC. Further, Drummond, through Araujo and members of the security staff, made a direct arrangement to raise funds and provide them to Colonel Mejia of the Popa Battalion so that he could pay the AUC based on the number of people killed that were suspected of being guerillas.

285.   One major way that the Popa Battalian assisted the AUC was to take civilians who had been executed by the AUC and dress them in guerilla uniforms to legitimize or "legalize" the murders.  There were 300 soliders from the Popa Battalian stationed at a base on the Drummond property near the mine and were

there to protect both Drummond's property as well as its personnel, in particular, its

U.S. personnel who live on their own compound with 24-hour military protection.

Drummond provided supplies, food and funds for the troops to be stationed there.

286.   The La Popa Battalion is well-known for its "false positives," a military

term referring to the corpses of civilians passed off by the Colombian military as

guerrillas or paramilitaries killed in action.  La Popa has been charged with

committing human rights abuses in coordination with drug-running paramilitary

groups.   Indeed, as previously alleged, when La Popa Battalion commander Colonel

Hernán Mejía took control of the troops responsible for the Drummond area in

roughly 1999, he met with the top leaders of the AUC, including Jorge 40, Hernan

Giraldo, Tolemaida, Omega, and David Hernandez, alias "39."  During this meeting

they agreed upon a method of payment such that Colonel Mejia would receive

"credit" for all the confirmed kills that the AUC carried out, and he arranged to pay

the AUC, with money supplied by Drummond, for each execution. He also directed

his men to "legalize" the murders of civilians by dressing them in guerilla uniforms.

According to Colonel Mejia, "the expenditures were justified as a means to establish

the structure needed to combat communist guerrilla groups by other means

available."  Colonel Mejia is now in prison facing charges of carrying out joint

operations with the AUC. He is also under investigation for presenting, as guerrilla

battlefield casualties, 18 members of paramilitary groups who were killed by their own colleagues.  In all, La Popa has been accused of the murder of 150 civilians.

287.   As previously alleged in ¶¶178-199, *supra*, which are incorporated herein by reference, the Colombian government had a direct role in setting up the AUC to serve as a special branch of the Colombian military that was unconstrained by the Geneva Convention and other rules of war.

288.   Further, as previously alleged in ¶¶224, *supra*, which are incorporated herein by reference, in a September 13, 1995 memo, Defendant Adkins reported to Defendant Mike Tracy that he had been approached by a military commander from the Cordoba Battalion to have Drummond join other companies in supporting the formation of a paramilitary unit to pursue guerilla units in the area of Drummond's operations.

289.   The specific AUC units that ultimately formed within the Northern Block and the Juan Andres Alvarez Front were thus initially formed, according to Defendant Adkins, through the direct participation of a Colombian military officer, who openly sought the assistance of Drummond to support this special force of the Colombian military. According to Colonel Mejia of the Popa Battalion, the Colombia military then had a direct role in providing funds to the AUC to support AUC operations around the Drummond facility.

290.   Once the AUC and the  Juan Andres Alvarez Front became functional in the areas in and around the Drummond rail line, the Colombian military operated in a cooperative fashion. According to AUC Commander El Tigre, the understanding was that "the Colombian army provided the stationary guards for Drummond's property. The AUC's role was to hunt and destroy the FARC and its sympathizers." El Tigre and Samario both served as AUC coordinators with the Colombian military stationed on Drummond's property.

291.   With respect to the La Popa Battalion's practice of assisting the AUC by creating "false positives," as alleged in ¶¶ 285-286, *supra*, the specific troops assigned to the Drummond facilities, and paid by Drummond to be there, utilized this practice from their base on the Drummond property. One member of that battalion, Edwin Guzman, has testified under oath that he was ordered by his superiors while serving in the Drummond security units to put guerilla uniforms on civilians executed in and around the Drummond facilities by the AUC.

292.   Because the Colombian military helped to create the AUC, including the Juan Andres Alvarez Front of the Northern Block, and then the specific military units of the La Popa Battalion based on Drummond's property cooperated and coordinated with the AUC, and also, through Colonel Mejia's arrangement with Drummond, provided direct funding to the AUC, the AUC units of the Juan Andres

197

Alvarez Front were acting under color of law, either because they were engaged in joint action with the Colombian military or were in a symbiotic relationship with the Colombian military.

### The Executions of Plaintiffs' Decedents Were Extrajudicial Killings

293.   All of Plaintiffs' decedents were executed by the AUC, which was acting under color of authority of the Colombian government. None of those executed had committed a crime, had been charged with a crime, or had been provided with any form of judicial process prior to their executions. Each of these executions were thus extrajudicial killings under the law of nations.

### Drummond Aided and Abetted the AUC's Extrajudicial Killings

294.   As previously alleged in ¶¶217-267, *supra*, which are incorporated herein by reference, the Drummond Defendants met the five elements of aiding and abetting the AUC's war crimes as identified by this Court.

295.   The primary war crime that Drummond aided and abetted was the killings of innocent civilians, including Plaintiffs' decedents. In aiding and abetting these war crimes, Drummond also aided and abetted the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the

AUC under color of the authority of the Government of Colombia.

## **Drummond Conspired With the AUC to Commit Extrajudicial Killings**

296.   As previously alleged in ¶¶269-275, *supra*, which are incorporated herein by reference, the Drummond Defendants met the three elements of conspiracy with the AUC to commit war crimes.

297.   The primary war crime that Drummond conspired with the AUC to commit was the killings of innocent civilians, including Plaintiffs' decedents. In conspiring to commit these war crimes, Drummond also conspired to commit the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

## **The AUC Was Acting as Drummond's Agent in Committing Extrajudicial Killings**

298.   As previously alleged in ¶¶277-281, *supra*, which are incorporated herein by reference, the AUC acted as Drummond's agent in committing war crimes.

299.   The primary war crime that the AUC committed while acting as Drummond's agent was the killings of innocent civilians, including Plaintiffs' decedents. In committing these war crimes acting as Drummond's agent, the AUC

also committed the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

300.   Drummond's ongoing regular payments to the AUC from November 1999-April 2006, with full knowledge by Drummond of the specific acts of violence and terror committed each month by the AUC in the areas in and around the Drummond rail line, constitutes ratification of these acts.

## Third Cause of Action

**The Torture Victims Protection Act, 28 U.S.C. § 1350 – Extrajudicial Killings
The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed
Under Color of the Authority of the Colombian Government, and the
Drummond Defendants Aided and Abetted or Conspired With the AUC, or the
AUC Was Drummond's Agent**

## All Plaintiffs Against All Defendants

301.   Plaintiffs incorporate by reference paragraphs 1 through 300 of this Complaint as is set forth herein.

## The AUC Was Acting Under Color of the Authority
## of the Colombian Government

302.   As previously alleged in ¶¶283-292, *supra*, which are incorporated

herein by reference,   as with Plaintiffs' Second Cause of Action for Extrajudicial

Killings under the Alien Tort Statute, the AUC, in committing the extrajudicial

killings of Plaintiffs' decedents, was acting under color of authority of the

Government of Colombia.

## The Executions of Plaintiffs' Decedents Were Extrajudicial Killings

303.    All of Plaintiffs' decedents were executed by the AUC, which was

acting under color of authority of the Colombian government. None of those

executed had committed a crime, had been charged with a crime, or had been

provided with any form of judicial process prior to their executions. Each of these

executions were thus extrajudicial killings under the Torture Victims Protection Act.

## Drummond Aided and Abetted the AUC's Extrajudicial Killings

304.    As previously alleged in ¶¶217-267, *supra*, which are incorporated

herein by reference, the Drummond Defendants met the five elements of aiding and

abetting the AUC's war crimes as identified by this Court.

305.    The primary war crime that Drummond aided and abetted was the

killings of innocent civilians, including Plaintiffs' decedents. In aiding and abetting

these war crimes, Drummond also aided and abetted the killings themselves, which

as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

### Drummond Conspired With the AUC to Commit Extrajudicial Killings

306.    As previously alleged in ¶¶269-275, *supra*, which are incorporated herein by reference, the Drummond Defendants met the three elements of conspiracy with the AUC to commit war crimes.

307.    The primary war crime that Drummond conspired with the AUC to commit was the killings of innocent civilians, including Plaintiffs' decedents. In conspiring to commit these war crimes, Drummond also conspired to commit the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

### The AUC Was Acting as Drummond's Agent in Committing Extrajudicial Killings

308.    As previously alleged in ¶¶277-281, *supra*, which are incorporated herein by reference, the AUC acted as Drummond's agent in committing war crimes.

309.    The primary war crime that the AUC committed while acting as Drummond's agent was the killings of innocent civilians, including Plaintiffs'

decedents. In committing these war crimes acting as Drummond's agent, the AUC also committed the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

310.   Drummond's ongoing regular payments to the AUC from November 1999-April 2006, with full knowledge by Drummond of the specific acts of violence and terror committed each month by the AUC in the areas in and around the Drummond rail line, constitutes ratification of these acts.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

311.   Plaintiffs demand a trial by jury on all issues so triable.

## IX.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)     enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)     declare that Defendants have violated Plaintiffs' human rights and the laws of the State of the United States and Colombia, as set forth herein;

(c)     award Plaintiffs compensatory and punitive damages;

(d)     grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other members of their communities in and around the Drummond facilities

in Colombia;

(e)     award Plaintiffs the costs of suit including reasonable attorneys' fees; and

(f)     award Plaintiffs such other and further relief as the Court deems just under the circumstances.

Respectfully submitted this 2nd day of September, 2011.

/s/ Terrence Collingsworth
By _____
Terrence P. Collingsworth
tc@conradscherer.com
Eric Hager
ehager@conradscherer.com
Christian Levesque
clevesque@conradscherer.com
Conrad & Scherer, LLP
1156 15th Street, NW
Washington, DC 20005
202-543-4001

William R. Scherer
wrs@conradscherer.com
633 South Federal Highway
Ft. Lauderdale, FL 33301
954-462-5500

***Attorneys for Plaintiffs***

# EXHIBIT A

FILED

MAR 19 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            :    CRIMINAL NO.:  07-055
                                     :
           v.                        :
                                     :
CHIQUITA BRANDS                      :
INTERNATIONAL, INC.,                 :
                                     :    *Let this be filed.*
           Defendant.                :    *Royce C. Lamberth*
                                          *U.S.D.J. 3/19/07*

## FACTUAL PROFFER

Had this case gone to trial, the government would have proven beyond a reasonable doubt that:

### Defendant Chiquita Brands International, Inc.

1.    Defendant **CHIQUITA BRANDS INTERNATIONAL, INC.** ("**CHIQUITA**"), was a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio. Defendant **CHIQUITA** engaged in the business of producing, marketing, and distributing bananas and other fresh produce. Defendant **CHIQUITA** was one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America, including within the District of Columbia. Defendant **CHIQUITA** reported over $2.6 billion in revenue for calendar year 2003. Defendant **CHIQUITA** had operations throughout the world, including in the Republic of Colombia.

2.    C.I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as "Banadex"), was defendant **CHIQUITA'S** wholly-owned Colombian subsidiary. Banadex produced bananas in the Urabá and Santa Marta regions of Colombia. By 2003, Banadex was defendant **CHIQUITA'S** most profitable banana-producing operation. In June 2004, defendant **CHIQUITA** sold Banadex.

EXHIBIT

A

## The AUC

3.      The United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), was a violent, right-wing organization in the Republic of Colombia. The AUC was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. The AUC's activities varied from assassinating suspected guerilla supporters to engaging guerrilla combat units. The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

4.      Pursuant to Title 8, United States Code, Section 1189, the Secretary of State of the United States had the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

5.      The Secretary of State of the United States designated the AUC as an FTO, initially on September 10, 2001, and again on September 10, 2003. As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, knowingly to provide material support and resources, including currency and monetary instruments, to the AUC.

6.      The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States. On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224. This Executive Order

prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

7.     The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201, *et seq.*, implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, was the entity empowered to authorize transactions with an SDGT. Such authorization, if granted, would have been in the form of a license.

8.     Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having first obtained a license or other authorization from OFAC.

### Relevant Persons

9.     Individual A was a high-ranking officer of defendant **CHIQUITA**.

-3-

10.     Individual B was a member of the Board of Directors of defendant **CHIQUITA** ("Board").

11.     Individual C was a high-ranking officer of defendant **CHIQUITA**.

12.     Individual D was a high-ranking officer of defendant **CHIQUITA**.

13.     Individual E was a high-ranking officer of defendant **CHIQUITA**.

14.     Individual F was a high-ranking officer of Banadex.

15.     Individual G was an employee of Banadex.

16.     Individual H was an employee of defendant **CHIQUITA**.

17.     Individual I was an employee of defendant **CHIQUITA**.

18.     Individual J was a high-ranking officer of defendant **CHIQUITA**.

### Defendant Chiquita's Payments to the AUC

19.     For over six years – from in or about 1997 through on or about February 4, 2004 – defendant **CHIQUITA**, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-producing operations: Urabá and Santa Marta.  Defendant **CHIQUITA** paid the AUC, directly or indirectly, nearly every month.  From in or about 1997 through on or about February 4, 2004, defendant **CHIQUITA** made over 100 payments to the AUC totaling over $1.7 million.

20.     Defendant **CHIQUITA** had previously paid money to other terrorist organizations operating in Colombia, namely to the following violent, left-wing terrorist organizations: Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as "the FARC"); and the National Liberation Army – an English translation of the Spanish name of

-4-

the group "Ejército de Liberación Nacional" (commonly known as and referred to hereinafter as "the ELN"). Defendant **CHIQUITA** made these earlier payments from in or about 1989 through in or about 1997, when the FARC and the ELN controlled areas where defendant **CHIQUITA** had its banana-producing operations. The FARC and the ELN were designated as FTOs in October 1997.

21.     Defendant **CHIQUITA** began paying the AUC in Urabá following a meeting in or about 1997 between the then-leader of the AUC, Carlos Castaño, and Banadex's then-General Manager. At the meeting Castaño informed the General Manager that the AUC was about to drive the FARC out of Urabá. Castaño also instructed the General Manager that defendant **CHIQUITA'S** subsidiary had to make payments to an intermediary known as a "convivir." Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property. Convivirs were private security companies licensed by the Colombian government to assist the local police and military in providing security. The AUC, however, used certain convivirs as fronts to collect money from businesses for use to support its illegal activities.

22.     Defendant **CHIQUITA'S** payments to the AUC were reviewed and approved by senior executives of the corporation, to include high-ranking officers, directors, and employees. No later than in or about September 2000, defendant **CHIQUITA'S** senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. An in-house attorney for defendant **CHIQUITA** conducted an internal investigation into the payments and provided Individual C with a memorandum detailing that investigation. The results of that internal investigation were discussed at a meeting of the then-Audit Committee of the then-Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters in or about September

2000. Individual C, among others, attended this meeting.

23.    For several years defendant **CHIQUITA** paid the AUC by check through various convivirs in both the Urabá and Santa Marta regions of Colombia.  The checks were nearly always made out to the convivirs and were drawn from the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary.  No convivir ever provided defendant **CHIQUITA** or Banadex with any actual security services or actual security equipment in exchange for the payments, for example, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training.  Defendant **CHIQUITA** recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

24.    In or about April 2002, defendant **CHIQUITA** seated a new Board of Directors and Audit Committee following defendant **CHIQUITA'S** emergence from bankruptcy.

25.    Beginning in or about June 2002, defendant **CHIQUITA** began paying the AUC in the Santa Marta region of Colombia directly and in cash according to new procedures established by senior executives of defendant **CHIQUITA**.  In or about March 2002, Individual C and others established new procedures regarding defendant **CHIQUITA'S** direct cash payments to the AUC.  According to these new procedures:

(A) Individual F received a check that was made out to him personally and drawn from one of the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary.  Individual F then endorsed the check.  Either Individual F or Individual G cashed the check, and Individual G hand-delivered the cash directly to AUC personnel in Santa Marta.

(B) Banadex treated these direct cash payments to the AUC as payments to Individual F, recorded the withholding of the corresponding Colombian tax liability, reported the payments to

Individual F as such to Colombian tax authorities, and paid Individual F's corresponding Colombian tax liability. This treatment of the payments made it appear that Individual F was being paid more money and thus increased the risk that Individual F would be a target for kidnapping or other physical harm if this became known.

(C) Individual F also maintained a private ledger of the payments, which did not reflect the ultimate and intended recipient of the payments. The private ledger only reflected the transfer of funds from Individual F to Individual G and not the direct cash payments to the AUC.

26.     On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters, Individual C described the procedures referenced in Paragraph 25. Individual A, Individual B, and Individual E, among others, attended this meeting.

## Designation of the AUC as a Foreign Terrorist Organization

27.     The United States government designated the AUC as an FTO on September 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was first reported in the national press (for example, in the Wall Street Journal and the New York Times) on September 11, 2001. It was later reported in the local press in Cincinnati where defendant **CHIQUITA'S** headquarters were located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The AUC's designation was even more widely reported in the public media in Colombia, where defendant **CHIQUITA** had its substantial banana-producing operations.

28.     Defendant **CHIQUITA** had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected

-7-

subscription service that defendant **CHIQUITA** paid money to receive. On or about September 30, 2002, Individual H, from a computer within defendant **CHIQUITA'S** Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC:

> "US terrorist designation
>
> International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

**Defendant Chiquita Continued to Pay the AUC after the AUC was Designated as an FTO.**

29.     From on or about September 10, 2001, through on or about February 4, 2004, defendant **CHIQUITA** made 50 payments to the AUC totaling over $825,000. Defendant **CHIQUITA** never applied for nor obtained any license from the Department of the Treasury's Office of Foreign Assets Control with respect to any of its payments to the AUC.

30.     On or about September 12, 2001, Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.[1]

31.     On or about November 14, 2001, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $56,292.

32.     On or about December 12, 2001, Individual F and Individual G paid the AUC in

---

[1]     With respect to all statements in this Factual Proffer relating to payments by check, the "on or about" dates refer to the dates on which such checks cleared the bank, not the dates on which the checks were issued or delivered.

Urabá and Santa Marta by check in an amount equivalent to $26,644.

33.    On or about February 4, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

34.    On or about March 7, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

35.    On or about March 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

36.    On or about April 16, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,675.

37.    On or about May 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $10,888.

38.    On or about May 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

39.    In or about June 2002, Individual F and Individual G began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 25.

40.    On or about June 11, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670, and $6,269, respectively.

41.    On or about June 14, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $31,131.

42.    On or about July 2, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $11,585.

43.     On or about July 9, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

44.     On or about August 6, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

45.     On or about August 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,841.

46.     On or about September 2, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

47.     On or about October 7, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

48.     On or about October 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $40,419.

49.     On or about November 8, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

50.     On or about November 29, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

51.     On or about December 9, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,424.

52.     On or about January 21, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

53.     On or about January 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $22,336.

54.     On or about February 11, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

**Defendant Chiquita Continued To Pay the AUC Against the Advice of Outside Counsel.**

55.     On or about February 20, 2003, Individual I stated to Individual C that Individual I had discovered that the AUC had been designated by the United States government as a Foreign Terrorist Organization.  Shortly thereafter, Individual C and Individual I spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about defendant **CHIQUITA'S** ongoing payments to the AUC.

56.     Beginning on or about February 21, 2003, outside counsel advised defendant **CHIQUITA**, through Individual C and Individual I,  that the payments were illegal under United States law and that defendant **CHIQUITA** should immediately stop paying the AUC directly or indirectly.  Among other things, outside counsel, in words and in substance, advised defendant **CHIQUITA**:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

-11-

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

57.   On or about February 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $17,434.

58.   On or about March 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $19,437.

59.   On or about April 3, 2003, Individual B and Individual C first reported to the full Board of Directors of defendant **CHIQUITA** that defendant **CHIQUITA** was making payments to a designated Foreign Terrorist Organization. A member of defendant **CHIQUITA'S** Board of Directors objected to the payments and recommended that defendant **CHIQUITA** consider taking immediate corrective action, to include withdrawing from Colombia. The Board agreed to disclose promptly to the Department of Justice the fact that defendant **CHIQUITA** had been making payments to the AUC.

60.   On or before April 4, 2003, according to outside counsel's notes concerning a conversation about defendant **CHIQUITA'S** payments to the AUC, Individual C said: "His and [Individual B's] opinion is just let them sue us, come after us. This is also [Individual A's] opinion."

61.   On or about April 8, 2003, Individual C and Individual D met at defendant **CHIQUITA'S** headquarters in Cincinnati with Individual F, Individual G, Individual H, and Individual I. According to the contemporaneous account of this meeting, Individual C and Individual D instructed Individual F and Individual G to "continue making payments" to the AUC.

62.   On or about April 24, 2003, Individual B and Individual C, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant **CHIQUITA** had been making payments to the AUC for years, and represented that the payments

had been made under threat of violence. Department of Justice officials told Individual B and Individual C that defendant **CHIQUITA'S** payments to the AUC were illegal and could not continue. Department of Justice officials acknowledged that the issue of continued payments was complicated.

63.      On or about April 30, 2003, Individual B and Individual C told members of the Audit Committee of the Board of Directors and the outside auditors of defendant **CHIQUITA** about the meeting with Department of Justice officials on April 24, 2003. Individual B and Individual C said that the conclusion of the April 24th meeting was that there would be "no liability for past conduct" and that there had been "[n]o conclusion on continuing the payments."

64.      On or about May 5, 2003, according to the contemporaneous account of this conversation, Individual I instructed Individual F and Individual J to "continue making payments" to the AUC.

65.      On or about May 12, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

66.      On or about May 21, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,235.

67.      On or about June 4, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

68.      On or about June 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

69.      On or about July 14, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,139.

-13-

70.     On or about July 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,136.

71.     On or about August 8, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

72.     On or about August 25, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $12,850.

73.     On or about September 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

74.     On or about September 8, 2003, outside counsel advised defendant **CHIQUITA** in writing, through Individual C and Individual I, that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

75.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $18,249.

76.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $9,439.

77.     On or about October 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,511.

78.     On or about November 5, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

79.     On or about December 1, 2003, Individual F and Individual G paid the AUC in Santa

Marta in cash in an amount equivalent to $6,337.

80.    On or about December 2, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,193.

81.    On or about December 4, 2003, Individual B and Individual C provided the Board of Directors additional details concerning defendant **CHIQUITA'S** payments to the AUC that had not previously been disclosed to the Board.  A member of defendant **CHIQUITA'S** Board of Directors responded to this additional information by stating: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

82.    On or before December 4, 2003, defendant **CHIQUITA** created and maintained corporate books and records that did not identify the ultimate and intended recipient of the payments to the AUC in Urabá in calendar year 2003 as follows:

| Reporting Period | Description of recipient | Description of payment |
|---|---|---|
| 1st Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security service." |
| 2nd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |
| 3rd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |

83.    On or about December 16, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $24,584.

84.    On or about December 22, 2003, Individual B sent an email to other Board members

-15-

on the subject of defendant **CHIQUITA'S** ongoing payments to the AUC, stating, among other things: "This is not a management investigation. This is an audit committee investigation. It is an audit committee investigation because we appear to [be] committing a felony."

85.     On or about January 9, 2004, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

86.     On or about January 13, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,958.

87.     On or about February 4, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $4,795.

**Defendant Chiquita's Profits from its Colombian Banana-Producing Operations**

88.     According to defendant **CHIQUITA'S** records, from September 10, 2001, through in or about January 2004, defendant **CHIQUITA** earned no more than $49.4 million in profits from its Colombian banana-producing operations.

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar No. 498610

By:     _____

Jonathan M. Malis
D.C. Bar No. 454548
Denise Cheung
D.C. Bar No. 451714
Assistant United States Attorneys
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

Stephen Ponticiello
PA Bar No. 44119
Department of Justice Trial Attorney
Counterterrorism Section

Dated: March 13, 2007

### Defendant's Stipulation and Signature

I am the Chairman of the Board of Directors, President, and Chief Executive Officer of Chiquita Brands International, Inc. I am authorized by Chiquita Brands International, Inc., to act on its behalf in this matter.

On behalf of Chiquita Brands International, Inc., after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Chiquita Brands International, Inc.

3/12/2007
Date

By: Fernando Aguirre
Chairman of the Board of Directors, President, and Chief Executive Officer of Chiquita Brands International, Inc.

### Attorney's Acknowledgment

I am counsel for Chiquita Brands International, Inc. I have carefully reviewed the above statement of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

3-13-07
Date

Eric H. Holder, Jr., Esq.
Counsel for Chiquita Brands International, Inc.

-17-