FILED
2012 Sep-17  PM 07:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Claudia Balcero Giraldo, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:09-cv-1041-RDP |
| | ) | |
| Drummond Company, Inc. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT DRUMMOND LTD.'S
## MOTION FOR SUMMARY JUDGMENT

William H. Jeffress, Jr.             William A. Davis, III (ASB-5657-D65W)
David A. Super                       H. Thomas Wells, III (ASB-4318-H62W)
Sara E. Kropf                        Benjamin T. Presley (ASB-0136-I71P)
Rachel Cochran                       Starnes Davis Florie LLP
Bryan H. Parr                        P.O. Box 59812
Baker Botts L.L.P.                   Birmingham, AL 35259
1299 Pennsylvania Avenue, NW         (205) 868-6000
Washington, DC 20004-2400            fax: (205) 868-6099
(202) 639-7700
fax: (202) 639-7890

*Attorneys for Defendants*

September 17, 2012

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................................................ 3

STATEMENT OF UNDISPUTED FACTS .................................................................................... 5

ARGUMENT ................................................................................................................................... 9

   I.   Summary Judgment Must Be Granted Where There Are No Genuine Issues Of  Material Fact ........................................................................................................................... 9

   II.   Plaintiffs' TVPA Claim Must Be Dismissed As A Matter Of Law (Third Cause of Action) .................................................................................................................. 10

   III.   The ATS Claims Must Be Dismissed Because the ATS Does Not Permit Claims Against Corporations And Because The ATS Cannot Be Applied Extraterritorially (First and Second Causes of Action) ................................................................................. 10

      A.   Corporations Cannot Be Sued Under The ATS ......................................................... 11

      B.   The ATS Cannot Be Applied Extraterritorially ......................................................... 12

   IV.   Plaintiffs' ATS Claim for Extrajudicial Killing Must Be Dismissed (Second Cause of Action) ........................................................................................................................ 13

      A.   State Action is Required for Extrajudicial Killings Under the ATS ........................... 13

      B.   The Evidence Presents No Genuine Dispute of Material Fact as to State Action ........ 14

      C.   Plaintiffs Have No Evidence to Support Their Secondary Theories of Liability for Extrajudicial Killings ............................................................................................... 19

   V.   Plaintiffs' ATS Claim for War Crimes Must Be Dismissed (First Cause of Action) ....... 22

      A.   War Crimes Require Intentional Killing of Innocent Civilians ................................... 22

         1.   Innocent Civilian Requirement ...................................................................... 22

         2.   Intentional Killing of Innocent Civilian Requirement .............................. 24

      B.   There Is No Evidence That DLTD Aided and Abetted War Crimes ........................... 26

      C.   The Evidence Does Not Satisfy the Requirements of Conspiracy to Commit War Crimes ........................................................................................................................ 37

   VI.   Plaintiffs' Claims For War Crimes and Extrajudicial Killings Based on A Ratification Theory of Agency Liability Must Be Dismissed (First and Second Causes of Action) .. 38

      A.   Ratification Is Not Permitted Under International Law ............................................... 38

      B.   Even If The Court Applies Domestic Law, DLTD Did Not Ratify the AUC's Acts ... 41

         1.   No Evidence That DLTD "Controlled" The AUC ....................................... 42

         2.   No Evidence To Satisfy The Elements of Ratification ............................... 45

   VII.   Punitive Damages Are Not Available In This Action ..................................................... 46

CONCLUSION .............................................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*Abecassis v. Wyatt,*
704 F. Supp. 2d 623 (S.D. Tex. 2010) .................................................................40

*Al Najjar v. Reno,*
97 F. Supp. 2d 1329 (S.D. Fla. 2000) .................................................................33

*Aldana v. Del Monte Fresh Produce,*
416 F.3d 1242 (11th Cir. 2005) ....................................................................12, 13

*Aldana v. Fresh Del Monte Produce, Inc.,*
2007 WL 7143959 (S.D. Fla. Aug. 30, 2007).......................................................47

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)......................................................................................9, 10

*Atherton v. FDIC,*
519 U.S. 213 (1997).........................................................................................47

*Aziz v. Alcolac, Inc.,*
658 F.3d 388 (4th Cir. 2011) .............................................................................39

*Baloco v. Drummond Co., Inc.,*
640 F.3d 1338 (11th Cir. 2011) .........................................................................48

*Bonner v. City of Pritchard,*
661 F.2d 1206 (11th Cir. 1981) (en banc) ............................................................34

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
531 U.S. 288 (2001)..........................................................................................14

*Burton v. Wilmington Parking Auth.,*
365 U.S. 715 (1961)..........................................................................................14

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.,*
139 F.3d 1396 (11th Cir. 1998) ...........................................................................9

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................................................9

*Chan v. Society Expeditions, Inc.,*
123 F.3d 1287 (9th Cir. 1997) ............................................................................49

*Chiminya Tachiona v. Mugabe*,
216 F. Supp. 2d 262 (S.D.N.Y. 2002) ...................................................................47

*Doe v. Exxon Mobil Corp.*,
654 F.3d 11 (D.C. Cir. 2011) ....................................................................11, 47

*Doe v. Nestle, S.A.*,
748 F. Supp. 2d 1057 (C.D. Cal. 2010) ...................................................12, 40, 42

*Exchange Security Bank v. King*,
301 So. 2d 193 (Ala. Civ. App. 1974) ...................................................................42

*Filartiga v. Pena-Irala*,
577 F. Supp. 860 (D.N.Y. 1984) ...................................................................48

*Filartiga v. Pena-Irala*,
630 F.2d 876 (2d Cir. 1980) ...................................................................48

*Flomo v. Firestone Nat. Rubber Co., LLC*,
643 F.3d 1013 (7th Cir. 2011) ...................................................................11

*Fountain v. United States*,
384 F.2d 624 (5th Cir. 1967) ...................................................................34

*Greene v. McElroy*,
360 U.S. 474 (1959) ...................................................................33

*Hilao v. Estate of Marcos*,
103 F.3d 767 (9th Cir. 1996) ...................................................................47

*In re Chiquita Brands Int'l Inc. Alien Tort Statute & Shareholder Deriv. Litig.*,
792 F. Supp. 2d 1301 (S.D. Fla. 2011) .........................................24, 27, 28, 39, 40, 41, 43, 44

*In re Gaston & Snow*,
243 F.3d 599 (2d Cir. 2001) ...................................................................47

*In re Oliver*,
333 U.S. 257 (1948) ...................................................................32

*In re Xe Servs. Alien Tort Litig.*,
665 F. Supp. 2d 569 (E.D. Va. 2009) ...................................................................24, 25

*Institute of Cetacean Research v. Sea Sheperd Conservation Soc.*,
--- F. Supp. 2d ---, 2012 WL 958545 (W.D. Wa. Mar. 19, 2012) ........................................46

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995) ...................................................................14, 24

*Khulumani v. Barclay Nat. Bank Ltd.*,
  504 F.3d 254 (2d Cir. 2007) (Korman, J. dissenting in part)................................46

*Kiobel v. Royal Dutch Petroleum Co.*,
  621 F.3d 111 (2d Cir. 2010), cert. granted 132 S. Ct. 472 (Oct. 17, 2011) ......................10, 11

*Macuba v. Deboer*,
  193 F.3d 1316 (11th Cir. 1999) ................................................................10, 20

*Mehinovic v. Vuckovic*,
  198 F. Supp. 2d 1322 (N.D. Ga. 2002) .................................................................17

*Mohamad v. Palestinian Authority*,
  --- U.S. ---, 132 S. Ct. 1702 (2012)..........................................................4, 10, 12

*Mwani v. Bin Ladin*,
  244 F.R.D. 20 (D.D.C. 2007)................................................................47

*Pescia v. Auburn Ford-Lincoln Mercury, Inc.*,
  68 F. Supp. 2d 1269 (M.D. Ala. 1999) .................................................................45

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  582 F.3d 244 (2nd Cir. 2009)............................................24, 37, 39, 48

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  453 F. Supp. 2d 633 (S.D.N.Y. 2006).................................................47, 48

*Raney v. Vinson Guard Serv., Inc.*,
  120 F.3d 1192 (11th Cir. 1997) ................................................................9

*Rayburn v. Hogue*,
  241 F.3d 1341 (11th Cir. 2001) ................................................................14

*Romero v. Drummond Co., Inc.*,
  552 F.3d 1303 (11th Cir. 2008) ................................................................12, 14

*Rowell v. Bellsouth Corp.*,
  433 F.3d 794 (11th Cir. 2005) ................................................................10, 21

*Sarei v. Rio Tinto PLC*,
  671 F.3d 736 (9th Cir. 2011) ................................................................23, 39

*Sinaltrainal v. Coca-Cola, Co.*,
  578 F.3d 1252 (11th Cir. 2009) .......................................................12, 13, 14, 24

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)................................................................11, 39, 41, 46

iii

*Taylor v. Alabama*,
  95 F. Supp. 2d 1297 (M.D. Ala. 2000) ...................................................................42

*United States v. Darwin*,
  757 F.2d 1193 (11th Cir. 1985) ...........................................................................33

*United States v. Monaco*,
  702 F.2d 860 (11th Cir. 1983) .........................................................................33, 34

*United States v. Parcels of Land*,
  903 F.2d 36 (1st Cir. 1990)..................................................................................33

*United States v. Smith*,
  157 F. App'x 215 (11th Cir. 2005) ......................................................................33

*Walker v. Hadi*,
  611 F.3d 720 (11th Cir. 2010) .............................................................................33

*Wilson v. Direct Cable Techs., Inc.*,
  964 F. Supp. 1548 (M.D. Ala. 1997) ...................................................................42

## STATUTES

28 U.S.C. § 1350 ("ATS") ..................................................................................... *passim*

42 U.S.C. § 1983 .........................................................................................................14

Torture Victims Protection Act, 28 U.S.C. § 1350 Note ("TVPA") ..............................1, 4, 10, 48

War Crimes Act of 1996, 18 U.S.C. § 2441(d)(1)(D) .........................................23, 24

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 .....................................................................................................1, 9

Restatement (Second) Conflicts of Laws § 145(2).............................................49, 50

Restatement (Second) of Agency § 94...........................................................................45

Restatement (Second) of Conflicts of Laws ................................................................49

Restatement (Third) of Agency § 1.01 .........................................................................42

*Belén González v. Colombia*,
  No. 66001-23-31-000-1996-3160-01(13232-15646) (Consejo de Estado, Sala de lo
  Contencioso Administrativa, Sección 3a, Bogotá Sept. 6, 2011)...........................50

Republic of Colombia, Law 365 Art. 186 (1997).........................................................6

Defendant Drummond Ltd. ("DLTD") hereby moves for summary judgment on all claims by all plaintiffs pursuant to Federal Rule of Civil Procedure 56(a). Plaintiffs have deposed numerous witnesses and received over 200,000 pages of documents from DLTD in discovery. Yet the allegations of the complaint on which the Court relied to deny DLTD's motion to dismiss have not been established by the evidence. Plaintiffs' claims should now be dismissed.

## INTRODUCTION

The 596 plaintiffs in this case bring claims on behalf of 144 people killed in Colombia between 1996 and 2006. Plaintiffs' theory is that DLTD collaborated with an illegal paramilitary group called the Autodefensas Unidas de Colombia ("AUC") to kill innocent civilians who lived along DLTD's rail line. They filed suit under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") and the Torture Victims Protection Act, 28 U.S.C. § 1350 Note ("TVPA"). Plaintiffs also sued Drummond Company, Inc. ("DCI"), Augusto Jiménez (president of DLTD's Colombian branch) and Mike Tracy (a current DCI executive).[1]

The evidence presented during discovery stands in sharp contrast to what Plaintiffs alleged in the Third Amended Complaint ("Complaint"). This Court's rulings denying DLTD's motions to dismiss the Complaint[2] necessarily accepted as

---

[1] DCI, Mr. Jiménez and Mr. Tracy will file separate motions for summary judgment, which will adopt most of the arguments in DLTD's motion and present other arguments.

[2] The motions to dismiss addressed the original complaint and the First Amended Complaint. *See* Mem. Op. (Nov. 9, 2009) (Dkt. 30); Mem. Op. (Apr. 30, 2010) (Dkt. 43). But the factual

true numerous allegations as to DLTD's participation in these killings that have been thoroughly discredited in discovery, or have been shown to be without any factual support.  For example, the Complaint alleged that "[d]uring the first year of Drummond's formal relationship with the AUC, Drummond escalated its own role and began coordinating the collection of funds from other companies and individuals in the area."  Third Am. Compl. ¶ 6.  No testimony or document supports this allegation.

The Complaint also alleges that "Drummond intended that, with its funds, the AUC would expand its war effort against the FARC and focus the AUC's military campaign in Cesar on specific areas along the Drummond rail line where the FARC had a foothold."  *Id*. ¶ 232.  Further, it is alleged that "Drummond had specific knowledge that the AUC would commit war crimes, including extrajudicial killings of innocent civilians, like Plaintiffs' decedents, who lived in and around the towns Drummond required the AUC to attack and pacify."  *Id*.  Not one witness testified that anyone at DLTD knew or intended that the AUC would kill "innocent civilians . . . who lived in and around" specific towns.  And no witness testified that DLTD "required the AUC to attack and pacify" any towns, or that DLTD had the power to "require" the AUC to do anything at all.

---

allegations of the First Amended Complaint (Dkt. 35) and the now-operative Third Amended Complaint (Dkt. 233) cited here are the same.

The Complaint is also replete with factual allegations related to state action that proved in discovery to be utterly baseless.   For example, it alleges that "Drummond, through Araujo and members of the security staff, made a direct arrangement to raise funds and provide them to Colonel Mejía of the Popa Battalion so that he could pay the AUC based on the number of people killed that were suspected of being guerillas."   *Id*. ¶ 284.   Colonel Mejía gave sworn testimony and flatly denied any sort of cooperation between the military and the AUC.   Ex. A, Mejía Dep. 17-19, July 13, 2012.[3]   There is not a single piece of testimony or evidence to support Plaintiffs' allegation.

In the end, although the evidence in this case presents a number of factual disputes, the evidence that is *not* in dispute requires that summary judgment be granted in favor of DLTD on all claims.

## SUMMARY OF ARGUMENT

DLTD moves for summary judgment on all three of Plaintiffs' causes of action.   ***First***, summary judgment should be granted in favor of DLTD on Plaintiffs' first cause of action, "War Crimes Under the ATS," because (1) there is no evidence that DLTD made any alleged payments to the AUC with the *intent* that the AUC kill innocent civilians living along DLTD's rail line; and (2) there is no evidence that DLTD made any alleged payments to the AUC with *actual*

---

[3] Colonel Hernán Mejía was not deposed but instead gave testimony in Colombian court through the letter rogatory process.   However, DLTD cites to both letters rogatory testimony and deposition testimony as "____ Dep." throughout this memorandum to avoid confusion.

*knowledge* that these alleged payments would assist the AUC in killing innocent civilians along DLTD's rail line; and (3) there is no evidence that DLTD and the AUC entered into an agreement to kill innocent civilians along DLTD's rail line.

**Second**, summary judgment should be granted in favor of DLTD on Plaintiffs' second cause of action, "Extrajudicial Killings Under the ATS," because (1) there is no evidence that the killings were committed through "state action"; (2) there is no evidence that DLTD made any alleged payments to the AUC with the *intent* that the AUC kill people living along DLTD's rail line; and (3) there is no evidence that DLTD made any alleged payments to the AUC with *actual knowledge* that the AUC would use these alleged payments to kill people along DLTD's rail line.

**Third**, summary judgment should be granted in favor of DLTD on Plaintiffs' third cause of action, "Extrajudicial Killings Under the TVPA," because the Supreme Court has ruled that the TVPA does not allow lawsuits against business entities. *Mohamad v. Palestinian Authority*, --- U.S. ---, 132 S. Ct. 1702 (2012).

In addition to these reasons to grant summary judgment in DLTD's favor, Plaintiffs' ATS causes of action should be dismissed to the extent they rely on an agency theory of international law because such a theory is not permitted under customary international law. They should also be dismissed because the ATS does not apply extraterritorially and all of the relevant allegations against DLTD

occurred in Colombia.  Finally, Plaintiffs should not be permitted to seek punitive damages here because Colombian law does not permit such a recovery.

DLTD does not, in this motion, address issues relating to causation as to any individual plaintiff.  Defendants have thus far been permitted to depose only a small fraction of the named plaintiffs, and the Court has previously recognized that motions for summary judgment based upon lack of proof that any conduct by a defendant caused injury to a plaintiff may be filed when discovery of the plaintiffs is completed.

## STATEMENT OF UNDISPUTED FACTS

1.    DLTD is a limited partnership organized under the laws of Alabama, and headquartered in Birmingham, Alabama.   Ex. B, Agreement of Ltd. P'ship of DLTD.

2.    Since approximately 1995, DLTD has owned and operated a coal mine and related facilities near the town of La Loma, in the Department of Cesar, Colombia, and a port for the loading and shipping of coal in La Cienaga, Department of Magdalena.  Ex. C, Tracy Dep. 35:11-17, June 28, 2012; Ex. D, G. Drummond Dep. 73:20-21, June 27, 2012; Ex. E, Jiménez Dep. 24:19-25:1, June 29, 2012.

3.    The Departments of Cesar and Magdalena were both areas that experienced violence by illegal guerilla and paramilitary forces from 1996 through 2006.  Ex. A, Mejía Dep. 16:2-17:4.

4.    The AUC and guerilla groups such as FARC were illegal throughout this time period under Colombian law and, after September 2001, under U.S. law.  Ex. F, Pacheco Dep. 52:3-53:11, July 12, 2012; Ex. E, Jiménez Dep. 81:11-82:18; Ex. G, Republic of Colombia, Law 365 Art. 186 (1997); Ex. H, Letter from Dept. of Treas. to A. Jiménez (Apr. 13, 2005).

5.    The Government of Colombia's policy throughout this time period was to combat illegal groups, both paramilitaries and guerillas, and arrest their members. Ex. A, Mejía Dep. 17-19; Ex. G, Republic of Colombia, Law 365 Art. 186 (1997).

6.    AUC members were in fact attacked and arrested or killed by the Colombian military throughout the 1996-2006 time period.   Ex. I, Mattos (Samario) Dep. 78:15-79:9, Mar. 12, 2012; Ex. J, Esquivel (El Tigre) Dep. 82:9-13, Mar. 22, 2012.

7.    The AUC was a paramilitary organization that was formed in late 1996 or early 1997 by a paramilitary leader named Carlos Castaño.  Ex. K, Adkins Dep. 188:11-189:11, Aug. 2, 2012.

8.    The AUC remained active throughout Colombia until it disbanded under the Justice and Peace process in 2006.  Ex. F, Pacheco Dep. 54:1-10.

9.    In 1994, Decree 356 of Colombia's Ministry of Defense authorized the creation and arming of legal self-defense groups known as Convivir groups.  Ex. L, Republic of Colombia, Decree 356 (1994).

10.    Convivir groups remained legal in Colombia until November 1997, when the Constitutional Court of Colombia stated that the provision of military weaponry to civilians and specifically to Convivir groups was unconstitutional and that effectively terminated the Convivir movement.   Ex. M, Constitutional Court of Colombia, Judgment C-572 at 123 (1997) ("CONVIVIR - May only use civilian firearms.")

11.    There is no evidence that any of Plaintiffs' decedents were killed by a member of a convivir group.   *See, e.g.*, Dkt. 346, Ex. A, Plaintiffs' Revised Excel Spreadsheet Containing Plaintiff Information (Apr. 6, 2012).

12.    The testimony by Plaintiffs' witnesses regarding supposed payments by DLTD to the AUC confirms that the supposed payments were made in Colombia and not in the United States.   Ex. J, Esquivel (El Tigre) Dep. at 34:20-36:9; Ex. N, Blanco Dep. at 72:9-74:9, Apr. 19 and May 25, 2012.

13.    There is no documentary evidence of any payments or other support by DLTD to the AUC, and DLTD had accounting practices in place to avoid such payments.   Ex. O, Peel Dep. 114:14-20; 118:16-119:7, June 6, 2012.

14.    There is no admissible evidence that DLTD knew and intended that the AUC use DLTD funds to kill innocent civilians near DLTD's rail line.   Ex. E, Jiménez Dep. 47:16-20; Ex. P, Defs. DCI and DLTD's Am. Resp. to Pls.' First Set of Interrogatories ("First Interrogatories"), No. 1.

15.     There is no admissible evidence that DLTD entered into an agreement with the AUC with the purpose of killing innocent civilians near DLTD's rail line.  Ex. D, G. Drummond Dep. 57:11-17; Ex. E, Jiménez Dep. 47:16-20; Ex. Q, Zervos Dep. 98:7-15, June 20, 2012; Ex. P, First Interrogatories, Nos. 2, 14.

16.     There is no admissible evidence that DLTD controlled the actions of the AUC or that DLTD directed the actions of the AUC.  Ex. J, Esquivel (El Tigre) Dep. 24:7-8; 43:10-14; 53:18-20; 113:16-19; 115:16-17.

17.     DLTD had a policy throughout its presence in Colombia not to have dealings with any illegal group including the AUC.  Ex. E, Jiménez Dep. 47:16-48:12; Ex. Q, Zervos Dep. 99:16-101:14; Ex. R, Memo. from A. Jiménez to G. Honeycutt, "Security Problems" (Feb. 27, 2004); Ex. S, Linares Dep. 167:9-168:12, June 7, 2012; Ex. K, Adkins Dep. 144:18 - 145:6.

18.     For security of its facilities and its railroad, DLTD relied on licensed private security contractors and support to the local communities.  Ex. S, Linares Dep. 118:3-7 (security companies); *id*. at 122:18-23 (security companies); *id*. at 124:17-19 (security companies); *id*. at 125:5-12 (security companies); *id*. at 129:1-6 (security companies); *id*. at 130:8-17 (security companies); *id*. at 127:7-128:8 (local communities); Ex. T, Araujo Dep. 115:9-116:14, May 24, 2012 (local communities).

19.    DLTD would also coordinate its internal security efforts with the local police and national military.   Ex. S, Linares Dep. 162:13-164:1 (military and police); *id.* at 115:8-116:2 (military); *id.* at 178:1-7 (military); *id.* at 189:9-19 (military); *id.* at 224:18-225:12 (military); *id.* at 263:7-16 (military).

## **ARGUMENT**

### I.    Summary Judgment Must Be Granted Where There Are No Genuine Issues Of Material Fact

Summary judgment under Rule 56 is appropriate when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

Once a party has properly filed evidence supporting the summary judgment motion, the nonmoving party may not rest upon mere allegations in the pleadings, but must set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322-24.  Conclusory statements, speculation and hunches, however, are insufficient to avoid summary judgment.  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997).  Summary judgment is appropriate "where the evidence of a genuine issue of material fact is 'merely colorable' or of insignificant probative value." *Camp Creek Hospitality Inns, Inc.*

*v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1400 (11th Cir. 1998). The existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 252. In addition, to avoid summary judgment, Plaintiffs must proffer evidence that would be admissible at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1324-25 (11th Cir. 1999); *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).

## II.   Plaintiffs' TVPA Claim Must Be Dismissed As A Matter Of Law (Third Cause of Action)

Plaintiffs seek to hold DLTD liable under the TVPA. It is undisputed that DLTD is a limited partnership, not a natural person. The Supreme Court's recent decision in *Mohamad v. Palestinian Authority*, --- U.S. ---, 132 S. Ct. 1702 (2012), holds that the TVPA "authorizes liability solely against natural persons" and foreclosed actions under the TVPA against partnerships, corporations, and other "nonnatural persons." *Id.* at 1708. The TVPA claims against DLTD must thus be dismissed.

## III.  The ATS Claims Must Be Dismissed Because the ATS Does Not Permit Claims Against Corporations And Because The ATS Cannot Be Applied Extraterritorially (First and Second Causes of Action)

The Supreme Court heard argument this spring and will hear additional argument on October 1 in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), cert. granted 132 S. Ct. 472 (Oct. 17, 2011), regarding two issues

relevant to this case. First, the Court heard argument regarding a circuit split over whether corporations may be held liable under the ATS.[4] *See* 132 S. Ct. 472. Second, following oral argument, the Court directed the parties to file supplemental briefs and scheduled additional argument regarding "whether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States," 132 S. Ct. 1738 (Mar. 5, 2012), suggesting that it will resolve that question, too.

### A.    Corporations Cannot Be Sued Under The ATS

The Supreme Court in *Sosa v. Alvarez–Machain* instructed courts to exercise "vigilant doorkeeping" to ensure that the scope of the ATS is not expanded beyond the "relatively modest set of actions alleging violations of the law of nations." 542 U.S. 692, 720, 729 (2004). Corporate liability is not a universally accepted norm of international law sufficient to confer jurisdiction under the ATS. *See Kiobel*, 621 F.3d at 120 ("no corporation has ever been subject to *any* form of liability under the customary international law of human rights, and thus the ATS, the remedy Congress has chosen, simply does not confer jurisdiction over suits against corporations [under the ATS]") (emphasis in original).

---

[4] *Compare Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011) (corporation may be liable under the ATS); *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013 (7th Cir. 2011) (corporation may be liable under the ATS); *with Kiobel*, 621 F.3d at 145 (corporations may not be held liable under ATS).

A panel of the Eleventh Circuit, in *Aldana v. Del Monte Fresh Produce,* 416 F.3d 1242 (11th Cir. 2005), overturned the dismissal of an ATS claim asserted against a corporation, but the issue of whether a corporation could properly be subject to liability under the ATS was never analyzed.   Subsequent panels have relied on *Aldana* as approval of corporate liability by the Eleventh Circuit without noting *Aldana*'s lack of analysis of the issue.   *See Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008); *Sinaltrainal v. Coca-Cola, Co.*, 578 F.3d 1252, 1263 (11th Cir. 2009).[5]

Because the Eleventh Circuit has held that corporations may be sued under the ATS, s*ee Romero*, 552 F.3d at 1315, Defendants raise the issue here to request reconsideration in light of the evidence and to preserve it for later review.

**B.     The ATS Cannot Be Applied Extraterritorially**

Regarding the second question before the Supreme Court, the Court in *Morrison v. National Australia Bank Ltd.*, --- U.S. ---, 130 S.Ct. 2869 (2010), emphasized that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *id.* at 2878, and "appl[ied] th[at] presumption in *all* cases," not just in the context of Section 10(b) securities litigations.  *Id.* at 2881.

---

[5] Other courts have commented on the omission. *See, e.g.*, *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1133 (C.D. Cal. 2010) ("Most of these cases refer to earlier cases that did not even mention corporate liability. *Compare Romero v. Drummond Co.*, 552 F.3d at 1315 (citing *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242 (11th Cir. 2005), as binding circuit 'precedent') *with Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d at 1244-53 (opinion is silent regarding corporate liability).")

Because the ATS gives no clear indication of extraterritorial application (or Congress's intent to overcome the presumption against extraterritorial application), it has no such application.   The allegations in this action (and the evidence purporting to support those allegations) against DLTD under the ATS concern activity solely within the territory of a foreign sovereign, the Republic of Colombia.   Because there is no evidence to support a violation of the ATS within the United States, Plaintiffs' ATS claims must be dismissed.   DLTD preserves this issue in anticipation of the Supreme Court's ruling.

## IV.    Plaintiffs' ATS Claim for Extrajudicial Killing Must Be Dismissed (Second Cause of Action)

### A.    State Action is Required for Extrajudicial Killings Under the ATS

Jurisdiction, and thus relief, is available under the ATS only for a tort committed "in violation of the law of nations." 28 U.S.C. § 1350; *Aldana v. Del Monte Fresh Produce, N.A.*, Inc., 416 F.3d 1242 (11th Cir. 2005).   Extrajudicial killing rises to the level of a violation of international law only where it is "state-sponsored." *Aldana*, 416 F.3d at 1247; *see also Sinaltrainal*, 578 F.3d at 1265; Mem. Op. (Nov. 9, 2009) at 7-8 (Plaintiffs must establish "that the paramilitaries were state actors as defined by Eleventh Circuit law.").   To prove the necessary state action, Plaintiffs must prove that the AUC members whom they claim committed these acts are in an "integral" and "indispensable" relationship with the Colombian government such that their actions can be considered state action.

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961); *Kadic v. Karadzic*, 70 F.3d 232, 243-44 (2d Cir. 1995).  Courts apply the jurisprudence of 42 U.S.C. § 1983 in analyzing state action claims under the ATS, and "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

Where a claim of state action is based on such a relationship between state and non-state actors, "the symbiotic relationship must involve the 'specific conduct of which the plaintiff complains.'"  *Sinaltrainal*, 578 F.3d at 1266 ("We demand allegations of a symbiotic relationship that 'involves the torture or killing alleged in the complaint to satisfy the requirement of state action.'" (quoting *Romero*, 552 F.3d at 1317)); Mem. Op. (Nov. 9, 2009) at 10; *Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001).  This Court has made clear that general evidence that the Colombian government, or its military, "encourages, supports, and relies on the[] existence" of the AUC is not enough—it must involve the killings alleged in the Complaint.  Mem. Op. (Apr. 30, 2010) at 11.

### B. The Evidence Presents No Genuine Dispute of Material Fact as to State Action

In declining to dismiss Plaintiffs' First Amended Complaint, the Court found that the Plaintiffs adequately pled state action based on the following

specific allegations:

> (1) that it was the Colombian Commander of the Cordoba Battalion who first approached Drummond about providing financial support to the AUC, (2) that the Colombian government created the legal structure for the AUC to form and collect monies from private parties; and (3) that Drummond provided funds directly to the AUC and also to Popa Battalion Commander Colonel Mejía . . . [who] then distributed the funds supplied by Drummond to AUC leaders based on confirmed executions of suspected guerilla supporters.

Mem. Op. (Apr. 30, 2010) at 12 (citations omitted).  Discovery is now complete and there is no evidence to support any of these allegations.

As an initial matter, as explained in the Introduction, Plaintiffs took the testimony of Colonel Mejía.  He flatly denied any knowledge that Drummond supplied funds to the AUC, or that the military collaborated with the AUC, Ex. A, Mejía Dep. 17-19, and there is absolutely no evidence to the contrary.

With respect to Plaintiffs' allegations about the Convivir groups, it is critical to understand that Colombian government's Convivir program preceded and was separate from the AUC.  To be sure, the Colombian government created the Convivir program in 1994 under Decree 356 of Colombia's Ministry of Defense. Ex. L, Republic of Colombia, Decree 356 (1994).  The purpose of the program was to create legal armed groups to protect the Colombian citizenry from guerilla extortion and violence.  However, the program was unsuccessful and effectively ended in mid-1997 when the Colombian Constitutional Court declared the

legislation unconstitutional. Ex. M, Constitutional Court of Colombia, Judgment C-572.

The AUC, in contrast, was illegal from the start. It was created in late 1996 or early 1997 by a notorious paramilitary leader named Carlos Castaño to centralize certain illegal groups battling the guerillas. There is no evidence that the Colombian government "created the legal structure for the AUC to form and collect monies from private parties," as alleged by Plaintiffs. In fact, the AUC was declared to be an illegal group by the Colombian government and the government, including the military, pursued and punished members of the AUC. Indeed, two of the former paramilitaries upon whom Plaintiffs rely, El Tigre and Samario, were arrested by the military or national police for paramilitarism. Ex. I, Mattos (Samario) Dep. 78:15-79:9; Ex. J, Esquivel (El Tigre) Dep. 82:9-13. It defies logic that the military was arresting and imprisoning prominent AUC members but was simultaneously in a "symbiotic relationship" with them.

A September 1995 memorandum by Jim Adkins, a member of DLTD's security department, reports that the commander of the local military battalion near DLTD's mine, the Córdoba Battalion, approached Adkins to request that DLTD financially support "Operacion Convivir"—a suggestion firmly rejected by Adkins. Ex. U, Memo. from J. Adkins to M. Tracey [sic], "Recent Insurgent Activity"

(Sept. 13, 1995).[6]  The uncontradicted evidence is that DLTD did not support the Convivir program.  *Id.*; *see also*, Ex. K, Adkins Dep. 180:16-181:3.

Moreover, the commander's request for financial support of ***the Convivir program*** in no way proves Plaintiffs' contention that the commander requested support of the ***AUC***.  When the request occurred in 1995, the AUC did not even exist.  It did not come into being until late 1996, at the earliest, a full year later. Further, the request came at a time when Convivirs were authorized by law.

Some of Plaintiffs' witnesses have testified that some officers of the military cooperated with the AUC.  *See, e.g.*, Ex. I, Mattos (Samario) Dep. 65-71; Ex. J, Esquivel (El Tigre) Dep. 54-56.  At best, however, the evidence is that there may have been incidents of unlawful cooperation between members of the Colombian military and the AUC.  *See* Ex. J, Esquivel (El Tigre) Dep. 54-55; Ex. I, Mattos (Samario) Dep. 73.  That is not sufficient to meet the demanding standard for state action.  There must be evidence that the wrongful conduct was part of an "official policy" of the state.  *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1346-47 (N.D. Ga. 2002) (rev'd on other grounds) (holding that international law violations "were, in fact, ordered, authorized, and perpetrated as part and parcel of official policy.").  The "official policy" and practice of the Colombian government was to attack illegal groups, guerilla and paramilitary alike.  *See* Ex. A, Mejía Dep., 17-

---

[6] Defendants no longer assert confidentiality over this document.

18, Ex. U, Memo. from J. Adkins to M. Tracey [sic], "Recent Insurgent Activity" (Sept. 13, 1995).

Even if there were evidence that the AUC and the Colombian government collaborated generally, there is no evidence that the Colombian government and the AUC were in a symbiotic relationship involving the murders along DLTD's rail line, as required by this Court's ruling.  Mem. Op. (April 30, 2010) at 11 (noting that general evidence that the Colombian government, or its military, "encourages, supports, and relies on the[] existence" of AUC does not satisfy state action standard and that Plaintiffs must show that the relationship involved the killings near DLTD's rail line).  In fact, Colonel Mejía testified to the contrary, explaining that the military not only did not cooperate with the AUC, but attacked them:  "When I got my unit [La Popa Battalion] I also got my orders, my mission, to attack all illegal armed groups.  As a matter of fact, I did, and the results of my actions show that this was so. . . . If at the time when I got my unit I would have known that there were people within the Army with links to illegal groups I would have denounced them."  Ex. A, Mejía Dep. 17:17-18:7.

Testimony by Plaintiffs' paramilitary witnesses was likewise devoid of any evidence of a symbiotic relationship between the Colombian government and the AUC in the killing of Plaintiffs' 144 decedents.  For example, when Samario was asked, "During the time that you were doing the operations up and down the

Drummond rail corridor, did you ever coordinate any activities with the official Colombian military that was in the area?" he responded, "I did not coordinate in that area directly . . ." Ex. I, Mattos (Samario) Dep. 65:3-7. The remainder of his testimony described interactions with members of the Colombian military that were admittedly nowhere near the rail line. *Id*. at 73-74, 150.

There is no evidence to satisfy the state action requirement under the ATS, and Plaintiffs' ATS claim for extrajudicial killing based on state action should therefore be dismissed.

### C. Plaintiffs Have No Evidence to Support Their Secondary Theories of Liability for Extrajudicial Killings

Even if Plaintiffs could establish state action, they must also prove that DLTD participated in the killings. To do so, Plaintiffs rely solely on three secondary liability theories—aiding and abetting, conspiracy and agency. These theories are discussed in detail in Sections V and VI below. As explained in those sections, the evidence does not satisfy the necessary knowledge and intent requirements of aiding and abetting and conspiracy. *See* § V *infra*. Plaintiffs' agency theories likewise fail because customary international law does not permit claims based on this secondary liability theory and because the evidence here does not meet the state-law standard for ratification. *See* § VI *infra*. For these independent reasons, Plaintiffs' ATS claim for extrajudicial killings must be dismissed.

Before discussing the three theories in turn, it is important to review the evidence regarding Plaintiffs' allegation of DLTD's support to the AUC.  Despite a massive production of documents by the defendants in response to 264 separate document requests covering a period of eleven years (1996 - 2006), there is not a single document evidencing any payment by DLTD or any of its employees to the AUC, directly or indirectly.  And despite having taken testimony from nine present executives or employees of Drummond,[7] three former employees,[8] five imprisoned paramilitaries,[9] a DLTD contractor (Jaime Blanco), a DLTD consultant (Fabio Echeverri) and a Colombian Army colonel (Hernan Mejía), Plaintiffs have elicited only two non-hearsay claims that DLTD made any payments whatsoever to the AUC:  El Tigre's testimony that cash was delivered to the Juan Andres Alvarez Front in late 1999 by agreement with Alfredo Araujo (DLTD's manager of community relations), and Jaime Blanco's testimony the Jim Adkins gave him $10,000 in cash on several occasions and arranged for overpayments to his food service company in order to funnel money to the AUC.[10]

---

[7] Garry Drummond, Mike Tracy, Augusto Jiménez, Alfredo Araujo, Bruce Webster, Jose Miguel Linares, Debra Peel, Ken Dortch, and John Fallis.

[8] Mike Zervos, Jim Adkins, and Julian Villate.

[9] Alcides Manuel Mattos Tabares ("Samario"), Jairo Esquivel Cuadrado ("El Tigre"), Libardo Duarte ("Bam Bam"), Jose Gelvez Albarracin, and Jairo de Jesus Charris.

[10] Plaintiffs elicited from witnesses a number of statements concerning supposed support to the AUC by DLTD that are rank hearsay, such as what the witness claimed to have heard from paramilitary leader Jorge 40 or others in the AUC.  *See, e.g.*, Ex. I, Mattos (Samario) Dep. 41:3-11; El Tigre Dep. 149:11-16; *id.* at 147:18-21.   That testimony is inadmissible and cannot be relied upon in opposition to a motion for summary judgment.  *Macuba v. Deboer*, 193 F.3d

El Tigre and Blanco not only contradict each other, but contradict their own testimony to the Fiscalia (public prosecutors) in Colombia.  Their testimony about payments is squarely and credibly denied by DLTD employees including Alfredo Araujo and Jim Adkins, and is unsupported by any documentary evidence.  And every present and former Drummond employee has testified that DLTD had a strong and unwavering policy against support for illegal groups of any kind, a fact support by contemporaneous documents.  *See* Ex. R, Memo. from A. Jiménez to G. Honeycutt (Feb. 27, 2004) ("You should know as everybody in this company must know very clear, the strong and very consistent policies of the company expressed by Mr. G.N. Drummond, that under no circumstances or threats Drummond will pay directly or indirectly to illegal groups."); Ex. V, Materials and Purchasing Manual 86 ("II. Drummond and the Law").  Moreover, every single present and former DLTD (and DCI) employee denied that the company planned or made any payments to the AUC, and reaffirmed the company's unwavering policy against doing so.  As recognized in this Court's prior rulings, however, mere support by DLTD to the AUC is ***not*** sufficient to establish Plaintiffs' claims that DLTD is liable for extrajudicial killings in violation of international law.

---

1316, 1324-25 (11th Cir. 1999); *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)

## V.    Plaintiffs' ATS Claim for War Crimes Must Be Dismissed (First Cause of Action)

Plaintiffs' third cause of action contends that DLTD collaborated with the AUC to commit war crimes by killing over 100 people who lived in towns along DLTD's rail line.  Third Am. Compl. ¶¶ 196-281.  They primarily rely on two theories of secondary liability—aiding and abetting and conspiracy.  To establish DLTD's liability under either theory, Plaintiffs must show that DLTD shared the AUC's intent to kill innocent civilians.  There is no evidence sufficient to create a genuine issue for trial on that element of Plaintiffs' claim.

### A. War Crimes Require Intentional Killing of Innocent Civilians

The Court has held that to establish a war crime, Plaintiffs must prove "(1) there was an armed conflict; (2) that the AUC and the FARC were parties to the conflict; and (3) that Plaintiffs were killed in the 'course of hostilities.'"  Mem. Op. (Apr. 30 2010) at 14 (Dkt. 43).  Plaintiffs must also prove that the victim was an innocent civilian in the conflict,[11] and that the perpetrator intentionally killed an innocent civilian.

### 1.  Innocent Civilian Requirement

Plaintiffs have already conceded that the victim of a war crime must be a "noncombatant," *i.e.*, an innocent civilian.  Pls. Opp. to Defs.' Mot. to Dismiss at 9 (Dkt. 20) ("In assessing the allegations of war crimes here, the legal elements are

---

[11] In its previous ruling, the Court did not address this issue.  Mem. Op. (Apr. 30, 2010) at 14 n.16.

whether there was an 'armed conflict'; whether the FARC and the AUC were parties to the conflict; and whether Plaintiffs were **noncombatants** killed in the 'course of hostilities.'") (emphasis added). Plaintiffs' concession is supported by numerous sources.

*First*, under customary international law only non-participants in the civil conflict may be considered victims of war crimes. Specifically, Common Article 3 of the Third Geneva Convention prohibits certain acts—including murder—against "[p]ersons taking no active part in the hostilities." Third Geneva Conv. Relative to the Treatment of Prisoners of War (Aug. 12, 1949). "War crimes are defined primarily by the Geneva Conventions, to which the United States, along with at least 180 nations, is a party and which constitute part of customary international law." *Sarei v. Rio Tinto PLC*, 671 F.3d 736, 763-64 (9th Cir. 2011) (citing Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101–30, at 15 (1990) ("[T]he Geneva Conventions, to which the United States and virtually all other countries are Parties . . . generally reflect customary international law.")).

*Second*, Congress has likewise defined "war crimes" to require that the victim "tak[es] no active part in the hostilities." War Crimes Act of 1996, 18 U.S.C. § 2441(d)(1)(D). Section 2441 adopts this definition of war crimes from Common Article 3, which is incorporated by reference. *Id*. § 2441(c)(1), (c)(3).

***Third***, federal courts in ATS cases have consistently adopted the definition of a war crime from Section 2441 and the Third and Fourth Geneva Conventions. The Second Circuit first held that Common Article 3 provides the correct standard for war crimes claims under the ATS. *Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995) (quoting "persons taking no active part in the hostilities" language from Article 3). This Circuit, as well as this Court, have cited *Kadic* as persuasive authority on war crimes under the ATS. *See Sinaltrainal*, 578 F.3d at 1266; Dkt. 43, at 14; *see also In re Chiquita Brands Int'l Inc. Alien Tort Statute & Shareholder Deriv. Litig.* ("*In re Chiquita*"), 792 F. Supp. 2d 1301, 1331 (S.D. Fla. 2011) (relying on *Kadic* and Geneva Convention to hold that war crimes requires that victims "were not active participants in the conflict"). Courts in other circuits have done the same. *Presbyterian Church of Sudan v. Talisman*, 582 F.3d 244, 257 (2nd Cir. 2009); *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569 (E.D. Va. 2009).

### 2.  Intentional Killing of Innocent Civilian Requirement

To constitute an actionable war crime, the perpetrator must have intentionally killed an innocent civilian. 18 U.S.C. § 2441(d)(1)(D) (defining murder as a war crime when a person "***intentionally*** kills, or conspires or attempts to kill . . . one or more persons taking no active part in the hostilities, including

those placed out of combat by sickness, wounds, detention, or any other cause").[12]

The Fourth Geneva Convention likewise protects against "*willful* killings, torture, or inhuman treatment . . . or *willfully* causing great suffering or serious injury to body or health." Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 147 (emphasis added)[13]; *see also Xe Servs.*, 665 F. Supp. 2d at 589 (relying on Geneva Conventions and holding that ATS war crimes cause of action "requires plaintiffs to show that defendants (i) *intentionally* (ii) killed or inflicted serious bodily harm (iii) *upon innocent civilians* (iv) during an armed conflict and (v) in the context of and in association with that armed conflict.") (emphasis added).  In other words, negligent or reckless killings of innocent civilians do not satisfy the standard.  *Xe Servs.*, 665 F. Supp. 2d at 591 (dismissing ATS war crimes claim against head of company because plaintiffs alleged no facts showing that executive "possessed the requisite intent to kill or inflict serious bodily injury" but only that he "was negligent or reckless.").

The requirement that the AUC intentionally killed an innocent civilian is critical in this case.  The Complaint alleges that "none of Plaintiffs' decedents were with the FARC or provided it with support" and that they were "merely innocent

---

[12] Section 2441 allows for murder as a war crime when the killing was "unintentional[]" but only where the killing occurred "in the course of committing any other offense" in the chapter. Plaintiffs have never contended that any of the killings here happened while these other offenses (such as rape, torture or kidnapping) took place.
[13] The Fourth Convention has been ratified by the United States "and every other nation in the world." *Xe Servs.*, 665 F. Supp. 2d at 583.

civilians." Third Am. Compl. ¶ 213. But it also alleges that they were "suspected of either [being a FARC member or supporter] by the AUC" and that these suspicions alone were "enough to get them killed." *Id*. The AUC's killing of a "suspected" FARC member or supporter is not a war crime. The definition of a war crime requires evidence that the AUC *intentionally* killed an innocent civilian. If the AUC suspected (perhaps mistakenly) that the decedent was a FARC member or supporter—and killed him for that reason—then the killing is simply not a war crime because the AUC did not intentionally kill someone who was innocent.[14] And, more important, support by a third party to the AUC for killings of suspected combatants (guerillas) cannot constitute aiding and abetting of war crimes. This murder may be an extrajudicial killing, but it does not meet the narrow definition of a war crime.

## B. There Is No Evidence That DLTD Aided and Abetted War Crimes

The Court has already defined the aiding and abetting standard for war crimes. To prove aiding and abetting, Plaintiffs must prove: "(1) the principal violated international law; (2) the defendant knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant

---

[14] Whether any plaintiff's decedent was in fact an innocent civilian, and whether those who killed or disappeared the decedent did so with knowledge that he or she was a noncombatant, are not questions presented by this motion for summary judgment. There has not been complete discovery of each individual decedent's circumstances so as to move for summary judgment on the question of whether the individual was truly an "innocent civilian" and not, in fact, a FARC member or supporter. To the extent this motion is not dispositive, DLTD preserves this issue for later motions for summary judgment.

specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation."  Mem. Op. (Apr. 30, 2010) at 20-21.  The intent and knowledge elements are critical here because there is no genuine dispute of material fact as to either one.

Specifically, as to the intent element, Plaintiffs must prove that DLTD "shared the same purpose" as the AUC to commit these specific killings; that is, DLTD shared the intent to kill innocent civilians near DLTD's rail line to "advance the AUC's interests over the interests of the FARC."  *Id.* at 24.[15]  Plaintiffs have conceded that this is the correct legal standard.  Pls.' Opp. to Defs.' Mot. to Dismiss at 14 (Dkt. 38) ("The intent required for aiding and abetting war crimes is to assist the attacks against innocent civilians.").

An ATS case in this Circuit with very similar facts, *In re Chiquita*, illustrates how the intent and knowledge elements preclude liability here.  792 F. Supp. 2d 1301.  In that case, the plaintiffs were relatives of people in Colombia's banana-growing region who were "trade unionists, banana-plantation workers, social activists and others tortured and killed."  *Id*. at 1305.  The plaintiffs claimed Chiquita paid the AUC to kill their relatives.  On a motion to dismiss, Chiquita

---

[15]  The Court's opinion on the motion to dismiss was focused on whether Plaintiffs had established facts sufficient to show that DLTD shared the intent for these killings "in the course of hostilities."  Mem. Op. (Apr. 30, 2010) at 24-29.  DLTD did not challenge on the motion to dismiss whether Plaintiffs had alleged facts sufficient to show that Drummond had shared the intent of the AUC to kill innocent civilians.

urged dismissal because the plaintiffs failed to allege facts showing that Chiquita had either the knowledge or the intent to collaborate with the AUC to kill these individuals.

The district court ultimately denied most of the motion to dismiss, but its legal analysis is instructive. The court held that the plaintiffs must ultimately prove "more than the mere fact that Chiquita had knowledge that the AUC would commit such offenses." *Id*. at 1344. Rather, the court required that the plaintiffs allege that Chiquita "paid the AUC with the specific purpose that the AUC commit the international-law offenses" and that Chiquita "intended the AUC to torture and kill civilians in Colombia's banana-growing regions, which is the conduct that allegedly harmed or killed Plaintiffs' relatives." *Id*. at 1344-45.

Applying *Chiquita's* well-reasoned analysis here, Plaintiffs must prove not only that DLTD knew that its alleged payments to the AUC would assist in killing innocent civilians but also that that DLTD intended that its alleged payments would be used to kill innocent civilians.

The evidence is undisputed that DLTD lacked the required intent or knowledge. Plaintiffs obtained testimony through the letter rogatory process from five paramilitaries and one paramilitary collaborator, all of whom are in prison in Colombia. Four of these witnesses testified in some way about alleged "agreements" between the AUC and DLTD. The key inquiry is whether these

witnesses offer admissible evidence that DLTD made payments as part of such an agreement (1) with the *intent* that the AUC intentionally kill innocent civilians near the rail line, and (2) with the *knowledge* that these payments would assist the intentional killing of innocent civilians near the rail line.  In the end, the testimony of these four witnesses creates no genuine issue of material fact on these two questions.  At best, they offer evidence that DLTD intended the AUC to fight the FARC members who were bombing DLTD's trains and impeding the company's operations, not that DLTD intended the AUC to kill innocent people.

      **1.**    ***Jhon Jaime Esquivel Cuadrado ("El Tigre")***.  El Tigre was the head of the Juan Andres Alvarez Front of the AUC from 1998 to July 2000.  Ex. J, Esquivel (El Tigre) Dep. 22:18-23:17; 82:9-11.  El Tigre testified that he and "Jorge 40" (another AUC leader) met with Alfredo Araujo, DLTD's manager of community relations, sometime in 1999.  *Id.* at 28:12-29:21.  At this meeting, Mr. Araujo told Jorge 40 that "Drummond Company[] was very concerned because in many occasions the guerilla had put down the railroad line."  *Id.* at 29:18-21.  El Tigre testified that Mr. Araujo agreed that if the AUC would "clean up of guerillas all the area that surrounded Drummond," then "Drummond would cooperate with the finances that they were going to provide to the AUC."  *Id.* at 33:14-18.  According to El Tigre, Mr. Araujo's focus was on the guerillas in the area, not on civilians: Mr. Araujo supposedly told El Tigre that "if Drummond noticed that [the

AUC] did not let *the guerilla* approach, then Drummond would cooperate with [the AUC]." *Id.* at 34:1-8 (emphasis added).

Other testimony by El Tigre makes clear that the only purpose of the supposed agreement between DLTD and the AUC was to fight the guerillas who were bombing DLTD's train, and not to kill innocent civilians. For example, El Tigre testified that he told Jaime Blanco, DLTD's independent food contractor, that El Tigre wanted to "combat the guerillas around Drummond" and in return wanted money from DLTD. *Id.* at 43:10-17. He also testified that DLTD "financed the AUC to combat the guerillas," and that DLTD "financed the paramilitary groups to fight against the guerillas." *Id.* at 73:18-74:1, 75:12-13.

El Tigre testified that the AUC would at times kill innocent civilians, but *never* testified (a) that DLTD agreed to any such killings near its rail line; (b) that DLTD knew that any of its alleged payments would assist such killings near the rail line; or (c) that anyone from DLTD knew it was the AUC's strategy to kill civilians generally. *See, e.g.*, *id.* at 34:1-3 (explaining that AUC would "kill[] all of the guerillas or guerilla men that are armed in the area and civilians as well"); *id.* at 53:1-4 (noting that the AUC would "put down people, whether they were militants or whether there was civilians of the guerillas").

2. *Jaime Blanco Maya*. Mr. Blanco was DLTD's independent food contractor from 1996 to mid-2001. Ex. N, Blanco Dep. 42:5-6. He was arrested in

September 2010 for conspiring with the AUC to kill two union leaders at DLTD. *Id*. at 122:5-10; 125:4-7.  Blanco was subsequently charged as well with causing the murder of a business competitor name Hugo Guerra.  *Id*. at 123:13-16.

Blanco claimed that he was the "intermediary," along with Jairo Jesus Charris Castro, between El Tigre and Jim Adkins of DLTD.   *Id*. at 33:4-6. According to Blanco, El Tigre approached Blanco sometime in 1996 hoping that Blanco's existing connection to DLTD would help the AUC "extort Drummond, and to grow as a front and to buy weapons."  *Id*. at 65:16-68:6.  Blanco testified that he told Adkins about El Tigre's request for money.   *Id*. at 70:15-18. According to Blanco, Adkins provided up to $10,000 in cash on one or more occasions, and DLTD and Blanco worked out a scheme where Blanco's company would invoice "some extra portions" to DLTD as part of the food service contract and "that money would be handed over to El Tigre."   *Id*. at 73:15-20.   That testimony cannot be reconciled with the testimony of El Tigre, who was positive that he never met Blanco until after the killings of CTI investigators in March of 2000.  El Tigre Dep. 44:10-45:4.  Indeed, El Tigre did not even arrive in the Department of Cesar until late 1998.  *Id*. at 48:20-49:9.

None of Blanco's testimony about these alleged payments from DLTD to El Tigre is admissible, or properly considered on this motion for summary judgment, because Blanco refused to answer questions on the subject on cross examination:

> Q.  And you said that you had met with El Tigre in 1996 and that El Tigre had told you he wanted money from Drummond; is that fair? . . .
> A.  I will abstain from answering that question.
> Q.  Mr. Blanco[, you] didn't abstain from answering the question when Mr. Collingsworth ask it of you did you?
> A.  That's correct.
> Q.  But you refuse to answer my question about the same thing?
> A.  What I said was already made clear in my statement. What I don't -- see, what I said is already there. It's clear it was made in that statement and if I already made it in that statement I don't see it needs to be repeated.

*Id.* at 207:14-208:11.  Blanco refused to answer many other questions on subjects related to his direct examination, based on his privilege against self-incrimination under Columbian law, such as his involvement in the killing of the union leaders,[16] whether he made payments to the paramilitaries in exchange for the return of his trucks,[17] and even the name of his wife and whether he asked her to contact Drummond's attorney, Jaime Bernal.[18]

The right to cross-examine an adverse witness is a fundamental element of due process.  *See In re Oliver,* 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his

---

[16] *See, e.g.,* Ex. N, Blanco Dep. 23:12-17 (stating on direct, "I had simply done nothing for these [union leader] killings to occur, but . . . I did have knowledge that these killings were being planned.  I remember having told this SOB gringo he screwed me, and I am assuming myself alone the consequences of all these problems."); *id.* at 172:7-11; 173:15-19 (when asked on cross, stated that he would "abstain from answering questions related to the homicide of the union members since I am awaiting sentencing and the law protects me in the aspect of self-incrimination."); *id.* at 174 (refusing to answer whether Edwin Angulo Blanco was involved with the union leader murders).

[17] *See id.* at 202, 204.

[18] *See id.* at 180.

defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him."); *Walker v. Hadi*, 611 F.3d 720, 723 (11th Cir. 2010) ("Individuals in civil commitment proceedings are entitled to certain due process protections guaranteed by the Fourteenth Amendment, including the rights to confront and cross-examination."); *Al Najjar v. Reno*, 97 F. Supp. 2d 1329, 1355 (S.D. Fla. 2000) ("[T]he concept of procedural due process arises more generally from the rights to confrontation and cross-examination, applicable in all judicial proceedings.") (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)), *vacated as moot*, *Al Najjar v. Ashcroft*, 257 F.3d 1262 (11th Cir. 2001).

District courts may strike or exclude testimony where a party had a limited ability to cross examine a witness. *See, e.g.*, *United States v. Smith*, 157 F. App'x 215, 217 (11th Cir. 2005); *United States v. Darwin*, 757 F.2d 1193, 1203 (11th Cir. 1985); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990) ("[A] witness' direct testimony can be stricken if she invokes the fifth amendment on cross-examination to shield that testimony from scrutiny."). A court should exclude such testimony where, as here, the inability to cross examine a witness "created a substantial danger of prejudice by depriving [the defendant] of the ability to test the truth of the witness' direct testimony." *United States v. Monaco*,

702 F.2d 860, 871 (11th Cir. 1983) (quoting *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir. 1967)) (internal quotations omitted).[19]

The Court should strike from the record Blanco's testimony regarding his agreement with El Tigre to funnel money from DLTD to the AUC. Blanco's refusal to address subjects on cross examination that he answered on direct examination by plaintiffs' counsel creates a fundamental unfairness for Defendants. This testimony should be disregarded for purposes of summary judgment because Defendants had no opportunity to examine and test these serious allegations by Blanco. Allowing such testimony would violate the Defendants' due process rights.

Even if this testimony is considered and the Court accepts it as true, Blanco's description of the supposed agreement surrounding them does not support Plaintiffs' war crimes claim. Blanco says that he had "an agreement with Mr. Adkins" to "create funds for the AUC." *Id*. at 90:12 – 91:1. Nowhere does Blanco say that DLTD had any knowledge or intent that these alleged payments were to assist the AUC in intentionally killing innocent civilians.

**3.** ***Alcides Mattos Tabares ("Samario")***.   Samario joined the AUC in 1997, and was part of the Juan Andres Alvarez Front from 2000 or 2001 to 2006.

---

[19] In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Ex. I, Mattos (Samario) Dep. 10:18-11:15.  He testified that from 2000 to 2002, he was the head of security for the commander of the Front (alias "Tolemaida").  *Id.* at 11:19-12:4.  Samario testified that he was later the head of the "urbanos" (hit men) from 2003 to 2005.  *Id.* at 12:13-14; 14:14-16.

While conceding that he had no personal knowledge of any payments by DLTD to the AUC, *id.* at 143:3-9, Samario testified that DLTD had an agreement with the AUC for "security for the railroad line," which was made "so that the guerillas, the FARC guerillas would not make any attempts against their facilities." *Id.* at 60:1-6.  Under this supposed agreement, the AUC was to kill "any subversives . . . operating near the Drummond facilities." *Id.* at 60:8-10.[20]

Tellingly, Samario's testimony directly contradicts Plaintiffs' theory that the AUC killed innocent civilians who lived in the nearby communities on DLTD's orders.  Samario testified that DLTD "would call us and report to us any strange ongoings or any strange people that would be around the area." *Id.* at 64:5-13. The AUC would then kill "the people who could not justify their being there," such as by explaining that they were from the "small communities around" the railroad. *Id.*  In other words, people who lived in the area and were not actually guerillas were not killed by the AUC as part of its supposed deal with DLTD.

---

[20] Samario uses the word "subversive" to mean "guerilla."  Ex. I, Mattos (Samario) Dep. at 17:2-11 (explaining how military would "fight the subversives"); *id.* at 148:3-10 (discussing how military would fight "subversives").

**4.** ***Jose Del Carmen Gelvez Albarracin ("El Canoso")***.   Mr. Gelvez

testified that before joining the AUC, he worked at a Colombian mining company

named Prodeco from 1996 until early 1998.   Ex. W, Gelvez Dep. 74:18-75:7, Mar.

16 and Apr. 20, 2012.   Gelvez testified that sometime in 1996, Mr. Gelvez's

supervisor at Prodeco, Manuel Gutiérrez, met with two members of the AUC—

"Lucho" and "El Profe"—to discuss an agreement to have the AUC "station more

people closer to the [Prodeco] mining operations so as to expel the guerillas from

the sector."   *Id*. at 33:19-21.   Gelvez did not testify that Prodeco and the AUC

discussed an agreement to kill innocent civilians, only to fight the guerillas in the

area.

Gelvez then testified that shortly after this meeting, individuals from

Prodeco met with individuals from DLTD's security department, including

General Peña, Colonel Rodríguez and Jim Adkins.   *Id*. at 49:9-20.[21]   During this

meeting, Mr. Gutiérrez supposedly told General Peña and Mr. Adkins what

Prodeco had "discussed with El Profe."   *Id*. at 53:5-10.   According to Gelvez,

Prodeco and DLTD wanted to "discuss with their people and get these monies" for

the AUC before meeting again.   *Id*. at 53:11-15.   Gelvez did not testify that he was

present for any meeting where the AUC and DLTD reached an agreement to kill

---

[21] In fact, Colonel Rodríguez did not start working at DLTD until November 1999.   Ex. X,
Managers in Drummond Ltd. Security Department, 1996-2006.   Gelvez was unable to explain on
cross-examination why he testified that Colonel Rodríguez could have attended a meeting on
behalf of DLTD when Col. Rodríguez did not even work at DLTD until years later.   Ex. W,
Gelvez Dep. 129:10-130:5.

innocent civilians, nor did he claim personal knowledge of any payments by DLTD to the AUC.[22]

None of Plaintiffs' witnesses offer admissible evidence that DLTD made payments to the AUC with the intent or knowledge that they would assist the AUC in killing innocent civilians.  Plaintiffs' war crimes claims based on a theory of aiding and abetting should be dismissed.

### C. The Evidence Does Not Satisfy the Requirements of Conspiracy to Commit War Crimes

Plaintiffs also proceed on a conspiracy theory of secondary liability.  This Court has already defined the elements of conspiracy.  Proof of conspiracy requires a showing that:  "(1) two or more persons agreed to commit a wrongful act; (2) defendants jointed the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."  Mem. Op. (Apr. 30, 2010) at 29.  Proof of intent under conspiracy "requires the same proof of *mens rea* as aiding and abetting claims—a showing of intent, not merely knowledge."  *Id*. at 30 (citing *Presbyterian Church*, 582 F.3d at 260).

---

[22] Mr. Gelvez offered inadmissible hearsay that DLTD agreed to this supposed plan to fight the guerilla, testifying that "Manuel Gutiérrez told me that the monies had been approved so that both Drummond Company and Prodeco would provide financing and support as far as the income of the AUC was concerned for their presence in the area outside the Calenturitas [Prodeco] mine."  *Id*. at 60:1-5.  Even if this testimony were admissible, Gelvez did not testify that this agreement was to assist the AUC in killing innocent civilians.

To survive summary judgment on their conspiracy claims, then, Plaintiffs must show that there is a genuine dispute of material fact as to whether (1) DLTD formed an agreement with the AUC to commit a war crime (that is, to kill innocent civilians along DLTD's rail line); (2) DLTD made this agreement with the intent to help the AUC kill innocent civilians; and (3) DLTD made the agreement with the knowledge that one of the conspiracy's goals was to kill innocent civilians.

As shown above, there is no evidence of the required knowledge or intent. Moreover, even taking as true that there was an agreement between the AUC and DLTD, there is no evidence that such an agreement was formed with the explicit purpose or goal of killing innocent civilians. At best, there is a genuine dispute as to whether DLTD agreed with the AUC to combat the *guerillas* who had been bombing DLTD's train. But that is not enough. Under the standard articulated by this Court, Plaintiffs must prove that DLTD formed an agreement with the AUC to kill *innocent civilians* along its rail line. Because they have not done so, Plaintiffs' war crimes claim based on a theory of conspiracy must be dismissed.

## VI.    Plaintiffs' Claims For War Crimes and Extrajudicial Killings Based on A Ratification Theory of Agency Liability Must Be Dismissed (First and Second Causes of Action)

### A.    Ratification Is Not Permitted Under International Law

Plaintiffs initially alleged that DLTD should be held liable for the AUC's conduct (for war crimes and for extrajudicial killings) under a third secondary

liability theory—agency.  Plaintiffs relied both on a general theory of agency and a specific theory of ratification.  The Court has already dismissed the general agency theory, finding that the complaint was "wholly missing" any allegations "that the AUC acted 'under the control of' Drummond."  Mem. Op. (Apr. 30, 2010) at 31. The Court allowed Plaintiffs to proceed solely on a theory of ratification.  It is Plaintiffs' burden to show that such a theory is well accepted in international law. *See In re Chiquita*, 792 F. Supp. 2d at 1352.

The Supreme Court has observed that courts should evaluate "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued."  *Sosa*, 542 U.S. at 732 n.20.  Consistent with *Sosa*, this Court has held that the "scope of liability for ATS violations should be derived from international law," and used the international law standards for aiding and abetting and conspiracy.  Mem. Op. (Apr. 30, 2010) at 20 n.21 (citing *Sosa*, 542 U.S. at 732 n.20).  The Court's conclusion on this point is in line with numerous other courts.  *See, e.g.*, *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011) ("[w]e agree that *Sosa* guides courts to international law to determine the standard for imposing accessorial liability"); *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 765 (9th Cir. 2011) (applying international law standard for aiding and abetting claims); *Presbyterian Church v. Talisman*, 582 F.3d 244, 260 (2d Cir. 2009) ("*Sosa* and our precedents send us to international law to find the standard for

accessorial liability."); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 654 (S.D. Tex. 2010) ("To find ATS jurisdiction over an alleged secondary tort, there must be a sufficient and sufficiently definite international consensus supporting . . . the form of secondary liability for th[e] tort.").

The parties both relied on domestic law at the motions to dismiss stage. Defendants' Mot. Dismiss at 32-33 (Dkt. 37); Plaintiffs' Opp. Mot. Dismiss at 25-33 (Dkt. 38).   As a result, the Court did not address the threshold question of whether domestic or international law governed these theories of liability and looked to domestic law.[23]   However, an ATS case in this Circuit (decided after the Court's opinion resolving the motion to dismiss) shows that any agency theory, including ratification, should be rejected because there is no customary international law supporting it.   In *In re Chiquita*, the district court rejected the plaintiffs' agency-based ATS claims in part because "such a theory is not cognizable under international law."   792 F. Supp. 2d at 1353.   "Without any authority recognizing this theory under international law, the Court cannot conclude that agency liability is sufficiently established or recognized to satisfy *Sosa*'s requirements for recognizing ATS liability."   *Id.* at 1352; *see also Doe v. Nestle N.A.*, 748 F. Supp. 2d 1057, 1112 (C.D. Cal. 2010) (rejecting agency theory

---

[23] Defendant James Adkins raised the issue of application of international law to the theory of agency liability but the Court dismissed as to him based on a lack of personal jurisdiction, and did not reach this issue.  Dkts. 78, 141, 304, 386.

of liability under ATS because "under *Sosa*, international law rather than domestic law must provide the relevant body of agency rules" and "Plaintiffs have failed to identify any international law in cases, treaties, or any other authority that recognizes an agency relationship" between the parties in the case).

Moreover, as *In re Chiquita* explained, it is plainly inconsistent to require both knowledge and intent for aiding and abetting and conspiracy theories but then permit liability under a ratification theory because ratification requires neither an *actus reus* by the defendant (failure to act is sufficient) or proof of intent (knowledge is sufficient). *Id*. at 1353. Such a low standard for liability is contrary to *Sosa*'s directive to exercise "great caution" before expanding the "narrow class" of claims under the ATS. 542 U.S. at 728, 729.

### B. Even If The Court Applies Domestic Law, DLTD Did Not Ratify the AUC's Acts

Should the Court apply domestic law to this issue, rather than international law, Plaintiffs still lose. Plaintiffs' ratification theory fails under Alabama law for two separate and independent reasons. First, Plaintiffs have no evidence to satisfy ratification's threshold requirement that the AUC was DLTD's agent when the wrongful conduct occurred. Second, Plaintiffs have no evidence to satisfy the elements of ratification that DLTD had actual knowledge that the AUC killed innocent civilians near the railroad on DLTD's behalf.

### 1.      No Evidence That DLTD "Controlled" The AUC

Ratification requires a threshold showing that the person whose acts are being ratified by the principal is *already the agent* of the principal. *Exchange Security Bank v. King*, 301 So. 2d 193, 196 (Ala. Civ. App. 1974) (holding that "'ratification can arise only when . . . there is the relationship of principal and agent, either actual or adopted. Ratification. . . is a doctrine of agency, and, where there is no agency and no attempt to act as agent, there is nothing to which the doctrine can apply.'"); *Taylor v. Alabama*, 95 F. Supp. 2d 1297, 1319 (M.D. Ala. 2000) (relying on *Exchange Security Bank* to reject ratification claim where plaintiff did not allege facts establishing that wrongdoer was the agent of defendant); *see also Doe v. Nestle N.A.*, 748 F. Supp. 2d 1057, 1113 (C.D. Cal. 2010) (rejecting ratification claims in ATS case because "absent a preexisting principal-agent relationship, the concept of 'ratification' cannot operate independently to create such a principal-agent relationship" and plaintiffs had not alleged facts showing an agency relationship).

Plaintiffs cannot establish that the AUC was DLTD's agent. Agency arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and *subject to the principal's control* and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (emphasis added); *Wilson v. Direct Cable*

*Techs., Inc.*, 964 F. Supp. 1548, 1553 (M.D. Ala. 1997) (requiring principal to control the agent).

As explained in *In re Chiquita*, "the mere fact that Chiquita paid the AUC and allegedly shared the same goals as the AUC, falls short of alleging that Chiquita, an American corporation, controlled the military campaign of the AUC, a violent Colombian paramilitary group." 792 F. Supp. 2d at 1353-54.  For example, there is no evidence that DLTD "directed the AUC's military strategy or tactics, directed any of the AUC's actions in the . . . region, or exercised any other direction over the AUC's decisions or conduct." *Id*. at 1354.

There is no evidence that DLTD controlled the AUC.  In fact, El Tigre testified precisely the opposite.  First, he testified that the AUC independently operated in the Cesar Department near DLTD's mine, Ex. J, Esquivel (El Tigre) Dep. 24:7-8, not that the AUC went to this area at DLTD's request.  Second, El Tigre testified that **El Tigre** "wanted the AUC to combat the guerillas around Drummond," *id*. at 43:10-14, not that DLTD directed him to do so.  Third, with respect to the specific killings of seven CTI employees at issue in this case, El Tigre explained he had ordered their killings "on orders of Carlos Castaño," another AUC leader, *id*. at 113:16-19, not on orders of DLTD.  Castaño had told El Tigre "that officers of the CTI were working for the guerillas." *Id*. at 114:3-5; 115:16-17.  Fourth, although El Tigre conceded that he committed approximately

"a thousand, fifteen hundred" killings, nowhere did he testify that DLTD directed any of these killings or that he acted under DLTD's control at any time. *Id*. at 53:18-20.

Jaime Blanco's testimony likewise confirms that the AUC acted independently and not under any control of DLTD when it chose to begin operating in the Cesar region near DLTD. Blanco explained that he personally attended paramilitary meetings in 1994, 1995 and early 1996 (before any supposed agreement with DLTD) "where the objectives of the AUC were discussed in coming to Cesar [Department]." Ex. N, Blanco Dep. 64:9-12. The DLTD mine and part of the railroad are located in the Cesar Department. According to Blanco, the AUC was already planning to come to the area near DLTD long before DLTD supposedly made any agreement with the AUC.

Even accepting as disputed facts whether DLTD paid the AUC and shared the AUC's goals to eradicate the guerillas near its railroad, these facts do not establish the control required here. Without evidence of control such as that articulated in *In re Chiquita*, Plaintiffs cannot establish that the AUC was DLTD's agent. As a result, summary judgment should be granted in favor of DLTD on plaintiffs' ratification-based claims for war crimes and extra-judicial killings.

44

## 2.      No Evidence To Satisfy The Elements of Ratification

Summary judgment is appropriate here for a second, independent reason under Alabama law.  In its opinion on the motion to dismiss, the Court applied the ratification standard in *Pescia v. Auburn Ford-Lincoln Mercury, Inc.*, 68 F. Supp. 2d 1269, 1283 (M.D. Ala. 1999) (quoting Restatement (Second) of Agency § 94): A "principal ratifies the acts of his agent when the principal: (1) had actual knowledge of the wrongful conduct; (2) knew or should have known that the conduct constituted a tort; and (3) armed with that knowledge, failed to take adequate steps to remedy the situation."  Mem. Op. (Apr. 30, 2010) at 31. Plaintiffs have no evidence that DLTD had the required "actual knowledge."

The Court allowed Plaintiffs' ratification claims to go forward based on the three allegations in the complaint that DLTD made payments to the AUC "with full knowledge of the specific acts of violence and terror committed in and around Drummond's rail line," that DLTD failed to remedy the situation once it was made aware that those acts were done its behalf and that DLTD benefitted from the killing of innocent civilians.  Mem. Op. (Apr. 30, 2010) at 31-32.  However, ***none*** of Plaintiffs' allegations in the complaint on these three points has been borne out by the evidence.

Plaintiffs must point to evidence that DLTD had "actual knowledge of the wrongful conduct," *id.* at 31—that is, the killing of innocent civilians along

DLTD's railroad.  As explained above, § V *supra*, there is no evidence to create a genuine issue of material fact whether DLTD had actual knowledge that the AUC was using DLTD's supposed payments to kill innocent civilians near DLTD's rail line.  Plaintiffs' ratification claims must be dismissed.

## VII.   Punitive Damages Are Not Available In This Action

Plaintiffs seek to recover punitive damages.   Under the facts alleged by Plaintiffs, however, the required choice of law analysis for damages for Plaintiffs' ATS claims directs the application of Colombian law.   Colombian law does not allow for punitive damages.   As a result, Plaintiffs' claims for punitive damages against DLTD must be dismissed.

It is well established that the ATS is a jurisdictional statute and that "violations of international law provide the basis for that jurisdiction."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712, 724 (2004).   International law, however, "does not provide remedies."  *Institute of Cetacean Research v. Sea Sheperd Conservation Soc.*, --- F. Supp. 2d ---, 2012 WL 958545, at *18 (W.D. Wa. Mar. 19, 2012).   Instead, once it has determined that the ATS provides jurisdiction, a court must conduct a choice of law analysis to determine the applicable substantive law, including for damages.  *See Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 304 (2d Cir. 2007) (Korman, J. dissenting in part) ("[A]ssumption of subject matter jurisdiction over a cause of action under the ATCA does not preclude a

choice-of-law analysis resulting in dismissal of the case. . . . This inquiry is separate from the jurisdictional analysis."); *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 269 (S.D.N.Y. 2002) (conducting a choice of law analysis and applying the law of Zimbabwe underlying plaintiffs' ATS claims); *Mwani v. Bin Ladin*, 244 F.R.D. 20, 25 (D.D.C. 2007) (citing cases and finding a "necessity of determining the legal basis for a remedy" only "after resolution of complicated choice of law questions").[24]

A choice of law analysis typically involves two steps:  first, determining which choice of law principles govern; second, applying those choice of law principles to determine which substantive law governs.  Regarding the first step, absent a specific showing of "'significant conflict between some federal policy or interest and use of state law,'" the law of the forum state, including its choice of law, applies.  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 682 (S.D.N.Y. 2006) (quoting *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)) (applying New York conflict of law principles in an ATS case); *In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001) ("Once it is recognized that federal choice of law rules are a species of federal common law, the framework the

---

[24] *Cf. Hilao v. Estate of Marcos*, 103 F.3d 767, 780 (9th Cir. 1996) (affirming application of Philippine law regarding exemplary damages); *Doe v. Exxon Mobil*, 654 F.3d 11, 23 (D.C. Cir. 2011) (the question is "whether the common law causes of action that federal courts recognize in ATS lawsuits may extend to harm to aliens occurring in foreign countries"); *Aldana v. Fresh Del Monte Produce, Inc.*, 2007 WL 7143959, at *5 (S.D. Fla. Aug. 30, 2007) (finding no conflict between state and federal common law for determining alter ego liability, thus obviating a choice of law analysis).

Supreme Court has established for determining whether the creation of federal common law is appropriate must be utilized."). "[A] federal policy interest in providing a forum . . . is not a substitute for the identification of a conflict requiring displacement of state law," just as "[a] generalized allegation of conflict is insufficient to justify the displacement of state law." *Presbyterian Church*, 453 F. Supp. 2d at 682-83.[25]

Given this mandate, Alabama choice of law principles must be applied to determine the substantive law governing Plaintiffs' ATS claims. As the Eleventh Circuit observed in *Baloco*, Alabama "adheres to the doctrine of *lex loci delicti*" for choice of law in tort cases. *Baloco v. Drummond Co., Inc.*, 640 F.3d 1338, 1349 n.12 (11th Cir. 2011).[26] There is no evidence in this action suggesting that the *locus delicti* (that is, the place where the tort occurred) is anywhere other than

---

[25] As the court in *Presbyterian Church* explained, the Supreme Court's curtailment of application of federal common law is a relatively recent development that affects interpretation of older precedent. *Id.* at 682. In that case, the lower court followed Second Circuit precedent of *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), to the extent it mandated a choice of law analysis. Given the Supreme Court's post-*Filartiga* admonition to avoid application of and reliance on federal common law, however, the court in *Presbyterian Church* did not follow the lower court in *Filartiga*'s decision on remand that was enabled by the "common law of the United States." *Filartiga v. Pena-Irala*, 577 F. Supp. 860, 865 (D.N.Y. 1984). *Compare Presbyterian Church*, 453 F. Supp. 2d at 683 (applying New York choice of law analysis in crafting its remedy) *with Filartiga*, 577 F. Supp. at 865 (applying Paraguayan law for compensatory damages and an "international prohibition" for punitives without conducting a choice of law analysis).

[26] The panel considered Alabama choice of law principles in its TVPA analysis and ultimately applied Colombian law to determine who constitutes a claimant in an action for wrongful death for purposes of the TVPA. *Id.*

Colombia.  Accordingly, under Alabama choice of law principles, the substantive law of Colombia applies to Plaintiffs' ATS claims.

In this case, this first step is a distinction without a difference, because both Alabama choice of law principles and federal common law choice of law principles mandate the application of Colombian law.  Federal common law follows the approach in the Restatement (Second) of Conflicts of Laws, *see, e.g.*, *Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997), and its "significant relationship" test.  For torts, that Restatement (Second) approach looks to "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered" in evaluating the "significant relationship" factors set out in section 6.[27]  Restatement (2d) Conflicts of Laws § 145(2).  Aside from the fact that DLTD is a partnership formed in the United States, all such contacts were in Colombia, and all of the "significant relationship" factors counsel in favor of application of Colombian law.

Under Colombian law, punitive damages are not available.  As a

---

[27] Specifically, in the absence of a state statutory directive, relevant "significant relationship" Restatement factors include "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

fundamental matter, the level of culpability is not and cannot be a factor in assessing damages.  *See* Ex. Y, Affidavit by Alejandro Linares-Cantillo ¶ 14 ("'Reparation . . . must only regard the magnitude of the damage itself; every damage caused must be repaired and only the damage caused, regardless of the level of culpability of the author or the existence of aggravating or attenuating circumstances . . . .'" (quoting *Belén González v. Colombia*, No. 66001-23-31-000-1996-3160-01(13232-15646) (Consejo de Estado, Sala de lo Contencioso Administrativo, Sección 3a, Bogotá Sept. 6, 2011)).  Moreover, Colombian law does not provide for the payment of punitive damages.  *See id.* ¶ 20.  Accordingly, Plaintiffs' claims for punitive damages against DLTD must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Third Amended Complaint should be dismissed.

Dated: September 17, 2012

| | |
|---|---|
| _/s/ William H. Jeffress, Jr.____ | _/s/ William A Davis, III_____ |
| William H. Jeffress, Jr. | William A. Davis, III (ASB-5657-D65W) |
| David A. Super | H. Thomas Wells, III (ASB-4318-H62W) |
| Sara E. Kropf | Benjamin T. Presley (ASB-0136-I71P) |
| Rachel Cochran | Starnes Davis Florie LLP |
| Bryan H. Parr | P.O. Box 59812 |
| Baker Botts L.L.P. | Birmingham, AL 35259 |
| 1299 Pennsylvania Avenue, NW | (205) 868-6000 |
| Washington, DC 20004-2400 | fax: (205) 868-6099 |
| (202) 639-7700 | |
| fax: (202) 639-7890 | |

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on **September 17, 2012**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Terrence P. Collingsworth, Esq.
Christian A. Levesque, Esq.
Rachel A. Sheridan, Esq.
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005

William R. Scherer, Esq.
Conrad & Scherer, LLP
633 South Federal Highway
Ft. Lauderdale, FL   33301

Eric J. Hager, Esq.
Conrad & Scherer, LLP
Avenida República de El Salvador 500 e Irlanda
Edificio Siglo XXI, PH Oficina W
Quito, Ecuador

/s/ William A. Davis, III
William A. Davis, III (ASB-5657-D65W)