FILED
2013 Jul-25  PM 12:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **CLAUDIA BALCERO GIRALDO, et al.,** | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:09-CV-1041-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

The central question presented to the court here is whether the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co. et. al.*, 133 S. Ct. 1659, 2013 WL 1628935 (April 17, 2013) is an earthquake that has shaken the very foundation of Plaintiffs' claims against Defendants, or merely a tremor that has caused the parties and the court to pause but not dispatch those claims.  On April 17, 2013, the Supreme Court issued its opinion in *Kiobel* which dealt with the extraterritorial reach of the Alien Tort Statute.  Because extraterritoriality is at the heart of the claims made against the Defendants in this case, the parties were ordered to brief the effect *Kiobel* might have here.  (*See* Doc. #447).  Those briefs have been submitted (*see* Docs. #447, 448, 449, 450, 452, 453, 454), and the issue is now ripe for decision.

The court fully understands there is much at stake in this four year old case.  Both time and resources have been heavily invested by the litigants, their counsel, and the court.  In the court's view, that is the major factor that continues to motivate the continued salvos in this legal battle, even after *Kiobel*.  That is, although Plaintiffs contend *Kiobel* is but a tremor, their arguments do not hold

up under careful review.  Plaintiffs' claims cannot withstand the seismic shift that *Kiobel* has caused on the legal landscape pertinent here.  For all the reasons stated below, the court concludes that Defendants' motions for summary judgment are due to be granted.

## I.      Introduction

The first step in analyzing *Kiobel* is to review the background of that case.  The Petitioners in *Kiobel* are a group of Nigerian nationals residing in the United States.  They filed suit in federal court against certain Dutch, British, and Nigerian corporations under the Alien Tort Statute, 28 U.S.C.  § 1350, alleging that those corporations aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria.  The question presented, as stated by the Supreme Court, was "whether and under what circumstances courts may recognize a cause of action under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States."  *Kiobel*, 133 S.Ct. at 1660, 2013 WL 1628935 at **1.

This is precisely the threshold question that must be addressed before the *Balcero* case (09cv1041) can proceed on the merits of the issues presented by pending motions for summary judgment.  The *Balcero* Plaintiffs allege, *inter alia*, that the Defendants (citizens and entities from the United States) committed acts in the United States in furtherance of human rights abuses in Colombia.  (*See* Doc. #449 at 4).  They further allege that, despite the decision in *Kiobel*, the extraterritorial reach of the Alien Tort Statute extends to their claims because those claims "touch and concern the United States . . . with sufficient force" such to survive any presumption against extraterritoriality.  (*See* Doc. #449 at 4-25).

The opinion of the *Kiobel* court is clear that the principles underlying the presumption against extraterritoriality constrain courts from exercising their power under the ATS.  *See Kiobel*, 133 S.

2

Ct. at 1665. That presumption is not rebutted by the ATS itself, which contains no clear indication of extraterritorial reach. *See id.*; *see also* Doc. #448 at 2 ("Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad."). Indeed, the Supreme Court went so far as to say that "there is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms. . . . 'No nation has ever yet pretended to be the custos morum of the whole world . . .'." *Id.* at 1668, *quoting United States v. The La Jeune Eugeine*, 26 F. Cas. 832, 847 (No. 15,551) (CC. Mass. 1822).

> And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at , *citing Morrison*, 561 U.S. – (slip op. at 17-24). Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices. If Congress were to determine otherwise, a statute more specific than the ATS would be required.

*Id*. It is now the duty of this court to determine whether or not ATS claims advanced here can survive the presumption against extraterritoriality. (*See* Doc. #449 at 2).

## II.    A Brief Review of the History of the *Balcero* Case (09cv1041)

Plaintiffs Jane Doe (1-166) and Peter Doe (1-81) commenced this action on May 27, 2009 by filing a complaint (Doc. #1) in this court for equitable relief and damages under the Alien Tort Claims Act ("ATS"),[1] Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, and Colombian wrongful death law. (*See* Compl. ¶¶ 122-144). In their original complaint, Plaintiffs alleged that they were wives and legal heirs, parents and legal heirs, and children and legal heirs of those

---

[1] Over time, courts have referred variously to 28 U.S.C. § 1350 as the Alien Tort Statute (hereinafter "ATS"), the Alien Tort Act, and the Alien Tort Claims Act. In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court referred to § 1350 as the Alien Tort Statute. *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 113, n. 2 (2d. Cir. 2008). This court will primarily use that designation.

"murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond to provide security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels."  (Compl., ¶ 15).  Plaintiffs sought "damages for the loss of their relative who was an innocent civilian murdered in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC[.]" (Compl., ¶ 15).  The allegations of the original complaint centered on the contention that Defendants Drummond Company, Inc. ("DCI") and Drummond Ltd. ("DLTD") paid and conspired with paramilitaries, specifically the AUC, to harm union leaders and provide "security" for Drummond's rail line and facilities.  (Compl., ¶ 106; *see also* Doc. #20 at 1).

The original complaint additionally asserted that each of the killings at issue was an "extrajudicial killing" in "violation of the law of nations" under the ATS and in violation of the TVPA.  Plaintiffs contend that Defendants were liable for those killings because the paramilitaries carried them out as Defendants' "agents," and because Defendants provided the paramilitaries with "knowing and substantial assistance," and conspired with, aided and abetted, and engaged in "joint action" with the paramilitaries in carrying out the murders.  (Compl., ¶¶ 106-120).

Defendants DCI and DLTD filed a motion to dismiss the original complaint on July 20, 2009.  (Doc. #13).  Upon careful consideration of the briefing on the motion to dismiss, the court concluded that the motion (Doc. #13) had clear merit.  However, Plaintiffs were afforded an opportunity to amend their complaint pursuant to Federal Rule of Civil Procedure 15(a).  (*See* Doc. #30 at 1).  The First Amended Complaint was filed on December 4, 2009, asserting claims for war crimes, extrajudicial killings, and crimes against humanity under the ATS, as well as claims for extrajudicial

killings under the TVPA. (*See* Docs. #32-35). Defendants filed a motion to dismiss (Doc. #37) the Amended Complaint on January 8, 2010, and briefing of that motion was completed on March 5, 2010. (*See* Docs. #38-42). The motion (Doc. #37) was granted in part and denied in part on April 30, 2010 – Plaintiffs' Third Cause of Action for Crimes Against Humanity stated under the Alien Tort Claims Act, 28 U.S.C. § 1350 was dismissed, and the First, Second, and Fourth Causes of Action remained. (*See generally* Docs. #43, 44).

A Second Amended Complaint (Doc. #55) was filed on June 14, 2010, and the identities of the Plaintiffs were revealed on June 17, 2010 (Doc. #56). On June 28, 2010 Defendants DCI and DLTD filed a motion for partial dismissal (Doc. #62). In that motion, Defendants sought dismissal of all Plaintiffs who were not suing as legal representatives of the decedents. (*See* Doc. #62 at 1-2). The court entered a Memorandum Opinion (Doc. #112) and Order (Doc. #113) on January 6, 2011 dismissing the 357 Plaintiffs named in the Second Amended Complaint who explicitly stated that they were not acting as legal representatives of the decedents' estates and directing Plaintiffs to file a Third Amended Complaint. But on February 3, 2011, the Eleventh Circuit entered an opinion in *Baloco et al. v. Drummond Company, Inc. et al.* which held that individuals have standing under the ATS and TVPA to bring wrongful death claims both: (1) on behalf of their deceased relatives and (2) for individual money damages. 631 F.3d 1350 (11th Cir. 2011). After hearing oral argument on a Motion to Reconsider (Doc. #129), the court held in abeyance the question of whether to reconsider the dismissal of the 357 Plaintiffs, and invited Plaintiffs to "renew this motion if mandate issues on the Eleventh Circuit's decision in *Baloco* . . ." (Doc. #140). On September 2, 2011, Plaintiffs filed a Motion for Leave to File Third Amended Complaint (Doc. #213) to "make the [Third Amended Complaint] consistent with *Baloco v. Drummond Co.*, 640 F.3d 1338 (11th Cir. May 20, 2011)."

5

That motion was opposed by Defendants but nevertheless granted by the court.  (*See* Doc. #232).

The Third Amended Complaint (Doc. #233), the operative complaint in this action, was filed on

September 29, 2011.[2]

In one of the motions currently before the court, Defendant DLTD seeks the entry of

summary judgment in its favor for each of the claims brought against it in the Third Amended

Complaint:

- As to the First Cause of Action for war crimes under the ATS, DLTD argues:[3] (1) war crimes require the intentional killing of innocent civilians; (2) there is no evidence that DLTD aided and abetted war crimes; (3) the evidence does not satisfy the requirements of conspiracy to commit war crimes; and (4) claims for war crimes based on a ratification theory of liability must be dismissed.  (Doc. #396 at 22-45).

- As to the Second Cause of Action for extrajudicial killings under the ATS, DLTD argues: (1) state action is required for extrajudicial killings under the ATS; (2) the evidence presents no genuine dispute of material fact as to the question of state action; (3) Plaintiffs have no evidence to support their secondary theories of liability for extrajudicial killings; and (4) claims for extrajudicial killings based on a ratification theory of liability must be dismissed.  (Doc. #396 at 13-22; 38-45).

- As to the Third Cause of Action for extrajudicial killings under the Torture Victims Protection Act ("TVPA"), DLTD argues that the claim must be dismissed as a matter of law based on *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012).  (Doc. #396 at 10).

- As to all causes of action, DLTD argues that punitive damages are not available.  (Doc. #396 at 46-50).

---

[2] The court denied without prejudice a Partial Motion to Dismiss the Third Amended Complaint (Doc. #237). (*See* Doc. #275).  The court also denied Plaintiffs' Motion to File a Fourth Amended Complaint (Doc. #340).  (*See* Doc. #378) ("Plaintiffs' failure to add Garry Drummond before now can not be remedied at this late stage.")

[3] DLTD contends that the First and Second Causes of Action must also be dismissed because the ATS does not permit claims against corporations and because the ATS can not be applied extraterritorially.  (Doc. #396 at 10-12).

Defendant DCI also seeks the entry of summary judgment in its favor for each of the claims brought against it in the Third Amended Complaint.  (*See generally* Doc. #400).  In addition to adopting and incorporating the arguments made by DLTD in its motion for summary judgment, DCI separately moves for summary judgment on the additional ground that there is no evidence that DCI is the alter ego of DLTD.  (*See* Doc. #400 at 8).

The motions for summary judgment of DLTD and DCI must now be considered in light of *Kiobel*.

**III.    Analysis**

Plaintiffs and Defendants are in sharp disagreement about *Kiobel*'s application here. Plaintiffs argue that *Kiobel*'s presumption against extraterritoriality has "no impact on this case" because that decision dealt with a "foreign cubed" case; here, they allege that "Plaintiffs' claims against U.S. Defendants involve substantial conduct in the U.S."  (Doc. #449 at 1).  Defendants counter that *Kiobel* applies to the case at hand – "the presumption against extraterritoriality applies to claims under the ATS, and . . . nothing in the statute rebuts that presumption. . . . Under *Kiobel*, the ATS can no longer be the basis for a lawsuit in which the alleged violations of the law of nations occurred in a foreign country."  (Doc. #448 at 2-3) (internal citations omitted).

**A.    Whether the Presumption Against Extraterritoriality is Displaced for the *Balcero* Plaintiffs**

From this court's perspective, *Kiobel* requires a district court to engage in an analysis borrowing aspects from *both* Plaintiffs' and Defendants' reading of the case.  The door to ATS lawsuits, which the *Sosa* court left "ajar, subject to vigilant doorkeeping" has now been closed. Nevertheless, that door may be re-opened "where the claims touch and concern the territory of the

United States … with sufficient force to displace the presumption" against extraterritoriality.  Is mere corporate presence in Colombia and the United States enough?  The Supreme Court has answered that question—clearly not.  What then is "enough" such that the conduct in Colombia touches and concerns the United States with sufficient force?  *Kiobel* has not given courts a road map for answering this question.

1.      **Plaintiffs' Arguments in Favor of Overcoming the Presumption**

Plaintiffs encourage this court to look at specific actions that occurred in the United States and from those acts, to make a finding that the presumption of extraterritoriality is displaced.  They argue that this case differs from *Kiobel*, which they characterize as a "foreign cubed" case, because it involves United States Defendants who committed acts in the United States in furtherance of human rights abuses in Colombia.  (*See* Doc. #449 at 4).  Specifically, Plaintiffs cite to the following factors as grounds that the *Balcero* ATS claims are not foreclosed by the decision in *Kiobel*: (1) the corporation being sued in *Balcero* is a United States defendant, not a foreign defendant, and therefore there is little chance of "diplomatic strife;" the United States has the power to apply international law under the ATS to its own citizens (Doc. #449 at 9-11); (2) the presumption against extraterritoriality is displaced when illegal schemes are directed or furthered in the United States as set forth in *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (requiring courts to analyze "how much, and what kinds of, domestic contacts are sufficient to trigger the application of the exception"); and (3) Defendants' conduct in the United States was "central to implementing the

8

illegal scheme to fund the AUC's commission of war crimes and extrajudicial killings." (Doc. #449

at 16). As to the conduct touching and concerning the United States, Plaintiffs argue the following:[4]

---

[4] In their brief concerning *Kiobel*, Plaintiffs note that they "have presented their evidence of Drummond's U.S. conduct, decisions, and agreements made in the U.S. in their opposition to Defendants' motions for summary judgment . . . [and] highlight particularly relevant evidence here for the purpose of assisting the court in determining the effect of *Kiobel* on the present case." (Doc. #449 at 16, n. 9). The "meat" of the facts as set forth in the summary judgment briefing was more specific, including:

- Jose Gelvez Albarracin ("Gelvez" or "El Canoso") testified that sometime in 1996, Manuel Gutierrez (the supervisor at the Drummond Prodeco mine) met with two members of the AUC, "Lucho" and "El Profe," for the purpose of discussing an agreement to have the AUC "station more people closer to the [Prodeco] mining operations so as to expel the guerillas from the sector." (Doc. #396, Exh. W at 33).

   Gelvez was present for this meeting. (*Id.* at 31-33). Gelvez then testified that shortly after this meeting, individuals from Prodeco met with individuals from DLTD's security department (General Pena, Colonel Rodriguez, and Jim Adkins) to "discuss with their people and get these monies" for the AUC. (*Id.* at 53). Gelvez was present for this meeting. (*Id.* at 54).

- John Jaime Esquivel Cuadrado ("El Tigre") testified that "Drummond Company was very concerned because in many occasions the guerilla had put down the railway line." (Doc. #396, Exh. J at 29). "Drummond was very concerned because they were having losses around the railroad lines. And also was agreed that in case that Drummond did not want to cooperate with the AUC, that if the guerilla would blow up again the train and the railroad lines then Drummond would then cooperate with the AUC." (*Id.* at 32-33). "Clean up means, yes, it means killing all of the guerillas or guerilla men that are armed in the area and the civilians as well." (*Id.* at 34). "We put down people, whether they were militants or whether there was civilians of the guerillas." (*Id.* at 53). "I had strict orders not to allow for the guerillas to have any presence whatsoever in the lower areas [of Cesar Department]." (*Id.* at 51).

- Alcides Mattos Tabares ("Samario") testified that he joined the AUC in 1996 and acted at some point thereafter on the Juan Andres Alvarez Front until the AUC was demobilized in 2006. (Doc. #396, Exh. I at 10-11). Samario was present at a May 2001 meeting in which "other matters were going to be dealt with on other types of operations such as the follow-up payment for security at Drummond and at the railroad line." (*Id.* at 53). "The meeting with the U.S. citizen and with Alfredo Araujo and Jaime Blanco did not last very long. This is what I remember. This is what, when dawn they met, and exactly what they discussed I would not know because I wasn't right there next to them. But then Tolemaida came and told us, all of us who were there, you know, for security, that there were good things in our future for the front." (*Id.* at 55). After he was told this, Samario noticed changes in the front. "The war front had 70 men including the Urbans. And when I left jail in December, on December 10, 2002 I found a front with now 250 armed men." (*Id.* at 57-58). As an operative for the AUC, Samario understood that he was operating for Drummond as far as "security for the railroad line. And, you know, let me just say it was like a sort of commitment, you know, an agreement that there was between the AUC and Drummond for – so that the guerillas, the FARC guerillas would not make any attempts against their facilities. And then, you know, our understanding was that any subversives or, you know, any such people that were operating near the Drummond facilities we were to kill them." (*Id.* at 59-60). "You know, we would just kill anyone who was said to be a guerilla around those parts." (*Id.* at 61). DLTD "would call us and report to us any strange ongoings or any strange people that would be around the area." (*Id.* at 64).

9

- Plaintiffs assert that Drummond's decision to provide material support to the AUC and commissioning others to engage in war crimes and extrajudicial killings was made by DCI's CEO, Garry Drummond, in Alabama. (*See* Doc. #449 at 16). According to Plaintiffs, Garry Drummond's authorization made the conspiracy operative and the relevant decision-making to provide material support to the AUC was made in the United States. (*See* Doc. #449 at 17).

- As part of the illegal scheme, Jim Adkins would travel frequently to Alabama to "meet directly with Garry Drummond to agree on everything that Adkins had to do." (Doc. #449 at 17). According to Plaintiffs, Adkins went to Alabama and obtained Garry Drummond's agreement in 1996 to start paying the AUC; the plan was implemented by Adkins bringing $10,000 in cash payments from Alabama to Colombia to evade the law and Drummond's accounting system; Adkins later developed schemes to hide the payments in inflated invoices to food contractor Jaime Blanco. (*See* Doc. #449 at 18).

- Drummond's Alabama-based officers, including Garry Drummond and Mike Tracy, made the decision to fund, and approved, payments to the Colombian military, with no controls on

---

- Jairo de Jesus Charris Castro ("Charris") testified regarding his operation as a security coordinator inside the Drummond mine. (Doc. #407, Exh. 2 at 15). "When [Americans] were being transported to the Descanso mine of the Drummond Company, I coordinated with the AUC, and specifically with one of their commanders called El Tigre." (*Id.* at 18). Charris testified that Drummond funneled money to the AUC through Jaime Blanco Maya. "Jaime Blanco Maya would send fictitious invoices for the amount, in the amount of 30 million pesos, where 25 million pesos were for El Tigre and the remaining 5 million were for Jaime Blanco Maya." (*Id.* at 30). Charris knew that orders were being communicated from Garry Drummond because "Jim Adkins of the special services office always assured me, confirmed that to me that it was a direct order from Garry Drummond because they were going through a crisis, a collapse, due to the guerilla attacks to the locomotive, the engines, the cars of the railroad." (*Id.* at 25).

the use of the funds thus allowing the military to use the funds for any purpose, including

making contributions to the AUC.  (*See* Doc. #449 at 19).

- Drummond controls operations in Colombia from its headquarters in Alabama and that Garry
  Drummond met regularly regarding security in Drummond's Colombian operations.  (*See*
  Doc. #449 at 20).

- Jim Adkins acted as Drummond's agent when he implemented the plan for Drummond to
  support the AUC's war effort in the area of Drummond's operations.  (*See* Doc. #449 at 22).

## 2.    The Court's Analysis of the Evidence

The problem with Plaintiffs' attempts to use these statements to oppose Defendant's Rule

56 motion is simply this: when the statements are brought into the sunshine, they can not withstand

scrutiny.[5]  Problems with admissibility begin with the deposition of Jaime Blanco Maya ("Blanco").

---

[5] As previously explained, the facts to which Plaintiffs cite in their Brief Concerning the Impact of *Kiobel v. Royal Dutch Petroleum Co.* on this Case (Doc. #449) and Response to Defendants' Supplemental Briefing Regarding *Kiobel v. Royal Dutch Petroleum Co.* (Doc. #452) are taken from evidence submitted to the court in the course of summary judgment briefing.  Because this case is at the summary judgment stage, the court will consider the admissibility of evidence under the guidance of Federal Rule of Civil Procedure 56 as suggested by the Plaintiffs in their briefing relevant to the *Kiobel* decision.  (*See* Doc. #449 at 16, n. 9).

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(a) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman,* 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.  The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a

Blanco was deposed by the parties in Colombia and testified that he operated as the intermediary (along with Charris) between El Tigre and Jim Adkins of DLTD.  (Doc. #396, Exh. N at 32-33).  "[Adkins] had come at El Tigre's request to Mr. Garry Drummond, that Mr. Drummond had liked the idea, but that we had to see – find a way to fly in the resources for the AUC because the law did not allow them to get money out for outlaw groups, because they had some very strict accounting systems that did not allow them to take the money out."  (*Id*. at 72).  Blanco further testified that Adkins and Blanco developed a scheme to use inflated invoices from Blanco, and he provided the overage to El Tigre.  (*Id*. at 73-75, 80-92).  But Blanco refused to answer important follow-up questions on cross examination, stating instead: "What I said was already made clear in my statement.  What I don't – see, what I said is already there.  It's clear it was made in that statement and if I already made it in that statement I don't see it needs to be repeated."  (Doc. #396, Exh. N at 207-08).

---

genuine issue of material fact (*i.e.*, facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

　　If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

The right to cross examination is a basic due process protection that is guaranteed by the Fourteenth Amendment. *See In re Oliver*, 333 U.S. 257, 273 (1949); *see also Al Najjar v. Reno*, 97 F. Supp.2d 1329, 1355 (S.D. Fla. 2000). Courts have excluded such testimony where, as here, the inability to cross examine a witness "created substantial danger of prejudice by depriving [the defendant] of the ability to test the truth of the witness' direct testimony." *United States v. Monaco*, 702 F.2d 860, 871 (11th Cir. 1983) (internal citations omitted). Deprivation of cross examination is particularly relevant in this case as Blanco is incarcerated in Colombia and will not be available at trial. *See Murder Conviction in Drummond union leader slaying in Colombia; investigation ordered of Drummond's U.S. - based president*, THE BIRMINGHAM NEWS (Feb. 6, 1013) at http://blog.al.com/wire/2013/02/murder_ conviction_in_drummond.html (Last accessed March 5, 2013) (stating that Blanco has been convicted in Colombia of murder and sentenced to nearly 38 years in prison). Therefore, the testimony of Blanco can not be considered on this issue for purposes of the motion for summary judgment and/or the effect of *Kiobel* on the *Balcero* case. (*See generally* Doc. #407 at 29-30) (failing to argue that the testimony of Blanco should be admissible on summary judgment)).

Admissibility problems continue for Plaintiffs with respect to the declaration of Jose Gelvez Albarracin ("Gelvez" or "El Canoso"). In his declaration, Gelvez testified:  "[W]e discussed and we all agreed that we would support the AUC with money for arms and supplies. We also agreed that we would give the AUC a monthly payment to cover the salaries, food, and costs of the AUC troops. We also agreed to buy the AUC some vehicles and supply them with fuel. There was no objection to any of these agreements from anyone present." (Doc. #407, Exh. 42, ¶ 16). DLTD argues that the declaration testimony of Gelvez is inadmissible and cites *Macuba v. Deboer*, 193

13

F.3d 1316, 1323-24 (11th Cir. 1999) in support of that position.  (*See* Doc. #407 at 13). *Macuba* stands for the proposition that the admissibility of an out-of-court statement is predicated on whether it can be reduced to admissible evidence at trial.  *Id.*  Here, pursuant to the letters rogatory process, Gelvez gave trial testimony. Because the contested statement was not made during the deposition, and because it is presented for the truth of the matter asserted, it will not be considered for purposes of summary judgment.  In fact, the entirety of Gelvez's declaration will not be considered herein for the truth of the matter asserted.  *See Macuba*, 193 F.3d at 1323-24.

Portions of the Gelvez and Charris testimony are similarly inadmissible, at least in part on hearsay grounds.  When asked about purported payments made by Drummond to support the AUC, Gelvez testified:  "I know because Manuel Gutierrez told me that the monies had been approved so that both Drummond Company and Prodeco would provide financing and support as far as the income of the AUC was concerned for their presence in the area outside the Calenturitas mine." (Doc. #396, Exh. W at 60).  Charris testified that Adkins told him that money was being funneled to the AUC.  (Doc. #407, Exh. 2 at 25).  These statements, presented for the truth of the matter asserted, cannot be reduced to admissible form for trial purposes in this case.  *See Macuba*, 193 F.3d at 1323-24.  Therefore, they will not be considered herein.

Additional admissibility questions have arisen with testimony from Jose Peinado and Oscar David Perez Bertel ("Yucca"), who have not testified and who have presented only declarations. (*See* Doc. #424 at 15).  Because there is no indication (and, indeed Plaintiffs have not argued) that Peinado and Yucca will be available to testify at trial, their declarations are not admissible on summary judgment.  (*See* Doc. #407 at 31).

14

Plaintiffs also cite to testimony concerning the murder of Drummond's union leaders.  (*See* Doc. #407 at 31-32).  This court has heretofore held that evidence concerning the union leader murders is not relevant to this case.  (*See* Doc. #30 at 11, n. 8 ("The murders at issue here are not alleged to involve union leaders or members.")).  Such evidence continues to be irrelevant for purposes of this motion as well.

Finally, and ironically, although Plaintiffs rely upon inadmissible evidence (*i.e.*, evidence that cannot be reduced to admissible evidence at trial), the Rule 56 record evidence that remains substantially undercuts their own arguments.  In a memo dated September 13, 1995, Jim Adkins reports to Mike Tracy on "recent insurgent activity" and says that "Cordoba Battalion Commander visited my office last week and made a presentation of the plan for the purpose of obtaining Drummond financial support . . . [S]uch a program will bring with it egregious human rights violations that preclude Drummond from ever participating . . . We are better advised to keep our heads down and keep producing coal.  It is not our fight but we are almost certain to be affected in some way by it."  (Doc. #407, Exh. 4 at DR 000334).  Later, in 1997, Adkins wrote a memo noting that "[a]s the new military commanders at all levels were being named, rumors began to make the rounds that they were not satisfied with the amount of support they were receiving from Drummond Limited."  (Doc. #407, Exh. 13 at DR 005010-5011).  The memo references large amounts of cash that DLTD had been giving to the Colombian military – "when the money went into the military fund the . . . military could do with it what it wanted."  (*Id.*; *see also* Doc. #396, Exh. K at 211-212).  Plaintiffs have presented evidence that DLTD was aware of reports issued by the Human Rights Watch and by the United States government concerning the AUC and guerillas in Colombia; the

15

State Department noted the AUC's record of brutality, including murders of civilians, from as early as 1996.  (Doc. #407, Exhs. 31, 34, 35, 36).

So the admissible Rule 56 evidence, boiled down to its essence, is this:  in 1996, there were discussions in Columbia about stationing AUC forces closer to the Prodeco mine; AUC operatives were instructed by local Colombian Drummond employees not to allow guerillas in the Cesar Province where Drummond operated; after a meeting among the AUC and Drummond officials in Columbia, the AUC presence along Drummond's rail line increased; AUC operatives understood that "cleaning up" meant killing guerillas and civilians; and Drummond corporate officers were aware that human rights violations would follow the AUC.  There is *nothing* left in this final analysis to support Plaintiffs' contention that DLTD made decisions in the United States to conspire with and aid and abet the commission of war crimes in Colombia, no matter how one interprets the "touch and concern" test mentioned in *Kiobel*.  For this reason, the motions for summary judgment of Drummond Ltd. and Drummond Company, Inc. (Docs. #396, 400), as they relate to claims made under the ATS, are due to be granted.

### 3.     The Court's Take on the Meaning of "Touch and Concern"

Even if this court were to find that Plaintiffs had presented sufficient Rule 56 evidence establishing that certain decisions had been made in the United States to support the AUC in Colombia, their theory on extraterritorial reach still does not hold water based on the most logical and unstrained reading of *Kiobel*.  In its final analysis, the *Kiobel* Court cited to *Morrison v. National Australia Bank Ltd*., 130 S.Ct. 2869 (2010), when addressing the operation of "touch and concern" in displacing the presumption against extraterritoriality.  As *Morrison* succinctly stated, "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to

16

its kennel whenever *some* domestic activity is involved . . . ." 130 S. Ct. at 2883-84. The Court held

that the analysis depended "not upon the place where the deception originated," but upon the focus

of the statute at issue (which in *Morrison* was the purchase and sale of securities). That is, where

a complaint alleges activity in both foreign and domestic spheres, an extraterritorial application of

a statute arises *only* if the event on which the statute *focuses* did not occur abroad. (*See* Doc. #448

at 4). Of course, the ATS *focuses* on the torts of extrajudicial killings and war crimes (violations of

the law of nations), and in the *Balcero* case, the tort at issue occurred abroad, in Colombia, and *not*

in the United States.[6] *See* 28 U.S.C. § 1350.

      For this separate and additional reason, the motions for summary judgment of Drummond

Ltd. and Drummond Company, Inc. (Docs. #396, 400), as they relate to claims made under the ATS,

are due to be granted.[7]

---

[6] Plaintiffs argue that because Defendants can be secondarily liable under the ATS, the crux of Drummond's secondary liability lies in the United States. In making this argument, Plaintiffs attempt to shift both the focus and the nature of the tort from what has been plainly alleged since the original complaint was filed in 2009. (*See* Doc. #449 at 15-22). Not only do Plaintiffs lack any admissible evidence connecting dots to the United States, but the torts alleged here *are for violations of the ATS*. Plaintiffs can no more contend that approval in the United States of conduct committed abroad provides a basis for jurisdiction than could the plaintiffs in *Morrison* contend that fraudulent acts in the United States establish jurisdiction when the focus of the claim – purchases and sales of securities – occurred entirely abroad. In fact, *Morrison* went so far as to state that the analysis depended "not upon the place where the deception originated" and rejected the Solicitor General's proposal to displace the presumption where an alleged violation "involves significant conduct in the United States that is material to the fraud's success." *Morrison*, 130 S. Ct. at 2884.

[7] On March 7, 2013, Plaintiffs filed a Motion to Compel Deposition Responses from Garry N. Drummond and Production of Documents Related to Drummond's April 2011 Press Release (Doc. #439). Mr. Drummond reportedly failed to answer questions involving: the sale of a portion of DLTD to a Japanese company, which relates to DLTD's alleged dependence on DCI and the financial worth of DCI and DLTD; Drummond's policy related to the AUC; and drafts of an April 2011 press release. (*See generally* Doc. #439). Because both DLTD and DCI are entitled to summary judgment on the grounds explained herein (which are separate and independent from those matters involved in the parties' discovery dispute), the questions raised during Mr. Drummond's deposition are no longer relevant to the case. Therefore, the Motion to Compel (Doc. #439) is **DENIED**.

**B.      Extrajudicial Killings under the TVPA (Count III) Against DLTD and DCI**

The Third Cause of Action set out in the Third Amended Complaint (Doc. #233) is stated under the Torture Victims Protection Act, 28 U.S.C. § 1350 for extrajudicial killings.  (*See* Doc. #233 at 200, "Third Cause of Action").  In asserting this claim, Plaintiffs allege that the AUC's extrajudicial killings of Plaintiffs' decedents were committed under color of the authority of the Colombian government, and that DLTD and DCI aided, abetted, or conspired with the AUC or was the agent of the AUC.  (*See* Doc. #233 at 200, "Third Cause of Action").

On April 18, 2012, the Supreme Court issued an opinion in *Mohamad v. Palestinian Authority*, 132 S.Ct. 1702 (2012).  There, the Supreme Court clearly held that the TVPA "authorizes liability solely against natural persons," thus foreclosing TVPA actions against any nonnatural persons including, as relevant here, against corporations.  *Mohamad*, 132 S. Ct. at 1708.  Without question, therefore, DLTD's Motion (Doc. #396) for Summary Judgment and DCI's Motion (Doc. #400) for Summary Judgment, as they relate to the Third Cause of Action, are due to be granted.

**C.      The Appropriateness of a Stay**

On May 8, 2013, Plaintiffs filed a Statement (Doc. #450) Concerning a Stay Pending the Eleventh Circuit's Resolution of the Interlocutory Appeal in *In re Chiquita Brands Int'l, Inc.* Alien Tort Statute and Shareholder Derivative Action.  The Statement (Doc. #450) does not request a stay, but rather states that "if the court feels judicial economy is best served by staying this case, Plaintiffs do not object to a short stay."  (Doc. #450 at 4).  Defendants' Response (Doc. #454) to Plaintiffs' Statement Regarding a Stay, filed on May 22, 2013, adds that "Defendants do not request a stay and would oppose any such request by the Plaintiffs if and when it were made."  (Doc. #454 at 1).

*In re Chiquita*, Appellate Case No. 12-14898, was certified on issues concerning: (1) state action elements under the ATS and the TVPA; (2) secondary liability for war crimes; and (3) the sufficiency of Plaintiffs' crimes against humanity claims.  (*See* Doc. #450 at 2).  Although the Eleventh Circuit may be inclined (or even compelled) to address these issues in that case under the guise of *Kiobel*, this court is confident that its decision as it relates to the specific facts presented in *Balcero* is the correct one.  This, combined with the fact that neither party has formally asked for a stay, counsels against holding this ruling in abeyance.

## IV.    Conclusion

For the foregoing reasons, the motions for summary judgment (Docs. #396, 400) filed by Drummond Ltd. and Drummond Company, Inc. are due to be granted.  There are no material issues of fact and Defendants are entitled to judgment as a matter of law.  A separate order will be entered dismissing all of Plaintiffs' claims asserted against Drummond Ltd. and Drummond Company, Inc.

**DONE** and **ORDERED** this _____25th_____ day of July, 2013.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE