# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CLAUDIA BALCERO GIRALDO, et al.,** | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:09-CV-1041-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the Motion for Summary Judgment (Doc. #404) filed by Defendant Mike Tracy ("Tracy") on September 21, 2012. Pursuant to the court's Order (Doc. #395) of August 21, 2012, the Motion (Doc. #404) has been fully briefed (*see* Docs. #404, 414, 415, 416, 420, 425, 426, 427, 429) and is properly before the court for review.

## I.   Procedural History

Plaintiffs Jane Doe (1-166) and Peter Doe (1-81) commenced this action on May 27, 2009 by filing a complaint (Doc. #1) in this court for equitable relief and damages under the Alien Tort Claims Act ("ATS"),[1] Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, and Colombian wrongful death law. (*See* Compl. ¶¶ 122-144). In their original complaint, Plaintiffs alleged that they were wives and legal heirs, parents and legal heirs, and children and legal heirs of those "murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond

---

[1] Over time, courts have referred variously to 28 U.S.C. § 1350 as the Alien Tort Statute (hereinafter "ATS"), the Alien Tort Act, and the Alien Tort Claims Act. In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court referred to § 1350 as the Alien Tort Statute. *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Company*, 517 F.3d 104, 113, n. 2 (2d. Cir. 2008). This court will primarily use that designation.

to provide security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels." (Compl., ¶ 15). Plaintiffs sought "damages for the loss of their relative who was an innocent civilian murdered in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC[.]" (Compl., ¶ 15). The original Complaint did not include Mike Tracy as a defendant. (*See generally* Doc. #1).

On December 4, 2009 a First Amended Complaint was filed. (*See* Doc. #35). The First Amended Complaint did not name Mike Tracy as a defendant. (*See generally* Doc. #35). After ruling on motions to dismiss, a Second Amended Complaint (Doc. #55) was filed on June 14, 2010. The Second Amended Complaint did not name Mike Tracy as a defendant. (*See generally* Doc. #55). On September 2, 2011, Plaintiffs filed a Motion for Leave to File Third Amended Complaint (Doc. #213) to "make the [Third Amended Complaint] consistent with *Baloco v. Drummond Co.*, 640 F.3d 1338 (11th Cir. May 20, 2011)." That motion was opposed by Defendants (*see* Docs. #222, 227) but nevertheless granted by the court (*see* Doc. #232). The Third Amended Complaint (Doc. #233), the operative complaint in this action which *does* name Mike Tracy as a defendant, was filed on September 29, 2011.[2]

In the motion currently before the court, Defendant Mike Tracy seeks the entry of summary judgment in his favor as to each of the claims brought against him in the Third Amended Complaint. Mike Tracy adopts and incorporates the arguments of DLTD and DCI that the First and Second Causes of Action must be dismissed because the ATS can not be applied extraterritorially. (*See* Doc.

---

[2] The court denied without prejudice a Partial Motion to Dismiss the Third Amended Complaint (Doc. #237). (*See* Doc. #275). The court also denied Plaintiffs' Motion to File a Fourth Amended Complaint (Doc. #340). (*See* Doc. #378) ("Plaintiffs' failure to add Garry Drummond before now can not be remedied at this late stage.")

#396 at 10-13; *see also* Doc. #404 at 1, n. 1).   In addition, for each claim brought against him, Tracy

argues: (1) there is no evidence that Tracy can be held liable under a theory of aiding and abetting;

(2) there is no evidence that Tracy can be liable under a conspiracy theory; and (3) there is no

evidence that Tracy can be liable under an agency theory.  (*See* Doc. #404 at i, 1, n. 1).[3]

---

[3] As Plaintiffs correctly point out, Tracy makes no argument in his motion for summary judgment related to a theory of superior responsibility, also referred to as command responsibility. (*See* Doc. #414 at 1, 14; *see also* Doc. #429 at 6-14).  But only one paragraph of the Third Amended Complaint could be read to potentially state a claim under such theory: "Tracy was in charge of all aspects of the Drummond mining operation in Colombia;" "was fully briefed by Defendant Adkins of the agreements made with the AUC;" and "approved of Drummond's direct collaboration with the AUC terrorists."  (Third Amended Complaint, ¶ 166).  Although the question of command responsibility was briefed by a different defendant (and not ruled on by the court), and those arguments were adopted and incorporated into a filing by Tracy, that alone does not speak to the question of whether the theory was in fact alleged in the Third Amended Complaint.  (*See* Doc. #414 at 1, n.1).

The theory of command responsibility was utilized most prominently during the Nuremberg and Tokyo proceedings following World War II to convict top Nazi and Japanese defendants. (*See* Doc. #414 at 14-20).  According to the doctrine, a military commander can be held legally responsible – either criminally or civilly – for unlawful acts committed by his subordinates.  The challenge in such a case is to establish the legal standard governing when an individual can be considered the legal subordinate of a defendant commander.  *See* Beth Van Schaack, "*Romagoza v. Garcia*: Proving Command Responsibility under the Alien Tort Claims Act and the Torture Victims Protection Act" at http://www.wcl.american.edu/hrbrief/10/1schaack.pdf (Last accessed March 11, 2013).

What is telling here is that there is no allegation in the Third Amended Complaint that Tracy controlled the actions of Adkins, or that any such control was similar to that exercised by military commanders.  (*See* Doc. #429 at 6, n. 2, citing *Prosecutor v. Delalic*, Case No. IT-96-21-A, Judgment (ICTY Feb. 20, 2001); *see also* Doc. #414 at 14).  The theory of command responsibility is one that is subject to much confusion and requires discovery into the precise nature of the relationship alleged.  The one paragraph in Plaintiffs' Third Amended Complaint that even brushes the issue cannot be deemed sufficient to have put Tracy on notice of the claim being alleged against him.  Moreover, a new theory of liability cannot, of course, be asserted at the summary judgment stage. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (A plaintiff "cannot amend her complaint through argument in an opposing brief. . . .").

A final note about the disputed claim –the court is skeptical that, even had command responsibility been alleged against Tracy, it could have proceeded in this case.  Only one court has applied the doctrine beyond the military context, and that case involved an individual who had authority over state-run military or police forces. *See Doe I v. Qi*, 349 F.Supp. 2d 1258, 1329-30 (N.D. Cal. 2004) (defendants were Mayor of Beijing and Deputy Provincial Governor who authorized and supervised state security forces in allegedly detaining, torturing, and killing members of Falun Gong). (*See also* Doc. #414 at 20, n. 12.).  Here, the Rule 56 record does not support such a summary judgment finding.

## II.   __Standard of Review__[4]

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(a) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman,* 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The method used by the party moving for summary judgment to discharge its initial burden depends on

---

[4] Federal Rule of Civil Procedure 56 was amended on December 1, 2010. However, even with the 2010 amendments, "the standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56 Advisory Committee's Note (2010 Amendments).

whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with

5

additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   **Relevant Facts**[5]

James Michael Tracy, a/k/a Mike Tracy, began working for Drummond Company, Inc. ("DCI") in 1975. (*See* Tracy Dep. at 17-18).[6] Starting in May 1986, Tracy traveled to Colombia to look at project development for a site in Colombia for mining operations. (*See* Tracy Dep. at 21-22). From 1990 until 1998, Tracy was President and Chief Operating Officer of Drummond Ltd. ("DLTD"), responsible for all operational functions of the Colombia project. (*See* Tracy Dep. at 25-26). Although the La Loma mine did not begin actual mining operations until 1994, Augusto Jimenez characterized Tracy as being "in charge of the mining operation" in Colombia from 1990 until 1998. (*See* Jimenez Dep. at 33).[7]

During Tracy's time as President and Chief Operating Officer of DLTD, the DLTD security department reported to Augusto Jimenez. (*See* Tracy Dep. at 54). James Adkins was hired, after being interviewed by Tracy and others, "to come in and just look over the security systems that were

---

[5] The Rule 56 record facts contained in the following three paragraphs provide background information. Because the facts must be analyzed in close connection with the allegations made, many will be presented only in the Analysis section, *infra*. Where the facts are in dispute, they are stated in the manner most favorable to Plaintiffs, the non-moving parties. *See Fitzpatrick*, 2 F.3d at 1115.

[6] The deposition testimony of James Michael Tracy is found at Document #396, Exh. C and is labeled "Confidential." A complete redacted copy of Tracy's testimony will be provided by the parties pursuant to an order that will be entered later today.

[7] The deposition testimony of Augusto Jimenez Mejia is found at Document #396, Exh. E and is labeled "Confidential." A complete redacted copy of Jimenez's testimony will be provided by the parties pursuant to an order that will be entered later today.

in place in Colombia and give comfort to our ex-pat population there associated with the project. . . . [T]he security situation in Colombia at that time, there was a lot of kidnaping, American citizens were primary targets to be held ransom, our ex-pats were nervous . . .". (Tracy Dep. at 102-03). As Adkins' supervisor, Tracy received security updates from Adkins whenever Adkins "felt like [Tracy] needed to know about" something. (Tracy Dep. at 27, 64-66, 106-07). Tracy does not recall having specific discussions with Garry Drummond regarding security issues in Colombia, other than about the murders of the union leaders. (*See* Tracy Dep. at 66-67).

In 1998, Tracy left the Colombia project and returned back to the United States to work for DCI. (*See* Tracy Dep. at 41). As the Vice President of Special Projects for DCI, Tracy was responsible for looking at different operations, improving efficiency, completing cost reviews and budget reviews, and selecting and procuring equipment. (*See* Tracy Dep. at 42). From approximately 2001 to 2004, Tracy served as Vice President and Assistant to the CEO of DCI, during which time he traveled to Colombia approximately three to five times a year to check on operations. (*See* Tracy Dep. at 62). In 2004, Tracy became President of Mining for DCI. (*See* Tracy Dep. at 70). As Tracy testified, in that capacity, "[i]nstead of being involved with Mr. Drummond on the overall corporate affairs of Drummond Company, I moved to be head of the mining group which does all the mining at all locations for Drummond." (Tracy Dep. at 70). Tracy held that position until 2007. (*See* Tracy Dep. at 73).

## IV.   <u>Analysis</u>

As explained at length in the Memorandum Opinion (Doc. #455) analyzing the Drummond companies' Motions for Summary Judgment, Plaintiffs' claims lodged against Tracy under the Alien Tort Statute fail as directed by the Supreme Court in *Kiobel v. Royal Dutch Petroleum Co. et. Al.*,

133 S. Ct. 1659 (April 17, 2013).  However, unlike DLTD and DCI, Tracy may potentially be liable to Plaintiffs under the Torture Victims Protection Act.  *See Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012).  Although there are no allegations in the Third Amended Complaint that Tracy directly or personally engaged in the alleged murders (*see generally* TAC; *see also* Doc. #414 at 27-29), Plaintiffs seek to hold Mike Tracy liable for the killings based upon three theories: (1) aiding and abetting; (2) conspiracy; and (3) ratification.[8]  Mike Tracy argues in his Motion for Summary Judgment (Doc. #404) that each of those claims for secondary liability fail.  Each of these claims is discussed in turn.

### A.    Aiding and Abetting under the Torture Victims Protection Act

International law elucidates the standard for aiding and abetting secondary liability.  (*See* Doc. #30 at 15-16; *see also* Doc. #43 at 20-21).  The elements are: (1) the principal (here, the AUC) violated international law; (2) the defendant (here, Mike Tracy) knew of the specific violation; (3) the defendant (again, Tracy) acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation.  *See Presbyterian Church of Sudan v. Talisman Energy Inc.*, 453 F. Supp.2d 633, 668 (S.D. N.Y. 2006); *see also In re Chiquita*, 792 F. Supp.2d at 1342-43.

At this stage of the proceedings, the court must consider whether there is sufficient evidence for a reasonable jury to conclude that Tracy intended to assist the AUC in the murders of noncombatants along DLTD's rail lines.  (*See* Doc. #404 at 9; *see also* Doc. #414 at 27; Doc. #43 at 21, 24).  Plaintiffs' evidence of intent (*see* Doc. #414 at 28) ("Evidence of Tracy's knowledge,

---

[8] *See* footnote 3, *supra*.

however, has been thoroughly set out.  PSUMF ¶¶ 14-16, 18-20")) and effect (*see* PSUMF ¶¶ 6, 8,

11, 13, 17, 21 for Plaintiffs' argument that Tracy was the driving force behind Drummond's

Colombian operations "in the key early years of the Drummond-AUC partnership, that he approved

(or at least ratified) that partnership, and that he maintained an active role in Colombian security

decisions throughout the liability period" (Doc. #414 at 28-29)) is rooted in the following:

- Between 1992 and 1998, Tracy worked with DLTD's security team to form and implement DLTD's security policies and regularly consulted with Garry Drummond regarding security issues in Colombia.  (Citations omitted). (*See* Doc. #414 at 6, ¶ 5).

- While acting as VP of Special Projects for DCI, between 1998 and 2001, Tracy assisted DLTD on security matters.  (Citations omitted).  (*See* Doc. #414 at 7, ¶ 8).

- Between 2001 and 2004, while acting as Vice President and Assistant to the CEO of DCI, Tracy was in charge of human resources for DCI and continued to be involved in Drummond's security policies in Colombia.  (Citations omitted).  (*See* Doc. #414 at 8, ¶ 11).

- From 2004 to 2007, as President of Mining at DCI and as a member of Drummond's USA's board, Tracy took part in meetings regarding Drummond's security policies in Colombia.  (Citations omitted).  (*See* Doc. #414 at 8, ¶ 13).

- Tracy had knowledge of the paramilitary presence near Drummond's operations and was aware of the paramilitary's violent methods.  (Citations omitted).  (*See* Doc. #414 at 8-9, ¶ 14).

- Tracy approved payments to the Colombian military after he was notified that the military was controlling and supporting paramilitary groups in the area.  (Citations omitted).  (*See* Doc. #414 at 9, ¶ 15).

- Despite receiving information from Adkins, a former CIA agent who was hired based on his intelligence experience, Tracy did nothing to investigate or report Drummond employees or contractors who were reportedly supporting the AUC or other illegal groups.  (Citations omitted).  (*See* Doc. #414 at 9-10, ¶ 16).

- Tracy had a duty to report Drummond employees or contractors who were reportedly supporting the AUC. (Citations omitted). (*See* Doc. #414 at 10-11, ¶17).[9]

- Tracy was notified (and in fact knew) that Drummond contractor Viginorte had connections to the AUC. (Citations omitted). (*See* Doc. #414 at 10-11, ¶ 18; *see also* Doc. #414 at 12, ¶ 1).

- Tracy was notified (and in fact knew) that Drummond contractor Secolda was paying paramilitaries. (Citations omitted). (*See* Doc. #414 at 11, ¶ 19; *see also* Doc. #414 at 12, ¶ 1).

- Tracy was notified (and in fact knew) that Drummond contractor Blanco collaborated with paramilitaries. (Citations omitted). (*See* Doc. #414 at 11, ¶ 20; *see also* Doc. #414 at 12, ¶ 1).

- Tracy did nothing to prevent or punish the support of the AUC by Drummond employees, Drummond contractors, or the military. (Citations omitted). (*See* Doc. #414 at 11, ¶21).

Drawing on the standard of *Presbyterian Church*, Plaintiffs must establish that Tracy acted with the intent to have noncombatants murdered along Drummond's rail lines. Plaintiffs argue that because a defendant intends "all the natural and probable consequences of [the] act knowingly done" (*see* Doc. #414 at 28, citing *U.S. v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992)),[10] Tracy intended that noncombatants be murdered because such was the natural consequence of Tracy knowing of the AUC's presence around the mine and knowing of Drummond's connection to certain paramilitaries.[11] This tenuous connection can not survive summary judgment. There is no evidence

---

[9] Plaintiffs say that Tracy had a duty to investigate reports of Drummond employees who were suspected of supporting the AUC. (*See* Doc. #414 at 10, ¶ 17). The cited pages of Tracy's deposition do not support that contention. (*See* Tracy Dep. at 86). However, it is undisputed on this record that Tracy would pass on to Garry Drummond "properly vetted" information about paramilitary support that was "not just a rumor." (*See* Tracy Dep. at 69, 169-70, 72).

[10] Of course, this is not the standard employed by the court on the intent inquiry in an aiding and abetting action. Indeed, there is no case law supporting the contention that *Myers* applies in an aiding and abetting case.

[11] At this stage of the proceedings, an inquiry into the circumstances of the deaths of each of the decedents is premature. (*See e.g.* Doc. #396 at 26, n. 14; Doc. #404 at 9; Doc. #414 at 28).

that Tracy knew that noncombatants were being murdered along the rail lines; nor is there any evidence that Tracy directed his actions to assist in such a violation. Quite to the contrary, all of the evidence is that: (1) Tracy directed his acts to prevent any violation (*see* Doc. #429 at 14) (Adkins states in a memorandum that Drummond was "forbidden by law to participate" in the Convivir program and that "such a program would bring with it egregious human rights violations that preclude Drummond from ever participating" and advising Drummond to "keep our heads down and keep producing coal.")); and (2) Tracy was advised that any potentially suspicious ties to paramilitaries were being cut (*see* Doc. #429 at 15) (noting a July 11, 2001 memorandum reporting that the guerillas suspected Jaime Blanco and Charris of having connections to the paramilitaries, Adkins advised Tracy that the information had been turned over to the proper authorities; Adkins recommended that Secolda's contract be terminated based on suspicions of connections to paramilitaries)). With the absence of any evidence of Tracy's knowledge that the AUC was allegedly being paid by Drummond, there necessarily can be no link to Tracy's purported intent to have noncombatants murdered along Drummond's rail lines.

For these reasons, Mike Tracy's motion for summary judgment, as it relates to claims brought against him for aiding and abetting violations of the TVPA, is due to be granted.

**B.    Conspiracy under the Torture Victims Protection Act**

For Tracy to be held liable under the secondary liability theory of conspiracy, Plaintiffs must present evidence that: (1) two or more persons agreed to commit a wrongful act; (2) Tracy joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy. *See Cabello*, 402 F.3d at 1159. Proof of

11

intent under a conspiracy theory "requires the same proof of *mens rea* as aiding and abetting claims – a showing of intent, not merely knowledge." (Doc. #43 at 30, citing *Presbyterian Church*, 582 F.3d at 260). Plaintiffs and Tracy acknowledge that the same standard applies for both theories of secondary liability. (*See* Doc. #404 at 7-8; *see also* Doc. #414 at 29; Doc. #429 at 14-15). Therefore, Tracy's motion for summary judgment, as it relates to the secondary liability theory of conspiracy, is due to be granted for the same reasons stated in Section IV.A., *supra*.

### C. Ratification under the Torture Victims Protection Act

Although two theories of agency secondary liability have been presented in this case, only one survived the motion to dismiss stage – ratification. (*See* Doc. #43 at 30-31)("[W]hat is wholly missing from the First Amended Complaint are any allegations that the AUC acted 'under the control of' Drummond . . . But what are present in the First Amended Complaint are allegations that Defendants ratified the conduct of the AUC in providing security to Drummond.") (internal citations omitted). In reaching that conclusion, this court (and parties) cited exclusively to *domestic law* without engaging in an analysis of whether domestic or international law governed the theory of ratification. (*See* Doc. #43 at 31-32). Citing to *Sosa* and previous opinions of this court, DLTD and Tracy point out that courts should evaluate "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued" and that the "scope of liability for ATS violations should be derived from international law." (Doc. #43 at 20, n.21 (internal citations omitted)). Plaintiffs counter that there is a dispute in the Eleventh Circuit, as well as in other circuits, as to whether domestic or international law applies to the question of the cognizability of a ratification claim. (*See* Doc. #407 at 36-38).

In 2005, the Eleventh Circuit, in considering claims for *state sponsored* torture (*i.e.*, not war crimes), looked to principles of agency law and jurisprudence under 42 U.S.C. § 1983 to determine accessorial liability.  *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247-48 (11th Cir. 2005).  Later in 2011, a court in the Southern District of Florida found that a ratification standard of liability was not cognizable under international law for purposes of an ATS claim.[12]  *See In re Chiquita*, 792 F.Supp.2d at 1353 ("[T]o permit Plaintiffs to plead an ATS claim so easily is at odds with *Sosa*'s directive that courts exercise great caution before adding to the narrow class of recognized international law norms.").  The court finds this reasoning highly persuasive.  Consistent with *Presbyterian Church*, the *Sosa* decision directs courts "to international law to find the standard for accessorial liability."  582 F.3d at 260.  There is no case law, from any jurisdiction, in which the question was considered and led to the conclusion that a ratification theory of secondary liability is cognizable under international law.  (*See* Doc. #407 at 36-38).

For these reasons, the court is convinced that international law should apply to the secondary liability theory of ratification, just as it does to aiding and abetting and conspiracy.  (*See* discussion, *supra*.  Because a ratification theory of liability is not accepted in international law, Tracy's motion for summary judgment, as it relates to Plaintiffs' ratification theory of liability, is due to be granted.

**V.**   **Conclusion**

For the foregoing reasons, Defendant Mike Tracy's Motion for Summary Judgment (Doc. #404) is due to be granted in its entirety.  A separate order will be entered dismissing Defendant Mike Tracy from this action.

---

[12] The *Chiquita* case was decided after this court entered the Memorandum Opinion noting that the First Amended Complaint contained allegations that DLTD ratified the conduct of the AUC in providing security to Drummond.  (*See* Doc. #43 at 31(entered April 30, 2010)).

**DONE** and **ORDERED** this _____25th_____ day of July, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE