# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **CLAUDIA BALCERO GIRALDO, et al.,** | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:09-CV-1041-RDP** |
| | } | |
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the Motion for Summary Judgment (Doc. #405) filed by Defendant Augusto Jimenez ("Jimenez") on September 24, 2012.  Pursuant to the court's Order (Doc. #395) of August 21, 2012, the Motion (Doc. #405) has been fully briefed (*see* Docs. #405, 417, 418, 421, 422, 430) and is properly before the court for review.

## I.    Procedural History.

Plaintiffs Jane Doe (1-166) and Peter Doe (1-81) commenced this action on May 27, 2009 by filing a complaint (Doc. #1) in this court for equitable relief and damages under the Alien Tort Claims Act ("ATS"),[1] Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, and Colombian wrongful death law.  (*See* Compl. ¶¶ 122-144).  In the original complaint, Plaintiffs alleged that they were wives and legal heirs, parents and legal heirs, and children and legal heirs of those "murdered by the AUC's Juan Andres Alvarez Front in furtherance of its agreement with Drummond to provide

---

[1] Over time, courts have referred variously to 28 U.S.C. § 1350 as the Alien Tort Statute (hereinafter "ATS"), the Alien Tort Act, and the Alien Tort Claims Act.  In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court referred to § 1350 as the Alien Tort Statute. *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 113, n. 2 (2d. Cir. 2008).  This court will primarily use that designation.

security, pacify the area, and otherwise ensure that the civilian population in and around the Drummond mine and its railroad line would not in any way provide support or cooperation to the FARC or other leftist rebels." (Compl., ¶ 15). Plaintiffs sought "damages for the loss of their relative who was an innocent civilian murdered in furtherance of Drummond's security objectives and also as a result of the civil conflict between the AUC and the FARC[.]" (Compl., ¶ 15). The allegations of the original complaint centered on the contention that Defendants, including Augusto Jimenez, paid and conspired with paramilitaries, specifically the AUC, to harm union leaders and provide "security" for Drummond's rail line and facilities. (Compl., ¶ 106; *see also* Doc. #20 at 1).

The original complaint additionally asserted that each of the killings at issue was an "extrajudicial killing" in "violation of the law of nations" under the ATS and in violation of the TVPA. Plaintiffs contend that Defendants, including Jimenez, were liable for those killings because the paramilitaries carried them out as Defendants' "agents," and because Defendants provided the paramilitaries with "knowing and substantial assistance," and conspired with, aided and abetted, and engaged in "joint action" with the paramilitaries in carrying out the murders. (Compl., ¶¶ 106-120).

After ruling on several motions to dismiss and receiving guidance from the Eleventh Circuit in *Baloco et al. v. Drummond Company, Inc. et al.*, 640 F.3d 1338 (11th Cir. 2011), the court allowed the Third Amended Complaint (Doc. #233), the operative complaint in this action, to be filed on September 29, 2011.[2]

In the motion currently before the court, Defendant Augusto Jimenez seeks the entry of summary judgment in his favor for each of the claims brought against him in the Third Amended

---

[2] The court denied without prejudice a Partial Motion to Dismiss the Third Amended Complaint (Doc. #237). (*See* Doc. #275). The court also denied Plaintiffs' Motion to File a Fourth Amended Complaint (Doc. #340). (*See* Doc. #378) ("Plaintiffs' failure to add Garry Drummond before now can not be remedied at this late stage.").

2

Complaint.  For each claim, Jimenez argues that the three (or four) theories of secondary liability cannot stand.[3]  (*See* Doc. #405 at 8-19).  The motion for summary judgment is addressed *infra* under the appropriate standard of review.

## II.   <u>Standard of Review.</u>[4]

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(a) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman,* 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *Chapman*, 229

---

[3] As Plaintiffs correctly point out, Jimenez makes no argument in his motion for summary judgment related to a theory of superior responsibility, a/k/a command responsibility.  (*See generally* Doc. #405; *see also* Doc. #417 at 2, n. 2).  For an analysis of the theory and explanation of why it is nevertheless relevant hereto, *see* Section IV.A., *infra*.

[4] Federal Rule of Civil Procedure 56 was amended on December 1, 2010.  However, even with the 2010 amendments, "the standard for granting summary judgment remains unchanged."  FED. R. CIV. P. 56 Advisory Committee's Note (2010 Amendments).

F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but

4

does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

III.    **Relevant Facts.**[5]

Augusto Jimenez is a Colombian citizen who became President of DLTD's Colombian branch in 1990. (*See* Jimenez Dep. at 23).[6] The main offices for DLTD's Colombian branch, including Jimenez's office, are located in Bogota, Colombia. (*See* Jimenez Dep. at 159-60). Alfredo Araujo, DLTD's director of community relations, "always reported directly to" Jimenez. (*See* Araujo Dep. at 99-100).[7] General Pena, the head of security at Drummond, also reported to Jimenez. (*See* Jimenez Dep. at 26).

---

[5] The following three paragraphs provide background information. Because the facts must be analyzed in close connection with the allegations made, many will be presented only in the Analysis, Section IV., *infra*. Where the facts are in dispute, they are stated in the manner most favorable to Plaintiffs, the non-moving parties. *See Fitzpatrick*, 2 F.3d at 1115.

[6] The deposition of Augusto Jimenez is available at Document #396, Exhibit E and is marked "Confidential." A complete, redacted copy of Jimenez's testimony will be provided by the parties pursuant to an order that will be entered later this day.

[7] The deposition of Alfredo Araujo is available at Document #396, Exhibit T.

Between 1996 and 2006, Jimenez supervised the development and implementation of Drummond's security plans. (*See* Tracy Dep. at 54, 201; *see also* Doc. #417 at 4-5, ¶ 1). "[I]f they show [security plans] to me I see them and they get my comments." (Jimenez Dep. at 89-90). Jimenez was also responsible for monitoring contractors and for causing an investigation to occur on an allegation of any Drummond employee assisting paramilitaries. (*See* Drummond Dep. at 85, 191).[8]

On November 6, 2012, DLTD announced that "Jimenez has tendered his resignation as President of Drummond Ltd. Colombia, which will be effective as of December 31, 2012." (Doc. #417, Exh. 2).

## IV.    Analysis.

As explained at length in the Memorandum Opinion (Doc. #455) analyzing the Drummond companies' Motions for Summary Judgment (*see* Docs. # 396, 400) and which is adopted and fully incorporated herein, Plaintiffs' claims lodged against Jimenez under the Alien Tort Statute fail as directed by the Supreme Court in *Kiobel v. Royal Dutch Petroleum Co. et*. al., 133 S. Ct. 1659 (April 17, 2013). However, unlike DLTD and DCI, Jimenez may potentially be liable to Plaintiffs under the Torture Victims Protection Act. *See Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012). Although there are no allegations in the Third Amended Complaint that Augusto Jimenez directly or personally engaged in the alleged murders, (*see* Third Amended Complaint, ¶¶ 196-281; *see also* Doc. #417 at 24-30; Doc. #430 at 9), Plaintiffs seek to hold Jimenez liable for the killings based

---

[8] The deposition of Garry Drummond is available at Document #396, Exhibit D and is marked "Confidential." A complete, redacted copy of Drummond's testimony will be provided by the parties pursuant to an order that will be entered later this day.

upon four theories: (1) superior responsibility; (2) aiding and abetting; (3) conspiracy; and (4) ratification.  Each is discussed below.

### A.        Superior Responsibility Against a Private Corporate Officer

As Plaintiffs correctly point out, Jimenez does not argue that the claims asserted against him can not stand on a command responsibility theory.  (*See* Doc. #417 at 15 ("Jimenez chose not to challenge Plaintiffs' superior responsibility theory in his opening brief (and cannot do so on reply.)")).  Whether such a theory has been stated in the Third Amended Complaint is the subject of debate.  (*See* Doc. #430 at 13-14, n. 10) ("The Eleventh Circuit makes clear that a plaintiff 'cannot amend her complaint through argument in a brief opposing summary judgment' by asserting new claims or theories of liability.  Plaintiffs did not plead command responsibility as a theory of liability in the Third Amended Complaint, and cannot defeat Mr. Jimenez's motion for summary judgment by advancing such a theory now.") (internal citations omitted).

On September 15, 2010, however, Defendant Augusto Jimenez filed a motion to dismiss the complaint.  (*See* Doc. #81).  In that motion, Jimenez argued, *inter alia*, that although certain allegations implicated the knowing participation of individuals *other than* Jimenez in assisting the AUC, "there is no allegation that Mr. Jimenez met or communicated with paramilitaries, or directed any payments to them.  The allegations merely state that Mr. Jimenez was kept apprised of paramilitary and guerilla activities, as would be expected of the President of a business entity operating in a region where the AUC and competing organizations were engaged in violence that affected all facets of life in that region, including the security of that business and its employees." (Doc. #81 at 8).  In response to this argument, Plaintiffs argued that Jimenez, as President of DLTD,

7

could be held liable for violations based on the doctrine of command responsibility. (*See* Doc. #91 at 25-29). That doctrine, Plaintiffs argued, "imposes liability on superiors when they know or should have known about their subordinates' violations of international law, but fail to prevent such acts or punish the perpetrators." (Doc. #91 at 25, citing *Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002)). Because a ruling on this issue was not necessary for purposes of the then-pending motion to dismiss, the court declined to rule on whether the theory of command responsibility might apply (or whether it was properly asserted) for the claims against Jimenez. (*See generally* Doc. #141).

Now the rubber has hit the road. There are very few allegations that directly implicate Jimenez in this matter (*see* discussion *infra* Sections IV.B, C, and D), so for Plaintiffs, a theory that can hold Jimenez responsible for the alleged actions of his inferiors might be the key for survival. (*See* Doc. #417 at 16-17). But no court, in any jurisdiction, has ever extended the doctrine of superior responsibility in ATS and/or TVPA cases to the corporate officers of private companies. That is because command responsibility is a military doctrine. *See Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002) (claims were brought pursuant to command responsibility doctrine against former Director of Salvadoran National Guard and former Salvadoran Minister of Defense); *Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009) (claims were brought pursuant to command responsibility doctrine against former Salvadoran military officer); *Prosecutor v. Delalic*, Case No. IT-96-21-A, Judgment (ICTY Feb 20, 2001) (theory used against prison camp guards); *Prosecutor v. Musema*, Case No. ICTR-96-13-A, Judgment and Sentence (Jan. 27, 2000) (theory used against director of a public factory). The theory has only been extended to civilians where those individuals had authoritative control over state-run military or public forces. *See Doe v. Qi*, 349 F.Supp. 2d 1258, 1329-30 (N.D. Cal. 2004) (defendants were political leaders that were part of state governing

bodies that authorized and supervised state security forces in allegedly detaining, torturing, and killing members of Falun Gong).  Jimenez's status with DLTD did not put him in such a position.

This court (like those before it) declines to extend the theory of command responsibility to officers of private corporations.  Therefore, no claims purportedly stated under such a theory in the Third Amended Complaint survive.[9]

### B.      Aiding and Abetting under the Torture Victims Protection Act

International law elucidates the standard for aiding and abetting secondary liability.  (See Doc. #30 at 15-16; Doc. #43 at 20-21; Doc. # (DLTD) at 13-20).  The elements are: (1) the principal (here, the AUC) violated international law; (2) the defendant (here, Augusto Jimenez) knew of the specific violation; (3) the defendant acted with the intent to assist that violation – that is, the defendant specifically directed his acts to assist in the specific violation; (4) the defendant's acts had a substantial effect upon the success of the criminal venture; and (5) the defendant was aware that his acts assisted the specific violation.  *See Presbyterian Church of Sudan v. Talisman Energy Inc*., 453 F. Supp.2d 633, 668 (S.D. N.Y. 2006); *see also In re Chiquita*, 792 F. Supp.2d at 1342-43.

At this stage of the proceedings, the court must consider whether there is sufficient evidence for a reasonable jury to conclude that Jimenez intended to assist the AUC in the murders of

---

[9] Such claims are now due to be dismissed despite the fact that they were not specifically argued in Jimenez's motion for summary judgment.  The court finds that they are due to be dismissed under the standards outlined in the Memorandum Opinion (Doc. #141) of March 11, 2011.

noncombatants along DLTD's rail lines.[10]  (See Doc. #405 at 9; see also Doc. #417 at 26-27; Doc.

#43 at 21, 24).  Plaintiffs' evidence of intent and effect are rooted in the following:[11]

- Jairo de Jesus Charris Castro ("Charris") testified about his operation as a
  security coordinator inside the Drummond mine.[12]  (Doc. #407, Exh. 2 at 14-
  15).  When Charris mentioned Jimenez in his testimony, however, it was in
  connection with the deaths of the union leaders.  (See Doc. #417 at 13, ¶ 8)
  (i.e., Adkins told Charris that Jimenez was in agreement about the death of
  the union leaders; Jimenez stated his satisfaction with the death of the union
  leaders as this solved a big problem for Drummond.).  As this court has
  previously explained, the labor conflict and plans to murder union leaders are
  not relevant to the claims currently before the court for review, i.e. there must
  be evidence that the defendant "specifically directed his acts to assist in the
  specific violation," here, the deaths of noncombatants along rail lines.  (See
  Doc. #30 at 11, n. 8 ("The murders at issue here are not alleged to involve
  union leaders or members.")); (see also Doc. #455 at 15).  However, the court

_____

[10] When deciding various motions to dismiss, the court noted some serious allegations lodged against Jimenez
– that he "was a direct participant in Drummond's plan to make significant payments to the AUC's Juan Andres Alvarez
Front" and that Alfredo Araujo "used his position in the company to get Defendant Jimenez and others to agree to the
plan to make substantial payments to the AUC."  (Second Amended Complaint, ¶¶ 133, 134; see also Doc. #141 at 28-
29).  These allegations have not been borne out by the admissible testimony obtained in this case.

[11] Plaintiffs cite to the deposition testimony of Jamie Blanco (DLTD's independent food contractor from 1996
to mid 2001) for the assertion that former AUC commander Jorge 40 stated that Drummond contractor Secolda was
providing funds to the AUC and that Jimenez "was handling that himself directly."  (Doc. #417 at 26) (citing Blanco
Dep. at 113-115).  The same deposition testimony is cited for the contention that Jimenez "voiced his concern about who
would manage Drummond's relationship with the AUC if [Blanco] left."  (Doc. #417 at 27) (citing Blanco Dep. at
PSDMF ¶ 6).  Additional testimony from Blanco describes Jimenez's knowledge of Adkins' alleged dealings with the
AUC.

   Blanco does not say that Jimenez approved of Adkins' alleged agreement to make payments to the AUC, or that
Jimenez intended that those payments be used to assist the AUC in murdering noncombatants along Drummond's rail
lines.  (See Doc. #405 at 12-13; see also Doc. #417 at 26-27).  The deposition testimony of Blanco is inadmissible
because Blanco did not allow himself to be fully cross examined during testimony.  (See Doc. #455 at 11-13; see also
Blanco Dep. at 173, 192-93, 203, 204, 207-08, 229, 232).  Courts have excluded such testimony where, as here, the
inability to cross examine a witness "created substantial danger of prejudice by depriving [the defendant] of the ability
to test the truth of the witness' direct testimony."  United States v. Monaco, 702 F.2d 860, 871 (11th Cir. 1983) (internal
citations omitted).  Deprivation of cross examination is particularly relevant in this case as Blanco is incarcerated in
Colombia and will not be available at trial.  See Murder Conviction in Drummond union leader slaying in Colombia;
investigation ordered of Drummond's U.S. - based president, THE BIRMINGHAM NEWS (Feb. 6, 2013) at
http://blog.al.com/wire/2013/02/murder_conviction_in_drummond.html (Last accessed March 5, 2013) (stating that
Blanco has been convicted in Colombia of murder and sentenced to nearly 38 years in prison).

[12] Charris also worked for Blanco's food service company, and later became a part of the Juan Andres Alvarez
Front of the AUC.  (See Doc. #407, Exh. 2, Charris Dep. at 48-49, 102).

will consider the testimony for the contention that Jimenez knew of the AUC's violent methods. (*See* Doc. #417 at 7, ¶ 8).

- Jimenez was notified and knew that Drummond contractor Viginorte had connections to the AUC. (*See* Doc. # 407, Exh. 25). He can not recall whether he did anything to investigate Viginorte after receiving information about its paramilitary links. (*See* Jimenez Dep. at 74).

- Jimenez was on notice as of September 2000 that the FARC believed that Alfredo Araujo had paramilitary connections. (*See* Doc. #407, Exh. 28).

- Jimenez was aware that it was Drummond's policy to cancel contracts with any contractor if there was evidence of payment to an illegal group. (*See* Jimenez Dep. at 55). "[I]t's on a case by case decision. And if we have a decision taken by court that one or a company is doing illegal things, we terminate it. And on the other hand, as I mentioned before, we have a list coming from the U.S. government prohibiting us from make contracts or have any relations with different organizations or individual companies." (Jimenez Dep. at 56).

Relying upon this evidence, Plaintiffs argue that Jimenez's intent is established by the same facts as his knowledge of the presence of the AUC, on the theory that Jimenez intended the "natural and probable consequences" of his actions or inactions. (*See* Doc. #417 at 27, citing *United States v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992) (approving a jury instruction stating "you may infer that a person ordinarily intends all the natural and probable consequences of an act knowingly done.")). This is not the standard employed by the court for the aiding and abetting analysis. (*See* Doc. #457 at 10, n.10). But more fundamentally, the problem for Plaintiffs is that they have no admissible evidence to link Jimenez's knowledge of the AUC's violent killings to the murders of *noncombatants along Drummond's rail lines*. (*See* Doc. #417 at 26-27, citing evidence that the court has found inadmissible for purposes of summary judgment and citing evidence regarding the murders of union leaders). *See Presbyterian Church of Sudan v. Talisman Energy Inc.*, 453 F. Supp.2d 633, 668 (S.D. N.Y. 2006); *see also In re Chiquita*, 792 F. Supp.2d at 1342-43. Without such evidence,

Plaintiffs' claims against Jimenez for aiding and abetting the murders along Drummond's rail lines necessarily fails.

Jimenez's motion for summary judgment, as it relates to claims brought under the aiding and abetting theory, is due to be granted.

### C.      Conspiracy under the Torture Victims Protection Act

For Jimenez to be held liable under the secondary liability theory of conspiracy, Plaintiffs must present evidence that: (1) two or more persons agreed to commit a wrongful act; (2) defendant (here, Jimenez) joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.  *See Cabello*, 402 F.3d at 1159.  Proof of intent under conspiracy "requires the same proof of *mens rea* as aiding and abetting claims – a showing of intent, not merely knowledge."  (Doc. #43 at 30, citing *Presbyterian Church*, 582 F.3d at 260).  Plaintiffs and Jimenez acknowledge that the same standard applies for both theories of secondary liability.  (*See* Doc. #396 at 37-38; Doc. #417 at 26-27; Doc. #430 at 9-10).  Therefore, Jimenez's motion for summary judgment, as it relates to the secondary liability theory of conspiracy, is due to be denied for the same reasons as it was in Section IV.B., *supra*.[13]

### D.      Ratification under the Torture Victims Protection Act

---

[13] Moreover, there is no admissible testimony by any witness that Augusto Jimenez personally agreed with any AUC member to do anything.  (*See* Doc. #417 at 26-27; *see also* Doc. #405 at 10-19).

With the opposition to Jimenez's motion for summary judgment, Plaintiffs argue two aspects of ratification – first, that Jimenez ratified the torts of DLTD and second, that Jimenez ratified the torts of the AUC.[14]  (*See* Doc. #417 at 24-26, 27-30).  As evidence of the first, Plaintiffs argue that Jimenez "failed to do anything when confronted with evidence that Drummond employees were supporting the AUC."  (Doc. #417 at 25).  As evidence of the second, Plaintiffs argue that Jimenez actually knew of the AUC's killings, Jimenez admitted that funding the AUC would be illegal, and Jimenez failed to take adequate steps to prevent more AUC killings or punish Drummond employees or contractors assisting the AUC, even those he had effective control over.  (*See* Doc. #417 at 28-29).

Of course, this court has previously rejected Plaintiffs' use of an agency law theory of ratification.  (*See* Doc. #457 at 12-13).  On Tracy's motion for summary judgment, the court considered that theory and determined, citing to *Sosa* and previous opinions of the court, that international law governs theories of accessorial liability.  *See Presbyterian Church*, 582 F.3d at 260.  The corporate law claim has not, however, been advanced before now.  (*See* Doc. #417 at 24-26; *see also* Doc. #430 at 13).

The corporate law theory advanced by Plaintiffs, *i.e.* that Jimenez can be held responsible for approving and ratifying the alleged torts of DLTD (*see* Third Amended Complaint, ¶¶ 164, 165, 191), arises from domestic corporate law.  (*See* Doc. #417 at 24, citing 3A Fletcher Cyclopedia of the Law of Corporations ("Fletcher") § 1135 (2012) and *Crigler v. Salac*, 438 So.2d 1375, 1380 (Ala. 1983)).  In accordance with that theory known as the responsible corporate officer doctrine,

---

[14] Only one theory of agency law survived the motion to dismiss stage – ratification.  (*See* Doc. #43 at 30-31)("[W]hat is wholly missing from the First Amended Complaint are any allegations that the AUC acted 'under the control of' Drummond . . . But what are present in the First Amended Complaint are allegations that Defendants ratified the conduct of the AUC in providing security to Drummond.") (internal citations omitted).

"if a corporate officer participates in the wrongful conduct, or knowingly approves the conduct, the

officer, as well as the corporation, is liable for the penalties."  Fletcher, § 1135.  "A corporate officer

who participates in the wrongful conduct, or knowingly approves of the corporation's conduct, is

liable."  Fletcher, § 1135; *see also Crigler*, 438 So. 2d at 1380 ("In order to hold an officer of a

corporation liable for the negligent or wrongful acts of the corporation, there must have been upon

his part such a breach of duty as contributed to, or helped bring about, the injury: that is to say, he

must be a participant in the wrongful act.") (internal quotations omitted).

Two problems arise for Plaintiffs in advancing this theory – first, there is no admissible Rule

56 evidence that Jimenez approved of the murders along Drummond's rail lines, much less that he

actively participated in the killings.  (*See* discussion *supra* Section III.A., B., and C.)  Second, as

with aiding and abetting and conspiracy secondary liability theories, the court must consider whether

there is a consensus for the use of the theory in international law before it can be applied to the

claims before this court.  (*See* Doc. #43 at 20, n. 21).  But Plaintiffs cite no international law

suggesting such a consensus, or any TVPA case applying such a theory.  (*See generally* Doc. #417

at 24-26; *see also* Doc. #430 at 12, n. 8).  Therefore, the court concludes that Plaintiffs' claims for

liability on any theory of ratification are due to be dismissed under Rule 56.

## V.  <u>Conclusion.</u>

Based on the foregoing, Defendant Augusto Jimenez's Motion for Summary Judgment (Doc.

#405) is due to be granted in its entirety.  A separate order will be entered dismissing Defendant

Augusto Jimenez from this action.

14

**DONE** and **ORDERED** this _____25th_____ day of July, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE